**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x
:
In re: : Chapter 11
:
ARSENAL ENERGY HOLDINGS LLC, : Case No. 19-10226 (___)
:
Debtor.[1] :
-------------------------------------------------------------x

**DECLARATION OF ALLEN GOETZ, CHIEF FINANCIAL OFFICER, IN SUPPORT
OF CHAPTER 11 PETITION, FIRST DAY PLEADINGS AND
RETENTION APPLICATIONS**

I, Allen Goetz, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer of Arsenal Energy Holdings LLC, the above-captioned debtor and debtor in possession (the "<u>Debtor</u>" or "<u>AEH</u>").  In addition to serving as the Chief Financial Officer for the Debtor, I also am the Chief Accounting Officer and a Senior Vice President of the Debtor and serve in similar capacities at each of the non-Debtor subsidiaries of the Debtor (the "<u>Non-Debtor Subsidiaries</u>" and, together with the Debtor and other non-Debtor affiliates, the "<u>Company</u>").  I have served as Chief Accounting Officer since February 2015 and as Chief Financial Officer since August 2017, and I am generally familiar with the Company's day-to-day operations, businesses, financial affairs, and books and records.

2.      I have over 30 years of accounting experience, including more than 10 years in the oil and gas industry. Prior to joining the Company, I served as Vice President of Corporate Accounting at Hess Corporation from November 2005 to February 2015. I previously served as Assistant Controller at Pfizer.  Prior to that, I was a public accountant at Deloitte in New Jersey. I hold a B.A. from Lafayette College, and I am a Certified Public Accountant.

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6279.  The Debtor's address is 6031 Wallace Road Ext., Suite 300, Wexford, PA 15090.

3.     I submit this declaration to provide an overview of the Company, its businesses, and the Chapter 11 Case (as defined below), as well as to support the Debtor's chapter 11 petition and the First Day Pleadings and Retention Applications (each as defined below). Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Company's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Company's management and the Company's advisors, or my opinion based on my experience concerning the Company's operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.     The Debtor commenced this chapter 11 case (the "Chapter 11 Case") on February 4, 2019 (the "Petition Date").  Prior to the Petition Date, the Debtor commenced solicitation on the *Pre-Packaged Plan of Reorganization of Arsenal Energy Holdings LLC* (as amended, supplemented or otherwise modified from time to time, the "Plan")[2] pursuant to a Transaction Support Letter, dated as of December 21, 2018 (as amended, supplemented or otherwise modified from time to time, the "Subordinated Notes Transaction Support Letter") signed by (a) the Debtor, (b) holders of 96% in outstanding principal amount of the Subordinated Note Claims entitled to vote on the Plan (the "Consenting Subordinated Noteholders"), and (c) holders of 100% of the Existing AEH Common Equity Interests (the "Consenting AEH Unitholders").[3]

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or, if not defined in the Plan, in the *Disclosure Statement for Pre-Packaged Plan of Reorganization of Arsenal Energy Holdings LLC* (as amended, supplemented or otherwise modified from time to time, the "Disclosure Statement").

[3]     The execution version of the Subordinated Notes Transaction Support Letter is attached hereto as **Exhibit A**.  The Subordinated Notes Transaction Support Letter was originally signed by holders of more than 76% of the principal amount of Subordinated Notes and 86% of the Existing AEH Common Equity Interests.

5.     The deadline to vote on the Plan was January 31, 2019.   Each holder of Subordinated Note Claims and Existing AEH Common Equity Interests submitted a Ballot, with overwhelming support in favor of the Plan.   Specifically, the percentages that voted to accept or reject the Plan are as follows:

| Plan Class | Amount Accepting Plan (% of Amount Voted) | Amount Rejecting Plan (% of Amount Voted) | Number Accepting Plan (% of Number Voted) | Number Rejecting Plan (% of Number Voted) |
|---|---|---|---|---|
| CLASS 3 (SUBORDINATED NOTE CLAIMS) | 95.93% | 4.07% | 93.33% | 6.67% |
| CLASS 6 (EXISTING AEH COMMON EQUITY INTERESTS) | 100% | 0% | 100% | 0% |

6.     The Plan is an integral (and the final) step in a complete recapitalization of the debt obligations of the Company that began in December 2018 and that will be completed upon consummation of the Plan. As described below and in the Disclosure Statement, the first stages of this recapitalization closed on December 21, 2018, at which time the Non-Debtor Subsidiaries refinanced their legacy debt obligations and the Company expanded its drilling program by having certain Non-Debtor Subsidiaries enter into a new reserve-based loan facility and a new joint venture, all without requiring any chapter 11 proceedings for the Non-Debtor Subsidiaries through which the Company operates.   These critical transactions were conditioned on AEH pursuing expeditious consummation of the Exchange Agreement, as described below.   However,

---

Thereafter, additional holders signed the Subordinated Notes Transaction Support Letter, increasing such percentages to 96% and 100%, respectively.

because one holder of Subordinated Notes did not sign the Exchange Agreement, the Debtor had to commence the Chapter 11 Case to implement the Exchange Agreement.

7.        On the Effective Date, the Exchange Agreement will close; the holders of the Subordinated Note Claims will receive 100% of the New AEH Class A Common Units, and the holders of Existing AEH Common Equity Interests will receive 100% of the New AEH Class B Common Units, other than Arsenal Resources Holdings LLC ("ARH") and FR Mountaineer Keystone Holdings LLC ("FRMKH"), which have agreed to receive 100% of the New AEH Class C Common Units in lieu of the New AEH Class B Common Units.  All other creditors will be unimpaired, including holders of Seller Notes, who will have their claims reinstated.  After the Effective Date, the Company will then gain access to an additional $35 million under its reserve-based loan facility, which will be critical to maximizing the value of its business.

8.        The Debtor is a holding company with no operations, no employees and virtually no assets other than a single bank account and its direct and indirect equity interests in the Non-Debtor Subsidiaries.  In addition, the Debtor expects to seek confirmation of the Plan at a hearing less than two weeks from the Petition Date.  Accordingly, the Debtor has filed motions seeking very limited "first day" relief (collectively, the "First Day Pleadings"), as well as applications for the retention of certain professionals who are assisting with the Chapter 11 Case (collectively, the "Retention Applications").  I am familiar with the contents of each First Day Pleading and Retention Application and believe that the relief sought in each First Day Pleading and Retention Application is reasonable and necessary to enable the Debtor to facilitate its prompt emergence from chapter 11 with minimal disruption.

9.        To familiarize the Court with the Company and the relief the Debtor seeks on the first day of the Chapter 11 Case, this declaration is divided into four sections.  Section I provides

an overview of the Company's businesses.  Section II discusses the Debtor's capital structure. Section III describes the events leading to the filing of the Chapter 11 Case, including the Recapitalization and the OpCo Refinancing (each as defined below).  Section IV summarizes the relief requested in, and the facts supporting, each of the First Day Pleadings and Retention Applications.

## I.    COMPANY OVERVIEW

10.    The Debtor is a holding company in a corporate enterprise that is engaged in the acquisition and development of natural gas resources in the Appalachian Basin.  The Company's operations were formed and began in 2011 through initial equity investments from First Reserve Corporation and members of the Company's management team.

11.    The Company operates seventy-seven (77) horizontal wells for the acquisition and development of natural gas.  In the year ended December 31, 2017, the Company had an average net daily production of 87.6 MMcf/d of natural gas, and the Company averaged 135.9 MMcf/d for the quarter ended September 30, 2018.

12.    The Company's revenues are derived from the sale of natural gas before the effects of derivatives.  To achieve more predictable cash flows and to reduce its exposure to downward price fluctuations, the Company uses derivative instruments to hedge future sales prices and basis differentials on portions of its natural gas production.  Its natural gas revenues may vary significantly from period to period as a result of changes in volumes of production sold or changes in commodity prices.  As of September 30, 2018, the estimated fair value of its commodity derivative contracts was a net asset of approximately $3.6 million.  For the year ended December 31, 2017, the Company had revenue of $105.9 million.  For the nine months ended September 30, 2018, the Company had revenue of $90.5 million.

13.     As of the Petition Date, the Company had approximately 86 full-time employees. The Debtor has no employees of its own.  No Company employee is covered by a collective bargaining agreement or represented by an employee union.

14.     For a further description of the Company's history and operations see <u>Article II</u> of the Disclosure Statement.  An organization chart is attached to this declaration as **Exhibit B**.

## II.     THE DEBTOR'S CAPITAL STRUCTURE

15.     The Debtor's only material indebtedness is the Seller Notes and the Subordinated Notes.  The Debtor has no known trade creditors.

*Subordinated Notes*

16.     On July 29, 2014, AEH (f/k/a Mountaineer Energy Holdings, LLC) entered into a note and warrant purchase agreement with the various purchasers thereto (the "<u>Initial Note and Warrant Purchase Agreement</u>" and, collectively with the subsequent amendments thereto, the "<u>Note and Warrant Purchase Agreements</u>"), pursuant to which AEH issued certain notes (the "<u>Subordinated Notes</u>") and warrants (the "<u>Warrants</u>") to purchase Existing AEH Common Equity Interests upon the satisfaction of certain conditions.  The aggregate proceeds from the issuance of the Subordinated Notes and Warrants under the Initial Note and Warrant Purchase Agreement were $370 million.  The Initial Note and Warrant Purchase Agreement was initially amended on September 26, 2014, further amended on November 10, 2016 and further amended on March 16, 2017, pursuant to which additional Subordinated Notes and Warrants were issued.

17.     As of December 31, 2018, the Debtor had Subordinated Notes outstanding under the Note and Warrant Purchase Agreements in an aggregate principal amount of approximately $861 million.  The proceeds from issuance of the Subordinated Notes and Warrants were used to pay costs and expenses associated with the Company's acquisition of PDC Mountaineer, LLC in 2014.  The Subordinated Notes are unsecured obligations and are contractually subordinated to

the Seller Notes described below and structurally subordinated to the obligations of the Non-Debtor Subsidiaries. The Warrants expired on April 14, 2018 without having been timely exercised by any holder.[4]

18.     As of the Voting Record Date, there were fifteen holders of Subordinated Notes, fourteen of which ultimately signed the Subordinated Notes Transaction Support Letter. All submitted Ballots, and all but one voted in favor of the Plan.

*Seller Notes*

19.     On October 14, 2014, AEH issued certain seller notes in favor of PDC Energy, Inc. in the original principal amount of $39,047,625.00 and in favor of LR-Mountaineer Holdings, L.P., in the original principal amount of $39,047,625.00 (as amended, supplemented or otherwise modified from time to time, collectively, the "Seller Notes"). The Seller Notes were used to pay for a portion of the Company's acquisition of PDC Mountaineer, LLC. As of December 31, 2018, there was approximately $116.7 million in aggregate principal amount outstanding under the Seller Notes. The Seller Notes mature on October 14, 2020. Pursuant to a subordination agreement, dated as of October 14, 2014, among the parties thereto, the Subordinated Note holders agreed to subordinate their claims to those of the Seller Note holders.

20.     On December 21, 2018, in connection with the OpCo Refinancing described below, Arsenal Resources Development Holdings 2 LLC ("ARDH 2"), a newly created indirect subsidiary of the Debtor, became a guarantor of the Seller Notes and ARH was released as a guarantor. To secure its obligations under the guarantee, ARDH 2 pledged its equity interests in its newly created wholly-owned subsidiary, Arsenal Resources Development Holdings 1 LLC

---

[4]     For the avoidance of doubt, to the extent they are deemed outstanding, the Warrants will be cancelled on the Effective Date, pursuant to the Plan and the Exchange Agreement.

("ARDH 1").  The Seller Notes also are secured by liens on substantially all of the assets of the Debtor, including by the equity interests held by it in its direct subsidiary, Arsenal Resources Intermediate Holdings LLC.  The guarantee and pledge by ARDH 2 is subject to a standstill during the pendency of the Chapter 11 Case.

21.     As of the Petition Date, there are two holders of the Seller Notes, both of which signed the Seller Notes Transaction Support Letter (as defined below) pursuant to which such holders agreed not to oppose the reinstatement treatment of the Seller Note Claims under the Plan.

### *Existing AEH Common Equity Interests*

22.     The Debtor is a privately-held entity, with approximately 80% of the Existing AEH Common Equity Interests (i.e., the common units of the Debtor) owned by ARH and FRMKH, and the remaining 20% owned by other investors.  As of the Voting Record Date, there were four holders of Existing AEH Common Equity Interests, all of which signed the Subordinated Notes Transaction Support Letter in their capacities as holders of Existing AEH Common Equity Interests.

## III.     THE RECAPITALIZATION, THE EXCHANGE AGREEMENT AND THE PLAN

### *The Recapitalization and the Exchange Agreement*

23.     Prior to the OpCo Refinancing described below, the Non-Debtor Subsidiaries had two funded debt facilities:

> (a)     Arsenal Resources Energy LLC ("ARE") (a Non-Debtor Subsidiary) was the borrower under a reserve based revolving loan facility, dated as of October 14, 2014 (the "Original RBL Facility"), and certain subsidiaries of ARE were guarantors (the "Guarantors").  Citibank, N.A. acted as administrative agent for the lenders under the Original RBL Facility.  The Original RBL Facility was secured by a first priority lien on substantially all of the assets of ARE and the Guarantors, including substantially all oil and gas reserves.  At the time of the OpCo Refinancing, approximately

$112 million of principal was outstanding under the Original RBL Facility.[5]

(b)     ARE was also a borrower under a second lien term loan facility, dated as of October 14, 2014 (the "Original Second Lien Facility"), which was also guaranteed by the Guarantors.  The Original Second Lien Facility was secured by liens on substantially all of the assets of ARE and the Guarantors, including substantially all oil and gas reserves, which liens were junior to the liens securing the Original RBL Facility pursuant to an intercreditor agreement. Chambers Energy Management, LP acted as administrative agent for the lenders under the Original Second Lien Facility.  At the time of the OpCo Refinancing, approximately $112 million of principal was outstanding under the Original Second Lien Facility.

24.     The Debtor was not an obligor under the Original RBL Facility or the Original Second Lien Facility and did not pledge any of its assets to secure any obligations thereunder.

25.     Recognizing that new capital was necessary for its development program and that affirmative steps were needed to reduce its loan debt, in late 2017 the Company, together with its advisors, approached certain key stakeholders with regard to a consensual restructuring of its capital structure.   These discussions culminated in a proposed comprehensive out-of-court recapitalization transaction (the "Recapitalization") that would leave operations unaffected and trade creditors unimpaired and was supported by a number of the Company's lenders.

26.     Specifically, the Recapitalization contemplated the following:

(a)     ARDH 1 would enter into a new term loan facility (the "New Term Loan Facility") in an original principal amount of $220 million, of which $110 million would be funded by new loans provided by Mercuria Energy Company, LLC ("Mercuria") and $110 million would be used to refinance the Original Second Lien Facility by converting $110 million in principal of the Original Second Lien Facility into loans under the New Term Loan Facility.

---

[5]     This amount excludes issued and outstanding letters of credit under the Original RBL Facility with a face amount of approximately $28 million.

(b)     The Original Second Lien Facility would be refinanced in full by converting the loans thereunder into loans outstanding under the New Term Loan Facility, as described above.

(c)     The remaining proceeds of the New Term Loan Facility would be used to repay a substantial portion of the Original RBL Facility.

(d)     Concurrently with entry into the New Term Loan Facility, Arsenal Resources Development, LLC ("ARD"), a newly created, wholly-owned subsidiary of ARDH 1, would enter into a new reserve based revolving loan facility (the "New RBL Facility") with an initial aggregate commitment of $145 million, the proceeds of which would be used to repay the remaining portion of the Original RBL Facility that was not repaid with the New Term Loan Facility and for working capital.

(e)     ARD would enter into a joint venture to drill for resources with IOG Resources LLC (the "IOG-ARD JV").  The IOG-ARD JV would allow the Company to capitalize on a favorable environment and take full advantage of profitable drilling opportunities.

(f)     AEH would enter into an exchange agreement (as may be amended, supplemented or otherwise modified from time to time, the "Exchange Agreement") with holders of the Subordinated Notes and Existing AEH Common Equity Interests, pursuant to which:

> (i)     the Subordinated Notes would be exchanged for New AEH Class A Common Units;
>
> (ii)     the Existing AEH Common Equity Interests would be exchanged into New AEH Class B Common Units with a liquidation preference subordinate to the liquidation preference of the New AEH Class A Common Units; provided ARH and FRMKH would agree to exchange their Existing AEH Common Equity Interests into New AEH Class C Common Units, with a liquidation preference subordinate to the liquidation preferences of the New AEH Class A Common Units and the New AEH Class B Common Units, respectively, as set forth in the New AEH Operating Agreement;
>
> (iii)     the Existing AEH Operating Agreement would be amended and restated into the New AEH Operating Agreement, which would govern the rights, priorities and restrictions with regard to the New AEH Common Units;
>
> (iv)     the New AEH Board would be appointed in accordance with the New AEH Operating Agreement; and

(v)    the New AEH Board would adopt the MIP, having the terms and conditions set forth in the New AEH Operating Agreement.

The Recapitalization steps described in paragraphs (a)-(e) above are referred to herein as the "OpCo Refinancing."

27.    The Recapitalization could only be consummated out-of-court if the Exchange Agreement was signed by each holder of Subordinated Notes and Existing AEH Common Equity Interests.  At that time, one or more holders were unwilling to sign the Exchange Agreement. This refusal imperiled the entire Recapitalization and forced the Company to consider implementing the Recapitalization through a comprehensive chapter 11 restructuring.

28.    The Company, Mercuria, the Consenting Subordinated Noteholders and the Consenting AEH Unitholders then entered into good faith negotiations to craft an alternative solution.  Ultimately, the parties agreed to effectuate the Recapitalization in two steps.  First, the OpCo Refinancing would be consummated out-of-court, as originally contemplated, so that the Company could begin its new drilling program immediately.  Second, after closing the OpCo Refinancing, the Exchange Agreement would be effectuated through the Plan.

29.    On December 21, 2018, the OpCo Refinancing was completed, and the Consenting Subordinated Noteholders, the Consenting AEH Unitholders and AEH entered into the Subordinated Notes Transaction Support Letter pursuant to which AEH agreed to commence Solicitation and the Chapter 11 Case to implement the Exchange Agreement if one or more holders of Subordinated Notes remained unwilling to sign the Exchange Agreement, and the Consenting Subordinated Noteholders and Consenting AEH Unitholders committed to vote in

favor of, and not object to, the Plan.[6]  On the same day, AEH and the Seller Noteholders (the "Consenting Seller Noteholders") entered into a separate transaction support letter (as amended, supplemented or otherwise modified, the "Seller Notes Transaction Support Letter") pursuant to which the Consenting Seller Noteholders committed not to object to or oppose the Plan.

30.      Significantly, the Subordinated Notes Transaction Support Letter contains various milestones related to the Plan.  The milestones provide that the Petition Date must occur no later than February 4, 2019, and the Effective Date must occur no later than March 21, 2019.  Failure to satisfy these milestones could result in a termination of the Subordinated Notes Transaction Support Letter and the withdrawal of votes in favor of the Plan by the Consenting Subordinated Noteholders and Consenting AEH Unitholders.  Furthermore, the New RBL Facility and the New Term Loan Facility contain various events of default if the Plan and Exchange Agreement are not consummated by March 21, 2019.  Critically, the New RBL Facility also reduces borrowing availability from $145 million to $110 million until the Plan and Exchange Agreement are consummated, which imposes additional burdens on the Company's operations.

31.      I believe that a protracted bankruptcy proceeding will significantly and detrimentally impact the Company's relationships with customers, employees, financing counterparties and vendors, and continue to constrain the Company's access to liquidity given the temporary block on availability as a result of the pending Chapter 11 Case. It is also my understanding that the Non-Debtor Subsidiaries would not be protected by the automatic stay applicable to the Debtor.  Accordingly, the Debtor (and the Company) will suffer detrimental consequences if the Plan and Exchange Agreement cannot be completed expeditiously, which

---

[6]       In connection with the Subordinated Notes Transaction Support Letter, AEH agreed to reimburse the reasonable fees and expenses of Cleary Gottlieb Steen & Hamilton LLP, as counsel to an ad hoc group of Consenting Subordinated Noteholders, that were incurred in connection with the Subordinated Transaction Support Letter and the Chapter 11 Case.

militates in favor of a swift emergence from chapter 11. The Consenting AEH Unitholders, the Consenting Subordinated Noteholders and the Consenting Seller Noteholders all are supportive of, and favor, the timeline proposed by the Debtor for the Chapter 11 Case. These constituents represent substantially all the parties in interest.

### *The Plan*

32.     As described above, the Plan implements the Exchange Agreement.  It is my understanding that the Plan also contemplates the following:

(a)     The Seller Notes Claims will be Unimpaired and Reinstated and the Seller Notes and other Seller Note Documents will remain in full force and effect.

(b)     All General Unsecured Claims and Other Secured Claims against the Debtor (if any) will be Unimpaired and will be paid in full in cash, paid or disputed in the ordinary course of business and in accordance with applicable law as if the Chapter 11 Case had not been commenced.

(c)     Each holder of a Subordinated Note Claim will be deemed party to the Exchange Agreement (regardless of whether such holder has executed and delivered a signature page thereto), and on the Effective Date, the Exchange Agreement will be implemented resulting in each holder of a Subordinated Notes Claim receiving its Pro Rata share of 100% of the New AEH Class A Common Units.

(d)     (x) The holders of Existing AEH Common Equity Interests other than ARH and FRMKH will receive their Pro Rata share of 100% of the New AEH Class B Common Units and (y) ARH and FRMKH will receive their Pro Rata share of 100% of the New AEH Class C Common Units.

(e)     All Existing AEH Other Equity Interests (if any) will be cancelled, and holders of Existing AEH Other Equity Interests will receive no recovery under the Plan.

33.     It also is my understanding that the Plan will provide for customary releases of specified Claims held by the Debtor, the Subordinated Noteholders, the Seller Noteholders (excluding LR-Mountaineer Holdings, L.P. and its related parties), the Existing AEH Common

Equity Interest Holders and certain other specified parties against one another and for customary exculpations and injunctions.

34.     On January 9, 2019, the Debtor caused its Voting Agent, Prime Clerk LLC ("Prime Clerk"), to serve the solicitation packages with a voting deadline of January 31, 2019, on the holders of Subordinated Note Claims in Class 3 and the holders of Existing AEH Common Equity Interests in Class 6, the only classes of creditors or interest holders entitled to vote on the Plan.  The Debtor also caused Prime Clerk to serve *Notice of (A) Combined Hearing to Consider (I) Adequacy of Disclosure Statement and (II) Confirmation of Pre-Packaged Plan, (B) Assumption of Executory Contracts and Unexpired Leases and Cure Amounts; (C) Objection Deadlines; and (D) Anticipated Commencement of Chapter 11 Case* on the voting parties, all parties in interest and all parties listed on the Schedule of Proposed Cure Amounts.  Each holder in Class 3 and Class 6 submitted a Ballot.  All other Classes are unimpaired other than Class 7, which is deemed to reject the Plan.[7]

## IV.     FIRST DAY PLEADINGS AND RETENTION APPLICATIONS[8]

35.     Contemporaneously herewith, the Debtor has filed certain First Day Pleadings seeking targeted relief intended to allow the Debtor to minimize the adverse effects of the commencement of the Chapter 11 Case.  The First Day Pleadings seek authority to maintain the Debtor's current bank account, to retain Prime Clerk as the claims and noticing agent and to approve the Debtor's scheduling motion, among other things.  In addition to the First Day Pleadings, the Debtor will file the Retention Applications seeking authorization to retain and

---

[7]     Although I understand that holders of Existing AEH Other Equity Interests would conclusively be deemed to reject the Plan under section 1126(g) of the Bankruptcy Code, I do not believe there are any such Persons because any Warrants issued pursuant to the Note and Warrant Purchase Agreements expired on April 14, 2018.

[8]     Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to them in the applicable First Day Pleading or Retention Application.

employ Simpson Thacher & Bartlett LLP and Young Conaway Stargatt & Taylor, LLP during the Chapter 11 Case.

36.    I have reviewed each of the First Day Pleadings and the Retention Applications. The facts and descriptions of the relief requested therein are detailed below and are true and correct to the best of my information and belief.  For the reasons set forth below and in the First Day Pleadings and Retention Applications, I believe that the Court should grant each of the First Day Pleadings and Retention Applications.

**A.    DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING CONTINUED MAINTENANCE AND USE OF PREPETITION BANK ACCOUNT; (II) AUTHORIZING CONTINUED USE OF EXISTING CHECK AND BUSINESS FORMS; (III) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(b); AND (IV) GRANTING RELATED RELIEF (THE "BANK ACCOUNT MOTION")**

37.    Pursuant to the Bank Account Motion, the Debtor seeks entry of an order (i) authorizing and approving the Debtor's continued maintenance and use of its prepetition bank account; (ii) authorizing the continued use of existing check and business forms; (iii) waiving the requirements of section 345(b) of the Bankruptcy Code; and (iv) granting related relief.

38.    The Debtor maintains one bank account with Huntington National Bank (the "Bank Account"), the details of which are attached as Exhibit 1 of the proposed order attached to the Bank Account Motion.  The Bank Account is a general operating account that was funded using a portion of the proceeds received in connection with the issuance of the Subordinated Notes and Warrants and from the repayment of certain intercompany advances.  The Debtor uses the Bank Account to pay expenses in connection with its ongoing corporate existence, which are typically infrequent and of a *de minimis* nature (usually between $300–500,000 per year). Disbursements typically are paid from the Bank Account by check or wire payment.  I do not anticipate that the Debtor will use the Bank Account during the Chapter 11 Case.

39.    I believe that the relief requested in the Bank Account Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to minimize unnecessary expenses.  I also believe that entry of an order approving the Bank Account Motion is particularly warranted given that the Debtor is a holding company with no operations, uses the Bank Account for a limited purpose, and has the ability to easily monitor cash inflows and outflows.  Moreover, the Debtor expects to seek confirmation of the Plan at a hearing less than two weeks from the Petition Date.  I believe that requiring the Debtor to strictly comply with the Operating Guidelines under these circumstances would be unnecessarily burdensome and would divert the attention of key individuals whose efforts will be needed for the Debtor to successfully reorganize on an expedited timeframe.  Permitting the Debtor to maintain the Bank Account will also aid the Debtor in expeditiously and efficiently resuming the use of such account at the conclusion of the Chapter 11 Case.  Accordingly, I respectfully submit that the Bank Account Motion should be approved.

**B.    DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) SCHEDULING COMBINED HEARING ON ADEQUACY OF DISCLOSURE STATEMENT AND CONFIRMATION OF PRE-PACKAGED PLAN; (II) APPROVING PROCEDURES FOR OBJECTING TO DISCLOSURE STATEMENT AND PRE-PACKAGED PLAN; (III) APPROVING PREPETITION SOLICITATION PROCEDURES AND FORM AND MANNER OF NOTICE OF COMMENCEMENT, COMBINED HEARING, AND OBJECTION DEADLINE; (IV) APPROVING NOTICE AND OBJECTION PROCEDURES FOR THE ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (V) CONDITIONALLY (A) DIRECTING THE UNITED STATES TRUSTEE NOT TO CONVENE SECTION 341(a) MEETING OF CREDITORS AND (B) WAIVING REQUIREMENT OF FILING SCHEDULES AND STATEMENTS AND RULE 2015.3 REPORTS; AND (VI) GRANTING RELATED RELIEF (THE "<u>SCHEDULING MOTION</u>").**

40.    Pursuant to the Scheduling Motion, the Debtor requests entry of an order: (a) scheduling a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan (the "<u>Combined Hearing</u>"); (b) approving procedures for objecting to

the Disclosure Statement and the Plan, including a deadline for such objection (the "Objection Deadline"); (c) approving the prepetition solicitation procedures (the "Solicitation Procedures"), including the forms of ballots and the form and manner of the notice of the commencement of the Chapter 11 Case, the Combined Hearing and the Objection Deadline (the "Combined Notice"); (d) approving notice and objection procedures for the assumption of executory contracts and unexpired leases; (e) conditionally (i) directing that the U.S. Trustee not convene a meeting of the creditors (the "Creditors' Meeting") under section 341(a) of the Bankruptcy Code and (ii) excusing the requirement that the Debtor file statements of financial affairs ("SOFAs"), schedules of assets and liabilities ("Schedules") and the periodic reports of financial information with respect to entities in which the Debtor's estate holds a controlling or substantial interest (the "Rule 2015.3 Reports") pursuant to rule 2015.3(a) of the Bankruptcy Rules; and (f) granting related relief.

41.    In connection with the foregoing, the Debtor requests that the Court approve certain proposed dates and deadlines relevant to the Solicitation Procedures and Combined Hearing.  For the convenience of the Court and parties in interest, the pertinent dates are set forth below.

| Event | Date/Deadline |
|---|---|
| Voting Record Date | January 8, 2019 |
| Commencement of Solicitation | January 9, 2019 |
| Voting Deadline | January 31, 2019 at 5:00 p.m. (Prevailing Eastern Time) |
| Petition Date | February 4, 2019 |
| Plan/Disclosure Statement Objection Deadline | February 6, 2019, at 4:00 p.m. (Prevailing Eastern Time) |
| Deadline to file proposed confirmation order | February 11, 2019 at 10:00 a.m. (Prevailing Eastern Time) |
| Deadline to file brief in support of confirmation | February 11, 2019 at 10:00 a.m. (Prevailing Eastern Time) |

| Combined Hearing | February 13, 2019 |
|---|---|

42.      The Debtor commenced solicitation with respect to the Plan prior to the Petition Date. On January 9, 2019, the Debtor caused its Voting Agent, Prime Clerk, to distribute the Disclosure Statement, Plan and the appropriate Ballot to each of the Holders of Claims and Equity Interests in the Voting Classes (collectively, the "Solicitation Package") and the Voting Deadline was January 31, 2019 (unless the Debtor determines otherwise or as permitted by the Court).   The Debtor solicited for 22 days in accordance with the Solicitation Procedures described in the Scheduling Motion, the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

43.      The Ballots substantially conform to Official Form No. 14.  Holders that received the Solicitation Package were directed in the Disclosure Statement and applicable Ballot to follow the instructions contained in the Ballot (and described in the Disclosure Statement) to complete and submit the respective Ballots to cast a vote to accept or reject the Plan.  Each Holder was explicitly informed in the Disclosure Statement and applicable Ballot that such Holder needed to submit its Ballot so that it is actually received by the Voting Agent on or before the Voting Deadline to be counted.  I understand that certain Holders of Claims or Equity Interests were not provided a Solicitation Package because such Holders are: (a) conclusively presumed to accept the Plan, under section 1126(f) of the Bankruptcy Code, because such Holders are unimpaired; or (b) conclusively deemed to reject the Plan, under section 1126(g) of the Bankruptcy Code, because such Holders are impaired and entitled to receive no distribution on account of their Claims or Equity Interests.

44.      The Debtor solicited acceptance of the Plan prepetition and anticipates the near-term confirmation of the Plan and subsequent emergence from chapter 11.  Accordingly, the

Debtor seeks an extension and conditional waiver of the Creditors' Meeting and the filing of SOFAs, Schedules and the Rule 2015.3 Reports.  Holders of Claims are either Unimpaired under the Plan or, with a single exception, have agreed to support the Plan pursuant to the Subordinated Notes Transaction Support Letter.   Therefore, the Debtor submits that its creditors are not prejudiced by the lack of a Creditors' Meeting.  Furthermore, the request for a final waiver of the requirement to file the Schedules, SOFAs and Rule 2015.3 Reports is appropriate given the pre-packaged nature of the Plan.  It is my understanding that the purpose of filing Schedules, SOFAs and Rule 2015.3 Reports is to permit parties in interest to understand the Debtor's assets and liabilities to facilitate plan negotiations.   Here, the Debtor has already negotiated with, and solicited votes from, all stakeholders impaired under the Plan other than Equity Interests in Class 7, which are deemed to reject the Plan.  Additionally, much of the information that would be contained in the Schedules and SOFAs is already available in the Disclosure Statement, which was sent to parties entitled to vote to accept or reject the Plan prior to the Petition Date.  Finally, the preparation and filing of the Schedules, SOFAs and Rule 2015.3 Reports would require a substantial expenditure of time and resources by the Debtor, diverting management's time and attention from ensuring a smooth transition into chapter 11 without serving the purposes of the reports.

45.     I believe that the relief requested in the Scheduling Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to effectuate expeditiously its restructuring and preserve value, minimize administrative expenses of the Estate and cause each of the parties in interest to be properly informed as promptly as possible of the anticipated schedule of events for confirmation of the Plan. Accordingly, I respectfully submit that the Scheduling Motion should be approved.

01:24141253.1

**C.    DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER APPOINTING PRIME CLERK LLC AS CLAIMS AND NOTICING AGENT PURSUANT TO 28 U.S.C. § 156(c), SECTION 105(a) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 2002(f), AND LOCAL RULE 2002-1(f), EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE (THE "<u>PRIME CLERK 156(c) APPLICATION</u>").**

46.    Pursuant to the Prime Clerk 156(c) Application, the Debtor is seeking authority to retain Prime Clerk as its Claims and Noticing Agent.  The Debtor evaluated at least three potential candidates to serve as its Claims and Noticing Agent.  The Debtor selected Prime Clerk to serve as the Claims and Noticing Agent following that review and a competitive selection process in order to relieve the Clerk of the administrative burdens that will be imposed on it upon the filing of the Chapter 11 Case.  I submit that the appointment of Prime Clerk as Claims and Noticing Agent is both necessary and in the best interests of the Debtor's estate.

47.    Based on Prime Clerk's experience in providing similar services in large chapter 11 cases, I believe that Prime Clerk is eminently qualified to serve as Claims and Noticing Agent in the Chapter 11 Case.  A detailed description of the services that Prime Clerk has agreed to render and the compensation and other terms of the engagement are provided in the Prime Clerk 156(c) Application.

48.    I have reviewed the terms of the engagement and believe that Prime Clerk's retention will enable the Debtor to seek expeditious emergence from chapter 11 without disruption, and the Debtor's estate, creditors, parties in interest, and the Court will benefit as a result of Prime Clerk's experience and cost-effective methods.  Accordingly, I respectfully submit that the Prime Clerk 156(c) Application should be approved.

01:24141253.1

**D.** **DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF SIMPSON THACHER & BARTLETT LLP AS COUNSEL TO THE DEBTOR PURSUANT TO SECTIONS 327(a) AND 330 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1 NUNC PRO TUNC TO THE PETITION DATE (THE "__SIMPSON THACHER APPLICATION__")**

and

**DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF YOUNG CONAWAY STARGATT & TAYLOR, LLP AS CO-COUNSEL TO THE DEBTOR, _NUNC PRO TUNC_ TO THE PETITION DATE (THE "__YOUNG CONAWAY APPLICATION__")**

49.     Pursuant to the Simpson Thacher Application and the Young Conaway Application, the Debtor is seeking approval of the retention of Simpson Thacher & Bartlett LLP ("Simpson Thacher") and Young Conaway Stargatt & Taylor, LLP ("Young Conaway", together with Simpson Thacher, the "Firms").

50.     The Debtor has selected Simpson Thacher and Young Conaway as its co-counsel because the Firms have experience and knowledge regarding the Debtor's financial affairs and expertise in all aspects of business reorganizations under chapter 11 of the Bankruptcy Code. Prior to the Petition Date the Company asked Simpson Thacher to assist in implementing strategic alternatives with respect to the Company's capital structure in connection with refinancings at the Non-Debtor Subsidiaries.  On December 11, 2018, the Debtor engaged Simpson Thacher and Young Conaway as restructuring co-counsel.  Since that time, Simpson Thacher and Young Conaway have worked closely with the Debtor in connection with the preparation of the chapter 11 materials and implementation of the pre-petition solicitation.  The Debtor did not interview any other law firms to serve as restructuring co-counsel.

51.     In preparation for the filing, the Firms have worked closely with the Debtor's management and other professionals and have become familiar with the Debtor's history, lines of

business, financial affairs, capital and corporate structures, and other information required to implement the restructuring.

52.     In selecting each of the Firms, the Debtor reviewed their respective hourly rates, including rates for bankruptcy services, and compared them to the rates of outside law firms that the Debtor has used in the past.  In light of this comparison, the Debtor has determined that each of the Firm's current hourly rates are reasonable.  Each of the Firms has also informed the Debtor that its current hourly rates are its standard hourly rates for work of this nature.

53.     In my capacity as Chief Financial Officer, I am one of the officers responsible for supervising outside counsel retained by the Debtor.  I am also responsible for reviewing the invoices regularly submitted by Simpson Thacher and Young Conaway, and can confirm that the rates the Firms charged the Debtor in the prepetition period are the same as the rates each will charge the Debtor in the postpetition period, subject to periodic adjustment to reflect economic and other conditions.

54.     The Debtor has approved or will approve each of the Firm's prospective budget and staffing plan, recognizing that in the course of a chapter 11 case, it is possible that there may be a number of unforeseen fees and expenses that will need to be addressed by the Debtor and the Firms.  However, given the nearly unanimous approval of the Plan by the creditors and the likely limited duration of the Chapter 11 Case, the Debtor is confident that the professional fees of the Firms will be limited.  In accordance with the U.S. Trustee Guidelines, the budgets may be amended as necessary to reflect changed expectations or unanticipated developments.   The Debtor further recognizes that it is its responsibility to closely monitor the billing practices of its counsel to ensure the fees and expenses paid by the estate remain consistent with the Debtor's expectations and the exigencies of this chapter 11 case.  The Debtor will continue to review

the invoices that the Firms regularly submit, and, together with each respective Firm, periodically amend the budget and staffing plan if needed as this case develops.

55.    As it did prepetition, the Debtor will continue to bring discipline, predictability, client involvement, and accountability to the counsel fees, expenses, and reimbursement process. While every chapter 11 case is unique, the budgets will provide guidance on the periods of time involved and the level of the attorneys and professionals that will work on various matters, as well as projections of average hourly rates for the attorneys and professionals during this chapter 11 case.

56.    Accordingly, I respectfully submit that the Simpson Thacher Application and Young Conaway Application should each be approved.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  February 4, 2019

*/s/ Allen Goetz*

Allen Goetz
Chief Financial Officer
Arsenal Energy Holdings LLC

**<u>EXHIBIT A</u>**

**SUBORDINATED NOTES TRANSACTION SUPPORT LETTER**

**Execution Version**

ARSENAL ENERGY HOLDINGS LLC
ARSENAL RESOURCES HOLDINGS LLC
6031 Wallace Road Ext., Suite 3000
Wexford, Pennsylvania 15090

December 21, 2018

Ladies and Gentlemen:

This letter agreement (as may be amended, supplemented or otherwise modified from time to time, this "**Letter Agreement**") is made as of December 21, 2018 by and among:

(a) Arsenal Energy Holdings LLC ("**AEH**");

(b) Arsenal Resources Holdings LLC ("**ARH**");[1]

(c) the undersigned entities that are holders of Subordinated Notes and Warrants (each as defined below) (the "**Consenting Subordinated Noteholders**"); and

(d) the undersigned entities that are members of AEH and holders of the AEH Units (as defined below) (the "**Consenting AEH Unitholders**").

Reference is made in this Letter Agreement to:

(a) each of the Note and Warrant Purchase Agreements, dated as of July 29, 2014, November 10, 2016 and December 22, 2016, respectively (collectively, as amended, supplemented or otherwise modified prior to the date hereof, the "**Note and Warrant Purchase Agreements**"), each among AEH and the financial institutions or other entities party thereto from time to time (the "**Subordinated Noteholders**"), pursuant to which the Subordinated Noteholders purchased certain notes (the "**Subordinated Notes**") and warrants (the "**Warrants**") issued by AEH;

(b) the Amended and Restated Operating Agreement of AEH, dated as of October 14, 2014 (as amended, supplemented or otherwise modified prior to the date hereof, the "**Existing AEH Operating Agreement**"), among AEH and each of the members of AEH, pursuant to which AEH issued common equity units (the "**AEH Units**") to such members; and

(c) the seller note issued by AEH on October 14, 2014 in favor of LR-Mountaineer Holdings, L.P. and the seller note issued by October 14, 2014 in favor of PDC Energy, Inc. and thereafter assigned to affiliates of or funds managed by Chambers Energy

---

[1] ARH to be automatically released from this Letter Agreement for all purposes to the extent it is not subject to the Seller Note guarantee other than in its capacities as a Consenting Subordinated Noteholder or Consenting AEH Unitholder, if applicable. Upon such release, this Letter Agreement shall be deemed automatically amended to delete all references to ARH herein.

Management LP, each in the original principal amount of $39,047,625.00 (collectively, and as amended by Amendment No. 1 thereto[2], the "**Seller Notes**").

AEH, the Consenting Subordinated Noteholders, the Consenting AEH Unitholders and their respective advisors have negotiated and reached an agreement regarding the terms and conditions of a restructuring of the Subordinated Notes and AEH Units (the "**Holdco Restructuring**") intended to be consummated in connection with a refinancing of certain financial obligations of AEH's operating subsidiaries (the "**Opco Refinancing**", and together with the Holdco Restructuring, the "**Restructuring**").

The terms and conditions of the Holdco Restructuring are set forth in the Exchange Agreement attached hereto as <u>Exhibit A</u> (together with all exhibits and schedules thereto, as each may be amended, supplemented or otherwise modified pursuant to the terms thereof, the "**Exchange Agreement**").[3]  In connection with the Opco Refinancing and pursuant to the Guaranty Agreement and the Collateral Agreement substantially in the forms attached hereto as <u>Exhibit B</u>, Arsenal Resources Development Holdings 2 LLC, a newly formed subsidiary of Arsenal Resources Energy LLC will guarantee on a secured basis AEH's obligations under the Seller Notes and ARH will be released as a guarantor of the Seller Notes (the "**Guarantee Assumption**").

Contemporaneously with the Letter Agreement Effective Date (as defined below), the Opco Refinancing and the Guarantee Assumption are intended to be consummated and it is contemplated that following the Letter Agreement Effective Date, the Holdco Restructuring will be consummated or pursued as part of an out-of-court or in-court prepackaged chapter 11 case pursuant to the provisions of this Letter Agreement and the transaction documents contemplated hereby, including the Exchange Agreement and the Plan of Reorganization referenced below.

1. <u>Chapter 11 Proceedings</u>

    (a) Subject to the terms and conditions of the Exchange Agreement, the Holdco Restructuring will be consummated out-of-court if Subordinated Noteholders holding 100% in principal amount of the Subordinated Notes become parties to the Exchange Agreement by executing and delivering signature pages thereto ("**Full Participation**"). Alternatively, if Full Participation has not been achieved on or prior to February 4, 2019 (the "**Proposed Filing Date**"), AEH and ARH may elect, in each of their respective sole and absolute discretion, following consultation with the Consenting Subordinated Noteholders and the Consenting AEH Unitholders, to commence proceedings under chapter 11 of the U.S. bankruptcy code ("**Chapter 11 Proceedings**") to consummate the Holdco Restructuring pursuant to a pre-packaged plan of reorganization substantially in the form attached hereto as <u>Exhibit C</u> (as may be amended, supplemented or otherwise modified pursuant to the terms of this Letter Agreement, the "**Plan of Reorganization**").

---

[2] A form of the Amendment No. 1 to the Seller Notes is attached hereto as <u>Exhibit D</u>.

[3] For the avoidance of doubt, each reference to the "Exchange Agreement" herein includes the agreed form of each document attached as an exhibit thereto, including the ARD Term Loan Credit Agreement, Joint Development Agreement, Affidavit of Loss, Second Amended and Restated Operating Agreement of AEH, Purchaser Closing Certificate, Seller Closing Certificate, and RBL Credit Facility.

2

(b) If Full Participation is not achieved on or before the Proposed Filing Date, AEH and ARH shall, on a several and not joint basis, and subject to the terms herein and to the extent not inconsistent with their respective fiduciary obligations under applicable law, use commercially reasonable efforts to commence the Chapter 11 Proceedings and to implement the Holdco Restructuring as quickly as possible under the circumstances.

2. <u>Support</u>

By signing this Letter Agreement, each Consenting Subordinated Noteholder and each Consenting AEH Unitholder, in each case on a several and not joint basis and subject to the terms herein, shall:

(a) execute and deliver to Simpson Thacher & Bartlett LLP, counsel to AEH ("**STB**"), a signature page to the Exchange Agreement and all other deliverables described in Section 2.3(a) of the Exchange Agreement no later than ten (10) business days after the Letter Agreement Effective Date, which signature pages and deliverables shall be held in escrow by STB and shall (subject to the last sentence of Section 6 below) be automatically released on the earlier to occur of (i) the date upon which both (A) STB has received signatures pages representing Full Participation and (B) the Opco Refinancing is consummated and (ii) if less than Full Participation has occurred as of the Proposed Filing Date, consummation of the Plan of Reorganization; and

(b) if the Chapter 11 Proceedings are commenced by AEH and ARH:

    (i) upon receipt of solicitation materials for the Chapter 11 Proceedings, consisting of the Plan of Reorganization, a related disclosure statement and a ballot with respect to all claims and interests arising under the Subordinated Notes and/or the AEH Units, vote (or cause to vote) to accept the Plan of Reorganization with respect to such claims or interests by delivering its duly executed and completed ballot(s) on or before the date that is ten (10) business days after the date on which such solicitation materials have been received;

    (ii) not withdraw, amend or revoke its vote with respect to the Plan of Reorganization, save (A) pursuant to the last sentence of Section 6 below, or (B) to the extent of any rights to do so which may be granted in the Plan of Reorganization, including, but not limited to, in relation to any amendment or modification to the Plan of Reorganization that materially and adversely changes the treatment contemplated thereunder for such party or that releases any claims or liabilities reserved under the Plan of Reorganization for such party, or any withdrawal thereof or implementation of a new plan of reorganization;

    (iii) not select on its ballot(s) the "opt-out" with respect to third party releases described in the Plan of Reorganization attached hereto; and

    (iv) not object to or oppose (or support any third parties objecting to or opposing) the consummation of the Holdco Restructuring (including pursuant to the Plan of Reorganization, if AEH and ARH elect to commence the Chapter 11 Proceedings).

3

3. <u>Transfers</u>

(a) Each Consenting Subordinated Noteholder and each Consenting AEH Unitholder agrees that, upon any Transfer (as such term is defined in the Note and Warrant Purchase Agreements) of Subordinated Notes or Warrants by a Consenting Subordinated Noteholder or AEH Units (together with the Subordinated Notes and Warrants, the "**Covered Interests**") by a Consenting AEH Unitholder, such Consenting Subordinated Noteholder and Consenting AEH Unitholder shall cause the transferee to become a party to this Letter Agreement by executing and delivering to AEH a joinder to this Letter Agreement in which any such transferee agrees to be bound by this Letter Agreement as if such transferee were a Consenting Subordinated Noteholder or a Consenting AEH Unitholder that had originally signed this Letter Agreement as of the date hereof, and which will otherwise be in a form reasonably acceptable to AEH. Each Consenting Subordinated Noteholder and each Consenting AEH Unitholder agrees that the execution and delivery of such a joinder will be a condition to the effectiveness of any Transfer of Subordinated Notes or Warrants or AEH Units. Any Transfer of Subordinated Notes or Warrants or AEH Units to a Person that is not then a party to this Letter Agreement that does not include the execution and delivery to AEH of such a joinder prior to or concurrently with such Transfer shall be null and void ab initio.

(b) Notwithstanding the foregoing paragraph, a Qualified Marketmaker (as defined below) that acquires any of the Covered Interests solely with the purpose and intent of acting as a Qualified Marketmaker for such Covered Interests, shall not be required to execute and deliver to AEH and ARH a joinder or otherwise agree to be bound by the terms and conditions set forth in this Letter Agreement if such Qualified Marketmaker transfers such Covered Interests (by purchase, sale, assignment, participation, or otherwise) to a Consenting Subordinated Noteholder or a Consenting AEH Unitholder or transferee (including, for the avoidance of doubt, the requirement that such transferee execute a joinder); <u>provided</u>, that notwithstanding the foregoing, if at the time of a proposed Transfer of such Covered Interests to a Qualified Marketmaker, such Covered Interests may be voted on the Plan of Reorganization, the proposed transferor Consenting Subordinated Noteholder or Consenting AEH Unitholder must first vote such Covered Interests in accordance with Section 2(b)(i) prior to such Transfer.

(c) "**Qualified Marketmaker**" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of AEH or ARH (or enter with customers into long and short positions in claims against AEH or ARH), in its capacity as a dealer or market maker in claims against AEH or ARH, and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

4. <u>Additional Covenants of AEH and ARH</u>

For so long as this Letter Agreement has not been validly terminated, AEH and ARH shall:

(a) promptly notify counsel to the Consenting Subordinated Noteholders and Consenting

4

AEH Unitholders of (i) any inquiries, proposals or offers to purchase any substantial assets or properties of AEH or ARH, to modify in a material manner any long-term commercial relationship with AEH or ARH, to make any material investment in AEH or ARH or to provide AEH or ARH with debt or equity financing, (ii) any proposed amendment, modification or supplement to the transaction documents related to the Opco Refinancing and (iii) any support agreement or letter which AEH or ARH enters into other than this Letter Agreement (an "**Alternative RSA**"), and any amendment, modification or supplement to such Alternative RSA, and in each case thereafter keep counsel to the Consenting Subordinated Noteholders and Consenting AEH Unitholders promptly and reasonably informed of the progress of any related discussions or negotiations;

(b) to the extent not inconsistent with their respective fiduciary obligations under applicable law, not take any action that is in any material respect contrary to or inconsistent with, or that would be reasonably expected to materially delay consummation of the Holdco Restructuring; and

(c) to the extent not inconsistent with their respective fiduciary obligations under applicable law, not, directly or indirectly (including through its representatives and advisors), seek, solicit, or encourage any discussions or other communications relating to, or enter into any agreements or arrangements relating to, any alternative plan or transaction other than the Plan of Reorganization that could reasonably be expected to prevent, delay, or impede the Holdco Restructuring as contemplated by the Plan of Reorganization, and otherwise object to any motion to approve or confirm, as applicable, any other plan of reorganization, sale transaction, or any motions related thereto.

## 5.   Consent and Waiver

Each Consenting Subordinated Noteholder hereby consents to the Opco Refinancing and the Guarantee Assumption (including the amendments to the Seller Notes implemented therewith pursuant to Amendment No. 1 to the Seller Notes) and waives any default or Event of Defaults under, and as such term is defined in, the Note and Warrant Purchase Agreements, resulting from the Opco Refinancing or the Guarantee Assumption (including such amendments), if any.

## 6.   Termination of Obligations

The obligations of each party under this Letter Agreement shall terminate as to such party and be of no further force and effect as to such party on the date that is two (2) business days following any of the events listed below unless such party affirms in writing its obligations under this Letter Agreement within such two (2) business day period:

(a) If there is not Full Participation on or prior to January 17, 2019, AEH and ARH shall not have commenced solicitation of the Plan of Reorganization by such date;

(b) If there is not Full Participation on or prior to the Proposed Filing Date, AEH and ARH shall not have commenced the Chapter 11 Proceedings by such date;

(c) If there is not Full Participation on or prior to the Proposed Filing Date, the Plan of Reorganization shall not have been confirmed by the Bankruptcy Court, pursuant to a confirmation order reasonably satisfactory to the Consenting Subordinated Noteholders, within 43 days after the date the Chapter 11 Proceedings are commenced;

(d) The Holdco Restructuring shall not have been consummated (including, without limitation, the entry into full force and effect of the Exchange Agreement and the Second Amended and Restated Operating Agreement of AEH) by 11:59 p.m. (Eastern Time) on the earlier of the date that is (x) 45 days after the Chapter 11 Proceedings commenced and (y) 90 days after the Letter Agreement Effective Date;

(e) This Letter Agreement, the Plan of Reorganization, the Exchange Agreement, the Opco Refinancing, or any of the transactions or documents effectuating the Restructuring or the Guarantee Assumption (including any exhibits thereto) is amended, supplemented or otherwise modified from the agreed forms thereof attached to this Letter Agreement, or the terms or conditions thereof are waived, in each case in a manner that (i) adversely affects the economic or governance interests or rights of such Subordinated Note Holder or AEH Unitholder, (ii) adds any obligations to or requirements on such party, or (iii) improves economic or governance interests or rights of other parties to such documents or transactions, in each case without written consent to such amendment, supplement, modification or waiver by such terminating party;

(f) If (a) any of the "Execution Date" under the Joint Development Agreement and the "Closing Date" under the RBL Credit Facility and ARD Term Loan Credit Agreement have not occurred on or prior to January 4, 2019, (b) any of the foregoing agreements or facilities ceases to be in full force and effect thereafter, or (c) there is a termination, acceleration, or other enforcement of remedies against AEH or any of its subsidiaries thereunder relating to the foregoing agreements referenced in this section 6(f);

(g) If AEH or ARH files or publicly announces that it will file or joins in or supports any plan of reorganization (or disclosure statement related thereto) in the Chapter 11 Proceedings other than as described herein, or AEH or ARH, in order to satisfy its respective fiduciary obligations, agrees to or announces it will pursue any other alternative transaction that is not the Holdco Restructuring or Plan of Reorganization, or otherwise invokes or relies upon its fiduciary duties in taking any action described in Section 1(b), 4(b) or 4(c);

(h) AEH or ARH breaches any of (i) its obligations hereunder in any material respect or (ii) any of its representations or warranties that would, in the case of clause (ii), be reasonably likely to have a material adverse impact on AEH or ARH or the ability to consummate the Plan of Reorganization, which breach, in the case of each of clause (i) and clause (ii), is not cured within ten (10) days after the receipt by counsel for AEH and ARH of written notice of the occurrence and nature of such breach;

(i) An Alternative RSA is entered into, or is thereafter amended or modified, that provides shorter milestones or impose additional obligations on AEH or ARH than the milestones or obligations imposed under this Letter Agreement, unless AEH or ARH offers to

amend or modify this Letter Agreement to include such shorter milestones or additional obligations; and

(j) (i) A trustee, receiver, or examiner with expanded powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code is appointed in one or more of the Chapter 11 Proceedings, (ii) the filing by any Debtor of a motion or other request for relief seeking to dismiss any of the Chapter 11 Proceedings or convert any of the Chapter 11 Proceedings to a case under Chapter 7 of the Bankruptcy Code, or (iii) entry of an order by the Bankruptcy Court dismissing any of the Chapter 11 Proceedings or converting any of the Chapter 11 Proceedings to a case under Chapter 7 of the Bankruptcy Code.

In addition, this Letter Agreement shall automatically terminate as to all parties upon the earlier of the effective date of the Plan of Reorganization and the consummation of the Holdco Restructuring.

In the event of a termination of this Letter Agreement under the provisions of any of clauses (a) through (j) above, (x) the terminating party shall promptly deliver a notice to the other parties hereto confirming such termination and (y) the respective signature pages to the Exchange Agreement and Plan of Reorganization ballots of each terminating Subordinated Noteholder and terminating AEH Unitholder will be automatically annulled and revoked.

7. <u>Representations and Warranties</u>

Each party hereto, severally and not jointly, represents and warrants to the other parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Subordinated Noteholder or Consenting AEH Unitholder becomes a party hereto):

(a) *Power and Authority.* Such party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Letter Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Letter Agreement and the performance of such party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b) *No Conflict.* The execution, delivery and performance by such party of this Letter Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(c) *No Consent or Approval.* The execution, delivery and performance by such party of this Letter Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the U.S. Securities and Exchange Commission; and

7

(d) *Enforceability*.  This Letter Agreement is the legally valid and binding obligation of such party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

AEH and ARH, severally and not jointly, represents and warrants to the Consenting Subordinated Noteholders and Consenting AEH Unitholders that the commencement of the Chapter 11 Proceedings does not and will not cause any default or termination of any material contract to which AEH, ARH or their respective affiliates or subsidiaries are party to as of the date hereof, which default or termination would be reasonably likely to result in a material adverse effect on the company as a whole.

8.  Prior Negotiations

This Letter Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the parties hereto (and their respective advisors), with respect to the subject matter hereof.

9.  Amendments

No amendment, supplement, modification or waiver of the terms of this Letter Agreement, the Plan of Reorganization or the Exchange Agreement (excluding any of the documents effectuating the Opco Refinancing) shall be valid unless such modification, amendment or waiver is consented to by AEH, ARH and Consenting Subordinated Noteholders holding not less than two-thirds in amount of all Subordinated Notes (excluding, for purposes of such calculation, any Subordinated Notes held by ARH, AEH or their subsidiaries); provided that, without limiting the foregoing, to the extent any such amendment, supplement modification or waiver directly affects the interests or obligations of the Consenting AEH Unitholders, such modification, amendment or waiver shall also require the consent of Consenting AEH Unitholders holding not less than two-thirds in amount of all AEH Units.

10. Governing Law

This Letter Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions. The parties hereto waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between the parties hereto, whether sounding in contract, tort or otherwise.

11. Effective Date

This Letter Agreement shall become effective on the date (the "**Letter Agreement Effective Date**") on which each of the following events has occurred:  (i) AEH has received counterparts hereof duly executed and delivered by AEH, ARH, holders of greater than one-half in number and two-thirds in amount of all Subordinated Notes and holders of greater than two-thirds in amount of all AEH Units, and (ii) AEH and ARH have delivered a written notice to the other parties hereto that the requirements in the foregoing clause have been satisfied.

8

12. Third-Party Beneficiary

This Letter Agreement is intended solely for the benefit of the parties hereto and no other person shall have any rights hereunder.

13. Confidentiality and Publicity

(a) Until the commencement of the Chapter 11 Proceedings or any other public disclosure hereof by AEH or ARH (notice of which shall be provided to each of the other parties hereto no less than two (2) business days prior to any such disclosure), this Letter Agreement and the transactions described herein shall remain strictly confidential and shall not be disclosed by any Consenting Subordinated Noteholder or Consenting AEH Unitholder to any third party without the prior written consent of AEH and ARH, except pursuant to clause (c) below.

(b) Under no circumstances may any party make any public disclosure of any kind that would disclose (i) the particular holdings of any Consenting Subordinated Noteholder or (ii) the identity of any Consenting Subordinated Noteholder, in each case without the prior written consent of such Consenting Subordinated Noteholder; provided that (x) AEH or ARH may disclose the aggregate holdings of the Consenting Subordinated Noteholders, but not individual holdings of any individual Consenting Subordinated Noteholder in any materials filed in the Chapter 11 Proceedings; and (y) AEH or ARH may disclose such identities (but not the particular holdings of any Consenting Subordinated Noteholder) in the Chapter 11 Proceedings if requested or required to do so by the Bankruptcy Court.

(c) It is understood that any party may make disclosures (A) to the extent compelled by legal process, by an order, judgment or decree of a court of other governmental authority of competent jurisdiction or (B) to its own employees, professionals, advisors or representatives.

14. Specific Performance

The parties agree that money damages would be an insufficient remedy for any breach of this Letter Agreement by any party and each non-breaching party shall be entitled to specific performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any party to comply promptly with any of its obligations hereunder, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, as the sole remedy to which such non-breaching party will be entitled, at law or in equity. The parties agree that such relief will be their only remedy against the applicable other party with respect to any such breach, and that in no event will any party be liable for monetary damages (including consequential, special, indirect or punitive damages or damages for lost profits) other than attorneys' fees and costs.

011958-1030-11363-Active.28364789.14

15. Counterparts

This Letter Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Letter Agreement may be delivered by facsimile or email, which shall be deemed to be an original for the purposes of this paragraph.

16. Notices

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier, or by registered or certified mail (return receipt requested) to the following addresses or electronic mail addresses:

**If to AEH or ARH:**

Arsenal Energy Holdings LLC
6031 Wallace Road Ext., Suite 3000
Wexford, PA 15090
Attn:  Craig Lavender
Fax: (800) 428-0981

**with a copy to (which shall not constitute notice):**

Counsel to AEH and ARH

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attn:    Michael H. Torkin, Esq. (michael.torkin@stblaw.com)
         Kathrine A. McLendon (kmclendon@stblaw.com)
         Nicholas E. Baker, Esq. (nbaker@stblaw.com)
         David Baruch, Esq. (david.baruch@stblaw.com)
Fax: (212) 455-2502

**If to a Consenting Subordinated Noteholder:**

To the address set forth on the signature page of such Consenting Subordinated Noteholder

**with a copy to (which shall not constitute notice):**

Cleary Gottlieb Steen & Hamilton
One Liberty Plaza
New York, NY 10006
Attn:    Sean A. O'Neal (soneal@cgsh.com)
         Humayun Khalid (hkhalid@cgsh.com)
Fax: (212) 225-3999

10

Counsel to Mercuria Investments US, Inc.

Vinson & Elkins LLP
666 Fifth Avenue, 25th Floor
New York, NY 10103
Attn:   David S. Meyer (dmeyer@velaw.com)
        Garrick C. Smith (gsmith@velaw.com)
Fax: (917) 849-5358

**If to a Consenting AEH Unitholder:**

To the address set forth on the signature page of such Consenting AEH Unitholder

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission

[REMAINDER INTENTIONALLY BLANK]

011958-1030-11363-Active.28364789.14

# EXHIBIT B

## DEBTOR'S CORPORATE STRUCTURE

**Exhibit B**

**DEBTOR'S CORPORATE STRUCTURE**

