## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------x

In re:                           :

                             :   Chapter 11

                             :

ARSENAL ENERGY HOLDINGS LLC,   :   Case No. 19-_____ (___)

                             :

             Debtor.[1]             :

                             :

------------------------------------------------------------------x

## DISCLOSURE STATEMENT FOR PRE-PACKAGED PLAN OF REORGANIZATION OF ARSENAL ENERGY HOLDINGS LLC

Dated: January 9, 2019

SIMPSON THACHER & BARTLETT LLP
Michael H. Torkin, Esq.
Kathrine A. McLendon, Esq.
Nicholas E. Baker, Esq.
425 Lexington Avenue
New York, NY 10017
T: (212) 455-2000
F: (212) 455-2502

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan, Esq.
Kara H. Coyle, Esq.
Ashley Jacobs, Esq.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
T: (302) 571-6600
F: (302) 571-1253

*Proposed Counsel to Debtor and Debtor in Possession*

**THE DEBTOR INTENDS TO REQUEST THAT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") SCHEDULE A HEARING TO APPROVE THIS DISCLOSURE STATEMENT AND CONFIRM THE ASSOCIATED PLAN OF REORGANIZATION NOT LATER THAN FEBRUARY 13, 2019, AND TO ESTABLISH FEBRUARY 6, 2019, AS THE DATE BY WHICH OBJECTIONS, IF ANY, TO THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN OF REORGANIZATION MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTOR.  SEE ARTICLES III.A. AND VI.A-B. FOR THE ANTICIPATED TIMETABLE FOR THE CHAPTER 11 CASE, AND PROCESS AND TIMING TO FILE OBJECTIONS.**

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6279.  The Debtor's address is 6031 Wallace Road Ext., Suite 300, Wexford, PA 15090.

**THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING COMMENCED TO OBTAIN ACCEPTANCES OF THE PLAN (AS DEFINED BELOW) BEFORE THE FILING OF THE VOLUNTARY CASE (THE "CHAPTER 11 CASE") UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"). BECAUSE THE CHAPTER 11 CASE HAS NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE, THE DEBTOR EXPECTS TO PROMPTLY SEEK (I) BANKRUPTCY COURT APPROVAL OF (A) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, AND (B) THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (II) CONFIRMATION OF THE PLAN.**

**DISCLOSURE STATEMENT, DATED JANUARY 9, 2019**

**Solicitation of Votes on the
Pre-Packaged Plan of Reorganization of**

**ARSENAL ENERGY HOLDINGS LLC**

**from the Holders of outstanding**

**SUBORDINATED NOTE CLAIMS AND
EXISTING AEH COMMON EQUITY INTERESTS**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING EASTERN TIME ON JANUARY 31, 2019, UNLESS EXTENDED BY THE DEBTOR.**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR EQUITY INTERESTS MAY VOTE ON THE PLAN IS JANUARY 8, 2019 (THE "VOTING RECORD DATE").**

**THE DEBTOR INTENDS TO REQUEST THAT THE BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE SCHEDULE A HEARING TO APPROVE THIS DISCLOSURE STATEMENT AND CONFIRM THE ASSOCIATED PLAN OF REORGANIZATION NOT LATER THAN FEBRUARY 13, 2019, AND TO ESTABLISH FEBRUARY 6, 2019 AS THE DATE BY WHICH OBJECTIONS, IF ANY, TO THE ADEQUACY OF THE**

i

**DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN OF REORGANIZATION MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE PARTIES SET FORTH IN ARTICLE VI.B OF THIS DISCLOSURE STATEMENT.**

**RECOMMENDATION BY THE DEBTOR**

**Arsenal Energy Holdings LLC ("AEH"), as the proposed Debtor, recommends that all creditors and equityholders whose votes are being solicited submit ballots to accept the Plan.**

**Pursuant to the Subordinated Notes Transaction Support Letter (as defined below), as of the date hereof, Holders of more than 76% in outstanding principal amount of the Subordinated Note Claims entitled to vote on the Plan (the "Consenting Subordinated Noteholders") and Holders of more than 86% of the common equity interest units of AEH (the "Consenting AEH Unitholders") already have agreed to vote in favor of the Plan.**

THIS DISCLOSURE STATEMENT IS BEING FURNISHED TO THE HOLDERS OF (A) SUBORDINATED NOTE CLAIMS AND (B) THE EXISTING AEH COMMON EQUITY INTERESTS. THE DEBTOR RESERVES THE RIGHT TO AMEND THIS DISCLOSURE STATEMENT WITH RESPECT TO ANY INDIVIDUAL RECIPIENT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OFFERED HEREBY BY ANY PERSON IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL FOR SUCH PERSON TO MAKE SUCH AN OFFER OR SOLICITATION.

IF YOU ARE A HOLDER OF SUBORDINATED NOTE CLAIMS OR EXISTING AEH COMMON EQUITY INTERESTS, YOU HAVE RECEIVED THIS DISCLOSURE STATEMENT, THE BALLOT AND THE OTHER ENCLOSED MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.

EACH PERSON RECEIVING THIS DISCLOSURE STATEMENT ACKNOWLEDGES THAT (I) SUCH PERSON HAS BEEN AFFORDED AN OPPORTUNITY TO REQUEST AND REVIEW, AND HAS RECEIVED, ALL ADDITIONAL INFORMATION CONSIDERED BY IT TO BE NECESSARY TO VERIFY THE ACCURACY OF, OR TO SUPPLEMENT, THE INFORMATION CONTAINED HEREIN, (II) SUCH PERSON HAS NOT RELIED ON ANY OTHER PERSON IN CONNECTION WITH ANY INVESTIGATION OF THE ACCURACY OF SUCH INFORMATION OR ITS INVESTMENT DECISION AND (III) NO OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION CONCERNING THE DEBTOR OR THE NEW AEH CLASS A COMMON UNITS, THE NEW AEH CLASS B COMMON UNITS OR THE NEW AEH CLASS C COMMON UNITS AND, IF GIVEN OR MADE, ANY SUCH OTHER INFORMATION OR REPRESENTATION SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

NONE OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC"), ANY OTHER SECURITIES COMMISSION, INCLUDING ANY STATE SECURITIES COMMISSION, OR ANY OTHER COURT OR REGULATORY AUTHORITY HAS APPROVED, DISAPPROVED OR RECOMMENDED THE PLAN OR THE NEW AEH CLASS A COMMON UNITS, THE NEW AEH CLASS B COMMON UNITS OR THE NEW AEH CLASS C COMMON UNITS NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE PLAN OR THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION, MAY CONSTITUTE "FORWARD-LOOKING STATEMENTS" AND ARE BASED ON ESTIMATES AND ASSUMPTIONS. ANY STATEMENTS THAT REFER TO EXPECTATIONS OR OTHER CHARACTERIZATION OF FUTURE EVENTS, CIRCUMSTANCES OR RESULTS ARE FORWARD-LOOKING STATEMENTS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT

PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, YOU ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT, INCLUDING THOSE SET FORTH UNDER THE HEADING "RISK FACTORS" IN ARTICLE IX OF THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD BE CONSIDERED CAREFULLY AND READERS SHOULD NOT PLACE UNDUE RELIANCE ON THE FORWARD-LOOKING STATEMENTS. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

IN MAKING A DECISION IN CONNECTION WITH THE PLAN, YOU MUST RELY ON YOUR OWN EXAMINATION OF THE DEBTOR'S BUSINESS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. YOU SHOULD CONSULT WITH YOUR OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED HEREBY.

HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS WILL NOT BE IMPAIRED BY THE PLAN AND, AS A RESULT, THE RIGHT OF SUCH HOLDERS TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PLAN. DURING THE CHAPTER 11 CASE, THE DEBTOR INTENDS TO OPERATE ITS BUSINESS IN THE ORDINARY COURSE AND, TO THE EXTENT APPLICABLE, WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL TRADE CREDITORS OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN. THE DEBTOR HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. NEITHER THIS DISCLOSURE STATEMENT'S DISTRIBUTION NOR THE PLAN'S CONSUMMATION WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME AFTER THE DATE HEREOF. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE. IN ANY CONTESTED MATTER OR ADVERSARY PROCEEDING, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY, BUT SHALL BE DEEMED A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN, AND, FOR THE AVOIDANCE OF DOUBT, CAPITALIZED TERMS USED IN ANY SUCH EXHIBIT BUT NOT DEFINED THEREIN HAVE THE RESPECTIVE MEANINGS ASCRIBED TO THEM HEREIN.

# TABLE OF CONTENTS

I. Summary ..................................................................................................................................... 1

II. Business ................................................................................................................................... 9

    A.   The Company ................................................................................................................... 9

    B.   Operations .................................................................................................................... 10

    C.   The Company's History and Organizational Structure ................................................ 10

    D.   Management ................................................................................................................. 13

    E.   Regulation of the Company's Business ...................................................................... 13

    F.   Prior and Pending Litigation Proceedings .................................................................. 13

    G.   Prepetition Contracts and Leases ................................................................................ 14

    H.   Bank Account ............................................................................................................... 14

III. Anticipated Events During the Chapter 11 Case .................................................................. 15

    A.   Timetable for the Chapter 11 Case ............................................................................. 15

    B.   Commencement of the Chapter 11 Case and First Day Motions ................................ 16

    C.   Automatic Stay ............................................................................................................ 16

    D.   Other Procedural Motions and Retention of Professionals; Other Matters Concerning the Chapter
11 Case ............................................................................................................................... 16

IV. Summary of Certain Provisions of the Plan ........................................................................ 17

    A.   Treatment of Unclassified Claims: Administrative Claims and Professional Fee Claims .............. 17

    B.   Treatment of Executory Contracts and Unexpired Leases .......................................... 17

    C.   Effects of Confirmation ............................................................................................... 20

V. Voting Procedures and Requirements .................................................................................... 25

    A.   Parties Entitled to Vote on the Plan ............................................................................ 25

    B.   Voting Deadline .......................................................................................................... 26

    C.   Submission of the Completed Ballots ......................................................................... 26

    D.   Voting Procedures ....................................................................................................... 27

    E.   Waivers of Defects, Irregularities, etc. ...................................................................... 29

VI. Confirmation of the Plan ..................................................................................................... 30

    A.   Confirmation Hearing ................................................................................................. 30

    B.   Objections to Confirmation ......................................................................................... 30

    C.   Requirements for Confirmation of the Plan ............................................................... 32

VII. Alternatives to the Plan ..................................................................................................... 36

VIII. Securities Law Matters ..................................................................................................... 37

    A.   The Solicitation ........................................................................................................... 37

    B.   Issuance of the New AEH Common Units Under the Plan ......................................... 37

IX. Risk Factors ......................................................................................................................... 39

A.   Risk Factors Relating to the Company's Business ........................................................... 39

B.   Risk Factors Relating to the New AEH Common Units ................................................. 48

C.   Risk Factors Relating to the Bankruptcy Process .......................................................... 50

D.   Additional Risk Factors ................................................................................................. 55

X. Certain U.S. Federal Income Tax Consequences of the Plan ................................................ 56

XI. Conclusion and Recommendation ........................................................................................ 64

DISCLOSURE STATEMENT EXHIBITS

Exhibit A   Plan
Exhibit B   Structure Chart
Exhibit C   Financial Projections
Exhibit D   Liquidation Analysis

# I.
# SUMMARY

This Disclosure Statement (as may be amended, supplemented or otherwise modified from time to time, this "**Disclosure Statement**") is being provided to Holders of Claims or Equity Interests entitled to vote on the Plan to provide them with information regarding the Debtor and the proposed Restructuring Transactions to assist them in making a decision regarding whether or not to vote in favor of the *Pre-Packaged Plan of Reorganization of Arsenal Energy Holdings LLC* (as may be amended, supplemented or otherwise modified from time to time, the "**Plan**"), a copy of which is attached as **Exhibit A**. Unless otherwise noted, capitalized terms used but not defined herein have the respective meanings ascribed to them in the Plan. All summaries herein are qualified by reference to the actual terms of the Plan.

The Debtor hereby transmits this Disclosure Statement for use in the solicitation of the Holders of Subordinated Note Claims and the Existing AEH Common Equity Interests to vote to accept the Plan. Upon receipt of votes in favor of the Plan from the Holders of Subordinated Note Claims and Existing AEH Common Equity Interests sufficient to satisfy the requirements of section 1126(c) of the Bankruptcy Code ("**Plan Approval**"), the Debtor will commence the Chapter 11 Case unless the Recapitalization (as defined below) can be commenced out-of-court in accordance with the terms of the Exchange Agreement and the Subordinated Notes Transaction Support Letter. **Following commencement of the Chapter 11 Case, the Debtor will seek confirmation of the Plan on February 13, 2019, or as soon as practicable thereafter**. Please reference the proposed timeline in Article III.A for the proposed schedule for the Chapter 11 Case.

### *The Debtor's Corporate and Capital Structure*

The Debtor is a holding company in a corporate enterprise (collectively with its non-debtor subsidiaries and affiliates, the "**Company**") that is engaged in the acquisition and development of natural gas resources in the Appalachian Basin. For a further description of the Company's history and operations see Article II and for an organization chart see **Exhibit B**. The Company's operations are conducted through wholly-owned non-debtor subsidiaries of the Debtor (the "**Non-Debtor Subsidiaries**") and other affiliated non-debtor entities, which employ all of the Company's employees and hold substantially all of the Company's assets. The Debtor has no employees or trade creditors and has no material assets other than a deposit account[2] and equity interests in the Non-Debtor Subsidiaries. The Debtor's only material indebtedness is the Seller Notes and the Subordinated Notes.

On July 29, 2014, AEH (f/k/a Mountaineer Energy Holdings, LLC) entered into a note and warrant purchase agreement with the various purchasers thereto (the "**Initial Note and Warrant Purchase Agreement**" and, collectively with the subsequent amendments thereto, the "**Note and Warrant Purchase Agreements**"), pursuant to which AEH issued certain notes (the

---

[2]     As of December 31, 2018, the Debtor had approximately $530,000 of cash on hand in its one bank account. The Debtor does not believe that any Entity has a perfected lien on this cash. In any event, the Debtor does not intend to use this cash during the pendency of this Chapter 11 Case if the schedule for Confirmation of the Plan proposed by the Debtor is approved by the Bankruptcy Court and the Plan is confirmed and becomes effective on or before February 28, 2019.

"**Subordinated Notes**") and warrants (the "**Warrants**") to purchase Existing AEH Common Equity Interests upon the satisfaction of certain conditions. The aggregate proceeds from the issuance of the Subordinated Notes and Warrants under the Initial Note and Warrant Purchase Agreement were $370 million. The Initial Note and Warrant Purchase Agreement was initially amended on September 26, 2014, further amended on November 10, 2016 and further amended on March 16, 2017, pursuant to which additional Subordinated Notes and Warrants were issued. As of December 31, 2018, the Debtor has Subordinated Notes outstanding under the Note and Warrant Purchase Agreements in an aggregate principal amount of approximately $861 million. The proceeds from issuance of the Subordinated Notes and Warrants were used to pay costs and expenses associated with the Company's acquisition of PDC Mountaineer, LLC. The Subordinated Notes are unsecured obligations and are contractually subordinated to the Seller Notes described below and structurally subordinated to the obligations of the Non-Debtor Subsidiaries. The Warrants expired on April 14, 2018 without having been timely exercised by any holder thereof. For the avoidance of doubt, to the extent they are deemed outstanding, the Warrants will be cancelled on the Effective Date, pursuant to the Plan and the Exchange Agreement.

On October 14, 2014, AEH issued those certain seller notes in favor of PDC Energy, Inc. in the original principal amount of $39,047,625.00 and in favor of LR-Mountaineer Holdings, L.P., in the original principal amount of $39,047,625.00 (collectively, the "**Seller Notes**"). The proceeds of the Seller Notes were used to pay costs and expenses associated with the Company's acquisition of PDC Mountaineer, LLC, and other general corporate purposes. As of December 31, 2018, there is approximately $116.7 million in aggregate principal amount outstanding under the Seller Notes. The Seller Notes mature on October 14, 2020. Pursuant to a subordination agreement, dated as of October 14, 2014, among the parties thereto, the Subordinated Note Holders agreed to subordinate their claims to those of the Seller Note Holders.

On December 21, 2018, in connection with the OpCo Refinancing described below, Arsenal Resources Development Holdings 2 LLC ("**ARDH 2**"), a newly created wholly-owned subsidiary of ARE, became a guarantor of the Seller Notes and Arsenal Resources Holdings LLC ("**ARH**") was released as a guarantor. To secure its obligations under the guarantee, ARDH 2 pledged its equity interests in its newly created wholly-owned subsidiary, Arsenal Resources Development Holdings 1 LLC ("**ARDH 1**") pursuant to the terms of the Collateral Agreement, dated as of December 21, 2018 by and among ARDH 2 and LR-Mountaineer Holdings, L.P., as collateral agent. In addition, subject to the terms of the Collateral Agreement, dated as of October 14, 2014, by and among AEH, ARH and LR-Mountaineer Holdings, L.P., as collateral agent, the Seller Notes are secured by liens on substantially all of the assets of AEH, including by the equity interests held by it in its direct subsidiary. The guarantee and pledge by ARDH 2 is subject to a standstill during the pendency of the Chapter 11 Case.

The Debtor is a privately-held entity, with approximately 80% of the Existing AEH Common Equity Interests (i.e., the common units of AEH) owned by ARH and FR Mountaineer Keystone Holdings LLC ("**FR Mountaineer**"), and the remaining 20% owned by other investors.

### *Non-Debtor Subsidiaries' Capital Structure*

Prior to the OpCo Refinancing described below, the Non-Debtor Subsidiaries had two funded debt facilities:

- Arsenal Resources Energy LLC ("**ARE**") (a Non-Debtor Subsidiary) was the borrower under a reserve based revolving loan facility, dated as of October 14, 2014 (as amended, supplemented or otherwise modified, the "**Original RBL Facility**"), and certain subsidiaries of ARE were guarantors (the "**Guarantors**"). Citibank, N.A. acted as administrative agent for the lenders under the Original RBL Facility. The Original RBL Facility was secured by a first priority lien on substantially all of the assets of ARE and the Guarantors, including substantially all oil and gas reserves. At the time of the OpCo Refinancing, approximately $112 million of principal was outstanding under the Original RBL Facility.[3]

- ARE was also a borrower under a second lien term loan facility, dated as of October 14, 2014 (as amended, supplemented or otherwise modified, the "**Original Second Lien Facility**"), which was also guaranteed by the Guarantors. The Original Second Lien Facility was secured by liens on substantially all of the assets of ARE and the Guarantors, including substantially all oil and gas reserves, which liens were junior to the liens securing the Original RBL Facility pursuant to an intercreditor agreement. Chambers Energy Management, LP acted as administrative agent for the lenders under the Original Second Lien Facility. At the time of the OpCo Refinancing, approximately $120 million of principal was outstanding under the Original Second Lien Facility.

The Debtor was not an obligor under the Original RBL Facility or the Original Second Lien Facility and did not pledge any of its assets to secure any obligations thereunder.

### *The Recapitalization*

Recognizing that new capital was necessary for its development program and that affirmative steps were needed to reduce its loan debt, in late 2017 the Company, together with the Company Advisors (as defined below), approached certain key stakeholders with regard to a consensual restructuring of its capital structure. These discussions culminated in a proposed comprehensive out-of-court recapitalization transaction (the "**Recapitalization**") that would leave operations unaffected and trade creditors unimpaired and was supported by a number of the Company's lenders.

Specifically, the Recapitalization contemplated the following:

1. ARDH 1 would enter into a new term loan facility (the "**New Term Loan Facility**") in an original principal amount of $220 million, of which $110 million would be funded by new loans provided by Mercuria Energy Company, LLC and $110 million would be used to refinance the Original Second Lien Facility by converting $110 million in principal of the Original Second Lien Facility into loans under the New Term Loan Facility.

---

[3]    This amount excludes issued and outstanding letters of credit as of the date hereof under the Original RBL Facility with a face amount of approximately $28 million.

2. The Original Second Lien Facility would be refinanced in full by converting the loans thereunder into loans outstanding under the New Term Loan Facility, as described above.

3. The remaining proceeds of the New Term Loan Facility would be used to repay $110 million of the Original RBL Facility.

4. Concurrently with entry into the New Term Loan Facility, Arsenal Resources Development, LLC ("**ARD**"), a newly created, wholly-owned subsidiary of ARDH 1, would enter into a new reserve based revolving loan facility (the "**New RBL Facility**") with an initial aggregate commitment of $135 million and an aggregate commitment of $145 million after the Recapitalization occurred, the proceeds of which would be used to repay the remaining portion of the Original RBL Facility that was not repaid with the New Term Loan Facility and for working capital.

5. ARD would enter into a joint venture to drill for resources with IOG Resources LLC (the "**IOG-ARD JV**"). The IOG-ARD JV would allow the Company to capitalize on a favorable environment and take full advantage of a profitable drilling opportunity.

6. AEH would enter into an exchange agreement (as may be amended, supplemented or otherwise modified, the "**Exchange Agreement**") with Holders of the Subordinated Notes and Existing AEH Common Equity Interests, pursuant to which:

   a. the Subordinated Notes would be exchanged for New AEH Class A Common Units;

   b. the Existing AEH Common Equity Interests would be exchanged into New AEH Class B Common Units with a liquidation preference subordinate to the liquidation preference of the New Class A Common Units; provided ARH and FR Mountaineer would agree to exchange their Existing AEH Common Equity Interests into New AEH Class C Common Units, with a liquidation preference subordinate to the liquidation preferences of the New AEH Class A Common Units and the New AEH Class B Common Units, respectively, as set forth in the New AEH Operating Agreement;

   c. the Existing AEH Operating Agreement would be amended and restated into the New AEH Operating Agreement, which would govern the rights, priorities and restrictions with regard to the New AEH Common Units; and

   d. the New AEH Board would be appointed in accordance with the New AEH Operating Agreement.  The New AEH Board would be appointed by the Holders of the New AEH Common Units in proportion to each Holder's percentage of the New AEH Common Units. One of the directors shall be the CEO of Reorganized AEH, who shall not have a vote. The Holders of New AEH Common Units holding less than 5% of the New AEH Common Units would collectively elect one director to be their representative.

4

7.   The New AEH Board would adopt the MIP, having the terms and conditions set forth in the New AEH Operating Agreement.

The Recapitalization steps described in paragraphs 1-5 above are referred to herein as the "**OpCo Refinancing**."

The Recapitalization could only be consummated out-of-court if the Exchange Agreement was signed by each Holder of Subordinated Notes and Existing AEH Common Equity Interests. However, one or more Holders of Subordinated Notes were unwilling to sign the Exchange Agreement. This refusal imperiled the entire Recapitalization and forced the Company to consider implementing the Recapitalization through a comprehensive chapter 11 restructuring.

The Company, Mercuria, the Consenting Subordinated Noteholders[4] and the Consenting AEH Unitholders then entered into good faith negotiations to craft an alternative solution. Ultimately, the parties agreed to effectuate the Recapitalization in two steps. First, the OpCo Refinancing would be consummated out-of-court, as originally contemplated, so that the Company could begin its own drilling program immediately. Second, after closing the OpCo Refinancing, the Exchange Agreement would be effectuated through the Plan. On December 21, 2018, the OpCo Refinancing was completed, and the Consenting Subordinated Noteholders, the Consenting AEH Unitholders and AEH entered into a transaction support letter (as amended, supplemented or otherwise modified, the "**Subordinated Notes Transaction Support Letter**") pursuant to which AEH agreed to commence Solicitation and the Chapter 11 Case to implement the Exchange Agreement if one or more Holders of Subordinated Notes remained unwilling to sign the Exchange Agreement, and the Consenting Subordinated Noteholders and Consenting AEH Unitholders committed to vote in favor of, and not object to, the Plan. Simultaneously therewith, AEH and the Seller Noteholders (the "**Consenting Seller Noteholders**") entered into a separate transaction support letter (as amended, supplemented or otherwise modified, the "**Seller Notes Transaction Support Letter**") pursuant to which the Consenting Seller Noteholders committed to not object to or oppose the Plan.

Significantly, the Subordinated Notes Transaction Support Letter contains various milestones related to the Plan. The milestones provide that the Petition Date must occur no later than February 4, 2019, and the Effective Date must occur no later than March 21, 2019. Failure to satisfy these milestones could result in a termination of the Subordinated Notes Transaction Support Letter and the withdrawal of votes in favor of the Plan by the Consenting Subordinated Noteholders and Consenting AEH Unitholders. Furthermore, the New RBL Facility and the New Term Loan Facility contain various events of default if the Plan and Exchange Agreement are not consummated by March 21, 2019. Critically, the New RBL Facility also reduces borrowing availability from $145 million to $110 million until the Plan and Exchange Agreement are

---

[4]   Certain of the Consenting Subordinated Noteholders, holding in aggregate approximately 41% of the principal amount the Subordinated Notes, are investment vehicles through which First Reserve Corporation ("**FR**") invested in the Company. For certain of those investment vehicles (referred to as the "**Annex Funds**"), holding in aggregate approximately 25% of the principal amount of the Subordinated Notes, all decisions related to the Restructuring, the Subordinated Notes Transaction Support Letter and the Plan, including whether to sign the Subordinated Notes Transaction Support Letter or vote in favor of the Plan, were made at the direction of independent third party investors not affiliated with FR. The Annex Funds are not "Affiliates" of the Debtor, as that term is defined in the Bankruptcy Code.

consummated, which imposes additional burdens on the Company's operations. Accordingly, the Debtor (and the Company) will suffer detrimental consequences if the Plan and Exchange Agreement cannot be completed expeditiously.

On or about October 25, 2017, the Company retained Barclays Capital Inc., as investment banker ("**Barclays**"). On or about December 11, 2018, the Debtor retained Simpson Thacher & Bartlett LLP and Young Conaway Stargatt & Taylor LLP ("**STB**" and "**YCST**," respectively, and, together with Barclays, the "**Company Advisors**") as legal co-counsel.

As described above, the Plan will implement the Exchange Agreement. The Plan also contemplates the following:

- The Seller Notes Claims shall be Unimpaired and Reinstated and the Seller Notes and other Seller Note Documents shall remain in full force and effect.

- All General Unsecured Claims and Other Secured Claims against the Debtor shall be Unimpaired and shall be paid in full in cash, paid or disputed in the ordinary course of business and in accordance with applicable law as if the Chapter 11 Case had not been commenced.

- Each Holder of a Subordinated Note Claim shall be deemed party to the Exchange Agreement (regardless of whether such Holder has executed and delivered a signature page thereto), which Exchange Agreement shall become effective on the Effective Date, and on the Effective Date, the Exchange Agreement will be implemented resulting in each Holder of a Subordinated Notes Claim receiving its Pro Rata share of 100% of the New AEH Class A Common Units.

- (x) The Holders of Existing AEH Common Equity Interests other than ARH and FR Mountaineer shall receive their Pro Rata share of 100% of the New AEH Class B Common Units and (y) ARH and FR Mountaineer shall receive their Pro Rata share of 100% of the New AEH Class C Common Units.

- All Existing AEH Other Equity Interests (if any) shall be cancelled, and Holders of Existing AEH Other Equity Interests shall receive no recovery under the Plan.

- Immediately after the Effective Date, the New AEH Board is expected to adopt the MIP.

- The New AEH Board would be appointed in accordance with the New AEH Operating Agreement. The New AEH Board would be appointed by the Holders of the New AEH Common Units in proportion to each Holder's percentage of the New AEH Common Units. One of the directors shall be the CEO of Reorganized AEH, who shall not have a vote. The Holders of New AEH Common Units holding less than 5% of the New AEH Common Units would collectively elect one director to be their representative.

- The Plan will provide for customary releases of specified Claims held by the Debtor, the Subordinated Noteholders, the Seller Noteholders (excluding LR-Mountaineer Holdings, L.P. and its related parties), the Existing AEH Common Equity Interest Holders and the

Existing AEH Other Equity Interest Holders and certain other specified parties against one another and for customary exculpations and injunctions.

The following table summarizes, assuming an Effective Date of February 28, 2019, (i) the treatment of Claims and Equity Interests under the Plan, (ii) which Classes are Impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, (iv) the estimated recoveries for Holders of Claims and Equity Interests in each Class to the extent such recovery can be estimated and (v) the estimated amount of Allowed Claims for each Class of Claims. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of other terms and provisions of the Plan, see Article IV of this Disclosure Statement.

| Class | Claim or Equity Interest | Treatment | Status | Voting Rights | Approx. Percentage Recovery | Estimated Amount of Allowed Claims or Interests |
|---|---|---|---|---|---|---|
| 1 | Other Secured Claims | In full and final satisfaction, settlement, discharge and release of, and in exchange for, each Allowed Other Secured Claim, on the Effective Date, at the option of the Debtor, each Allowed Other Secured Claim will be (i) paid in full in Cash, (ii) Unimpaired and Reinstated or (iii) treated on such other terms as either (x) the Debtor, or (y) the Reorganized Debtor, as applicable, and the Holder thereof may agree. | Unimpaired | Presumed to Accept | 100% | Undetermined[5] |
| 2 | Seller Notes Claims | On the Effective Date, all Allowed Seller Notes Claims will be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | Presumed to Accept | 100% | $116.7 million |
| 3 | Subordinated Note Claims | In full and final satisfaction, settlement, discharge and release of, and in exchange for, each Allowed Subordinated Note Claim, on the Effective Date, except to the extent a Holder of an Allowed Subordinated Note Claim agrees to less favorable treatment with either (x) the Debtor or (y) the Reorganized Debtor, as applicable, each Allowed Subordinated Note Claim will receive its Pro Rata share of the New Class A Common Units. | Impaired | Entitled to Vote | Undetermined[6] | $861 million |
| 4 | General Unsecured Claims | All Allowed General Unsecured Claims are Unimpaired by the Plan. At the option of the Debtor or the Reorganized Debtor, as applicable, (i) the Plan may leave unaltered the legal, equitable, and contractual rights of a Holder of an | Unimpaired | Presumed to Accept | 100% | Undetermined |

---

[5]     The Debtor is not aware of any Claims in either Class 1 or Class 4 but anticipates that such Claims will be satisfied in full in accordance with the Plan if any Claims exist.

[6]     For more information on the recovery to the Holders of Subordinated Notes Claims, see the sub-section of Article X of this Disclosure Statement entitled, "**Consequences to the Debtor and Its Owners**."

| Class | Claim or Equity Interest | Treatment | Status | Voting Rights | Approx. Percentage Recovery | Estimated Amount of Allowed Claims or Interests |
|---|---|---|---|---|---|---|
| | | Allowed General Unsecured Claim, (ii) the Debtor or the Reorganized Debtor, as applicable, may pay such Allowed General Unsecured Claim in full in Cash on the Effective Date or as soon thereafter as is practicable, (iii) the Debtor or the Reorganized Debtor, as applicable, may pay such Allowed General Unsecured Claim in a manner agreed to by the Holder of such Claim, or (iv) the Plan may reinstate the legal, equitable, and contractual rights of the Holder of an Allowed General Unsecured Claim in accordance with section 1124(2) of the Bankruptcy Code. | | | | |
| 5 | Intercompany Claims | Each Intercompany Claim shall be Reinstated and Unimpaired. | Unimpaired | Presumed to Accept | 100% | N/A |
| 6 | Existing AEH Common Equity Interests | In full and final satisfaction, settlement, discharge and release of, and in exchange for, each Existing AEH Common Equity Interest, on the Effective Date, the Holders of Existing AEH Common Equity Interests shall receive their Pro Rata share of 100% of the New AEH Class B Common Units in accordance with the schedule attached to the New AEH Operating Agreement, unless any such Holders elect less favorable treatment; provided that, in accordance with the right to elect less favorable treatment, ARH and FR Mountaineer, as Holders of Existing AEH Common Equity Interest, have elected to receive their Pro Rata share of 100% of the New AEH Class C Common Units, in accordance with the schedule attached to the New AEH Operating Agreement. | Impaired | Entitled to Vote | N/A | N/A |
| 7 | Existing AEH Other Equity Interests | On the Effective Date, all Existing AEH Other Equity Interests will be cancelled, and Holders of Existing AEH Other Equity Interests will receive no recovery under the Plan. [7] | Impaired | Deemed to Reject | 0% | N/A |

---

[7]    The Debtor does not believe there are any Existing AEH Other Equity Interests because any warrants issued pursuant to the Note and Warrant Purchase Agreements expired on April 14, 2018. However, out of the abundance of caution, any such Equity Interests that are not common units are separately classified and will be cancelled pursuant to the Plan and the Exchange Agreement.

> **THE DEBTOR BELIEVES THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTOR'S ESTATE, AND PROVIDES THE BEST RECOVERY TO CLAIM AND EQUITY INTEREST HOLDERS.**
>
> **FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTOR URGES ALL PARTIES ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOT AND TO VOTE TO ACCEPT THE PLAN.**

## II.
## BUSINESS

### A.    The Company

The Company is an independent exploration and production company engaged in the acquisition and development of unconventional natural gas resources in the Appalachian Basin. To date, the Company has accumulated approximately 188,000 net acres in the dry gas window of the Marcellus Shale, a formation characterized by the U.S. Energy Information Administration as one of the most prolific natural gas-producing formations in the country. The Company creates value by leveraging its technical expertise and local knowledge to assemble a portfolio of concentrated, high-quality drilling locations, develop its acreage position safely and efficiently and install midstream infrastructure to support its upstream activities.

The Company's asset base represents one of the largest acreage positions in West Virginia, and the Company believes its geographic concentration positions it to capture cost and scale efficiencies that give it a competitive advantage over other Appalachian Basin operators. To date, the Company has delineated approximately 103,000 net acres across Barbour, Harrison, Taylor and Preston Counties in West Virginia, which is the Company's "core focus area." The Company has an active infill leasing program to increase its footprint in the core focus area and routinely participates in acreage swaps to consolidate its acreage position. To date, the Company has identified more than 1,015 gross (467 net) potential drilling locations, which include approximately 4,500,000 net undeveloped lateral feet across the core focus area.

The Company's principal executive offices are located at 6031 Wallace Road Ext., Suite 300, Wexford, Pennsylvania 15090.

For the year ended December 31, 2017, the Company had revenue of $105,884,000. For the nine months ended September 30, 2018, the Company had revenue of $90,453,000.

### B.    Operations

As of December 31, 2018, the Company operated 77 horizontal wells.  The Company had an average net daily production of 87.6 MMcf/d for the year ended December 31, 2017 and 135.9 MMcf/d for the quarter ended September 30, 2018. The Company initiated operations on its acreage in 2012 with three test wells that demonstrated the productivity of the Marcellus Shale in northeastern Barbour County. From 2014 through December 31, 2018, the Company acquired 31

operating, producing horizontal wells, and drilled 43 horizontal wells that are revenue-producing. By applying the Company's technological and operational expertise, Arsenal has seen an increase in estimated ultimate recovery, or EUR, from 1.5x to 1.8x, representing an improvement of approximately 20% over the wells that were acquired in 2014.

The Company believes its proximity and access to advantaged, long-haul natural gas pipelines and premium basis markets help it realize higher in-basin prices and more stable margins than many of its peers. During the nine months ended September 30, 2018, the Company marketed approximately 62% of its natural gas sales to favorable basis markets, including primary delivery points on TransCanada Corporation's Columbia Gas pipeline interstate system. Through multi-year, firm transportation contracts and short-term firm sales arrangements, the Company actively manages its contracted capacity to provide transportation solutions for its expected production. As needed, the Company also contracts firm sales arrangements for seasonal periods, enabling it to more accurately predict its anticipated transportation needs for that period.  To manage the liability exposure of the Company's commitments and other longer-dated transportation solutions, the Company coordinates its marketing and hedging strategies to reduce price volatility and protect its ability to fulfill its commitments.

The Company's revenues are derived from the sale of natural gas before the effects of derivatives. To achieve more predictable cash flows and to reduce its exposure to downward price fluctuations, the Company uses derivative instruments to hedge future sales prices and basis differentials on portions of its natural gas production. Its natural gas revenues may vary significantly from period to period as a result of changes in volumes of production sold or changes in commodity prices. As of September 30, 2018, the estimated fair value of its commodity derivative contracts was a net asset of approximately $3.6 million.

C.    **The Company's History and Organizational Structure**

1.    **Corporate Structure**

*Prior to the Restructuring*

Arsenal Resources LLC, a Non-Debtor Subsidiary of the Company, was formed in June 2011 concurrently with the purchase of approximately 50,000 net acres in Preston, Barbour, Taylor and Monongalia Counties, West Virginia through initial equity investments from the First Reserve Corporation and members of the Company's management team. Through 2013, the Company had drilled and completed three horizontal test wells in northeastern Barbour County, conducting numerous tests, including a full bore geologic core sample, micro-seismic analysis, landing zone analytics, various drilling equipment configurations, sand concentration tests and general completion design configurations. With the increase of the Company's production performance and reduction of the average cost per lateral foot, combined with the encouraging results of its third well, the Company shifted focus to consolidation of its acreage footprint.

In October 2014, the Company completed the acquisition of PDC Mountaineer, LLC through which it acquired approximately 120,000 net acres to the west of its pre-existing acreage and largely concentrated in Harrison, Taylor and Barbour Counties and a small gathering system that served the existing producing assets. The acquisition added approximately 40 MMcf/d of

production in the fourth quarter of 2014, as well as 29 operated horizontal producing wells and 24 miles of gathering lines.

In 2015, the Company developed 20 wells within its core position. During that development period, the Company further refined the technical approach while driving improved cost efficiencies in drilling and completion activities.

In November 2016, the Company consolidated Arsenal Midstream Holdings through an exchange of equity issued in AEH and completed a $160 million capital raise to fund 2017 exploration and production operations through the incremental issuance of Subordinated Notes and Warrants. In 2017 and 2018, the Company developed 23 wells, primarily within the Company's core acreage position. The Company also advanced plans for full-field upstream and midstream development to optimize value creation from its existing acreage position. In late 2017, a number of the Company's leases expired, causing its net acreage to decline from its high of approximately 212,000 net acres in the dry gas window of the Marcellus Shale to the current approximately 188,0000 net acres in the dry gas window of the Marcellus Shale.

The following graphic illustrates the history of the Company's acreage expansion and operations:



*Following the Restructuring*

On and after the Effective Date, the Company will continue to operate through its existing organizational structure as modified in conjunction with the OpCo Refinancing. Other than the change to the ownership of AEH (as described above), the remainder of the Company's corporate structure will be maintained and will be unaffected by the Restructuring, including that ARE will remain a wholly-owned subsidiary of Arsenal Resources Intermediate Holdings LLC.

Upon consummation of the Restructuring, the Holders of Subordinated Notes will receive the New AEH Class A Common Units, which will contain an accreting liquidation preference, as further set forth in the New AEH Operating Agreement. The Holders of Existing AEH Common Equity Interests other than ARH and FR Mountaineer will receive New AEH Class B Common Units in exchange for their Existing AEH Common Equity Interests; ARH and FR Mountaineer have agreed to receive New AEH Class C Common Units. The New AEH Class B Common Units will contain a liquidation preference subordinate to that of the New AEH Class A Common Units, and the liquidation preference of the New AEH Class C Common units will be subordinate to those of the New Class A Common Units and the New AEH Class B Common Units, in each case, as further set forth in the New AEH Operating Agreement.

### 2. Employees

As of December 31, 2018, the Company had approximately 86 full-time employees.  The Debtor has no employees of its own.  None of the Company's employees is covered by collective bargaining agreements or represented by an employee union.

### D. Management

The current senior management of the Company (the "**Senior Management Team**") is comprised of Jonathan Farmer, the Chief Executive Officer, Allen Goetz, the Chief Financial Officer, Jon Sheldon, the Chief Operating Officer and Craig Lavender, General Counsel.

The current management committee of the Company (the "**Board**") is Jonathan Farmer, Alex Krueger and Juan Diego Vargas.

### E. Regulation of the Company's Business

The Company is subject to federal, state and, in some cases, local regulation in the jurisdictions in which it operates. These regulations govern and/or affect many aspects of its overall business.

All of the jurisdictions in which the Company owns or operates producing natural gas and oil properties have statutory provisions regulating the exploration for and production of natural gas and oil, including provisions related to permits for the drilling of wells, bonding requirements to drill or operate wells, the location of wells, the method of drilling and casing wells, the surface use and restoration of properties upon which wells are drilled, sourcing and disposal of water used in the drilling and completion process, the management and disposal of wastes generated in various aspects of the Company's operations, and the abandonment of wells. The Company's operations are also subject to various conservation laws and regulations. These include the regulation of the size of drilling and spacing units or proration units, the number of wells which may be drilled in an area, as well as regulations that generally restrict or prohibit the venting or flaring of natural gas, and impose certain requirements regarding the ratability or fair apportionment of production from fields and individual wells.

In order to comply with the laws and regulations applicable to its businesses, the Company has policies, standards and procedures in place for its business activities and with its third-party vendors and providers. In connection with these laws and regulations, the Company must obtain

12

and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. Failure to comply with these laws and regulations may also result in the suspension or termination of its operations as well as injunctions limiting or prohibiting its activities.  As discussed further in the risk factors in <u>Article IX</u> of this Disclosure Statement, any future regulatory modifications could have a substantial impact on the Company's profitability in the short, medium and long terms.

### F.    **Prior and Pending Litigation Proceedings**

In the ordinary course of its business, the Company is party to various legal proceedings, for example, those brought by current or former employees, customers and competitors, the outcome of which cannot be predicted with certainty. There is no outstanding material litigation involving the Company.

The Company's policy is to defend vigorously all claims and actions brought against it. Although the Company intends to continue to defend itself aggressively against all claims asserted against it, any future claims are subject to the uncertainties attendant to litigation and the ultimate outcome of any such proceedings cannot be predicted.

### G.    **Prepetition Contracts and Leases**

The Company's operations are conducted by Non-Debtor Subsidiaries. The Company expects that its existing contracts and leases will be maintained without any impact from the Chapter 11 Case. The Debtor retains various professionals for services in the ordinary course, which include legal, financial advisory and audit and tax services.

### H.    **Bank Account**

Given that the Company's operations are conducted by Non-Debtor Subsidiaries, substantially all of the Company's cash and other liquid assets are held in accounts that are not in the Debtor's name. The Debtor maintains one account with Huntington Bank to fund minor general and administrative activities of the Debtor. As of December 31, 2018, this account contained approximately $530,000.

### III.
### ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE

Upon receipt of Plan Approval, the Debtor expects to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which will commence the Chapter 11 Case.

### A.        Timetable for the Chapter 11 Case

It is critical that the Debtor emerge from the Chapter 11 Case as expeditiously as possible because protracted bankruptcy proceedings will significantly and detrimentally impact the Company's relationships with customers, employees, financing counterparties and vendors. There are material limitations on borrowing availability under the New RBL Facility until the Plan and Exchange Agreement are consummated. Critically, also, in the absence of expeditious confirmation of the Plan, events of default would occur under the New RBL Facility and the New Term Loan Facility. Unless these events of default were waived, the lenders under these facilities could begin to exercise remedies against the assets pledged by the Company as collateral or take other actions to enforce their rights. This could have significant adverse consequences for the Company, including the possible commencement of proceedings under chapter 11 of the Bankruptcy Code by the Non-Debtor Subsidiaries.

Accordingly, the Debtor will request that the Bankruptcy Court confirm the Plan as soon as the Bankruptcy Court will allow and is practicable. Specifically, the Debtor proposes the following dates for the Chapter 11 Case:

| | |
|---|---|
| January 9, 2019 | Launch Solicitation |
| January 31, 2019 | Voting Deadline |
| February 4, 2019 | Commencement of the Chapter 11 Case |
| February 6, 2019 | Plan/Disclosure Statement Objection Deadline; First Day Hearing |
| February 13, 2019 | Confirmation Hearing |
| February 14, 2019 | Proposed Effective Date and Emergence |

Although the Debtor will request this schedule, there can be no assurance that the Bankruptcy Court will grant such request. The Plan provides that the Effective Date will be the date on which a notice of effectiveness is filed with the Bankruptcy Court confirming that (a) all conditions in Article VIII.A of the Plan have been satisfied or waived as provided for in Article VIII.B and (b) consummation of the Restructuring Transactions has occurred.

### B.        Commencement of the Chapter 11 Case and First Day Motions

The Debtor anticipates that the Company's business will operate in the ordinary course during the pendency of the Chapter 11 Case in the same manner as prior to the Petition Date, and

the Chapter 11 Case is anticipated to have no impact on any of the Non-Debtor Subsidiaries, where all operations of the Company are conducted, or on any of their customers, vendors or counterparties.

## 1.    First and Second Day Relief

As noted above, the Debtor is a holding company and all operations of the enterprise are conducted by certain Non-Debtor Subsidiaries. Accordingly, the Debtor anticipates seeking limited "first day" relief. Specifically, the Debtor anticipates seeking an order (a) authorizing the Debtor to continue using its existing bank account and business forms and (b) (i) scheduling a combined hearing to consider approval of the Disclosure Statement and Plan confirmation; (ii) approving the procedures for objecting to the Disclosure Statement and Plan; (iii) approving the prepetition solicitation procedures and form and manner of notice of the Chapter 11 Case, the combined hearing, and deadline to object to the Disclosure Statement and Plan; (iv) approving assumption procedures; (v) conditionally directing the U.S. Trustee not to convene a creditors' meeting; (vi) conditionally waiving the requirement to file schedules of assets and liabilities, statements of financial affairs, and Bankruptcy Rule 2015.3 reports; and (vii) granting related relief.

## C.    Automatic Stay

The filing of the Debtor's bankruptcy petition on the Petition Date will trigger the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtor and both the commencement and the continuation of prepetition litigation against the Debtor. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan.

## D.    Other Procedural Motions and Retention of Professionals; Other Matters Concerning the Chapter 11 Case

The Debtor may file other motions that are common to chapter 11 proceedings generally. Additionally, the Debtor anticipates filing applications, and seeking Bankruptcy Court orders, approving the retention of various professionals to assist in carrying out the Debtor's duties as debtor in possession and to represent its interests in the Chapter 11 Case, including STB, as restructuring co-counsel, YCST, as Delaware restructuring co-counsel and Prime Clerk, as administrative advisor, noticing and voting agent.

No bar date is anticipated to be set in the Chapter 11 Case, and Holders of Claims against the Debtor will not be required to file proofs of claim.

**IV.**
**SUMMARY OF CERTAIN PROVISIONS OF THE PLAN**

The following description of the Plan is a brief summary of certain provisions of the Plan. This summary does not purport to be complete, and other provisions of the Plan are not summarized herein.  This summary, and the other provisions of the Plan not summarized herein, are subject to, and qualified in its entirety by reference to, the Plan attached hereto as **Exhibit A**.

**A.**     **Treatment of Unclassified Claims: Administrative Claims and Professional Fee Claims**

Subject to subparagraph (a) below, in full and complete satisfaction, settlement, discharge and release of each Allowed Administrative Claim, except to the extent that a Holder of such Allowed Administrative Claim and either (x) the Debtor, or (y) the Reorganized Debtor, as applicable, agree in writing to less favorable treatment, the Debtor or Reorganized Debtor, as applicable, shall pay to each Holder of an Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim on, or as soon thereafter as is reasonably practicable (a) the Effective Date or, if payment is not then due, (b) on the due date of such Allowed Administrative Claim; *provided*, *however*, that Administrative Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(a)     Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must file and serve on the Reorganized Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date. The reasonable and documented professional fees and expenses of Cleary Gottlieb Steen & Hamilton LLP and one local counsel, as counsel to certain of the Consenting Subordinated Noteholders, incurred prior to the Petition Date and thereafter up to the Effective Date shall paid by the Debtor or the Reorganized Debtor on or immediately following the Effective Date without the need for filing any fee application or approval by the Bankruptcy Court.

**B.**     **Treatment of Executory Contracts and Unexpired Leases**

**1.**     **Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, or unless such Executory Contract or Unexpired Lease (1) expired or terminated pursuant to its own terms before the Effective Date or (2) is the subject of a motion to reject filed on or before the Effective Date,  as of the Effective Date, the Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.

Without amending or altering any prior order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtor, and be enforceable by the Reorganized Debtor in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or conditions assumption, assignment or transfer. Any provision of any Assumed Agreement that permits a person to terminate or modify such agreement or to otherwise modify the rights of the Debtor or the Reorganized Debtor, as applicable, based on the filing of the Chapter 11 Case or the financial condition of the Debtor or the Reorganized Debtor, as applicable, shall be unenforceable. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtor's assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party or parties thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Assumed Agreement will revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## 2.       Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure amount in Cash, on the later of (1) the Effective Date and (2) the date such payment is due pursuant to the terms of the Assumed Agreement, in the amount set forth on the Schedule of Proposed Cure Amounts, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. If an Executory Contract or Unexpired Lease is not listed on the Schedule of Proposed Cure Amounts, the proposed Cure amount for such Executory Contract or Unexpired Lease shall be zero dollars.

Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented thereto and will be deemed to have forever released and waived any objection to the proposed assumption or Cure amount. In the event of a dispute regarding (1) the Cure amount, (2) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the applicable Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. **Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.**

## 3.       Assumption of Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be

Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtor shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including any obligations to obtain tail coverage liability insurance due to the change in control triggered on the Effective Date). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtor under the Plan as to which no proof of claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors, and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

### 4. Indemnification

The indemnification provisions in any Indemnification Agreement with respect to or based upon any act or omission taken or omitted by an indemnified party in such indemnified party's capacity under such Indemnification Agreement will be Reinstated (or assumed, as the case may be) and will survive effectiveness of the Plan.

### 5. Reservation of Rights

Except with respect to the Subordinated Notes Transaction Support Letter and the Seller Notes Transaction Support Letter, nothing contained in the Plan shall constitute an admission by the Debtor, Reorganized Debtor, or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtor or Reorganized Debtor have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized Debtor, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

## C.    Effects of Confirmation

### 1. Exculpation and Limitation of Liability

To the maximum extent permitted under applicable non-bankruptcy law, the Exculpated Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken

or omitted to be taken in connection with, or related to formulating, negotiating, preparing, filing, disseminating, implementing, administering, confirming or effecting the consummation of the Chapter 11 Case, the Plan, the Disclosure Statement, the Exchange Agreement, the Subordinated Notes Transaction Support Letter, the Seller Notes Transaction Support Letter, the New AEH Common Units, the Reorganized Debtor Governance Documents, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement, or Confirmation or consummation of the Plan; *provided*, *however*, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted fraud, gross negligence, or willful misconduct, but in all respects each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.

**2.      Releases by the Debtor**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS CONFIRMED IN THE PLAN, THE DEBTOR AND ITS ESTATE SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, WHETHER KNOWN OR UNKNOWN, ASSERTED OR UNASSERTED, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE LAWS OR OTHERWISE, INCLUDING AVOIDANCE ACTIONS, THOSE CAUSES OF ACTION BASED ON VEIL PIERCING OR ALTER-EGO THEORIES OF LIABILITY, CONTRIBUTION, INDEMNIFICATION, JOINT LIABILITY OR OTHERWISE THAT THE DEBTOR OR THE DEBTOR'S ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S RESTRUCTURING, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR DURING THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE SUBORDINATED NOTES TRANSACTION SUPPORT LETTER, THE SELLER NOTES TRANSACTION SUPPORT LETTER, THE EXCHANGE AGREEMENT, THE REORGANIZED DEBTOR GOVERNANCE DOCUMENTS, THE**

NEW AEH COMMON UNITS OR ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, THE PURSUIT OF CONFIRMATION, ANY ACTION OR ACTIONS TAKEN IN FURTHERANCE OF OR CONSISTENT WITH THE ADMINISTRATION OR IMPLEMENTATION OF THE PLAN OR THE DISTRIBUTION OF THE NEW AEH COMMON UNITS AND RELATED DOCUMENTS OR OTHER PROPERTY UNDER THE PLAN, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE ARISING FROM OR RELATING TO ANY OF THE FOREGOING, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE; *PROVIDED, HOWEVER,* THAT THE FOREGOING PROVISIONS OF THE RELEASE (I) SHALL OPERATE TO WAIVE AND RELEASE ONLY THOSE CAUSES OF ACTION EXPRESSLY SET FORTH IN AND RELEASED BY THE PLAN AND (II) SHALL NOT OPERATE TO WAIVE AND RELEASE THE RIGHTS OF THE DEBTOR OR THE REORGANIZED DEBTOR TO ENFORCE THE PLAN, THE EXCHANGE AGREEMENT, THE CONFIRMATION ORDER, THE REORGANIZED DEBTOR GOVERNANCE DOCUMENTS, THE NEW AEH COMMON UNITS OR ANY RELATED AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED OR REINSTATED PURSUANT TO THE PLAN OR FINAL ORDER OF THE BANKRUPTCY COURT; *PROVIDED, FURTHER, HOWEVER,* THE NON-DEBTOR SUBSIDIARIES SHALL NOT BE DEEMED RELEASED PARTIES FOR PURPOSES OF <u>ARTICLE X.E</u> OF THE PLAN.

   3.  Releases by Holders of Claims and Equity Interests.

   NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR AND ITS ESTATE AND THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS CONFIRMED BY THE PLAN, EACH OF THE RELEASING PARTIES SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE DEBTOR AND ITS ESTATE AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR OR THE DEBTOR'S ESTATE, WHETHER KNOWN OR UNKNOWN, ASSERTED OR UNASSERTED, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE LAWS OR OTHERWISE, INCLUDING AVOIDANCE ACTIONS, THOSE CAUSES OF ACTION BASED ON VEIL PIERCING OR ALTER-EGO THEORIES OF LIABILITY, CONTRIBUTION, INDEMNIFICATION, JOINT LIABILITY OR OTHERWISE THAT ANY SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR

COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S RESTRUCTURING, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR OR ANY RELEASED PARTY, ON ONE HAND, AND ANY RELEASING PARTY, ON THE OTHER HAND, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR DURING THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE SUBORDINATED NOTES TRANSACTION SUPPORT LETTER, THE SELLER NOTES TRANSACTION SUPPORT LETTER, THE EXCHANGE AGREEMENT, THE REORGANIZED DEBTOR GOVERNANCE DOCUMENTS, THE NEW AEH COMMON UNITS AND/OR ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, THE PURSUIT OF CONFIRMATION, ANY ACTION OR ACTIONS TAKEN IN FURTHERANCE OF OR CONSISTENT WITH THE ADMINISTRATION OR IMPLEMENTATION OF THE PLAN OR THE DISTRIBUTION OF THE NEW AEH COMMON UNITS, OR OTHER PROPERTY UNDER THE PLAN, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE ARISING FROM OR RELATING TO ANY OF THE FOREGOING, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE; *PROVIDED, HOWEVER*, THAT THE FOREGOING PROVISIONS OF THE RELEASE (I) SHALL OPERATE TO WAIVE AND RELEASE ONLY THOSE CAUSES OF ACTION EXPRESSLY SET FORTH IN AND RELEASED BY THE PLAN AND (II) SHALL NOT OPERATE TO WAIVE AND RELEASE THE RIGHTS OF THE RELEASING PARTIES TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE EXCHANGE AGREEMENT, THE REORGANIZED DEBTOR GOVERNANCE DOCUMENTS, THE NEW AEH COMMON UNITS OR ANY RELATED AGREEMENTS, INSTRUMENTS, AND OTHER DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED OR REINSTATED PURSUANT TO THE PLAN OR FINAL ORDER OF THE BANKRUPTCY COURT; *PROVIDED, FURTHER, HOWEVER,* THE NON-DEBTOR SUBSIDIARIES SHALL NOT BE DEEMED A RELEASING PARTY AS TO THE DEBTOR FOR PURPOSES OF <u>ARTICLE X.F</u> OF THE PLAN; AND, *PROVIDED FURTHER, HOWEVER*, NEITHER LR-MOUNTAINEER HOLDINGS, L.P. NOR ANY RELATED PARTY WITH RESPECT TO LR-MOUNTAINEER HOLDINGS, L.P., IN ITS CAPACITY AS SUCH OR IN ITS CAPACITY AS SELLER NOTE AGENT, SHALL BE DEEMED A RELEASING OR A RELEASED PARTY UNDER <u>ARTICLE X.F</u> OF THE PLAN OR A RELEASED PARTY UNDER <u>ARTICLE X.E</u> OF THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NOTHING IN THE PLAN OR ANY DOCUMENT EXECUTED OR TRANSACTION ENTERED INTO IN CONNECTION WITH THE PLAN OR THE RESTRUCTURING TRANSACTIONS SHALL RELEASE ANY CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND

LIABILITIES WHATSOEVER UNDER THE JOINT DEVELOPMENT AGREEMENT OR THAT IOG RESOURCES LLC MAY HAVE AGAINST ANY ENTITY, AND ALL SUCH CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER ARE FULLY RESERVED AND PRESERVED IN ALL RESPECTS.

4.      Injunction

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL PERSONS OR ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A CLAIM THAT IS DISCHARGED OR AN EQUITY INTEREST THAT IS TERMINATED PURSUANT TO THE TERMS OF THE PLAN ARE PERMANENTLY ENJOINED AND PRECLUDED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH DISCHARGED CLAIMS OR TERMINATED EQUITY INTERESTS OR RIGHTS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST ANY RELEASED PARTY (OR PROPERTY OR ESTATE OF ANY RELEASED PARTY) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES, AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE PROPERTY; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE PROPERTY ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (III) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM OR ENCUMBRANCE AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE PROPERTY ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE PROPERTY, *PROVIDED*, THAT ANY RIGHTS OF SETOFF AND RECOUPMENT OF ANY ENTITY OR PERSON ARE PRESERVED FOR THE PURPOSE OF ASSERTING SUCH RIGHTS AS A DEFENSE TO ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTOR OR ITS ESTATE REGARDLESS OF WHETHER SUCH ENTITY OR PERSON IS THE HOLDER OF AN ALLOWED CLAIM; AND (V) COMMENCING OR CONTINUING ANY ACTION, ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN, THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE

**PROVISIONS OF THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, THE PLAN SHALL NOT ENJOIN, OR BE DEEMED TO ENJOIN, ANY PARTY (INCLUDING IOG RESOURCES LCC) FROM ASSERTING ANY CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES ARISING UNDER THE JOINT DEVELOPMENT AGREEMENT.**

## V.
## VOTING PROCEDURES AND REQUIREMENTS

### A.    Parties Entitled to Vote on the Plan

The Debtor is soliciting the votes of the Holders of Subordinated Note Claims in Class 3 and of the Holders of Existing AEH Common Equity Interests in Class 6 (collectively, the "**Voting Parties**"). If the Plan is not accepted at the requisite thresholds described below, the Debtor may seek alternatives to the consummation of the Restructuring Transactions pursuant to the Plan.

Only holders of claims against or equity interests in a Chapter 11 debtor that are in "impaired" (as defined in section 1124 of the Bankruptcy Code) classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of a claim or equity interest in an impaired class will not receive or retain any distribution under a plan on account of such claim or equity interest, section 1126(g) of the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, all such holders do not actually vote on the plan. If a class of claims or equity interests is not impaired by the plan, section 1126(f) of the Bankruptcy Code deems the holders in such class to have accepted the plan and, accordingly, such holders are not entitled to vote on the plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan, in each case, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.  The Bankruptcy Code defines "acceptance" of a plan by a class of equity interests as acceptance by holders in that class that hold at least two-thirds (2/3) in amount of the equity interests that cast ballots for acceptance or rejection of the plan, in each case, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

The Claims and Equity Interests in the following Classes are Impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 3 – Subordinated Note Claims; and
- Class 6 – Existing AEH Common Equity Interests.

Because all other Classes are either Unimpaired by the Plan and are conclusively presumed to have accepted the Plan or are Impaired by the Plan and are conclusively presumed to have rejected the Plan, only Classes 3 and 6 are entitled to vote.

### B.   Voting Deadline

Before deciding whether to vote to accept or reject the Plan, each Voting Party as of the Voting Record Date should carefully review this Disclosure Statement, including the exhibits hereto. All Voting Parties are advised to follow the instructions in their applicable Ballot carefully. All descriptions of the Plan set forth in this Disclosure Statement are subject to, and qualified in their entirety by reference to, the Plan.

The Ballot in respect of the Subordinated Note Claims (the "**Subordinated Notes Ballot**") will be provided to each Holder of Subordinated Note Claims as of the Voting Record Date to vote to (x) accept the Plan, including the Releases, or (y) reject the Plan and/or opt out of the Releases. The Subordinated Notes Ballot contains detailed voting instructions and sets forth, among other things, the deadlines, procedures and instructions for voting to (i) accept the Plan, including the Releases, or (ii) reject the Plan and/or opt out of the Releases.

The Ballot in respect of the Existing AEH Common Equity Interests (the "**AEH Common Interests Ballot**") will be provided to each Holder of Existing AEH Common Equity Interests as of the Voting Record Date to vote to (x) accept the Plan, including the Releases, or (y) reject the Plan and/or opt out of the Releases. The AEH Common Interests Ballot contains detailed voting instructions and sets forth, among other things, the deadlines, procedures, and instructions for (a) voting to (i) accept the Plan, including the Releases, or (ii) reject the Plan and/or opt out of the Releases.

The Debtor has engaged Prime Clerk LLC (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR COMPLETED BALLOT(S) MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT IN THE MANNER SET FORTH BELOW AND ON THE BALLOTS ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M., PREVAILING EASTERN TIME, ON JANUARY 31, 2019.**

Notwithstanding the foregoing, the Debtor may, in its sole discretion, commence the Chapter 11 Case prior to the Voting Deadline upon receipt of Plan Approval. Nevertheless, despite any such earlier commencement of the Chapter 11 Case, the Voting Deadline will not be impacted and the Voting Agent will continue to receive completed Ballots. **YOUR VOTE MATTERS, AND, DESPITE ANY SUCH EARLIER COMMENCEMENT OF THE CHAPTER 11 CASE, THE DEBTOR STRONGLY RECOMMENDS YOU SUBMIT YOUR COMPLETED BALLOT(S) ON OR PRIOR TO THE VOTING DEADLINE SET FORTH ABOVE IN CONNECTION WITH EFFECTUATING THE RESTRUCTURING TRANSACTIONS.**

### C.   Submission of the Completed Ballots

Voting Parties must submit the completed applicable Ballots to the Voting Agent either:

| **Via the E-Ballot Platform located at:** | **Via mail, personal delivery, or overnight courier:** |
|---|---|
| https://cases.primeclerk.com/AEH<br><br>For detailed instructions, please review the instructions provided in the Ballots. | Arsenal Ballot Processing<br>c/o Prime Clerk LLC<br>830 Third Avenue, 3rd Floor<br>New York, New York 10022 |

### D.      Voting Procedures

The Debtor is providing copies of this Disclosure Statement and the documents attached hereto to the Voting Parties. Any Holder of Subordinated Note Claims or Existing AEH Common Equity Interests that has not received its applicable Ballot(s) should contact the Voting Agent. Each Holder of Subordinated Note Claims or Existing AEH Common Equity Interests must submit its own completed Ballot(s).

Each Holder of Subordinated Note Claims or Existing AEH Common Equity Interests should provide all of the information requested by its applicable Ballot(s). Each Holder of Subordinated Note Claims or Existing AEH Common Equity Interests should complete all items in its applicable Ballot(s) in accordance with the instructions set forth therein and return such Ballot(s) directly to the Voting Agent in accordance with the instructions contained therein on or before the Voting Deadline.

All materials in the Ballots must be signed by the applicable Holder of record of the Subordinated Note Claims or Existing AEH Common Equity Interests, as applicable, or any person who holds a properly completed proxy from such Holder of record on such date. For purposes of the Ballots, the Holders of the Subordinated Note Claims or Existing AEH Common Equity Interests will be deemed to be the "Holders" of the Claims or Equity Interests represented thereby, as applicable.

If you return more than one Ballot voting different Claims or Equity Interests in the same Class, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot, as applicable, that attempts to partially accept and partially reject the Plan will likewise not be counted. If you cast more than one Ballot voting the same Claim(s) or Equity Interest(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent, and thus, to supersede any prior Ballot. If you cast Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

The Ballots provided to the Holders of Subordinated Note Claims or Existing AEH Common Equity Interests will reflect the principal amount of such Holder's Claim or amount of Equity Interests held by such Holder, as applicable.

Except as provided below, unless a completed Ballot is timely submitted to the Voting Agent before the Voting Deadline with any other documents required by the materials contained

in such Ballot, the Debtor may, in its sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

**ANY BALLOT THAT IS NOT RETURNED TO THE VOTING AGENT IN CONFORMITY WITH THE INSTRUCTIONS PROVIDED IN THE APPLICABLE BALLOT WILL NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN. DELIVERING TO THE VOTING AGENT AN OTHERWISE PROPERLY COMPLETED BALLOT THAT IS NOT APPLICABLE TO YOUR CLASS WILL NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN.  ANY BALLOT THAT IS EXECUTED AND RETURNED, BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL, IN EACH CASE, NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN. ANY BALLOT THAT IS EXECUTED AND RETURNED THAT REJECTS THE PLAN, BUT DOES NOT AFFIRMATIVELY OPT OUT OF THE RELEASES DESCRIBED IN THE PLAN, SHALL BE DEEMED TO HAVE ACCEPTED THE RELEASE PROVISIONS SET FORTH IN <u>ARTICLE X</u> OF THE PLAN.  THE DEBTOR, IN ITS SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTING PARTIES TO CURE ANY DEFECTS IN THE BALLOTS. THE FAILURE TO VOTE ON THE PLAN DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN. AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN, OR A CONSENT TO OR OPT OUT OF THE RELEASE PROVISIONS SET FORTH IN <u>ARTICLE X</u> OF THE PLAN.**

### 1.    Fiduciaries and Other Representatives

*If the applicable Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtor of authority to so act. Authorized signatories should submit the separate Ballots of each Holder for whom they are voting.*

### 2.    Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of such Holder with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, release, and exculpation provisions set forth in <u>Article X</u> therein. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### 3.    Change of Vote

Any party that has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot.

E.      **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtor in its sole discretion, which determination will be final and binding. The Debtor reserves the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, as applicable, be unlawful. The Debtor further reserves its right to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of the Voting Parties. The interpretation (including the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court, as applicable) determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

# VI.
# CONFIRMATION OF THE PLAN

## A.    Confirmation Hearing

**Upon commencement of the Chapter 11 Case, the Debtor will ask the Bankruptcy Court to consider (i) the adequacy of this Disclosure Statement and (ii) confirmation of the Plan at the Confirmation Hearing to be held within nine (9) days of the Petition Date or as soon as practicable thereafter as the Bankruptcy Court may allow, before the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801. The expected date of the Confirmation Hearing is February 13, 2019, though the date of the Confirmation Hearing may be moved by the Court, in its discretion, or by the Debtor, in its discretion, after the Commencement of the Case. At the Confirmation Hearing, the Debtor will request confirmation of the Plan, as it may be modified from time to time, under section 1129 of the Bankruptcy Code. Subject to the terms of the Subordinated Notes Transaction Support Letter and the Seller Notes Transaction Support Letter, the Debtor may modify the Plan, to the extent permitted by section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, as necessary to confirm the Plan. The Confirmation Hearing may be adjourned from time-to-time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.**

## B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Notice of the Confirmation Hearing and of the time to present objections will be provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules. Parties in interest will receive notice of the date for the hearing to confirm the Plan and approve the Disclosure Statement and deadline for any objections thereto **before filing** and will need to file any objections to Confirmation or the Disclosure Statement **either before or promptly after** the commencement of the Chapter 11 Case in accordance with such notice. Any objection to the adequacy of the Disclosure Statement or confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor's estate or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court,[8] together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order, **by no later than <u>February 6, 2019 at 4:00 p.m. (ET)</u>**:

> **To the Debtor:**
>
>> Arsenal Energy Holdings, LLC
>> 6031 Wallace Road Ext.,

---

[8]    Immediately upon the commencement of the Chapter 11 Case, the Debtor will file any objections received by the Debtor prior to the commencement of the Chapter 11 Case on the Bankruptcy Court's docket on behalf of the objecting party.

Suite 300
Wexford, PA 15090
Attn: General Counsel

**with a copy to:**

Proposed Counsel to the Debtor

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attn:  Michael H. Torkin, Esq. (michael.torkin@stblaw.com)
       Kathrine A. McLendon (kmclendon@stblaw.com)
       Nicholas E. Baker, Esq. (nbaker@stblaw.com)
Fax: (212) 455-2502

– and –

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Attn:  Pauline K. Morgan, Esq. (pmorgan@ycst.com)
       Kara H. Coyle, Esq. (kcoyle@ycst.com)
       Ashley Jacobs, Esq. (ajacobs@ycst.com)
Fax: (302) 571-1253

**To Counsel to the Subordinated Noteholders:**

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn:  Sean A. O'Neal, Esq. (soneal@cgsh.com)
       Humayun Khalid, Esq. (hkhalid@cgsh.com)
Fax: (212) 225-3999

**To Counsel to Mercuria:**

Vinson & Elkins LLP
666 Fifth Avenue, 25th Floor
New York, NY 10103
Attn: David S. Meyer, Esq. (dmeyer@velaw.com)
      Garrick C. Smith, Esq. (gsmith@velaw.com)
Fax: (917) 849-5358

**To the United States Trustee:**

> Office of the United States Trustee for the District of Delaware
> 844 King Street
> Suite 2207
> Wilmington, Delaware 19801
> Fax: (302) 573-6491

**C.    Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan pursuant to section 1129 are: (i) the Plan is in the "best interests" of holders of claims and equity interests; (ii) the Plan is feasible and (iii) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class or if an Impaired Class is deemed to reject, the Plan "does not discriminate unfairly and is fair and equitable" as to such Class.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfied all of the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtor has complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

**1.    Best Interests Test/Liquidation Analysis**

The Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the "best interests" of all Holders of Claims or Equity Interests that are Impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or equity interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such member would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

The Debtor believes that, under the Plan, all Holders of Impaired Claims or Equity Interests will receive property with a value not less than the value such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtor's belief is based primarily on consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Impaired Claims or Equity Interests, as described in the Liquidation Analysis attached hereto as **Exhibit D** (the "**Liquidation Analysis**"). As described in the Liquidation Analysis, a liquidation under chapter 7 would not result in a greater recovery to creditors than those provided for in the Plan.

The Debtor believes that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor. The Liquidation Analysis provided in **Exhibit D** is solely for the purpose of describing to Holders of Claims or Equity Interests the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein. There can be no assurance as to the outcomes actually be realized in

31

a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

  **2.**  **Feasibility**

  In connection with Confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This is the so-called "feasibility" test. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtor prepared the financial projections (the "**Financial Projections**") set forth in **Exhibit C**. Based upon such Financial Projections, the Debtor believes it will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

  **THE FINANCIAL PROJECTIONS ARE BY THEIR NATURE FORWARD LOOKING, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE INFORMATION SET FORTH THEREIN. ACCORDINGLY, READERS OF THIS DISCLOSURE STATEMENT ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FINANCIAL PROJECTIONS, AND SHOULD CAREFULLY REVIEW THE RISK FACTORS CONTAINED IN ARTICLE IX OF THIS DISCLOSURE STATEMENT THAT COULD IMPACT THE FEASIBILITY OF THE PLAN. THE FINANCIAL PROJECTIONS SHOULD NOT BE RELIED UPON AS NECESSARILY INDICATIVE OF FUTURE, ACTUAL RECOVERIES.**

  Holders of Claims against or Equity Interests in the Debtor are advised that the Financial Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles. Furthermore, the Debtor's independent certified public accountants have not compiled or examined the Financial Projections and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Projections.

  The Financial Projections assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtor, and (iii) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtor other than as noted in the Financial Projections. Although considered reasonable by the Debtor as of the date hereof, unanticipated events and circumstances occurring after the preparation of the Financial Projections may affect actual recoveries under the Plan.

  The Debtor does not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the

underlying assumptions do not come to fruition. Furthermore, the Debtor does not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

### 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following sub-Section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of allowed claims in that class, counting only those claims that have voted to accept or reject the plan. Bankruptcy Code section 1126(d) defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds (2/3) in amount of allowed equity interests in that class, counting only those equity interests that have voted to accept or reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number of the voting members of such class cast their ballots in favor of acceptance, and a class of equity interests will have voted to accept the plan only if two-thirds (2/3) in amount of the voting members of such class cast their ballots in favor of acceptance.

### 4.    Additional Requirements for Non-Consensual Confirmation

In the event that any Impaired Class of Claims or Equity Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if the Plan has been accepted by at least one Impaired Class and, as to each Impaired Class of Claims or Equity Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Equity Interests, pursuant to section 1129(b) of the Bankruptcy Code.

(a)    Unfair Discrimination Test

The "unfair discrimination" test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its holders' claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtor believes the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than

100% of the allowed amount of the claims or equity interests in such class. As to dissenting classes, the test sets different standards depending on the type of claims or equity interests in such class.

(i)      Secured Creditors

The Bankruptcy Code provides that each holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan of reorganization, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale or (iii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)      Unsecured Creditors

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization property of a value equal to the amount of its allowed claim or (ii) the holders of claims or equity interests that are junior to the claims of the dissenting class of unsecured claims will not receive any property under the plan of reorganization.

(iii)      Equity Interests

With respect to a class of equity interests, the Bankruptcy Code requires that either (i) each holder of an equity interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity interests that are junior to any dissenting class of equity interests will not receive any property under the plan of reorganization.

In the event any Class is deemed or vote to reject the Plan, the Debtor will seek confirmation of the Plan pursuant to the cramdown provisions under section 1129 of the Bankruptcy Code with respect to such rejecting Class.  Furthermore, Confirmation by the Bankruptcy Court will bind all Holders of Claims against and Equity Interests in the Debtor regardless of whether they voted for or against the Plan and regardless of whether they voted at all on the Plan.

## VII.
## ALTERNATIVES TO THE PLAN

The Debtor has evaluated several alternatives to the Restructuring Transactions. After studying these alternatives, the Debtor, the Consenting Subordinated Noteholders and the Consenting AEH Unitholders believe that the Plan is the preferred approach to resolving the Company's capital requirements, implementing the balance-sheet restructuring and maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies.

In the absence of expeditious confirmation of the Plan, events of default would occur under the New RBL Facility and the New Term Loan Facility. Unless these events of default were waived, the lenders under these facilities could begin to exercise remedies against the assets pledged by the Company as collateral or take other actions to enforce their rights. This could have significant adverse consequences for the Company, including the possible commencement of proceedings under chapter 11 of the Bankruptcy Code by the Non-Debtor Subsidiaries.

Alternatively, if the Plan is not confirmed, the Debtor could seek authorization to sell its assets under section 363 of the Bankruptcy Code. Upon analysis and consideration of this alternative, the Debtor does not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for Holders of Claims or Equity Interests than the Plan, given that the Holders of Claims in Class 1 and Class 2 would be entitled to credit bid on any property to which their security interest is attached and to offset their Claims against the purchase price. If the Class 1 and Class 2 Claims were satisfied by their respective collateral, any remaining funds could be used to pay Holders of Claims or Equity Interests in Classes 3, 4, 5, 6 and 7.

Finally, if no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. The assets available for distribution to creditors would be reduced by (a) additional expenses of the chapter 7 liquidation, (b) certain Claims that may be entitled to priority in the context of a liquidation and/or might arise by reason of the liquidation and (c) the absence of a robust market for the liquidation of the Debtor's assets.

The Liquidation Analysis attached hereto as **Exhibit D** describes that Holders of Claims and Equity Interests would not have a greater recovery in a chapter 7 liquidation than provided for in the Plan.

THE COMPANY, THE CONSENTING SUBORDINATED NOTEHOLDERS AND THE CONSENTING AEH UNITHOLDERS THEREFORE BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO CREDITORS THAN WOULD ANY OTHER ALTERNATIVE AND SHOULD BE CONFIRMED PROMPTLY.

## VIII.
## SECURITIES LAW MATTERS

### A.    The Solicitation

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(c) and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of chapter 11 of the Bankruptcy Code. The Debtor is soliciting acceptances of the Plan from all Voting Parties upon the terms and subject to the conditions set forth in this Disclosure Statement and consistent with sections 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.  This Disclosure Statement has been neither approved nor disapproved by the SEC nor any state regulatory authority, nor has the SEC nor any state regulatory authority passed upon the accuracy or adequacy of the statements contained herein.

### B.    Issuance of the New AEH Common Units Under the Plan

The Plan provides for the Reorganized Debtor to distribute the New AEH Common Units to the Subordinated Noteholders and the Existing AEH Common Equity Interest Holders.  The Debtor believes that the New AEH Common Units will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and applicable state securities laws ("**Blue Sky Laws**").

Notwithstanding the foregoing, the Debtor will rely on section 1145(a)(1) of the Bankruptcy Code to exempt the exchange, issuance and distribution of the New AEH Common Units and any other equity interests in the Reorganized Debtor to Holders of Claims against and/or Equity Interests in the Debtor under the Plan from the registration requirements of the Securities Act and any Blue Sky Laws, insofar as, for the Reorganized Debtor, (i) the securities are issued by the Reorganized Debtor, an affiliate participating in a joint plan therewith, or a successor thereto under the Plan; (ii) the recipients of securities hold Claims against, Equity Interests in, or claims for administrative expenses in the Chapter 11 Case concerning, the Debtor; and (iii) the securities are issued entirely in exchange for a recipient's Claim against or Equity Interest in the Debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property (the "**Section 1145 Securities**").

In general, the Section 1145 Securities will be freely tradable and transferable, subject to (i) compliance with any applicable rules and regulations of the SEC at the time of any future transfer, (ii) any restrictions on the transferability of such securities under the Reorganized Debtor Governance Documents (as amended from time to time) and (iii) applicable regulatory approval. However, if the holder is an "underwriter" (as defined in section 1145(b) of the Bankruptcy Code) with respect to such securities, resales by such holder of such securities will not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such holder may still be permitted to sell such securities without registration if it is able to comply with the provisions of Rule 144 under the Securities Act.

Rule 701 under the Securities Act provides a safe harbor exemption from registration under the Securities Act for equity securities issued as employee compensation. Accordingly, the Debtor believes that the New AEH Profits Interests Units issued under the MIP to directors, officers, and other key employees of the Debtor will be exempt from registration under the Securities Act and any applicable Blue Sky Laws. Individuals who receive equity securities under the Plan are urged to consult their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue Sky Laws, including determination of whether such person is or is not an "underwriter", and with respect to restrictions applicable under the Securities Act and any appropriate rules and the circumstances under which securities may be sold in reliance upon any such rules.

**IX.**

**<u>RISK FACTORS</u>**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, TOGETHER WITH ANY ATTACHMENTS AND EXHIBITS. THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE COMPANY'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION. ADDITIONAL RISKS NOT PRESENTLY KNOWN TO THE DEBTOR OR WHICH IT CURRENTLY DEEMS IMMATERIAL MAY ALSO IMPAIR THE COMPANY'S BUSINESS. IF ONE OR MORE OF THESE RISKS ACTUALLY OCCUR, IT COULD HAVE A MATERIAL ADVERSE EFFECT ON THE COMPANY'S BUSINESS, FINANCIAL POSITION OR RESULTS OF OPERATIONS, AND YOU COULD LOSE ALL OR A PART OF YOUR INVESTMENT.

**A.**     **<u>Risk Factors Relating to the Company's Business</u>**

There are risks, uncertainties and other important factors that could cause the Debtor's actual performance or achievements to be materially different from those it may project and the Debtor undertakes no obligation to update any such statement.

**1.**     **The Company's development projects require substantial capital expenditures. The Company may require additional capital in the future to execute its growth strategy. The Company does not project positive free cash flow in the near term.**

The natural gas industry is capital intensive. The Company makes and expects to continue to make substantial capital expenditures for the development and acquisition of natural gas reserves. Historically, the Company has financed these investments through cash flows from operations, external borrowings and capital contributions. As described in the Financial Projections, the Company anticipates that it will have negative free cash flow for the next three fiscal years given the funding of these anticipated capital expenditures, and there is no assurance the Company will have positive free cash flow thereafter. The Company may encounter difficulties in scaling up its methods of accessing capital to the level of its planned capital expenditures. A further reduction or sustained depression in natural gas prices from current levels may result in a decrease in the Company's cash flow from operations and access to third party capital, which would reduce its actual capital expenditures and negatively impact its ability to grow production. Additionally, the Company's previous sources of capital may not be available, or sufficient, to fund its future development.

The actual amount and timing of the Company's future capital expenditures may differ materially from its estimates as a result of, among other things, natural gas prices, actual drilling results, the availability of drilling rigs and other services and equipment and the regulatory, technological and competitive environment. If the Company is unable to fund capital expenditures

38

for any reason, the Company may not be able to capture available growth opportunities and any such failure could have a material adverse effect on its results of operations and financial condition.

    **2.**      **Part of the Company's strategy involves using some of the latest available horizontal drilling and completion techniques, which involve risks and uncertainties in their application.**

The Company's operations involve utilizing some of the latest drilling and completion techniques as developed by its engineers and its service providers. Risks that the Company faces while drilling include, but are not limited to, the following: (1) effectively controlling the level of pressure flowing from particular wells; (2) landing its wellbore in the desired drilling zone; (3) staying in the desired drilling zone while drilling horizontally through the formation; (4) running its casing the entire length of the wellbore; and (5) being able to run tools and other equipment consistently through the horizontal wellbore. The Company also faces certain risks while completing its wells. If its drilling results are less than anticipated, the return on investment for a particular project may not be as attractive as initially anticipated, the Company could incur material write-downs of unevaluated properties and the value of its undeveloped acreage could decline in the future.

    **3.**      **The Company's producing properties are concentrated in the Appalachian Basin, making it vulnerable to risks associated with operating in one major geographic area.**

The Company's producing properties are geographically concentrated in the Appalachian Basin, with a particular concentration in Barbour, Harrison, Taylor and Preston Counties in West Virginia. As of December 31, 2018, substantially all of its total estimated proved reserves were attributable to properties located in this area. As a result of this geographic concentration, an adverse development in the oil and natural gas business in the Company's operating areas could have a greater impact on its financial condition and results of operations than if it were more geographically diverse. Due to the concentrated nature of its properties, the Company may be disproportionately exposed to the impact of regional supply and demand factors, delays or interruptions of production from wells in this area caused by governmental regulation, processing or transportation capacity constraints, market limitations, water shortages or other weather-related conditions or interruption of the processing or transportation of oil, natural gas or natural gas liquids ("**NGLs**"). Such conditions could have a material adverse effect on the Company's financial condition and results of operations.

In addition, a number of areas within the Appalachian Basin have historically been subject to mining operations. For example, third parties may engage in subsurface mining operations near or under the Company's properties, which could cause subsidence or other damage to its properties, adversely impact its drilling or midstream activities or those on which the Company relies. In such event, the Company's operations may be impaired or interrupted, and the Company may not be able to recover the costs incurred as a result of temporary shut-ins, the plugging and abandonment of any of its wells or the repair of its midstream facilities. Furthermore, the existence of mining operations near the Company's properties could require coordination to avoid adverse impacts as a result of drilling and mining in close proximity. These restrictions on its operations, and any similar restrictions, can cause delays or interruptions or can prevent the Company from

executing its business strategy, which could have a material adverse effect on its financial condition and results of operations.

Due to the concentrated nature of its portfolio of natural gas properties, a number of its properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on the Company's results of operations than they might have on other companies that have a more diversified portfolio of properties.

4.    **The Company's producing properties are concentrated in West Virginia, a state without a compulsory pooling statute, which may affect its ability to fully develop its properties without seeking amendments for unitization rights within its leases and leasing additional acreage to complete planned units.**

The Company's producing properties are concentrated in West Virginia, a state that relies on voluntary pooling, or unitization, of lands and leases. Under West Virginia law, in order to form a unit and pool the Company's interests with the interests of third parties within such unit, the Company must obtain leases that do not restrict pooling or unitization and that cover the entire lateral length of the planned wells the Company intends to drill. If all interest holders in a drilling unit are parties to a joint operating agreement, the joint operating agreement will govern development and pooling will not be required. However, in the absence of a joint operating agreement or other agreement that covers all interests within the unit, pooling of the interest holders who are not subject to the joint operating agreement would be economically necessary to develop. Under West Virginia law, a party interested in development has no legal right to request the state of West Virginia to force pool interests for the development and operation of a drilling unit. Certain of the horizontal wells the Company intends to drill in the future may require pooling of its lease interests with the interests of third parties with whom the Company does not have a joint operating agreement in order to create a unit. If these third parties are unwilling to voluntarily pool their interests with the Company's interests or the Company is unable to lease their acreage on terms that permit pooling or unitization, the Company may be unable to integrate tracts, form units and drill long laterals on its leases, making it more difficult to fully develop properties where the Company does not hold, or have an agreement with other owners covering, 100% of the leasehold interests within a unit. As such, the absence of a compulsory pooling statute could expose the Company's operations to potential holdout costs, and result in the possibility of its actual drilling activities being materially different from those presently projected, including fewer drilling locations, shorter laterals and increased expense. Therefore, the Company may not be able to drill all of its potential drilling locations.

5.    **Properties that the Company decides to drill may not yield natural gas in commercially viable quantities.**

Properties that the Company decides to drill that do not yield natural gas in commercially viable quantities will adversely affect its results of operations and financial condition. The Company's project areas are in various stages of development, ranging from project areas with current drilling or production activity to project areas that consist of recently acquired leasehold acreage or that have limited drilling or production history. If the wells in the process of being completed do not produce sufficient revenues to return a profit or if the Company drills dry holes

in the future, it may lose leasehold acreage for undeveloped acreage, and its business may be materially affected. In addition, there is no way to predict in advance of drilling and testing whether any particular prospect will yield natural gas in sufficient quantities to recover drilling or completion costs or to be economically viable. The use of seismic data and other technologies and the study of producing fields in the same area will not enable the Company to know conclusively prior to drilling whether natural gas will be present or, if present, whether natural gas will be present in commercial quantities. The Company cannot assure you that the analogies it draws from available data from other wells, more fully explored prospects or producing fields will be applicable to its drilling prospects. Further, the Company's drilling operations may be curtailed, delayed or cancelled as a result of numerous factors.

6.      **The Company depends upon a limited number of significant purchasers for the sale of most of its production. The loss of one or more of these purchasers, if not replaced, or their inability to meet their obligations to the Company could reduce its revenues and have a material adverse effect on its financial condition and results of operations.**

The Company depends upon a limited number of significant purchasers for the sale of most of its production. The loss of these purchasers, should the Company be unable to replace them, could adversely affect its revenues and have a material and adverse effect on its financial condition and results of operations. The Company cannot assure you that any of its purchasers will continue to do business with the Company or that it will continue to have ready access to suitable markets for its future production. In addition, the Company does not require its purchasers to post collateral. The inability or failure of significant purchasers to meet their obligations to the Company or their insolvency or liquidation may adversely affect its financial condition and results of operations.

7.      **The Company is required to pay fees to its service providers based on minimum volumes under long-term contracts regardless of actual volume throughput.**

The Company has various firm transportation, gas processing, gathering and compression service and water handling and treatment agreements in place, each with minimum volume delivery commitments. Lower commodity prices may lead to reductions in its drilling program, which may result in insufficient production to utilize its full firm transportation and processing capacity. Its firm transportation agreements expire at various times from 2022 to 2033. The Company is obligated to pay fees on minimum volumes to its service providers regardless of actual volume throughput. Additionally, the Company's commitments and obligations under firm transportation agreements could continue to increase depending on utilization of its transportation capacity based on future production and how much, if any, future excess transportation can be marketed to third parties.

8.      **The Company may incur losses as a result of title defects in the properties in which it invests.**

Leases in the Appalachian Basin are particularly vulnerable to title deficiencies due to the long history of land ownership in the area, resulting in extensive and complex chains of title. In the course of acquiring the rights to develop oil and natural gas, it is standard procedure for the

Company and its lessor to execute a lease agreement with payment subject to title verification. In most cases, the Company incurs the expense of retaining lawyers to verify the rightful owners of the oil and gas interests prior to payment of such lease bonus to the lessor. There is no certainty, however, that a lessor has valid title to its lease's oil and gas interests. In those cases, such leases are generally voided and payment is not remitted to the lessor. As such, title failures may result in fewer net acres to the Company. Prior to the drilling of an oil or natural gas well, however, it is the normal practice in the industry for the person or company acting as the operator of the well to obtain a preliminary title review to ensure there are no obvious defects in title to the well. Frequently, as a result of such examinations, certain curative work must be done to correct defects in the marketability of the title, and such curative work entails expense. The Company's failure to cure any title defects may delay or prevent it from utilizing the associated mineral interest, which may adversely impact its ability in the future to increase production and reserves. Accordingly, undeveloped acreage has greater risk of title defects than developed acreage. If there are any title defects or defects in assignment of leasehold rights in properties in which the Company holds an interest, the Company may suffer a financial loss, which could adversely affect its business, financial condition and results of operations.

9. **Conservation measures and technological advances could reduce demand for the Company's natural gas.**

Fuel conservation measures, alternative fuel requirements, increasing consumer demand for alternatives to oil and natural gas, technological advances in fuel economy and energy generation devices could reduce demand for oil and natural gas. The impact of the changing demand for the Company's natural gas may have a material adverse effect on its business, financial condition, results of operations and cash flows.

In addition, the Company can be the target of opposition to oil and natural gas drilling and development activity from certain stakeholder groups. The Company's need to incur costs associated with responding to these initiatives or complying with any new legal or regulatory requirements resulting from these activities that are substantial and not adequately provided for, could have a material adverse effect on its business, financial condition and results of operations. Furthermore, the use of social media channels can be used to cause rapid, widespread reputational harm to the Company.

10. **The Company's derivative activities could result in financial losses or could reduce its earnings.**

To achieve more predictable cash flows and reduce its exposure to adverse fluctuations in the prices of natural gas, the Company enters into derivative instrument contracts, including fixed-price swaps, for a significant portion of its natural gas production, as limited to 85% of its anticipated proved production under its revolving credit facility. As of September 30, 2018, the Company had entered into hedging contracts through December 31, 2019, covering a total of approximately 21,825,000 MMBtu of its expected natural gas production at a weighted average price of $2.98 per MMBtu. Accordingly, the Company's earnings may fluctuate significantly as a result of changes in fair value of its derivative instruments.

Derivative instruments also expose the Company to the risk of financial loss in some circumstances. The Company's hedging transactions expose it to risk of financial loss if a counterparty fails to perform under a derivative contract. Disruptions in the financial markets could lead to sudden decreases in a counterparty's liquidity, which could make them unable to perform under the terms of the derivative contract, and the Company may not be able to realize the benefit of the derivative contract. As of September 30, 2018, the estimated fair value of its commodity derivative contracts was a net asset of approximately $3.6 million. Any default by the counterparties to these derivative contracts when they become due would have a material adverse effect on its financial condition and results of operations.

In addition, derivative arrangements could limit the benefit the Company would receive from increases in the prices for natural gas, which could also have an adverse effect on its financial condition. If natural gas prices exceed the price at which the Company has hedged its commodities, or if its production is less than the volume commitments under its hedging arrangements, it may be obligated to make cash payments to its hedge counterparties, which could, in certain circumstances, be significant.

> **11.    Unless the Company replaces its reserves with new reserves and develops those reserves, its reserves and production will decline, which would adversely affect its future cash flows and results of operations.**

Producing natural gas reservoirs generally are characterized by declining production rates that vary depending upon reservoir characteristics and other factors. Unless the Company conducts successful ongoing development and exploration activities or continually acquires properties containing proved reserves, its proved reserves will decline as those reserves are produced. The Company's future reserves and production, and therefore its future cash flow and results of operations, are highly dependent on its success in efficiently developing and exploiting its current reserves and economically finding or acquiring additional recoverable reserves. The Company may not be able to develop, find or acquire sufficient additional reserves to replace its current and future production.

> **12.    The Company is subject to complex laws and regulations that could adversely affect the cost, manner or feasibility of conducting its operations or expose it to significant liabilities.**

The Company's natural gas exploration, production and transportation operations are subject to complex and stringent laws and regulations, including those relating to hydraulic fracturing and the protection of the environment and worker health and safety. In order to conduct its operations in compliance with these laws and regulations, the Company must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. The Company may incur substantial costs in order to maintain compliance with these existing laws and regulations. Failure to comply with these laws and regulations may also result in the suspension or termination of its operations and subject it to administrative, civil and criminal penalties, including the assessment of natural resource damages, as well as injunctions limiting or prohibiting its activities. These regulations could change to the Company's detriment. The Company's costs of compliance may increase if existing laws and regulations are revised or reinterpreted, or if new laws and regulations become applicable to our

43

operations. Such costs could have a material adverse effect on the Company's business, financial condition and results of operations.

13.    **Federal and state legislative and regulatory initiatives relating to pipeline safety that require the use of new or more stringent safety controls or result in more stringent enforcement of applicable legal requirements could lead to increased capital costs and costs of operation and operational delays for the Company or the pipeline operators on which it depends.**

Pursuant to the authority under the Natural Gas Pipeline Safety Act ("**NGPSA**") and the Hazardous Liquid Pipeline Safety Act ("**HLPSA**"), as amended by the Pipeline Safety Improvement Act of 2002, the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006 and the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011 (the "**2011 Pipeline Act**"), the Pipeline and Hazardous Materials Safety Administration ("**PHMSA**") has promulgated regulations requiring pipeline operators to develop and implement integrity management programs for certain gas and hazardous liquid pipelines that, in the event of a pipeline leak or rupture could affect "high consequence areas", which are areas where a release could have the most significant adverse consequences, including high-population areas, certain drinking water sources and unusually sensitive ecological areas.

The 2011 Pipeline Safety Act is recent federal legislation which amends the NGPSA and HLPSA pipeline safety laws, requiring increased safety measures for gas and hazardous liquids pipelines. Among other things, the 2011 Pipeline Safety Act directs the Secretary of Transportation to promulgate regulations relating to expanded integrity management requirements, automatic or remote-controlled valve use, excess flow valve use, leak detection system installation, testing to confirm the material strength of certain pipelines, and operator verification of records confirming the maximum allowable pressure of certain intrastate gas transmission pipelines. Changes to pipeline safety laws by Congress and regulations by PHMSA or states that result in more stringent or costly safety standards could have a significant adverse effect on the Company and similarly situated midstream operators.

14.    **Seasonal weather conditions and laws and regulations designed to protect wildlife can adversely affect the Company's ability to conduct drilling activities in some of the areas where it operates.**

Natural gas operations in the Company's operating areas can be adversely affected by seasonal weather conditions. This limits its ability to operate in those areas and can intensify competition during certain periods of the year for drilling rigs, oilfield equipment, services, supplies and qualified personnel, which may lead to periodic shortages. In addition, laws and regulations designed to protect wildlife, including the Endangered Species Act ("**ESA**"), can restrict activities that may affect endangered or threatened species or their habitats. Similar protections are offered to migratory birds under the Migratory Bird Treaty Act. For example, the Company operates in areas that are designated as habitats for the northern long-eared bat and the Indiana bat, which are protected species under the ESA. These designations restrict or increase the cost of its operations by, among other things, limiting the Company's ability to clear trees to establish rights of way or pad locations on some of its acreage during certain periods of the year.

These constraints and the resulting shortages or high costs could delay operations and materially increase the Company's operating and capital costs.

15.    **The unavailability or high cost of additional drilling rigs, equipment, supplies, quality personnel and oilfield services could adversely affect the Company's ability to execute its exploration and development plan within its budget and on a timely basis.**

The demand for quality field personnel to drill wells and conduct field operations, geologists, geophysicists, engineers and other professionals in the oil and natural gas industry can fluctuate significantly, often in correlation with natural gas and oil prices, causing periodic shortages. These shortages can cause escalating prices, delays in drilling and other exploration activities and the possibility of poor services coupled with potential damage to downhole reservoirs and personnel injuries. Such pressures may increase the actual cost of services, extend the time to secure such services and add costs for damages due to any accidents sustained from the overuse of equipment and inexperienced personnel.

Historically, there have been shortages of drilling and workover rigs, pipe and other equipment as demand for rigs and equipment has increased along with the number of wells being drilled. The rigs the Company intends to add to its drilling program are not under contract yet. The Company cannot predict whether such shortages of equipment will impact its ability to enter into drilling contracts in 2019 and beyond and, if so, what the timing and duration of such shortages will be. If the Company is unable to secure a sufficient number of drilling rigs that meet its specifications or at reasonable costs, the Company may not be able to drill all of its acreage before its leases expire or in time to achieve its development plan. Equipment shortages could delay or cause the Company to incur significant expenditures that are not provided for in its capital budget, which could have a material adverse effect on the Company's business, financial condition or results of operations.

16.    **The loss of senior management or technical personnel could adversely affect operations.**

The Company depends on the services of its senior management and technical personnel. The Company does not maintain, nor does it plan to obtain, any insurance against the loss of any of these individuals. The loss of the services of its senior management or technical personnel could have a material adverse effect on its business, financial condition and results of operations.

17.    **Increases in interest rates could adversely affect the Company's results of operations and financial condition.**

The Company's business and operating results can be harmed by factors such as the availability, terms of and cost of capital or increases in interest rates. These changes could cause the Company's cost of doing business to increase, limit its ability to pursue acquisition opportunities, reduce cash flow used for drilling and place the Company at a competitive disadvantage. If interest rates increase, so will the Company's interest costs, which may have a material adverse effect on its results of operations and financial condition. Recent and continuing disruptions and volatility in the global financial markets may lead to a contraction in credit

availability impacting its ability to finance its operations. The Company requires continued access to capital. A significant reduction in cash flows from operations or the availability of credit could materially and adversely affect the Company's ability to achieve its planned growth and operating results.

**18.    The Company's business may be adversely affected by information technology disruptions.**

Cybersecurity incidents are increasing in frequency, evolving in nature and include, but are not limited to, installation of malicious software, unauthorized access to data and other electronic security breaches that could lead to disruptions in systems, unauthorized release of confidential or otherwise protected information and the corruption of data. The Company believes it has implemented appropriate measures to mitigate potential risks. However, given the unpredictability of the timing, nature and scope of information technology disruptions, the Company could be subject to manipulation or improper use of its systems and networks or financial losses from remedial actions, any of which could have a material adverse effect on its financial condition and results of operations.

**19.    Natural gas prices are volatile. A reduction or sustained decline in commodity prices, or the existence of negative basis differentials, is likely to adversely affect the Company's business, financial condition or results of operations and its ability to meet our capital expenditure obligations and financial commitments.**

The prices the Company receives for its natural gas production heavily influence, and to the extent it produces NGLs and oil in the future, the prices the Company receives for NGL and oil production will heavily influence, its revenue, operating results profitability, access to capital, future rate of growth and carrying value of its properties. As in recent years, decreases in both oil and gas prices can lead the Company to suspend or curtail drilling, which limits its ability to produce natural gas and therefore impacts its revenues. Natural gas, NGLs and oil are commodities, and therefore, their prices are subject to wide fluctuations in response to relatively minor changes in supply and demand. Historically, the commodities market has been volatile. This market will likely continue to be volatile in the future. The prices the Company receives for its production, and the levels of its production, depend on numerous factors beyond its control.

Prices for oil and natural gas historically have been extremely volatile and are expected to continue to be volatile. If the prices of natural gas continue their recent volatility, the Company's operations, financial condition, cash flows and level of expenditures may be materially and adversely affected.

**B.    Risk Factors Relating to the New AEH Common Units**

**1.    The New AEH Common Units will be subject to certain transfer restrictions.**

The New AEH Common Units will be subject to restrictions, including, among others, that certain transfers must be pursuant to general terms and conditions established in the Reorganized Debtor Governance Documents that are attached to the Exchange Agreement, which may include

that transfers be subject to (i) a right of first refusal, drag-along rights and tag-along rights (subject to certain ownership thresholds) and (ii) compliance with laws applicable to such transfers, including applicable securities laws.  Any such transfer restrictions and the terms thereof will be set forth in the Reorganized Debtor Governance Documents that are attached to the Exchange Agreement. For more information on the Reorganized Debtor Governance Documents and applicable transfer restrictions, see Article I.

> **2.      The ability to transfer the New AEH Common Units may be limited by the absence of an active trading market and the New AEH Common Units will not be registered.**

An active trading market for the New AEH Common Units may not develop or be maintained in the future or, even if developed, may not be liquid as it is unlikely that the New AEH Common Units will be registered pursuant to the Securities Act or listed on any securities exchange in the near future. The liquidity of any market for the New AEH Common Units will depend on various factors, including the number of holders of the New AEH Common Units and the interest of security dealers in making a market for the New AEH Common Units.  If an active trading market does not develop and is not maintained or such trading market is not liquid, holders of New AEH Common Units may be unable to sell their New AEH Common Equity at fair market value or at all. Consequently, holders of the New AEH Common Units may bear certain risks associated with holding securities for an indefinite period of time, including, but not limited to, the risk that the New AEH Common Units will lose some or all of their value.  No assurance can be given that the liquidity of any trading market may develop, that the holders of the New AEH Common Units will be able to sell their New AEH Common Units or on the price at which holders would be able to sell their New AEH Common Units. In addition, holders of the New AEH Common Units will not have the protection afforded to equity holders of listed issuers as a result of the appointment of audit, nominating and compensation committees consisting solely of independent directors and certain other corporate governance mechanisms required of "listed issuers" as defined under Section 10A-3 of the Exchange Act.

> **3.      The Reorganized Debtor is under no obligation to declare or pay any dividends or other distributions.**

The Reorganized Debtor is under no obligation, and does not expect, to declare or pay any dividends or other distributions on account of the New AEH Common Units. The terms of any such distributions shall be set forth in the Reorganized Debtor Governance Documents. Consequently, a holder's only ability to recognize a return on the New AEH Common Units may be through the sale of the New AEH Common Units. Additionally, covenants in the documents governing the Non-Debtor Subsidiaries' indebtedness, including the New Term Loan Facility and the New RBL Facility, prohibit the Non-Debtor Subsidiaries' ability to declare or pay dividends and make distributions and certain other payments to the Debtor, subject to certain exceptions including to pay taxes and expenses associated with the Chapter 11 Case.

> **4.      The New AEH Common Units are subject to dilution.**

All New AEH Common Units issued on the Effective Date in connection with the Plan are subject to dilution as a result of the issuance of new equity securities after the consummation of

the Restructuring Transactions, including on account of the MIP and any other equity issued by Reorganized AEH. In addition, the New AEH Board may agree to grant equity securities to employees, consultants and directors under certain management incentive plans, including, but not limited to, the MIP, that may result in additional issuances of New AEH Common Units or rights with respect thereto.  Furthermore, Reorganized AEH may issue equity securities in connection with future investments, acquisitions or capital raising transactions. Such grants or issuances may result in substantial dilution in ownership of the New AEH Common Units.

### 5.    The New AEH Class B Common Units and the New AEH Class C Common Units will be subject to subordinate liquidation preferences.

The New AEH Class B Common Units issued pursuant to the Exchange Agreement will have an initial liquidation preference on the Effective Date equal to $62.1 million, which will be subordinate to the liquidation preference of the New AEH Class A Common Units equal to the aggregate principal amount outstanding under the Subordinated Notes as of the Effective Date. The New AEH Class C Common Units issued pursuant to the Exchange Agreement will have an initial liquidation preference on the Effective Date equal to $250 million, which will be subordinate to the liquidation preferences of the New AEH Class B Common Units and of the New AEH Class A Common Units. The subordinate liquidation preferences of the New AEH Class B Common Units and New AEH Class C Common Units create greater risk that the Holders of those units will not receive a recovery in a liquidation or a sale. As such, there is added risk to the New AEH Class B Common Units and greater risk still to the New AEH Class C Common Units, given their further subordinated standing relative to the New AEH Class B Common Units.

### 6.    Reorganized AEH will be a holding company and the value of the New AEH Common Units is dependent on its subsidiaries' performance.

Upon consummation of the Restructuring, Reorganized AEH will continue to be a holding company and, as such, it will not have any independent operations. Its most significant asset will continue to be its ownership of the capital stock of its subsidiaries, including the Non-Debtor Subsidiaries. The value of the New AEH Common Units thus will continue to be entirely dependent upon the future performance of its subsidiaries and upon the financial, business and other factors affecting its subsidiaries and the markets in which they do business, as well as general economic and financial conditions.

### 7.    Holders of the New AEH Common Units may not be able to recover in future cases of bankruptcy, liquidation, insolvency, or reorganization.

Holders of the New AEH Common Units will be subordinated to all liabilities of the Reorganized Debtor and its subsidiaries.  Therefore, the assets of the Reorganized Debtor will not be available for distribution to any holder of the New AEH Common Units in any future bankruptcy, liquidation, insolvency or reorganization of the Reorganized Debtor unless and until all indebtedness, if any, of the Reorganized Debtor and its subsidiaries have been paid. The remaining assets of the Reorganized Debtor and each of its subsidiaries may not be sufficient to satisfy the outstanding claims of its equity holders, including the holders of the New AEH Common Units.

C.    **Risk Factors Relating to the Bankruptcy Process**

The following risks apply in the context of the Chapter 11 Case in the Bankruptcy Court and should be considered along with other risk factors.

1.    **The Debtor may fail to satisfy the vote requirement.**

Although the Debtor intends to commence the Chapter 11 Case after having received sufficient votes to approve the Plan, the Debtor can provide no assurance that it will receive the requisite acceptances to confirm the Plan. In the event that sufficient votes are not received, the Debtor may seek to accomplish an alternative chapter 11 plan or other restructuring. There can be no assurance that the terms of any such alternative restructuring would be similar to those proposed in the Plan or as favorable to the Holders of Allowed Claims or Allowed Equity Interests as those.

2.    **Parties in interest may object to the Plan's classification of Claims and Equity Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion, and the Plan may not be confirmed if the Bankruptcy Court determines that the Plan's classification of Claims and Equity Interests was not appropriate.

3.    **The Debtor may not be able to obtain Confirmation of the Plan.**

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan.   Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan.

The Bankruptcy Court may determine that this Disclosure Statement and/or the solicitation procedures did not satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules or may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.  If the Debtor fails to achieve Confirmation of the Plan, the Chapter 11 Case would likely continue for a protracted period without indication of how or when the Chapter 11 Case may be completed. Some of the risks that the Company faces in a bankruptcy proceeding would become more acute in such a scenario, including certain risks that are beyond its control, such as further deterioration or other changes in economic conditions, changes in the industries in which the Company operates, potential revaluing of its assets due to chapter 11 proceedings, changes in customer demand for, and acceptance of, its products, regulatory difficulties and increasing expenses.

If the requisite acceptances of the Plan are not received, the Debtor may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims or Equity Interests. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one Impaired class (which cannot be an "insider" class) has accepted the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the plan as proposed.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtor may not be able to complete the Restructuring Transactions and implement the Exchange Agreement; (b) the distributions that Holders of Claims or Equity Interests ultimately would receive, if any, with respect to their Claims or Equity Interests are uncertain and (c) there is no assurance that the Debtor will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims or Equity Interests.

**4.      Modifications to the Plan may result in less favorable distributions.**

Section 1127 of the Bankruptcy Code permits the Debtor to modify the Plan at any time before Confirmation, but not if such modified Plan fails to meet the requirements for Confirmation. The Debtor or the Reorganized Debtor may modify the Plan at any time after Confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for Confirmation.  The Debtor, subject to the terms and conditions of the Plan, the Subordinated Notes Transaction Support Letter and the Seller Notes Transaction Support Letter, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.

Furthermore, if the Plan is not confirmable, the Debtor may be forced to modify the Plan. If the Plan is not confirmed or if the Debtor determines to modify the Plan, the Debtor will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to a modified Plan. Any Holder of an Allowed Claim or Allowed Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

Any modifications to the Plan could result in treatment less favorable to any non-accepting Class, as well as to any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.

**5.      The Debtor may fail to satisfy solicitation requirements.**

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or equity interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such

solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or equity interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the Bankruptcy Court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtor is delivering this Disclosure Statement to all Holders of Claims and Equity Interests in Classes 3 and 6 as of the Voting Record Date. In that regard, the Debtor believes that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. The Debtor cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that the Debtor did not satisfy the solicitation requirements, then the Debtor may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. The Debtor cannot provide any assurances that such a resolicitation would be successful.

**6.      Confirmation and consummation may be delayed if the Debtor is required to resolicit.**

The Debtor may need to resolicit votes to accept or reject the Plan if, among other things, (a) the Debtor failed to receive the requisite votes for Confirmation, (b) the Debtor made changes to the terms of the Plan that constituted material changes under section 1127 of the Bankruptcy Code, (c) the Debtor waived a material condition to Confirmation, (d) the Bankruptcy Court concluded that the Debtor did not satisfy the solicitation requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) or (e) the Bankruptcy Court denied the motion seeking approval of the adequacy of this Disclosure Statement.

If the Debtor resolicits acceptances of the Plan from the Voting Parties, or if the Debtor is required to solicit the votes of the Holders of Claims or Equity Interests that have been deemed to reject the Plan, Confirmation of the Plan could be delayed and possibly jeopardized.

**7.      The Debtor may not be able to confirm and consummate the Plan quickly.**

While the Debtor intends to file the Plan in the pre-packaged Chapter 11 Case and intends to seek confirmation and consummation of the Plan as soon as practicable, the Debtor may not be able to confirm and consummate the Plan quickly if, among other things, the Effective Date is significantly delayed due to the Debtor's need to resolicit the Plan or if there are significant objections to the Plan that otherwise require the Bankruptcy Court to adjourn the Confirmation Hearing to allow the Debtor sufficient time to address the objections and, if necessary, amend the Plan or other Plan Documents or file responses to objecting parties' concerns with respect to the

Plan. Nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time the Company could experience significant deterioration in its relationships with trade vendors and major customers.

> ### 8. The Debtor's exclusive right to propose the Plan may expire or be terminated.

Upon filing the petition for chapter 11 relief, the Debtor will have the exclusive right to propose the Plan or any other alternative plan of reorganization. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve Confirmation of the Plan in order to achieve the Debtor's stated goals.

> ### 9. The Debtor's emergence from Chapter 11 is not assured.

While the Debtor expects to emerge from Chapter 11 promptly, the Debtor can give no assurance it will successfully reorganize or when this reorganization will occur, irrespective of the Debtor's obtaining Confirmation of the Plan.

> ### 10. Releases, injunctions, and exculpation provisions of the Plan may not be approved.

Article X of the Plan provides for certain releases, third-party releases, injunctions, and exculpations, including a release of any claims that might otherwise be asserted against the Debtor, the Reorganized Debtor, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the Releases are not approved, certain Released Parties may withdraw their support for the Plan, and the Debtor may not be able to obtain Confirmation of the Plan.

> ### 11. The Chapter 11 Case may be converted into a Chapter 7 case.

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Holders of Equity Interests, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. See the description of the Liquidation Analysis in Section VII.C of this Disclosure Statement and attached hereto as **Exhibit D**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Holders of Equity Interests.

> ### 12. Restructuring under Chapter 11 of the Bankruptcy Code may adversely affect the Debtor's business.

Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, proceedings to confirm the Plan could have an adverse effect on the Company's business. Although the Company intends to continue operating its business in the ordinary course of business

during the pendency of the Chapter 11 Case, there is no guarantee that its customers will continue to conduct business with it or that qualified professionals will be available to the Company in adequate numbers to staff its operating segments in light of the uncertainties inherent in the chapter 11 process. The loss of any major customer relationships or the Company's failure to retain employees could significantly impair the Company's performance. Further, the chapter 11 process may harm the Company's image and reputation, which in turn could materially and adversely affect the Company's business and operating results. This is particularly the case if the chapter 11 process requires significantly more time to complete than the Debtor anticipates, which may depend on factors beyond the Debtor's control. The proceedings will also involve additional expense and may divert some of the attention of the Debtor's management away from business operations.

### 13.      The Debtor intends to request prompt Confirmation of the Plan, so parties will need to object promptly.

The Debtor intends to seek, as promptly as practicable after commencing the Chapter 11 Case, Confirmation of the Plan by the Bankruptcy Court. As such, parties in interest will receive notice of the date for the hearing to confirm the Plan and approve the Disclosure Statement and deadline for any objections thereto **before filing** and will need to file any objections to Confirmation or the Disclosure Statement **either before or promptly after** the commencement of the Chapter 11 Case in accordance with such notice. Additionally, the Debtor will have limited time to consensually resolve any objections to the Plan if the Chapter 11 Case is to be promptly confirmed.

### 14.      The Debtor could withdraw the Plan.

Subject to the terms of, and without prejudice to, the rights of any party to the Subordinated Notes Transaction Support Letter and the Seller Notes Transaction Support Letter, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor.

## D.      Additional Risk Factors

### 1.      The Debtor has no duty to update.

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 2.      The financial information contained in this Disclosure Statement has not been audited.

In preparing this Disclosure Statement, the Debtor relied on financial information derived from its books and records that was available at the time of such preparation. Such financial information has not been audited, reviewed, or compiled by the Debtor's independent registered public accounting firm. Accordingly, the Debtor's independent registered public accounting firm does not express an opinion or any other form of assurance with respect thereto and assumes no

responsibility for, and disclaims any association with, this information.  The Debtor is unable to represent or warrant that the financial information contained in this Disclosure Statement is without inaccuracies.

        **3.**        **No representations outside this Disclosure Statement are authorized.**

No representations concerning or related to the Debtor, the Chapter 11 Case or the Plan, as applicable, are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your vote to accept the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

**X.**
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan and of the ownership of the Class 3 Claims, the Class 6 Interests and the New AEH Common Units (solely for the purposes of this Article X, an "**Interest**") as of the date hereof. Except where noted, this summary deals only with Holders of Interests that hold such Interests as capital assets. This summary does not represent a detailed description of the U.S. federal income tax consequences applicable under all circumstances and does not address the Medicare tax on net investment income or the effects of any state, local or non-U.S. tax laws. The tax consequences of the Plan are complex, and the tax treatment of certain aspects of the Plan may be subject to considerable uncertainty. You should consult your own tax advisors as to the particular U.S. federal income tax consequences to you of the Plan, as well as the consequences to you arising under other U.S. federal tax laws and the laws of any other taxing jurisdiction. This summary does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws, including if you are:

- A dealer in securities or currencies;

- A financial institution;

- A regulated investment company;

- A real estate investment trust;

- An insurance company;

- A tax-exempt organization;

- A person holding Interests as part of a hedging, integrated or conversion transaction, a constructive sale or a straddle;

- A trader in securities that has elected the mark-to-market method of accounting for its securities;

- A person required to accelerate the recognition of any item of gross income with respect to the Interests as a result of such income being recognized on an applicable financial statement;

- A person liable for the alternative minimum tax;

- A partnership or other pass-through entity for U.S. federal income tax purposes; or

- A U.S. Holder (as defined below) whose "functional currency" is not the U.S. dollar.

As used herein, the term "**U.S. Holder**" means a beneficial owner of Interests that is for U.S. federal income tax purposes:

55

- An individual citizen or resident of the United States;

- A corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- An estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- A trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a United States person.

The term "**non-U.S. Holder**" means a beneficial owner of Interests (other than a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) that is not a U.S. Holder.

If a partnership holds Interests, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding an Interest, you should consult your tax advisors.

This summary assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss tax consequences to Holders of Interests that act or receive consideration in a capacity other than as a Holder of Interests, and the tax consequences for such Holders may differ materially from that described below.

The discussion below is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), and regulations, rulings and judicial decisions thereunder as of the date hereof, and such authorities may be replaced, revoked or modified, possibly with retroactive effect, so as to result in U.S. federal tax consequences different from those discussed below. Except as otherwise noted, this discussion is limited to U.S. Holders and does not address the consequences to non-U.S. Holders.

### Consequences to the Debtor and Its Owners

The Debtor is a pass-through entity for U.S. federal income tax purposes, and any U.S. federal income tax consequences of the Plan will generally not be borne by the Debtor, but instead will be taken into account by the direct or indirect owners of the Debtor (each, a "**Pass-Through Owner**") immediately after the exchange of the Class 3 Claims and Class 6 Interests for New AEH Common Units pursuant to the Plan. Direct and indirect owners of the Debtor should consult their own tax advisors regarding the consequences of the Plan to them as a result of their ownership of the Debtor.

In general, absent an applicable exception, a Pass-Through Owner will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of the outstanding indebtedness of the Debtor for total consideration less than the adjusted issue price of such

indebtedness. The amount of COD Income recognized by a Pass-Through Owner, in general, is such Pass-Through Owner's distributive share (generally determined in accordance with the existing limited liability company agreement of each Debtor and applicable law) of the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, and (y) the fair market value of any other consideration (including New AEH Common Units) given in satisfaction of such indebtedness at the time of the exchange. Pass-Through Owners who receive New AEH Common Units under the Plan will continue to be members of the Reorganized Debtor and will receive a deemed distribution of cash as a result of any decrease in their share of the liabilities of the Reorganized Debtor. See "Consequences to U.S. Holders of Ongoing Ownership of New AEH Common Units - Distributions."

Because the Plan provides that Holders of Class 3 Claims will receive New AEH Class A Common Units, the amount of COD Income will depend in part on the fair market value of the New AEH Class A Common Units as of the Effective Date. Although the parties will agree that the value of the New AEH Class A Common Units as of the Effective Date will be at least equal to the principal amount and accrued interest outstanding on the Class 3 Claims, this value cannot be known with certainty until after the Effective Date. Moreover, there can no assurance that the Internal Revenue Service (the "**IRS**") will agree with such value.

## Consequences to U.S. Holders of Class 3 Claims

### *Exchange by U.S. Holders of Class 3 Claims for New AEH Class A Common Units*

The exchange by a U.S. Holder of Class 3 Claims of its Class 3 Claims for New AEH Class A Common Units is expected to be treated as a tax free transaction for U.S. federal income tax purposes under Section 721 of the Internal Revenue Code (except with respect to accrued but unpaid interest as discussed below). A U.S. Holder of Class 3 Claims should have a tax basis in the New AEH Class A Common Units equal to its tax basis in the Class 3 Claims (except with respect to any New AEH Class A Common Units attributable to accrued but unpaid interest as discussed below). A U.S. Holder of Class 3 Claims should have a holding period in the New AEH Class A Common Units that includes the holding period for the Class 3 Claims surrendered therefor (except with respect to any New AEH Class A Common Units attributable to accrued but unpaid interest as discussed below).

### *Accrued but Unpaid Interest*

A portion of the consideration received by U.S. Holders of Class 3 Claims may be attributable to accrued but unpaid interest on such Class 3 Claims. Any such amount should be taxable to that U.S. Holder of Class 3 Claims as interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on the Class 3 Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is uncertain. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Class 3 Claims will be allocated first to the principal amount of Class 3 Claims, with any excess allocated to untaxed interest that accrued on such Class 3 Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal

and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain U.S. Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by U.S. Holders of Class 3 Claims should be allocated in some way other than as provided in the Plan. U.S. Holders of Class 3 Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but unpaid interest and the impact of receiving New AEH Class A Common Units in respect of accrued but unpaid interest on their basis and holding period in their New AEH Class A Common Units.

## Consequences to U.S. Holders of Class 6 Interests

*Exchange by U.S. Holders of Class 6 Interests for New AEH Class B Common Units and New AEH Class C Common Units*

The exchange by a U.S. Holder of Class 6 Interests of its Class 6 Interests for New AEH Class B Common Units and New AEH Class C Common Units is expected to be treated as a tax free transaction for U.S. federal income tax purposes under Section 721 of the Internal Revenue Code. A U.S. Holder of Class 6 Interests should have a tax basis in the New AEH Class B Common Units and New AEH Class C Common Units equal its tax basis in the Class 6 Interests. A U.S. Holder of Class 6 Interests should have a holding period in the New AEH Class B Common Units and New AEH Class C Common Units that includes the holding period for the Class 6 Interests surrendered therefor.

## Consequences to U.S. Holders of Ongoing Ownership of New AEH Common Units

The following is a summary of certain U.S. federal tax consequences that will apply to you if you are a U.S. Holder of New AEH Common Units.  Tax-exempt U.S. Holders and non-U.S. Holders are not addressed in this discussion, and such holders should consult their own tax advisor regarding the ownership of New AEH Common Units and whether such ownership is appropriate given their circumstances.

*General*

Reorganized AEH will be a Delaware limited liability company and is intended to be treated as a partnership for U.S. federal income tax purposes.  If Reorganized AEH were to be a "publicly traded partnership" (as determined for U.S. federal income tax purposes), it could be taxable as a corporation unless it satisfied certain income requirements.  Reorganized AEH is not expected to be a publicly traded partnership, and the New AEH Operating Agreement will include restrictions on transfers of New AEH Common Units if such transfer would (i) cause Reorganized AEH to be taxed as an association taxable as a corporation for federal or applicable state income tax purposes or (ii) cause Reorganized AEH to fail to meet either the "private placement" safe harbor or another safe harbor from treatment as a "publicly traded partnership" as described in U.S. Treasury Regulations Section 1.7704-1.  An organization that is classified as a partnership for U.S. federal income tax purposes is generally not subject to U.S. federal income tax itself, although it must file an annual information return and the partnership may be subject to liability for adjustments to the partnership's tax returns in certain circumstances absent an election to the contrary.

Each U.S. Holder of New AEH Common Units will be required to take into account, as described below, its distributive share of each item of Reorganized AEH's income, gain, loss, deduction and credit for each taxable year of Reorganized AEH ending with or within the U.S. Holder's taxable year. Generally, each item will have the same character and the same source (either U.S. or foreign), as though the U.S. Holder realized the item directly. U.S. Holders must report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized AEH for such taxable year.

Taxable income allocated to a U.S. Holder may exceed cash distributions, if any, made to such U.S. Holder, in which case such U.S. Holder would have to satisfy tax liabilities arising from its interest in Reorganized AEH from such U.S. Holder's own funds.

The accruing liquidation preference of the New AEH Class A Common Units may be treated as a guaranteed payment to U.S. Holders for U.S. federal income tax purposes. Any guaranteed payments would give rise to ordinary income. Recently proposed U.S. Treasury Regulations would, if finalized, treat certain guaranteed payments as payments of interest and limit the deductibility of such payments by members of Reorganized AEH. Such regulations are not effective until made final and there can be no assurance when, or if, such regulations will be made final. Taxpayers should consult their tax advisors regarding the consequences of such treatment.

*Market Discount*

Under the "market discount" provisions of Sections 1276 through 1278 of the Internal Revenue Code, some or all of any gain realized by a U.S. Holder of debt instruments on sale or disposition of those instruments may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the exchanged debt. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder of that instrument has an adjusted tax basis in the debt instrument of less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

The application of the "market discount" rules to New AEH Common Units received in a tax-free exchange for a debt instrument acquired with "market discount" is uncertain. U.S. Holders who receive New AEH Common Units in exchange for debt instruments acquired with "market discount" should consult their tax advisors.

*Intangible Drilling Costs*

Reorganized AEH may elect to deduct current intangible drilling costs ("**IDCs**") incurred in connection with the development of its oil and gas properties.  Upon the sale of any oil and gas properties by Reorganized AEH, a portion of gain realized will be treated as ordinary income to the extent any IDC has previously been deducted.

*Depletion*

Holders of economic interests in oil and gas wells are permitted to deduct a reasonable allowance for depletion equal to the greater of cost depletion (calculated as a unit of production method of cost recovery) or percentage depletion (generally 15% of gross income from the wells). In the case of investments by an entity treated as a partnership, the depletion allowance is computed separately by the partners and not by the partnership. Accordingly, the determination of which depletion method will apply to a U.S. Holder of the New AEH Common Units (the cost method or percentage method) will be made separately by each U.S. Holder. To enable each U.S. Holder of the New AEH Common Units to compute its depletion allowance, each U.S. Holder will be allocated its proportionate share of the adjusted tax basis in each oil and gas property which will be used by such U.S. Holder in calculating the depletion deductions and any gain or loss on the sale of property by Reorganized AEH. U.S. Holders of the New AEH Common Units that have more than 1,000 barrels of oil production per day (or gas equivalent) or that are engaged in refining or retailing activities may not qualify for percentage depletion and should consult their tax advisors.

*Basis*

The tax basis of a U.S. Holder in its New AEH Common Units should equal its tax basis in its Class 3 Claims (except with respect to any New AEH Common Units attributable to accrued but unpaid interest as discussed above in "Consequences to U.S. Holders of Class 3 Claims-Accrued but Unpaid Interest") or Class 6 Interests surrendered therefor, plus the share of Reorganized AEH's liabilities allocated to such U.S. Holder. That basis will be increased by such U.S. Holder's share of Reorganized AEH's income and by any increases in such U.S. Holder's share of Reorganized AEH's liabilities. That basis will be decreased, but not below zero, by distributions from Reorganized AEH, by the U.S. Holder's share of Reorganized AEH's losses, by any decreases in its share of Reorganized AEH's liabilities and by such U.S. Holder's share of Reorganized AEH's expenditures that are not deductible in computing taxable income and are not required to be capitalized. Reorganized AEH's members should consult their tax advisors to determine their tax basis in the New AEH Common Units.

*Distributions*

Distributions of cash (including, in certain circumstances, distributions of certain "marketable securities" treated as cash distributions) from Reorganized AEH to a U.S. Holder in any year will reduce the adjusted tax basis of the U.S. Holder's New AEH Common Units by the amount of such cash distribution. To the extent such distributions exceed the adjusted basis of a U.S. Holder's New AEH Common Units, such U.S. Holder will be treated as having recognized gain from the sale or exchange of such New AEH Common Units. In general, distributions (other than liquidating distributions) of property other than cash will reduce the adjusted basis (but not below zero) of a U.S. Holder's New AEH Common Units by the amount of Reorganized AEH's adjusted basis in such property immediately before its distribution but will not result in the realization of taxable income to the U.S. Holder.

*Limitations on Losses*

While Reorganized AEH is not intended as a "tax shelter," it is possible that losses and expenses could exceed Reorganized AEH's income and gain in a given year. The ability of a U.S. Holder to deduct such a net loss from its taxable income from other sources may be subject to a number of limitations under the Internal Revenue Code. These limitations include the basis limitations under Section 704 of the Internal Revenue Code and for certain U.S. Holders, such as individuals, the "at risk" rules of Section 465 of the Internal Revenue Code, and the limitations on miscellaneous itemized deductions under Section 67 of the Internal Revenue Code. Additionally, individuals will be subject to limitations on interest deductions under Section 163 of the Internal Revenue Code and the limitations on passive activity losses of Section 469 of the Internal Revenue Code. Further, Section 470 of the Internal Revenue Code may limit losses allocated to members by Reorganized AEH if Reorganized AEH leases property to tax-exempt lessees in certain circumstances.

*Sale or Disposition of New AEH Common Units*

A U.S. Holder that sells or otherwise disposes of New AEH Common Units in a taxable transaction generally will recognize gain or loss equal to the difference, if any, between the adjusted tax basis of the New AEH Common Units and the amount realized from the sale or disposition. The amount realized will include the member's share of Reorganized AEH's liabilities outstanding at the time of the sale or disposition. If the U.S. Holder holds the New AEH Common Units as a capital asset, such gain or loss will generally be treated as capital gain or loss to the extent a sale of assets by Reorganized AEH would qualify for such treatment and will generally be long-term capital gain or loss if the U.S. Holder had held the New AEH Common Units for more than one year on the date of such sale or disposition, provided, that a capital contribution by the U.S. Holder within the one-year period ending on such date may cause part of such gain or loss to be short-term. Gain from the sale or other disposition of New AEH Common Units will be treated as ordinary income to the extent of the U.S. Holder's distributive share of any "unrealized receivables" and "inventory items." In addition, if the capital contribution of a new U.S. Holder is distributed to the members (other than such new U.S. Holder), for U.S. federal income tax purposes, such distributions will likely be treated as a taxable sale of a portion of their interests by members receiving such distributions. Long-term capital gain of individuals are generally taxed at reduced rates, but could be taxed at a rate of 25% to the extent any of such gain is attributable to depreciation that is not recaptured as ordinary income.

In the event of a sale or other transfer of New AEH Common Units at any time other than the end of Reorganized AEH's taxable years, the share of income and losses of Reorganized AEH for the year of transfer attributable to the interest transferred will be allocated for U.S. federal income tax purposes between the transferor and the transferee on either an interim closing-of-the-books basis or pro rata basis reflecting the respective periods during such year that each of the transferor and the transferee owned the interest.

*Information Reporting and Backup Withholding*

In general, information reporting will apply to allocations of income in respect of New AEH Common Units and the proceeds from the sale, exchange or redemption of New AEH

Common Units that are paid to a U.S. Holder within the United States (and in certain cases, outside the United States), unless such U.S. Holder is an exempt recipient such as a corporation. A backup withholding tax (currently at a 24% rate) generally applies if a U.S. Holder of New AEH Common Units (i) fails to furnish its social security number or other taxpayer identification number ("**TIN**"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct TIN and that it is a U.S. person not subject to backup withholding. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules will be allowed as a refund or as a credit against your U.S. federal income tax liability provided the required information is timely furnished to the IRS.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. FEDERAL, STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**XI.**
**CONCLUSION AND RECOMMENDATION**

**THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR, ITS ESTATE, ITS CREDITORS AND ITS OTHER STAKEHOLDERS, INCLUDING THE VOTING PARTIES. FOR THESE REASONS, THE DEBTOR URGES ALL VOTING CLASSES TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL ACTUALLY BE RECEIVED BY THE VOTING AGENT ON OR BEFORE 5:00 P.M. (PREVAILING EASTERN TIME) ON JANUARY 31, 2019. THE DEBTOR REITERATES THAT, GIVEN THE CONDENSED TIMELINE OF THIS CASE, ALL VOTING CLASSES ARE URGED TO RETURN THEIR BALLOTS AS PROMPTLY AS PRACTICABLE.**

**ARSENAL ENERGY HOLDINGS LLC**

/s/ Jonathan D. Farmer

Name:    Jonathan D. Farmer
Title:    Chief Executive Officer

DATED: January 9, 2019

**Exhibit A**

**Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
In re:                                   :
                                         : Chapter 11
                                         :
ARSENAL ENERGY HOLDINGS LLC,             : Case No. 19-[_____] ([__])
                                         :
            Debtor.¹                     :
                                         :
-----------------------------------------------------------x
```

## PRE-PACKAGED PLAN OF REORGANIZATION
## OF ARSENAL ENERGY HOLDINGS LLC

Dated: January 9, 2019

SIMPSON THACHER & BARTLETT LLP
Michael H. Torkin, Esq.
Kathrine A. McLendon, Esq.
Nicholas E. Baker, Esq.
425 Lexington Avenue
New York, NY 10017
T: (212) 455-2000
F: (212) 455-2502

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan, Esq. (No. 3650)
Kara Hammond Coyle, Esq. (No. 4410)
Ashley E. Jacobs, Esq. (No. 5635)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
T: (302) 571-6600
F: (302) 571-1253

*Proposed Counsel to Debtor and Debtor in Possession*

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTOR'S FILING FOR CHAPTER 11 BANKRUPTCY.**

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6279. The Debtor's address is 6031 Wallace Road Ext., Suite 3000, Wexford, Pennsylvania, PA 15090.

# TABLE OF CONTENTS

Page

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS.....................................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law...........2

    B.    Definitions.........................................................................................................2

ARTICLE II. TREATMENT OF UNCLASSIFIED CLAIMS ....................................12

    A.    Administrative Claims ...................................................................................12

    B.    Priority Tax Claims........................................................................................12

    C.    Statutory Fees.................................................................................................13

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND EQUITY INTERESTS ....................................................................13

    A.    Introduction....................................................................................................13

    B.    Summary of Classification and Treatment of Classified Claims and
Equity Interests .............................................................................................13

    C.    Classification and Treatment of Claims and Equity Interests...................13

    D.    Special Provisions Regarding Unimpaired Claims....................................16

    E.    Subordinated Claims .....................................................................................16

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ...........................17

    A.    Presumed Acceptance of the Plan ...............................................................17

    B.    Deemed Rejection of the Plan......................................................................17

    C.    Voting Classes ...............................................................................................17

    D.    Acceptance by Impaired Classes of Claims and Equity Interests.............17

    E.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code........17

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ........................17

    A.    Corporate and Organizational Existence; Reorganized Capital
Structure and the New AEH Common Units...............................................17

    B.    Organizational Documents of the Reorganized Debtor.............................18

    C.    Managers, Directors and Officers of Reorganized Debtor;
Corporate Governance ..................................................................................18

    D.    Issuance of New Securities and Related Documents..................................18

    E.    Management Incentive Plan...........................................................................19

    F.    Restructuring Transactions ...........................................................................19

    G.    Vesting of Assets in the Reorganized Debtor ............................................19

    H.    Release of Liens, Claims and Equity Interests...........................................20

I.       Cancellation of Stock, Certificates, Instruments and Agreements ........... 20

J.       Preservation and Maintenance of Debtor Causes of Action .................... 20

K.     Exemption from Certain Transfer Taxes ................................................. 21

L.      Distributions ............................................................................................ 21

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ....................................................................................................... 21

A.     Assumption of Executory Contracts and Unexpired Leases.................... 21

B.     Cure of Defaults for Assumed Executory Contracts and Unexpired
Leases ...................................................................................................... 22

C.     Assumption of Insurance Policies ........................................................... 23

D.     Indemnification ........................................................................................ 23

E.     Reservation of Rights ............................................................................... 23

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS............................ 24

A.     Distribution Record Date ......................................................................... 24

B.     Dates of Distributions ............................................................................. 24

C.     Distribution Agent .................................................................................. 24

D.     Cash Distributions................................................................................... 24

E.     Allocation Between Principal and Interest ............................................. 25

F.     Withholding Taxes................................................................................... 25

G.     Surrender of Canceled Instruments or Securities.................................... 25

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........... 25

A.     Conditions to Effective Date................................................................... 25

B.     Waiver of Conditions .............................................................................. 26

ARTICLE IX. RETENTION OF JURISDICTION................................................. 26

A.     Retention of Jurisdiction ......................................................................... 26

B.     Failure of Bankruptcy Court to Exercise Jurisdiction............................. 28

ARTICLE X. EFFECTS OF CONFIRMATION ..................................................... 28

A.     General Settlement of Claims ................................................................. 28

B.     Binding Effect......................................................................................... 28

C.     Discharge of the Debtor .......................................................................... 28

D.     Exculpation and Limitation of Liability ................................................. 29

E.     Releases by the Debtor............................................................................ 29

F.     Releases by Holders of Claims and Equity Interests. .............................. 30

G.     Injunction ............................................................................................... 32

H.     Protection Against Discriminatory Treatment ......................................... 33

ARTICLE XI. MISCELLANEOUS PROVISIONS ................................................................. 33

    A.       Modification of Plan .............................................................. 33

    B.       Revocation of Plan ................................................................. 34

    C.       Severability of Plan Provisions .............................................. 34

    D.       Successors and Assigns .......................................................... 34

    E.       Term of Injunctions or Stays ................................................. 35

    F.       Reservation of Rights ............................................................ 35

    G.      Notices ................................................................................... 35

    H.      Governing Law ...................................................................... 36

    I.        Exhibits .................................................................................. 36

    J.       Conflicts ................................................................................ 36

    K.      Immediate Binding Effect ...................................................... 37

    L.       Entire Agreement ................................................................... 37

    M.     Reservation of Rights ............................................................ 37

PRE-PACKAGED PLAN OF REORGANIZATION OF
ARSENAL ENERGY HOLDINGS LLC

## INTRODUCTION

Arsenal Energy Holdings LLC, a Delaware limited liability company, as the Debtor,[2] hereby proposes the Plan for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (distributed contemporaneously herewith) for a discussion of the Debtor's history, business, properties, and projections and the events leading up to Solicitation of the Plan and for a summary of the treatment provided for herein. The Debtor urges all Holders of Claims and Equity Interests entitled to vote on the Plan to review the Disclosure Statement and the Plan in full before voting to accept or reject the Plan. There may be other agreements and documents that will be filed with the Bankruptcy Court that are referenced in the Plan as Exhibits. All such Exhibits are incorporated into and are a part of the Plan as if set forth in full herein. Subject to certain restrictions set forth in the Plan, and the requirements set forth in 11 U.S.C. § 1127 and Bankruptcy Rule 3019, the Debtor reserves the right to amend, supplement, amend and restate, modify, revoke or withdraw the Plan prior to the Effective Date.

---

[2]    Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I.B of the Plan.

# ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

**A.    Rules of Interpretation, Computation of Time and Governing Law**

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections hereof; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (j) "$" or "dollars" means dollars in lawful currency of the U.S.; (k) any effectuating provisions may be interpreted by the Debtor or the Reorganized Debtor in a manner consistent with the overall purpose and intent of the Plan, all without further notice to or action, order, or approval of the Bankruptcy Court or any other entity, and, to the extent of any dispute with respect thereto, the Bankruptcy Court shall retain jurisdiction consistent with <u>Article IX</u>; and (l) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

**B.    Definitions**

1.1    "**2014 Note and Warrant Purchase Agreement**" means that certain Note and Warrant Purchase Agreement dated as of July 29, 2014, among AEH and each of the Subordinated Noteholders party thereto.

1.2    "**2016A Note and Warrant Purchase Agreement**" means that certain Note and Warrant Purchase Agreement dated as of November 10, 2016 among AEH and each of the Subordinated Noteholders party thereto.

1.3     "**2016B Note and Warrant Purchase Agreement**" means that certain Note and Warrant Purchase Agreement dated as of December 22, 2016 among AEH and each of the Subordinated Noteholders party thereto.

1.4     "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtor's Estate and operating the Debtor's business, (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to and including the Effective Date, and (c) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code.

1.5     "**AEH**" means Arsenal Energy Holdings LLC, a Delaware limited liability company and formerly known as Mountaineer Energy Holdings, LLC.

1.6     "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.7     "**Allowed**" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest or any portion thereof that the Debtor or the Reorganized Debtor has assented to the validity of or that has been (a) allowed by a Final Order of the Bankruptcy Court, (b) allowed pursuant to the terms of the Plan, (c) allowed by agreement between the Holder of such Claim, on one hand and the Debtor or Reorganized Debtor, as applicable, on the other hand, or (d) allowed by a Final Order of a court in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Case had not been commenced.

1.8     "**ARH**" means Arsenal Resources Holdings LLC, a Delaware limited liability company and formerly known as Mountaineer Resources Holdings LLC.

1.9     "**Assumed Agreement**" means an Executory Contract or Unexpired Lease which has been assumed by the Debtor either pursuant to the terms of the Plan or pursuant to an order of the Bankruptcy Court.

1.10     "**Avoidance Actions**" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies arising under chapter 5 of the Bankruptcy Code.

1.11     "**Ballot**" means, with respect to a Holder of a Claim or Equity Interest in a Voting Class, the applicable voting form distributed to such Holder on which the Holder is to indicate, among other things, acceptance or rejection of the Plan in accordance with the instructions contained therein and make any other elections or representations required pursuant to the Plan or as described in the Disclosure Statement.

1.12     "**Bankruptcy Code**" means title 11 of the United States Code, as now in effect or hereafter amended.

1.13    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

1.14    "**Bankruptcy Rules**" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms and the Local Rules, in each case as amended from time to time and as applicable to the Chapter 11 Case or proceedings therein.

1.15    "**Business Day**" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York.

1.16    "**Cash**" means legal tender of the U.S. or the equivalent thereof.

1.17    "**Cause of Action**" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, cross-claim, counterclaim, or recoupment, and any claim on a contract or for a breach of duty imposed by law or in equity; (b) with respect to the Debtor, the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Action; and (f) any state law fraudulent transfer claim.

1.18    "**Chapter 11 Case**" means the case commenced by the Debtor under chapter 11 of the Bankruptcy Code on the Petition Date in the Bankruptcy Court.

1.19    "**Claim**" means a "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

1.20    "**Class**" means a category of Claims or Equity Interests classified under Article III of the Plan pursuant to section 1122 of the Bankruptcy Code.

1.21    "**Confirmation**" means the entry by the Bankruptcy Court of the Confirmation Order on the docket of the Chapter 11 Case, within the meanings of Bankruptcy Rules 5003 and 9021.

1.22    "**Confirmation Date**" means the date upon which Confirmation occurs.

1.23    "**Confirmation Hearing**" means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.24    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan and approving the Disclosure Statement entered pursuant to section 1129 of

the Bankruptcy Code substantially in the form filed with the Bankruptcy Court on the Petition Date and otherwise in form and substance reasonably satisfactory to the Debtor and the Required Consenting Subordinated Noteholders.

1.25    "**Consenting AEH Unitholders**" means entities that are members of AEH and holders of the Existing AEH Common Equity Interests that are party to the Subordinated Notes Transaction Support Letter.

1.26    "**Consenting Subordinated Noteholders**" means the Subordinated Noteholders that are party to the Subordinated Notes Transaction Support Letter and that have not breached their obligations thereunder.

1.27    "**Consenting Seller Noteholders**" means LR-Mountaineer Holdings, L.P. and such other Holders of Seller Notes party to the Seller Notes Transaction Support Letter.

1.28    "**Cure**" means the payment of Cash, or the distribution of other property or other action (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtor that the Debtor may assume under section 365(a) of the Bankruptcy Code.

1.29    "**Debtor**" means AEH, as debtor and debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.30    "**Disclosure Statement**" means that certain Disclosure Statement for the Pre-Packaged Plan of Reorganization of Arsenal Energy Holdings LLC, as may be amended, supplemented, amended and restated, or otherwise modified from time to time, and that is prepared and distributed in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and applicable non-bankruptcy law and otherwise in form and substance reasonably satisfactory to the Required Consenting Subordinated Noteholders.

1.31    "**Distribution Agent**" means Reorganized AEH or any party designated by Reorganized AEH to serve as distribution agent under the Plan.

1.32    "**Distribution Record Date**" means the Confirmation Date.

1.33    "**D&O Liability Insurance Policies**" means all insurance policies (including any "tail policy") for liability of the current or former managing members, members, managers, directors, and officers maintained by the Debtor as of the Petition Date or thereafter.

1.34    "**Effective Date**" means the date on which a notice of effectiveness is filed with the Bankruptcy Court confirming that (a) all conditions in Article VIII.A of the Plan have been satisfied or waived as provided for in Article VIII.B and (b) consummation of the Restructuring Transactions has occurred.

1.35    "**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

1.36    "**Equity Interest**" means all outstanding ownership interests in the Debtor, including any interest evidenced by common or preferred stock, a limited liability company or other membership or partnership interest or unit, a warrant, an option, or any other right to acquire or otherwise receive any ownership interest in the Debtor, or any right to payment or compensation based upon any such interest, whether or not such interest is owned by the Holder of such right to payment or compensation.

1.37    "**Estate**" means the estate of the Debtor in the Chapter 11 Case, as created under section 541 of the Bankruptcy Code.

1.38    "**Exchange Act**" means the Securities Exchange Act of 1934, as now in effect or hereafter amended, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder.

1.39    "**Exchange Agreement**" means the Exchange Agreement in the form attached to this Plan as Exhibit A, as may be amended, supplemented or modified in accordance with the terms thereof.

1.40    "**Exculpated Parties**" means, (a) the Debtor, (b) the Reorganized Debtor and (c) all current and former officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents, managers, managing members, principals and other representatives of the Debtor in their capacity as such.

1.41    "**Executory Contract**" means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.42    "**Exhibit**" means an exhibit annexed to the Plan or as an exhibit or appendix to the Disclosure Statement (as such exhibits may be amended, supplemented, amended and restated, or otherwise modified from time to time).

1.43    "**Existing AEH Common Equity Interests**" means the existing Equity Interests in AEH consisting of the common Units (as defined in the Existing AEH Operating Agreement).

1.44    "**Existing AEH Operating Agreement**" means the Amended and Restated Operating Agreement of AEH, dated as of October 14, 2014, as in effect on the Petition Date.

1.45    "**Existing AEH Other Equity Interests**" means any Equity Interests in AEH other than the Existing AEH Common Equity Interests.

1.46    "**Final Order**" means an order or judgment of the Bankruptcy Court or another court of competent jurisdiction as to which no stay has been entered and either the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtor or the Reorganized Debtor, as applicable, or, in the event that an appeal, writ of

certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been affirmed, or otherwise not vacated, or such appeal, writ of certiorari, new trial, reargument, or rehearing shall have been denied, in each case, by the highest court to which such appeal, writ of certiorari, new trial, reargument, or rehearing had been sought and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

1.47    "**FRMH**" means FR Mountaineer Keystone Holdings LLC.

1.48    "**General Unsecured Claim**" means any Claim against the Debtor that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Professional Fee Claim, Seller Note Claim, Subordinated Note Claim, Other Secured Claim or Intercompany Claim.

1.49    "**Governmental Unit**" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

1.50    "**Holder**" means an Entity holding a Claim against, or Equity Interest in, the Debtor as of the applicable date of determination.

1.51    "**Impaired**" means, with respect to a Claim, Equity Interest or Class of Claims or Equity Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

1.52    "**Indemnification Agreement**" means any organizational or employment and/or service agreement of or with the Debtor and currently in place that provides for the indemnification of any current or former managing member, member, manager, director, officer or employee of the Debtor.

1.53    "**Intercompany Claim**" means any Claim by an Affiliate of the Debtor against the Debtor.

1.54    "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

1.55    "**Joint Development Agreement**" means the Joint Development Agreement, dated December 21, 2018, between Arsenal Resources Development LLC and IOG Resources, LLC.

1.56    "**Lien**" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

1.57    "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.58    "**MIP**" means a management incentive plan to be adopted by the New AEH Board immediately after the Effective Date, which shall include the issuance of New AEH Profits Interests Units.

1.59    "**New AEH Board**" means Reorganized AEH's initial board of managers as selected in accordance with the New AEH Operating Agreement.

1.60    "**New AEH Class A Common Units**" means Class A common units of Reorganized AEH to be issued pursuant to the Exchange Agreement, which shall have the rights and obligations set forth in the New AEH Operating Agreement.

1.61    "**New AEH Class B Common Units**" means Class B common units of Reorganized AEH to be issued pursuant to the Exchange Agreement, which shall have the rights and obligations set forth in the New AEH Operating Agreement.

1.62    "**New AEH Class C Common Units**" means Class C common units of Reorganized AEH to be issued pursuant to the Exchange Agreement, which shall have the rights and obligations set forth in the New AEH Operating Agreement.

1.63    "**New AEH Common Units**" means, collectively, (a) the New AEH Class A Common Units (b) the New AEH Class B Common Units and (c) the New AEH Class C Common Units, as applicable.

1.64    "**New AEH Operating Agreement**" means the limited liability company operating agreement of Reorganized AEH, as amended and restated on the Effective Date pursuant to the Plan and the Exchange Agreement, substantially in the form attached to this Plan as Exhibit B.

1.65    "**New AEH Profits Interests**" means the Profits Interest Units as defined in the New AEH Operating Agreement.

1.66    "**Non-Debtor Subsidiaries**" means, collectively, each of the direct and indirect subsidiaries of the Debtor.

1.67    "**Other Priority Claim**" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

1.68    "**Other Secured Claim**" means any Secured Claim against the Debtor other than a Seller Note Claim.

1.69    "**Person**" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association or other Entity, whether acting in an individual, fiduciary or other capacity.

1.70    "**Petition Date**" means the date on which the Debtor filed its petition for relief commencing the Chapter 11 Case.

1.71    "**Plan**" means, collectively, this pre-packaged plan of reorganization, the Exhibits, all supplements, appendices, and schedules hereto, either in their present form or as the same may be amended, supplemented, amended and restated, or otherwise modified from time to time.

1.72    "**Preference Actions**" means any and all avoidance, recovery or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under section 547 of the Bankruptcy Code.

1.73    "**Priority Tax Claim**" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.74    "**Professional**" means: (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

1.75    "**Professional Claims Bar Date**" means thirty (30) days after the Effective Date.

1.76    "**Professional Fee Claim**" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or reimbursement of costs, expenses or other charges incurred by Professionals after the Petition Date and prior to and including the Effective Date.

1.77    "**Pro Rata**" means, at any time, the proportion that the face amount of a Claim or Equity Interest in a particular Class bears to the aggregate face amount of all Claims or Equity Interests in that Class, unless the Plan provides otherwise.

1.78    "**Reinstated**" or "**Reinstatement**" means leaving a Claim unimpaired under the Plan pursuant to section 1124(a)(2) of the Bankruptcy Code.

1.79    "**Related Parties**" means, with respect to an Entity, collectively, its direct and indirect affiliates, and its and its respective affiliates' current and former equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, financial advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, financial advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives, each in their capacity as such).

1.80    "**Released Parties**" means, collectively, in each case solely in their respective capacities as such: (a) the Debtor, (b) the Reorganized Debtor, (c) the Non-Debtor Subsidiaries, (d) the Consenting Subordinated Noteholders, (e) the Holders of the Seller Notes and (f) each of the Related Parties of the Entities in the foregoing (a)-(e); *provided, however*, that any Holder of a Claim or Equity Interest in a voting class that "opts out" of the releases provided

in the Plan on its Ballot or any such Holder in a non-voting class that timely objects to the releases shall not be included in the definition of "Released Parties."

1.81    "**Releasing Parties**" means, collectively, in each case solely in their respective capacities as such: (a) the Debtor, (b) the Reorganized Debtor, (c) the Non-Debtor Subsidiaries, (d) the Subordinated Noteholders, (e) the Holders of the Seller Notes, (f) each of the Related Parties of the Entities in the foregoing (a)-(e) and (g) those Holders of Claims or Equity Interests (i) who vote to accept the Plan, (ii) who are Unimpaired under the Plan and do not timely object to the releases provided herein, (iii) whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and do not opt out of granting the releases herein, or (iv) who vote to reject the Plan but do not opt out of granting the releases herein. Notwithstanding anything to the contrary herein, neither IOG Resources, LLC nor any Related Party with respect to IOG Resources, LLC, in its capacity as such, shall constitute a Releasing Party for any purpose under the Plan.

1.82    "**Reorganized**" means, in reference to the Debtor, the Debtor from and after the Effective Date.

1.83    "**Reorganized Debtor Governance Documents**" means the New AEH Operating Agreement and any other applicable organizational or governance documents of the Reorganized Debtor.

1.84    "**Required Consenting Subordinated Noteholders**" means, at any time, Consenting Subordinated Noteholders holding at least 66⅔% in principal amount of the Subordinated Notes at the time outstanding (exclusive of Subordinated Notes then owned by the Debtor or its Subsidiaries).

1.85    "**Restructuring Transactions**" means the restructuring transactions for the Debtor, in accordance with, and subject to the terms and conditions set forth in, the Plan and the Exchange Agreement.

1.86    "**Schedule of Proposed Cure Amounts**" means that schedule of proposed Cure amounts, if any, to be paid on account of each Assumed Agreement, which is attached to this Plan as Exhibit C.

1.87    "**Secured Claim**" means a Claim that is secured by a Lien on property in which the Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.88    "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder.

1.89    "**Seller Note Agent**" means LR-Mountaineer Holdings, L.P., or any successor as the collateral agent under the Collateral Agreement (as defined in the Seller Note).

1.90    "**Seller Note Claims**" means any Claims arising under or related to the Seller Notes.

1.91    "**Seller Note Documents**" means the Seller Notes and the Collateral Agreement, the Guaranty Agreement, the Collateral Agency Agreement and the Subordination Agreement (as such terms are defined in the Seller Notes).

1.92    "**Seller Notes**" means the Seller Notes originally issued by AEH to (a) LR-Mountaineer Holdings, L.P. and (b) PDC Energy, Inc., which were subsequently assigned by PDC Energy, Inc. to affiliates of or funds managed by Chambers Energy Management LP, each dated as of October 14, 2014, and each issued in the original principal amount of $39,047,625.

1.93    "**Seller Notes Transaction Support Letter**" means the letter agreement, dated as of December 21, 2018, among AEH, ARH, LR-Mountaineer Holdings, L.P. and the other Holders of Seller Notes party thereto.

1.94    "**Solicitation**" means the Debtor's formal request for acceptances of the Plan, consistent with sections 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.

1.95    "**Subordinated Note Claims**" means any Claims arising under or related to the Subordinated Notes and the Subordinated Note Purchase Agreement.

1.96    "**Subordinated Note Purchase Agreement**" means, collectively, (a) the 2014 Note and Warrant Purchase Agreement, (b) the 2016A Note and Warrant Purchase Agreement and (c) the 2016B Note and Warrant Purchase Agreement.

1.97    "**Subordinated Noteholder**" means a Holder of the Subordinated Notes.

1.98    "**Subordinated Notes**" means the subordinated notes issued pursuant to the Subordinated Note Purchase Agreement in the original aggregate principal amount of approximately $530,000,000.

1.99    "**Third Party Released Claims**" shall have the meaning set forth in Article III.D of the Plan.

1.100   "**Subordinated Notes Transaction Support Letter**" means the letter agreement, dated as of December 21, 2018, among AEH, ARH, each of the Consenting Subordinated Noteholders and each of the Consenting AEH Unitholders.

1.101   "**Unexpired Lease**" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.102   "**Unimpaired**" means any Claim or Equity Interest that is not designated as Impaired.

1.103   "**Unimpaired Claim**" means Administrative Claims, Priority Tax Claims and any Claim arising prior to the Effective Date in Class 1, 2, 4 or 5 of the Plan.

1.104   "**U.S.**" means the United States of America.

1.105   "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

1.106   "**Voting Classes**" means collectively, Classes 3 and 6.

1.107   "**Voting Record Date**" means the date for determining which Holders are entitled to receive the Disclosure Statement and vote to accept or reject the Plan, as applicable, which date is January 8, 2019 for all Holders of Claims and Equity Interests in the Voting Classes.

## ARTICLE II.

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

### A.    Administrative Claims

Subject to subparagraph (i) below, in full and complete satisfaction, settlement, discharge and release of each Allowed Administrative Claim, except to the extent that a Holder of such Allowed Administrative Claim and either (x) the Debtor, or (y) the Reorganized Debtor, as applicable, agree in writing to less favorable treatment, the Debtor or Reorganized Debtor, as applicable, shall pay to each Holder of an Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim on, or as soon thereafter as is reasonably practicable (a) the Effective Date or, if payment is not then due, (b) on the due date of such Allowed Administrative Claim; *provided*, *however*, that Administrative Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(i)    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must file and serve on the Reorganized Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date. The reasonable and documented professional fees and expenses of Cleary Gottlieb Steen & Hamilton LLP and one local counsel, counsel to certain of the Consenting Subordinated Noteholders, incurred prior to the Petition Date and thereafter up to the Effective Date shall paid by the Debtor or the Reorganized Debtor on or immediately following the Effective Date without the need for filing any fee application or approval by the Bankruptcy Court.

**B.**      **Priority Tax Claims**

On the Effective Date, each Holder of an Allowed Priority Tax Claim will, as determined by the Debtor, or the Reorganized Debtor, as applicable, be satisfied in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

**C.**      **Statutory Fees**

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtor shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation pursuant to 28 U.S.C. § 1930(a)(6). On and after the Effective Date, to the extent the Chapter 11 Case remains open, and for so long as the Reorganized Debtor remains obligated to pay quarterly fees, the Reorganized Debtor shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtor or Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**ARTICLE III.**

**CLASSIFICATION AND TREATMENT OF
CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.**      **Introduction**

All Claims and Equity Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below in accordance with section 1123(a)(1) of the Bankruptcy Code. The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

**B.**      **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2. | Seller Note Claims | Unimpaired | Presumed to Accept |
| 3. | Subordinated Note Claims | Impaired | Entitled to Vote |
| 4. | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 5. | Intercompany Claims | Unimpaired | Presumed to Accept |
| 6. | Existing AEH Common Equity Interests | Impaired | Entitled to Vote |
| 7. | Existing AEH Other Equity Interests | Impaired | Deemed to Reject |

**C.      Classification and Treatment of Claims and Equity Interests**

(i)      Class 1 – Other Secured Claims.

         (1)      <u>Classification</u>: Class 1 consists of all Other Secured Claims. All Other Secured Claims are Allowed.

         (2)      <u>Treatment</u>: In full and final satisfaction, settlement, discharge and release of, and in exchange for, each Other Secured Claim, on the Effective Date, at the option of the Debtor, each Other Secured Claim shall be (i) paid in full in Cash, (ii) Unimpaired and Reinstated or (iii) treated on such other terms as either the Debtor or the Reorganized Debtor, as applicable, and the Holder thereof may agree.

         (3)      <u>Impairment and Voting</u>: Class 1 is Unimpaired by the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

(ii)     Class 2 – Seller Note Claims.

         (1)      <u>Classification</u>: Class 2 consists of all Seller Note Claims. The Seller Note Claims are Allowed.

         (2)      <u>Treatment</u>: On the Effective Date, the Seller Note Claims and the Seller Note Documents shall be Unimpaired and Reinstated and shall remain in full force and effect. Notwithstanding anything to the contrary in the Plan, the Confirmation Order or any document executed or transaction entered into in connection with the Plan or the Restructuring Transactions, until Class 2 Claims have been paid in full in accordance with the terms of the Seller Notes and the Seller Note Documents, (a) the provisions of Articles V.G, V.H, X.C, X.E, X.F or X.G of the Plan shall not apply or take effect to such Class 2 Claims, (b) such Class 2 Claims shall not be deemed settled, satisfied, resolved, released, discharged or enjoined by any provision of the Plan and (c) the Reorganized Debtor shall remain liable for such Class 2 Claims.

         (3)      <u>Impairment and Voting</u>: Class 2 is Unimpaired by the Plan. Each Holder of a Seller Note Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of a Seller Note Claim is not entitled to vote to accept or reject the Plan.

(iii)    Class 3 – Subordinated Note Claims.

         (1)      <u>Classification</u>: Class 3 consists of all Subordinated Note Claims. The Subordinated Note Claims shall be Allowed in an aggregate principal amount of approximately $861 million, plus any accrued and unpaid interest thereon plus all other unpaid and outstanding obligations thereunder, as applicable and such Subordinated Note Claims shall not be subject to disallowance, setoff, recoupment, subordination (other than with respect to the Seller Notes pursuant to the Seller Note Documents),

recharacterization or reduction of any kind, including pursuant to Section 502(d) of the Bankruptcy Code.

(2)    <u>Treatment</u>:  In full and final satisfaction, settlement, discharge and release of, and in exchange for, each Subordinated Note Claim, on the Effective Date, each Holder of a Subordinated Note Claim shall be deemed party to the Exchange Agreement (regardless of whether such Holder has executed and delivered a signature page thereto), which Exchange Agreement shall become effective on the Effective Date and pursuant to which, among other rights and benefits, each Holder of a Subordinated Note Claim shall receive its Pro Rata share of 100% of the New AEH Class A Common Units.

(3)    <u>Impairment and Voting</u>: Class 3 is Impaired by the Plan. Each Holder of a Subordinated Note Claim is entitled to vote to accept or reject the Plan.

(iv)    Class 4 – General Unsecured Claims.

(1)    <u>Classification</u>: Class 4 consists of all General Unsecured Claims. All General Unsecured Claims are Allowed.

(2)    <u>Treatment</u>:  All General Unsecured Claims are Unimpaired by the Plan. At the option of the Debtor or the Reorganized Debtor, as applicable, (i) the Plan may leave unaltered the legal, equitable, and contractual rights of a Holder of a General Unsecured Claim, (ii) the Debtor or the Reorganized Debtor, as applicable, may pay such General Unsecured Claim in full in Cash on the Effective Date or as soon thereafter as is practicable, (iii) the Debtor or the Reorganized Debtor, as applicable, may pay such General Unsecured Claim in a manner agreed to by the Holder of such Claim, or (iv) the Plan may reinstate the legal, equitable, and contractual rights of the Holder of an General Unsecured Claim in accordance with section 1124(2) of the Bankruptcy Code.

(3)    <u>Impairment and Voting</u>: Class 4 is Unimpaired by the Plan. Each Holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of a General Unsecured Claim is not entitled to vote to accept or reject the Plan.

(v)    Class 5 – Intercompany Claims.

(1)    <u>Classification</u>: Class 5 consists of all Intercompany Claims. All Intercompany Claims are Allowed.

(2)    <u>Treatment</u>: Each Intercompany Claim shall be Reinstated and Unimpaired.

(3)    <u>Impairment and Voting</u>: Class 5 is Unimpaired by the Plan.  Each Holder of an Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Claim is not entitled to vote to accept or reject the Plan.

(vi)    Class 6 – Existing AEH Common Equity Interests.

(1)    <u>Classification</u>: Class 6 consists of all Existing AEH Common Equity Interests.  All Existing AEH Common Equity Interests are Allowed.

(2)    <u>Treatment</u>: In full and final satisfaction, settlement, discharge and release of, and in exchange for, each Existing AEH Common Equity Interest, on the Effective Date, the Holders of Existing AEH Common Equity Interests shall receive their Pro Rata share of 100% of the New AEH Class B Common Units in accordance with the schedule attached to the New AEH Operating Agreement, unless any such Holders elect less favorable treatment; *provided* that, in accordance with the right to elect less favorable treatment, ARH and FRMH, as Holders of Existing AEH Common Equity Interests, have elected to receive, and shall receive, their Pro Rata share of 100% of the New AEH Class C Common Units, in accordance with the schedule attached to the New AEH Operating Agreement.

(3)    <u>Impairment and Voting</u>: Class 6 is Impaired by the Plan. Each Holder of an Allowed Existing AEH Common Equity Interest is entitled to vote to accept or reject the Plan.

(vii)    Class 7 – Existing AEH Other Equity Interests.

(1)    <u>Classification</u>: Class 7 consists of all Existing AEH Other Equity Interests.

(2)    <u>Treatment:</u> On the Effective Date, all Existing AEH Other Equity Interests shall be cancelled, and Holders of Existing AEH Other Equity Interests shall receive no recovery under the Plan.

(3)    <u>Impairment and Voting</u>: Class 7 is Impaired by the Plan, and each Holder of an Existing AEH Other Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Existing AEH Other Equity Interest is not entitled to vote to accept or reject the Plan.

**D.    Special Provisions Regarding Unimpaired Claims**

The Debtor, the Reorganized Debtor and any other Entity shall retain all defenses, counterclaims, rights to setoff, and rights to recoupment, if any, as to Unimpaired Claims. Holders of Unimpaired Claims shall not be required to file a proof of claim with the Court and shall retain all their rights under applicable non-bankruptcy law to pursue their Unimpaired Claims in any forum with jurisdiction over the parties. Notwithstanding anything to the contrary in the Plan, each Holder of an Allowed Other Secured Claim, Allowed General Unsecured Claim, or Allowed Intercompany Claim shall be entitled to enforce its rights in respect of such Unimpaired Claim against the Debtor or the Reorganized Debtor, as applicable, until such Unimpaired Claim has been either (a) paid in full (i) on terms agreed to between the Holder of such Unimpaired Claim and the Debtor or the Reorganized Debtor, as applicable, or (ii) in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction.  If the Debtor or the Reorganized Debtor dispute any Unimpaired Claim,

such dispute shall be determined, resolved or adjudicated pursuant to applicable non-bankruptcy law.

**E.    Subordinated Claims**

Pursuant to section 510 of the Bankruptcy Code, the Debtor or the Reorganized Debtor, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**A.    Presumed Acceptance of the Plan**

Classes 1, 2, 4 and 5 are Unimpaired by the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**B.    Deemed Rejection of the Plan**

Class 7 is Impaired by the Plan and is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.    Voting Classes**

Each Holder of an Allowed Claim or Allowed Equity Interest in the Voting Classes as of the applicable Voting Record Date is entitled to vote to accept or reject the Plan.

**D.    Acceptance by Impaired Classes of Claims and Equity Interests**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.  Pursuant to section 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

**E.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtor may request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtor, with the consent of the Required Consenting Subordinated Noteholders, reserves the right to modify the Plan or the Disclosure Statement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

# ARTICLE V.

# MEANS FOR IMPLEMENTATION OF THE PLAN

## A.    Corporate and Organizational Existence; Reorganized Capital Structure and the New AEH Common Units

The Reorganized Debtor shall continue to exist, pursuant to its organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended by the Plan and pursuant to the Exchange Agreement, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date. To the extent such documents are amended on or prior to the Effective Date, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

On the Effective Date, the reorganized capital structure of Reorganized AEH shall consist of (i) the Seller Notes, (ii) New AEH Class A Common Units, (iii) New AEH Class B Common Units, (iv) New AEH Class C Common Units and (v) the New AEH Profits Interests Units and any other equity or other interests allocated pursuant to the MIP. The rights, priorities and restriction with respect to the New AEH Common Units shall be governed by the New AEH Operating Agreement.

At any time prior to the Effective Date, FRMH (or any of its designated affiliates) may contribute or otherwise transfer all or a portion of the Subordinated Notes held by FRMH (or such affiliates) to ARH and, following such transfer, ARH shall be deemed the Holder of such Subordinated Notes so transferred for all purposes hereunder.

## B.    Organizational Documents of the Reorganized Debtor

On the Effective Date, pursuant to the Exchange Agreement and the Plan, the New AEH Operating Agreement shall become effective and be deemed to amend and restate the Existing AEH Operating Agreement and each holder of New AEH Common Units shall be automatically deemed a party thereto and bound thereby in accordance with the terms of the Existing AEH Operating Agreement.  To the extent necessary, the organizational documents of the Reorganized Debtor will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, the Reorganized Debtor may amend and restate its certificate of incorporation, certificate of formation, limited liability company agreement, operating agreement, and bylaws, and other applicable organizational documents, as permitted by applicable law and pursuant to the terms contained therein.

## C.    Managers, Directors and Officers of Reorganized Debtor; Corporate Governance

The New AEH Board shall be selected in accordance with the New AEH Operating Agreement, effective as of the Effective Date. To the extent not previously disclosed, the Debtor will disclose prior to or at the Confirmation Hearing, the affiliations of each Person proposed to

serve on the New AEH Board or as an officer of the Reorganized Debtor, and, to the extent such Person is an insider other than by virtue of being a manager, director or officer, the nature of any compensation for such Person.

**D.        Issuance of New Securities and Related Documents**

On the Effective Date, Reorganized AEH will be authorized to, and will, issue and execute, as applicable, the New AEH Common Units and related documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity subject to the terms of the Exchange Agreement and the Reorganized Debtor Governance Documents. Reorganized AEH may also agree, in its sole discretion, with each Holder of the Subordinated Notes that the closing of the transactions contemplated by the Exchange Agreement with respect to such Holder's Subordinated Notes will be deemed to have occurred within 24 hours of the Closing (as defined in the Exchange Agreement).

The issuance and distribution of the New AEH Common Units will be made in reliance on the exemption from registration under the Securities Act provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, in each case to the extent applicable, and will be exempt from registration under applicable securities laws.

**E.        Management Incentive Plan**

The MIP shall be adopted by the New AEH Board immediately after the Effective Date in accordance with the New AEH Operating Agreement.

**F.        Restructuring Transactions**

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtor, and/or the Reorganized Debtor, as applicable, shall implement the Restructuring Transactions. The Debtor and/or the Reorganized Debtor, as applicable, shall take any actions, as agreed to by the Required Consenting Subordinated Noteholders, as may be necessary or appropriate to effect a restructuring of the Debtor's business or the overall organization or capital structure consistent with the terms of this Plan and the Exchange Agreement.  All matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, managing members, members, managers, directors, or officers of the Debtor (as of or prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law, the provisions of the Reorganized Debtor Governance Documents, and without any requirement of further action by the equity holders, managing members, members, managers, directors, or officers of the Debtor, or the need for any approvals, authorizations, actions or consents of any Person.

**G.        Vesting of Assets in the Reorganized Debtor**

Except as provided elsewhere in the Plan, or in the Confirmation Order, on or after the Effective Date, all property and assets of the Estate (including Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been

waived or released pursuant to the terms of the Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtor pursuant to the Plan, will vest in the Reorganized Debtor, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order, or the Reorganized Debtor Governance Documents.

## H.      Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, or Equity Interests in or against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens, Claims, or Equity Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtor such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtor and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

## I.      Cancellation of Stock, Certificates, Instruments and Agreements

On the Effective Date, all stock, units, instruments, certificates, agreements and other documents evidencing the Existing AEH Equity Interests and Existing AEH Other Equity Interests (if any) will be cancelled, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

## J.      Preservation and Maintenance of Debtor Causes of Action

(i)      Maintenance of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in Article X or elsewhere in the Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, on and after the Effective Date, the Reorganized Debtor shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding filed in the Chapter 11 Case.

(ii)    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan (including, and for the avoidance of doubt, the releases contained in Article X of the Plan) or any Final Order (including the Confirmation Order), or (B) subject to the discharge and injunction provisions in Article X of the Plan, and the Confirmation Order, in the case of each of clauses (A) and (B), the Debtor and the Reorganized Debtor, as applicable, expressly reserve such Cause of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order. No Entity may rely on the absence of a specific reference in the Plan, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it. The Debtor and the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

## K.    Exemption from Certain Transfer Taxes

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtor to the Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Such exemption under section 1146(a) of the Bankruptcy Code specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, Lien, or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the issuance, distribution, and/or sale of any of the New AEH Common Units and any other securities of the Debtor or the Reorganized Debtor; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

## L.    Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtor or Reorganized Debtor to make payments required pursuant to the Plan will be paid from the Cash balances of the Debtor, Reorganized Debtor or Non-Debtor Subsidiaries (subject to the terms of the Non-Debtor Subsidiaries' loan agreements). Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtor, as applicable, or any designated Affiliates of the Reorganized Debtor on its behalf.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

### A.    Assumption of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, or unless such Executory Contract or Unexpired Lease (1) expired or terminated pursuant to its own terms before the Effective Date or (2) is the subject of a motion to reject filed on or before the Effective Date, as of the Effective Date, the Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.

Without amending or altering any prior order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtor, and be enforceable by the Reorganized Debtor in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or conditions assumption, assignment or transfer. Any provision of any Assumed Agreement that permits a person to terminate or modify such agreement or to otherwise modify the rights of the Debtor or the Reorganized Debtor, as applicable, based on the filing of the Chapter 11 Case or the financial condition of the Debtor or the Reorganized Debtor, as applicable, shall be unenforceable. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtor's assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party or parties thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Assumed Agreement will revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure amount in Cash, on the later of (1) the Effective Date and (2) the date such payment is due pursuant to the terms of the Assumed Agreement, in the amount set forth on the Schedule of Proposed Cure Amounts, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. If an Executory Contract or Unexpired Lease is not listed on the Schedule of Proposed Cure Amounts, the proposed Cure amount for such Executory Contract or Unexpired Lease shall be zero dollars.

Any objection by a counterparty to the Cure amount associated with any Executory Contract or Unexpired Lease to be assumed pursuant to the Plan must be filed, served and actually received by the Debtor by no later than seven (7) days prior to the date of the Confirmation Hearing.[3] Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented thereto and will be deemed to have forever released and waived any objection to the proposed assumption or Cure amount. In the event of a dispute regarding (1) the Cure amount, (2) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the applicable Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. **Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.**

C.     **Assumption of Insurance Policies**

Notwithstanding anything in the Plan to the contrary, all of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtor shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including any obligations to obtain tail coverage liability insurance due to the change in control triggered on the Effective Date).  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of all such insurance policies, including the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtor under the Plan as to which no proof of claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors, and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

---

[3]     Immediately upon the commencement of the Chapter 11 Case, the Debtor will file any objections received by the Debtor prior to the commencement of the Chapter 11 Case on the Bankruptcy Court's docket on behalf of the objecting party.

## D.        Indemnification

The indemnification provisions in any Indemnification Agreement with respect to or based upon any act or omission taken or omitted by an indemnified party in such indemnified party's capacity under such Indemnification Agreement will be Reinstated (or assumed, as the case may be) and will survive effectiveness of the Plan.

## E.        Reservation of Rights

Except with respect to the Subordinated Notes Transaction Support Letter and the Seller Notes Transaction Support Letter, nothing contained in the Plan shall constitute an admission by the Debtor, Reorganized Debtor, or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtor or Reorganized Debtor have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized Debtor, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.        Distribution Record Date

Distributions hereunder to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Any transfers of Claims after the Distribution Record Date shall not be recognized for purposes of the Plan unless otherwise provided herein. Distributions to the Subordinated Noteholders shall be made in accordance with the Exchange Agreement and distributions to the Holders of Existing AEH Common Equity Interests shall be made in accordance with the Exchange Agreement and the New AEH Operating Agreement.

## B.        Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date. For the avoidance of doubt, Holders of Seller Note Claims are not subject to Article VII.B of the Plan.

## C.     Distribution Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent. All distributions to the Holders of the Subordinated Note Claims shall be made pursuant to the Exchange Agreement.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) empower professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as are necessary and proper to implement the provisions hereof. If the Distribution Agent is an entity other than the Reorganized Debtor, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

## D.     Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtor, except that Cash payments made to foreign Holders of Claims or Equity Interests, if any, may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## E.     Allocation Between Principal and Interest

Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest accrued through the Effective Date, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim). For the avoidance of doubt, Holders of Seller Note Claims are not subject to Article VII.E of the Plan.

## F.     Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities and shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate. From and as of the Effective Date, the Reorganized Debtor shall comply with all reporting obligations imposed on them by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. As a condition to receiving any distribution under the Plan, the Reorganized Debtor may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Reorganized Debtor to comply with applicable tax reporting and withholding laws.

Notwithstanding the foregoing, each Holder of an Allowed Claim or Allowed Equity Interest that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

### G.    Surrender of Canceled Instruments or Securities

Except as otherwise provided herein, as a condition precedent to receiving any distribution on account of its Allowed Claim or Allowed Equity Interest, each Holder of an Allowed Claim or Allowed Equity Interest in the Voting Classes based upon an instrument or other security shall be deemed to have surrendered such instrument, security or other documentation underlying such Claim or Equity Interest and all such surrendered instruments, securities and other documentation shall be deemed canceled pursuant to Article V.L of the Plan.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.    Conditions to Effective Date

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(i)    The Confirmation Order shall have been entered and shall not be subject to a stay.

(ii)    The Exchange Agreement shall be in full force and effect, all conditions to the effectiveness thereof shall have been satisfied or waived in accordance with the terms thereof (other than the occurrence of the Effective Date) and the Exchange Agreement shall be consummated contemporaneously with the satisfaction of the other conditions to the Effective Date.

(iii)    The Subordinated Notes Transaction Support Letter shall be in full force and effect as to (i) Holders of Subordinated Note Claims that hold at least 66.67% in amount and more than 50% in number of the Subordinated Note Claims that have accepted or rejected the Plan and (ii) Holders of Existing AEH Common Equity Interests that hold at least 66.67% in amount of Existing AEH Common Equity Interests that have accepted or rejected the Plan.

### B.    Waiver of Conditions

The conditions to the Effective Date of the Plan set forth in this Article VIII may be waived only if waived in writing by the Debtor and the Required Consenting Subordinated Noteholders; *provided*, that the condition requiring that the Confirmation Order shall have been entered by the Bankruptcy Court may not be waived.

# ARTICLE IX.

## RETENTION OF JURISDICTION

**A.      Retention of Jurisdiction**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor and the Plan as is legally permissible, including jurisdiction to:

(i)      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

(ii)      grant or deny any applications for allowance of Professional Fee Claims;

(iii)      resolve any matters related to the assumption of any Executory Contract or Unexpired Lease to which the Debtor is party;

(iv)      resolve any issues related to any matters adjudicated in the Chapter 11 Case;

(v)      ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

(vi)      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending in the Chapter 11 Case as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date; *provided*, that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

(vii)      resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, and all orders previously entered into by the Bankruptcy Court, or any Entity's obligations incurred in connection with the Plan;

(viii)      issue and enforce injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(ix)      enforce the terms and condition of the Plan and the Confirmation Order;

(x)      resolve any cases, controversies, suits or disputes with respect to the releases, the exculpations, the indemnification provisions and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to

-27-

implement, enforce, or determine the scope of all such releases, exculpations, injunctions and other provisions;

(xi)    enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xii)    resolve any cases, controversies, suits or disputes that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted or entered into in connection with the Plan or the Disclosure Statement;

(xiii)    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order previously entered by the Bankruptcy Court, including the Confirmation Order;

(xiv)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xv)    hear any other matter not inconsistent with the Bankruptcy Code; and

(xvi)    enter an order closing the Chapter 11 Case.

As of the Effective Date, notwithstanding anything in this <u>Article IX</u> to the contrary, the Exchange Agreement, the New AEH Operating Agreement, and the other Reorganized Debtor Governance Documents shall be governed by the respective jurisdictional provisions therein.

**B.    Failure of Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in <u>Article IX.A</u> of the Plan, the provisions of this <u>Article IX</u> shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**ARTICLE X.**

**EFFECTS OF CONFIRMATION**

**A.    General Settlement of Claims**

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a

finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, the Reorganized Debtor and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.

**B.    Binding Effect**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR, AND EACH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT ANY SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.**

**C.    Discharge of the Debtor**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, and effective as of the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests herein will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of its assets, property, or Estate; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtor's liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g), 502(h) or 502(i) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all Entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtor, the Debtor's Estate, the Reorganized Debtor, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

**D.    Exculpation and Limitation of Liability**

To the maximum extent permitted under applicable non-bankruptcy law, the Exculpated Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, filing, disseminating, implementing, administering, confirming or effecting the consummation of the Chapter 11 Case, the Plan, the Disclosure Statement, the Exchange Agreement, the Subordinated Notes Transaction Support Letter, the Seller Notes Transaction Support Letter, the New AEH Common Units, the Reorganized Debtor Governance Documents, or any other

contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement, or Confirmation or consummation of the Plan; *provided*, *however*, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted fraud, gross negligence, or willful misconduct, but in all respects each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.

**E.      Releases by the Debtor**

**NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE DEBTOR AND ITS ESTATE SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, WHETHER KNOWN OR UNKNOWN, ASSERTED OR UNASSERTED, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE LAWS OR OTHERWISE, INCLUDING AVOIDANCE ACTIONS, THOSE CAUSES OF ACTION BASED ON VEIL PIERCING OR ALTER-EGO THEORIES OF LIABILITY, CONTRIBUTION, INDEMNIFICATION, JOINT LIABILITY OR OTHERWISE THAT THE DEBTOR OR THE DEBTOR'S ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S RESTRUCTURING, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR DURING THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE SUBORDINATED NOTES TRANSACTION SUPPORT LETTER, THE SELLER NOTES TRANSACTION SUPPORT LETTER, THE EXCHANGE AGREEMENT, THE REORGANIZED DEBTOR GOVERNANCE DOCUMENTS, THE NEW AEH COMMON UNITS OR ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, THE PURSUIT OF CONFIRMATION, ANY ACTION OR ACTIONS TAKEN IN FURTHERANCE OF OR CONSISTENT WITH THE ADMINISTRATION OR IMPLEMENTATION OF THE PLAN OR THE DISTRIBUTION OF THE NEW AEH COMMON UNITS AND**

**RELATED DOCUMENTS OR OTHER PROPERTY UNDER THE PLAN, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE ARISING FROM OR RELATING TO ANY OF THE FOREGOING, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE; *PROVIDED, HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS RELEASE (I) SHALL OPERATE TO WAIVE AND RELEASE ONLY THOSE CAUSES OF ACTION EXPRESSLY SET FORTH IN AND RELEASED BY THE PLAN AND (II) SHALL NOT OPERATE TO WAIVE AND RELEASE THE RIGHTS OF THE DEBTOR OR THE REORGANIZED DEBTOR TO ENFORCE THE PLAN, THE EXCHANGE AGREEMENT, THE CONFIRMATION ORDER, THE REORGANIZED DEBTOR GOVERNANCE DOCUMENTS, THE NEW AEH COMMON UNITS OR ANY RELATED AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED OR REINSTATED PURSUANT TO THE PLAN OR FINAL ORDER OF THE BANKRUPTCY COURT; *PROVIDED, FURTHER, HOWEVER,* THE NON-DEBTOR SUBSIDIARIES SHALL NOT BE DEEMED RELEASED PARTIES FOR PURPOSES OF THIS <u>ARTICLE X.E.</u>**

F.      **Releases by Holders of Claims and Equity Interests.**

**NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR AND ITS ESTATE AND THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH OF THE RELEASING PARTIES SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE DEBTOR AND ITS ESTATE AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR OR THE DEBTOR'S ESTATE, WHETHER KNOWN OR UNKNOWN, ASSERTED OR UNASSERTED, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE LAWS OR OTHERWISE, INCLUDING AVOIDANCE ACTIONS, THOSE CAUSES OF ACTION BASED ON VEIL PIERCING OR ALTER-EGO THEORIES OF LIABILITY, CONTRIBUTION, INDEMNIFICATION, JOINT LIABILITY OR OTHERWISE THAT ANY SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S RESTRUCTURING, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN,**

THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR OR ANY RELEASED PARTY, ON ONE HAND, AND ANY RELEASING PARTY, ON THE OTHER HAND, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR DURING THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE SUBORDINATED NOTES TRANSACTION SUPPORT LETTER, THE SELLER NOTES TRANSACTION SUPPORT LETTER, THE EXCHANGE AGREEMENT, THE REORGANIZED DEBTOR GOVERNANCE DOCUMENTS, THE NEW AEH COMMON UNITS AND/OR ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, THE PURSUIT OF CONFIRMATION, ANY ACTION OR ACTIONS TAKEN IN FURTHERANCE OF OR CONSISTENT WITH THE ADMINISTRATION OR IMPLEMENTATION OF THE PLAN OR THE DISTRIBUTION OF THE NEW AEH COMMON UNITS, OR OTHER PROPERTY UNDER THE PLAN, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE ARISING FROM OR RELATING TO ANY OF THE FOREGOING, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE; *PROVIDED, HOWEVER,* THAT THE FOREGOING PROVISIONS OF THIS RELEASE (I) SHALL OPERATE TO WAIVE AND RELEASE ONLY THOSE CAUSES OF ACTION EXPRESSLY SET FORTH IN AND RELEASED BY THE PLAN AND (II) SHALL NOT OPERATE TO WAIVE AND RELEASE THE RIGHTS OF THE RELEASING PARTIES TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE EXCHANGE AGREEMENT, THE REORGANIZED DEBTOR GOVERNANCE DOCUMENTS, THE NEW AEH COMMON UNITS OR ANY RELATED AGREEMENTS, INSTRUMENTS, AND OTHER DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED OR REINSTATED PURSUANT TO THE PLAN OR FINAL ORDER OF THE BANKRUPTCY COURT; *PROVIDED, FURTHER, HOWEVER,* THE NON-DEBTOR SUBSIDIARIES SHALL NOT BE DEEMED A RELEASING PARTY AS TO THE DEBTOR FOR PURPOSES OF THIS ARTICLE X.F; AND, *PROVIDED FURTHER, HOWEVER,* NEITHER LR-MOUNTAINEER HOLDINGS, L.P. NOR ANY RELATED PARTY WITH RESPECT TO LR-MOUNTAINEER HOLDINGS, L.P., IN ITS CAPACITY AS SUCH OR IN ITS CAPACITY AS SELLER NOTE AGENT, SHALL BE DEEMED A RELEASING OR A RELEASED PARTY UNDER THIS ARTICLE X.F OR A RELEASED PARTY UNDER ARTICLE X.E. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NOTHING IN THE PLAN OR ANY DOCUMENT EXECUTED OR TRANSACTION ENTERED INTO IN CONNECTION WITH THE PLAN OR THE RESTRUCTURING TRANSACTIONS SHALL RELEASE ANY CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER UNDER THE JOINT DEVELOPMENT AGREEMENT OR THAT IOG RESOURCES LLC MAY HAVE AGAINST ANY ENTITY, AND ALL SUCH CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES,

**AND LIABILITIES WHATSOEVER ARE FULLY RESERVED AND PRESERVED IN ALL RESPECTS.**

**G.    Injunction**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL PERSONS OR ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A CLAIM THAT IS DISCHARGED OR AN EQUITY INTEREST THAT IS TERMINATED PURSUANT TO THE TERMS OF THE PLAN ARE PERMANENTLY ENJOINED AND PRECLUDED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH DISCHARGED CLAIMS OR TERMINATED EQUITY INTERESTS OR RIGHTS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST ANY RELEASED PARTY (OR PROPERTY OR ESTATE OF ANY RELEASED PARTY) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES, AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE PROPERTY; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE PROPERTY ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (III) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM OR ENCUMBRANCE AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE PROPERTY ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE PROPERTY, *PROVIDED*, THAT ANY RIGHTS OF SETOFF AND RECOUPMENT OF ANY ENTITY OR PERSON ARE PRESERVED FOR THE PURPOSE OF ASSERTING SUCH RIGHTS AS A DEFENSE TO ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTOR OR ITS ESTATE REGARDLESS OF WHETHER SUCH ENTITY OR PERSON IS THE HOLDER OF AN ALLOWED CLAIM; AND (V) COMMENCING OR CONTINUING ANY ACTION, ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN, THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, THE PLAN SHALL NOT ENJOIN, OR BE DEEMED TO ENJOIN, ANY PARTY (INCLUDING IOG RESOURCES LCC)

**FROM ASSERTING ANY CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES ARISING UNDER THE JOINT DEVELOPMENT AGREEMENT.**

**H.      Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor, or another Entity with whom the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

**A.      Modification of Plan**

Subject in all respects to the limitations in the Subordinated Notes Transaction Support Letter, the Seller Notes Transaction Support Letter, and this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, supplement, amend and restate, or otherwise modify the Plan prior to the entry of the Confirmation Order; (b) after the entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as applicable, may, after notice and hearing and entry of an order of the Bankruptcy Court, amend, supplement, amend and restate, or otherwise modify the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; and (c) a Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as amended, supplemented, amended and restated, or otherwise modified, if the proposed amendment, supplement, amendment and restatement, or other modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder, or release any claims or liabilities reserved by such Holder under the Plan. Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.  Prior to the Effective Date, the Debtor may make appropriate technical adjustments to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments or modifications shall be reasonably satisfactory to the Required Consenting Subordinated Noteholders and the Consenting Seller Noteholders.

**B.        Revocation of Plan**

The Debtor, with the prior written consent of the Required Consenting Subordinated Noteholders and the Consenting Seller Noteholders, reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans, but without prejudice to the respective parties' rights under the Subordinated Notes Transaction Support Letter and the Seller Notes Transaction Support Letter. If the Debtor revokes or withdraws the Plan, or if Confirmation or consummation of the Plan does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtor or any other Entity.

**C.        Severability of Plan Provisions**

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted and the Debtor, with the consent of the Required Consenting Subordinated Noteholders and the Consenting Seller Noteholders, may amend, supplement, amend and restate, or otherwise modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. Notwithstanding any such holding of the Bankruptcy Court, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**D.        Successors and Assigns**

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person or Entity.

**E.        Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the Effective Date has occurred.

**F.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date shall have occurred. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or Equity Interest or other Entity, in each case, prior to the Effective Date.

**G.     Notices**

Any notice, request, or demand required or permitted to be made or provided to or upon the Debtor or the Consenting Subordinated Noteholders under the Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) facsimile transmission or (e) email transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

> **If to the Debtor:**
>
>> Arsenal Energy Holdings LLC
>> 6031 Wallace Road Ext., Suite 3000
>> Wexford, PA 15090
>> Attn:  Craig Lavender, Esq. (clavender@arsenalresources.com)
>> Fax: (800) 428-0981
>
> **with a copy to (which shall not constitute notice):**
>
> Counsel to the Debtor
>
>> Simpson Thacher & Bartlett LLP
>> 425 Lexington Avenue
>> New York, NY 10017
>> Attn:  Michael H. Torkin, Esq. (michael.torkin@stblaw.com)
>>       Kathrine A. McLendon (kmclendon@stblaw.com)
>>       Nicholas E. Baker, Esq. (nbaker@stblaw.com)
>> Fax: (212) 455-2502
>
>> – and –
>
>> Young Conaway Stargatt & Taylor, LLP
>> Rodney Square
>> 1000 North King Street
>> Wilmington, DE 19801
>> Attn:  Pauline K. Morgan, Esq. (pmorgan@ycst.com)
>>       Kara Hammond Coyle, Esq. (kcoyle@ycst.com)
>>       Ashley E. Jacobs, Esq. (ajacobs@ycst.com)

Fax: (302) 571-1253

**If to the Consenting Subordinated Noteholders:**

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn:  Sean A. O'Neal, Esq. (soneal@cgsh.com)
        Humayun Khalid, Esq. (hkhalid@cgsh.com)
Fax: (212) 225-3999

**To Counsel to Mercuria:**

Vinson & Elkins LLP
666 Fifth Avenue, 25th Floor
New York, NY 10103
Attn: David S. Meyer, Esq. (dmeyer@velaw.com)
        Garrick C. Smith, Esq. (gsmith@velaw.com)
Fax: (917) 849-5358

## H.    Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

## I.    Exhibits

All exhibits and schedules to the Plan, including the Exhibits, are incorporated and are a part of the Plan as if set forth in full herein.

## J.    Conflicts

In the event of a conflict between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of a conflict between the Confirmation Order and the Plan, the Confirmation Order shall control.

## K.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, the Holders of Claims and Equity Interests, the Released Parties, and each of their respective successors and assigns.

**L.**     **Entire Agreement**

On the Effective Date, this Plan, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**M.**     **Reservation of Rights**

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtor with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to any Claims or Equity Interests prior to the Effective Date.

[Remainder of page intentionally left blank]

January 9, 2019

ARSENAL ENERGY HOLDINGS LLC
/s/ Jonathan D. Farmer
_____
Name:    Jonathan D. Farmer
Title:    Chief Executive Officer

**Exhibit A**

Form of Exchange Agreement

EXCHANGE AGREEMENT

by and among

Arsenal Energy Holdings LLC,

each of the Purchasers identified herein

and,

solely for purposes of Section 2.3(c) and Section 5.6 hereof,

each of the Members identified herein

dated as of [●], 2019

# TABLE OF CONTENTS

**Page**

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions ........................................................................................................ 2

## ARTICLE II
## THE EXCHANGE

Section 2.1    Exchange of Notes for Class A Common Units; Cancelation of Warrants .......... 6

Section 2.2    Closing ............................................................................................................. 7

Section 2.3    Closing Deliverables ........................................................................................ 7

Section 2.4    Deemed Closing ............................................................................................... 8

Section 2.5    Tax Treatment .................................................................................................. 8

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Section 3.1    Incorporation; Authorization; Enforceability; Non-contravention; Consents ...... 9

Section 3.2    Absence of Litigation ..................................................................................... 10

Section 3.3    No Broker ....................................................................................................... 10

Section 3.4    Side Letters .................................................................................................... 11

Section 3.5    No Other Representations and Warranties ...................................................... 11

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Section 4.1    Incorporation; Authorization; Enforceability; Non-contravention; Consents ..... 11

Section 4.2    Title to Notes and Warrants ........................................................................... 12

Section 4.3    Absence of Litigation ..................................................................................... 13

Section 4.4    No Broker ....................................................................................................... 13

Section 4.5    Accredited Investor ........................................................................................ 13

Section 4.6    Restrictions on Transfer; No Public Market ..................................................... 13

Section 4.7    Investment Representations ............................................................................ 13

Section 4.8    Plan Assets ..................................................................................................... 14

Section 4.9    OFAC .............................................................................................................. 14

Section 4.10  U.S. Persons .................................................................................................... 15

Section 4.11  No Other Representations and Warranties ...................................................... 15

## ARTICLE V
## COVENANTS

i

Section 5.1    Rights and Liabilities under the Note and Warrant Purchase Agreement and the Warrants 15

Section 5.2    Mutual Release ................................................................................................ 15

Section 5.3    Cooperation .................................................................................................... 16

Section 5.4    Confidentiality ................................................................................................ 16

Section 5.5    Transfers of Notes and Warrants .................................................................. 16

Section 5.6    Approval of Company Operating Agreement ................................................. 17

## ARTICLE VI
## CLOSING CONDITIONS

Section 6.1    Conditions Precedent to Obligations of the Company ........................................ 17

Section 6.2    Conditions Precedent to Obligations of Purchasers ........................................... 18

## ARTICLE VII
## TERMINATION

Section 7.1    Termination .................................................................................................... 19

Section 7.2    Effect of Termination ..................................................................................... 20

## ARTICLE VIII
## Miscellaneous

Section 8.1    Action by Purchasers ..................................................................................... 20

Section 8.2    Survival ......................................................................................................... 20

Section 8.3    Counterparts .................................................................................................. 20

Section 8.4    Governing Law; Jurisdiction; Waiver of Jury Trial ....................................... 20

Section 8.5    Entire Agreement; No Third Party Beneficiary ............................................. 22

Section 8.6    Expenses ....................................................................................................... 22

Section 8.7    Notices ........................................................................................................... 22

Section 8.8    Successors and Assigns .................................................................................. 23

Section 8.9    Headings ........................................................................................................ 23

Section 8.10   Amendments and Waivers ............................................................................. 23

Section 8.11   Interpretation ................................................................................................ 23

Section 8.12   Severability .................................................................................................... 24

Section 8.13   Further Assurances ........................................................................................ 24

Section 8.14   Business Days ................................................................................................ 24

Section 8.15   Specific Performance ..................................................................................... 24

Section 8.16   Joint and Several Obligations ........................................................................ 24

Section 8.17   No Reliance .................................................................................................... 24

Section 8.18   No Recourse Against Non-Parties ................................................................... 24

Section 8.19  Effectiveness of Agreement ................................................................. 25

Schedules

Schedule A        Signing Purchasers
Schedule B        Signing Members
Schedule C        Class A Common Units to be Issued
Schedule D        Ownership of Notes and Warrants

Exhibits

Exhibit A        ARD Term Loan Credit Agreement
Exhibit B        Joint Development Agreement
Exhibit C        RBL Credit Facility
Exhibit D        Form of Affidavit of Loss
Exhibit E        Form of Second Amended and Restated Operating Agreement of the Company
Exhibit F        Form of Legal Opinion of Simpson Thacher & Bartlett LLP
Exhibit G        Form of Purchaser Closing Certificate
Exhibit H        Form of Company Closing Certificate

002129-0002-25324783

EXCHANGE AGREEMENT

This EXCHANGE AGREEMENT (this "<u>Agreement</u>") is dated as of [●], 2019 and is entered into by and among Arsenal Energy Holdings LLC (formerly known as Mountaineer Energy Holdings, LLC), a Delaware limited liability company (the "Company"), each of the Purchasers identified on Schedule A hereto, and, solely for purposes of Section 2.3(c) and Section 5.6 hereof, each of the members of the Company identified on Schedule B hereto (the "Members"). All capitalized terms used herein but not defined shall have the meaning set forth in the Note and Warrant Purchase Agreement (as defined below).

INTRODUCTION

A.    The Company and each of the purchasers (such purchasers, together with their transferees and assigns, if any, "Purchasers") of subordinated unsecured notes (the "Notes") and warrants (the "Warrants") are party to one or more of (a) the Note and Warrant Purchase Agreement, dated as of July 29, 2014 (as amended, supplemented or otherwise modified from time to time, the "2014 Note and Warrant Purchase Agreement"), (b) the Note and Warrant Purchase Agreement, dated as of November 10, 2016 (as amended, supplemented or otherwise modified from time to time, the "2016A Note and Warrant Purchase Agreement"), and (c) the Note and Warrant Purchase Agreement, dated as of December 22, 2016 (as amended, supplemented or otherwise modified from time to time, the "2016B Note and Warrant Purchase Agreement" and, together with the 2014 Note and Warrant Purchase Agreement and the 2016A Note and Warrant Purchase Agreement, the "Note and Warrant Purchase Agreement").

B.    The Note and Warrant Purchase Agreement has previously been amended by (a) Amendment No. 1 to Note and Warrant Purchase Agreement, dated as of September 26, 2014, (b) Waiver and Amendment No. 2 to Note and Warrant Purchase Agreement, dated as of November 10, 2016, and (c) Waiver and Amendment No. 3 to Note and Warrant Purchase Agreement, dated as of March 16, 2017, entered into, in each case, by the Company and the Purchasers party thereto.

C.    The Company, ARH, certain of the Purchasers and certain of the Members have entered into the Restructuring Transaction Support Letter to facilitate the consummation of the transactions contemplated by this Agreement, including by voting in favor of the AEH Plan of Reorganization to implement this Agreement if the AEH Restructuring Cases are commenced.

D.    [Pursuant to the AEH Plan of Reorganization, each Purchaser [and each Member] is deemed party to and bound by this this Agreement as of the effective date of the AEH Plan of Reorganization, regardless of whether such Purchaser [or Member] submits a signature page hereto.][1]

E.    [The effective date of the AEH Plan of Reorganization occurred on [_____]. 2019.]

---

[1] Bracketed language to be included if AEH Restructuring Cases are commenced.

1

F.      In exchange for the surrender and cancelation by Purchasers of all of the outstanding Notes, and on the terms and conditions set forth herein, the Company shall issue to Purchasers Class A common units (the "<u>Class A Common Units</u>") of the Company.

In consideration of the mutual terms, conditions and other covenants and agreements set forth herein, the parties agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1      <u>Definitions</u>. As used in this Agreement, the following terms shall have the following meanings:

"<u>2014 Note and Warrant Purchase Agreement</u>" has the meaning given in the introduction.

"<u>2016A Note and Warrant Purchase Agreement</u>" has the meaning given in the introduction.

"<u>2016B Note and Warrant Purchase Agreement</u>" has the meaning given in the introduction.

"<u>Action</u>" means any action (at law or in equity), claim, litigation, suit, arbitration, hearing, audit, review, inquiry, proceeding or investigation.

"<u>AEH Plan of Reorganization</u>" means a plan of reorganization with respect to the Company and ARH substantially in the form attached as Exhibit B to the Restructuring Transaction Support Letter.

"<u>AEH Restructuring</u>" means the restructuring of the Notes and the equity interests of the Company in a manner consistent with this Agreement.

"<u>AEH Restructuring Cases</u>" means the chapter 11 cases of the Company and ARH that may be filed in the United States Bankruptcy Court for the District of Delaware to effectuate the AEH Restructuring pursuant to the terms of the Restructuring Transaction Support Letter.

"<u>Affidavit of Loss</u>" has the meaning given in Section 2.3(a)(ii).

"<u>Affiliate</u>" of a Person means any other Person that directly or indirectly Controls, is Controlled by or is under common Control with such Person.

"<u>Agreement</u>" has the meaning given in the preamble.

"<u>ARD Term Loan Credit Agreement</u>" means a Credit Agreement, entered into among Arsenal Resources Development Holdings 1, LLC, as borrower, Chambers Energy Management, LP, as administrative agent, and the lenders and other parties party thereto from time to time (as amended, restated, supplemented, waived, replaced or amended and restated with the approval of the management committee of the Company and the other parties thereto). The ARD Term Loan Credit Agreement as in effect on the date hereof is attached hereto as <u>Exhibit A</u>.

2

"ARH" means Arsenal Resources Holdings LLC, a Delaware limited liability company.

"Business Day" means any day other than a Saturday, a Sunday or a day on which commercial banks in New York, New York or Houston, Texas are required or authorized to be closed.

"Class A Common Units" has the meaning given in the introduction.

"Closing" has the meaning given in Section 2.2.

"Closing Date" has the meaning given in Section 2.2.

"Code" means the Internal Revenue Code of 1986, and the rules and regulations promulgated thereunder, as amended from time to time.

"Company" has the meaning given in the preamble.

"Company Material Adverse Effect" means any change, event, development or effect that has had, or is reasonably likely to have, a material adverse effect on the ability of the Company to consummate the transactions contemplated by this Agreement.

"Company Operating Agreement" has the meaning given in Section 2.3(a)(iv).

"Company Released Claim/Liability" has the meaning given in Section 5.2(a).

"Company Released Parties" has the meaning given in Section 5.2(b).

"Company Releasors" has the meaning given in Section 5.2(a).

"Contract" means any oral or written agreement, instrument, contract, undertaking, arrangement, mortgage, indenture, lease, license or other understanding.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Embargoed Person" means any Person subject to trade restrictions administered by OFAC, including OFAC sanctions programs implemented under the International Emergency Economic Powers Act, 50 U.S.C. §§1701, et seq., The Trading with the Enemy Act, 50 U.S.C. §§ App. 1, et seq., any foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended), or any enabling legislation or regulations promulgated thereunder or any executive order relating thereto (including Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079 (2001)) or 31 C.F.R. §594.101, et seq.) with the result that a purchase of assets or any other transaction entered into by such Person with respect to any assets, whether directly or indirectly, is prohibited by or in violation of U.S. law.

3

"End Date" has the meaning given in Section 7.1(b).

"Equity Interests" means, with respect to any Person, any and all shares, interests, participations, rights in, or other equivalents (however designated and whether voting or non-voting) of, such Person's capital stock or other equity interests, partnership, membership or limited liability company interests in a partnership or limited liability company, or any other ownership interest or equity participation that confers on a Person the right to receive a share of the profits and losses, or distributions of assets, of the issuing Person, or options or warrants to obtain any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, and the rules and regulations promulgated thereunder, as amended from time to time.

"Governmental Authority" means any foreign, United States, international, multi-national, supra-national, federal, state or local (or any subdivision thereof) governmental, regulatory or administrative agency, authority, bureau, commission, branch, department or similar body or instrumentality thereof, or any court, panel, tribunal, or judicial or arbitral body.

"Joint Development Agreement" means a joint development agreement, entered into between certain Subsidiaries of the Company and IOG Resources, LLC (or an Affiliate thereof) relating to the funding of the development of certain assets located in Barbour, Harrison and Taylor Counties, West Virginia which are owned by certain Subsidiaries of the Company (as amended, restated, supplemented, waived, replaced or amended and restated with the approval of the management committee of the Company and the other parties thereto). The Joint Development Agreement as in effect on the date hereof is attached hereto as Exhibit B.

"Legal Requirement" means all treaties, statutes, codes, ordinances, decrees, rules, regulations, standards, municipal by-laws, judicial or arbitral or administrative or regulatory judgments, Orders, injunctions, decisions, rulings or awards or other requirement of any Governmental Authority and including general principles of common law and equity, binding on or affecting the Person referred to in the context in which such word is used.

"Liability" means any debt, obligation or liability of any kind, nature, character, description or basis whatsoever (including any of the foregoing existing or arising under any Contract or imposed by operation of law), whether known or unknown, anticipated or unanticipated, accrued or unaccrued, fixed or unfixed, certain or uncertain, non-contingent or contingent, liquidated or unliquidated, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, now existing, choate or inchoate, developed or undeveloped, discovered or undiscovered, or otherwise.

"Lien" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, mortgage, security agreement, right of first refusal, right to acquire, right of pre-emption, option, restrictive covenant, right-of-way, easement or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code, as amended (and any successor thereto) or any other Legal Requirement of any jurisdiction) or other security interest or any other agreement or arrangement having a similar effect or any agreement to create any of the foregoing.

"<u>Liquidation Value</u>" has the meaning given in Section 2.5.

"<u>Members</u>" has the meaning given in the preamble.

"<u>Non-Party Affiliates</u>" has the meaning given in Section 8.18.

"<u>Note and Warrant Purchase Agreement</u>" has the meaning given in the introduction.

"<u>Noteholder</u>" means a Purchaser that is a holder of Notes.

"<u>Notes</u>" has the meaning given in the introduction.

"<u>OFAC</u>" means the U.S. Treasury Department's Office of Foreign Assets Control.

"<u>Order</u>" means any preliminary or permanent injunction or other order or decree of a Governmental Authority of competent jurisdiction.

"<u>Permit</u>" means any franchise, approval, permit, consent, qualification, certification, authorization, license, Order, registration, certificate, exemption, variance or other similar permit, right or authorization from any Governmental Authority and all pending applications therefor.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Plan</u>" includes (a) an employee benefit plan (within the meaning of Section 3(3) of ERISA), whether or not such plan is subject to Title I of ERISA, (b) a plan, individual retirement account or other arrangement that is described in Section 4975 of the Code, whether or not subject to Section 4975 of the Code, (c) an insurance company using general account assets if such general account assets are deemed to include the assets of any of the foregoing types of plans, accounts or arrangements for purposes of Title I of ERISA or Section 4975 of the Code under Section 401(c)(1)(A) of ERISA or the regulations promulgated thereunder and (d) an entity that is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements, pursuant to ERISA, Section 4975 of the Code or laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the Code.

"<u>Prepayment Amount</u>" has the meaning given in Section 2.1(b).

"<u>Purchaser Material Adverse Effect</u>" means any change, event, development or effect that has had, or is reasonably likely to have, a material adverse effect on the ability of a Purchaser to consummate the transactions contemplated by this Agreement.

"<u>Purchaser Released Claim/Liability</u>" has the meaning given in Section 5.2(b).

"<u>Purchaser Released Parties</u>" has the meaning given in Section 5.2(a).

"<u>Purchaser Releasors</u>" has the meaning given in Section 5.2(b).

"Purchasers" has the meaning given in the introduction.

"RBL Credit Facility" means the means a Credit Agreement, entered into among Arsenal Resources Development LLC, as borrower, Citibank, N.A., as administrative agent, and the lenders and other parties party thereto from time to time (as amended, restated, supplemented, waived, replaced or amended and restated with the approval of the management committee of the Company and the other parties thereto). The RBL Credit Facility as in effect on the date hereof is attached hereto as Exhibit C.

"Required Holders" means, at any time, Noteholders holding at least 66⅔% in principal amount of the Notes at the time outstanding (exclusive of Notes then owned by the Company or its Subsidiaries).

"Restructuring Transaction Support Letter" means that certain letter agreement dated as of December 21, 2018, by and among the Company, ARH and each of the other Persons party thereto.

"Securities Act" has the meaning given in Section 4.5.

"Subsidiary" means, with respect to any Person, any other Person of which at least 50% of (i) the total Equity Interest or (ii) total voting power of shares of stock (or equivalent ownership or Controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees (or similar Persons) thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Transaction Documents" means this Agreement, the Company Operating Agreement and the other agreements, instruments and documents contemplated hereby and thereby, including each schedule, exhibit and other ancillary document hereto and thereto.

"Warrantholder" means a Purchaser that is a holder of Warrants.

"Warrants" has the meaning given in the introduction.

ARTICLE II
THE EXCHANGE

Section 2.1    Exchange of Notes for Class A Common Units; Cancelation of Warrants.

(a)    On the terms and subject to the conditions set forth in Agreement, at the Closing, each Noteholder shall surrender [(and pursuant to the AEH Plan of Reorganization, shall be deemed to surrender)] to the Company all of the Notes held by such Noteholder, whereupon such Notes shall be canceled, and such Noteholder shall thereby cancel and relinquish [(and pursuant to the AEH Plan of Reorganization, shall be deemed to have cancelled and relinquished)] all right, title and interest such Noteholder has with respect to such any Notes. In exchange for such surrender and cancellation, the Company shall issue to each Noteholder at the Closing the number of Class A Common Units set forth opposite such Noteholder's name on Schedule C (as updated by the Company before the Closing in accordance with such Schedule

C), and each such Noteholder shall acquire and accept such Class A Common Units from the Company. Upon such issuance of Class A Common Units to such Noteholder all of the Notes held by such Noteholder shall be deemed to have been paid in full and such Noteholder shall thereafter no longer have any right, title or interest with respect to such Notes.

(b)     Upon the issuance of the Class A Common Units pursuant to Section 2.1(a), each Warrant shall be deemed to have been canceled, and each Warrantholder shall thereafter no longer have any right, title or interest with respect to such Warrant.

Section 2.2     Closing. On the terms and subject to the conditions set forth in this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") shall occur at the offices of Simpson Thacher & Bartlett LLP, 600 Travis Street, Suite 5400, Houston, Texas 77002, as soon as practicable, but in no event later than the 2nd Business Day after the satisfaction or waiver of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing), or at such other date, place or time as the Company and Purchasers may mutually agree. The Company may also agree with each Purchaser that the closing of the transactions contemplated by this Agreement with respect to such Purchaser will be deemed to have occurred within 24 hours of the Closing. The date on which the Closing occurs is referred to herein as the "Closing Date".

Section 2.3     Closing Deliverables.

(a)     At the Closing, each Purchaser shall deliver or cause to be delivered to the Company the following:

(i)          the certificate or certificates contemplated by Section 6.1(a).

(ii)         original copies of all Notes held by such Purchaser, whereupon each such Purchaser agrees that each such Notes shall, as of the Closing Date, be marked as canceled by the Company or, in lieu thereof, an Affidavit of Loss in the form attached hereto as Exhibit D (an "Affidavit of Loss"), duly executed by such Purchaser;

(iii)        original copies of all Warrants held by such Purchaser or any of its Affiliates, whereupon each such Purchaser or any of its Affiliates agrees that such Warrants shall, as of the Closing Date, be marked as canceled by the Company or, in lieu thereof, an Affidavit of Loss, duly executed by such Purchaser or any of its applicable Affiliates;

(iv)        an executed counterpart signature page from such Purchaser and any of its Affiliates that are, or that are contemplated to be, members of the Company to the Second Amended and Restated Operating Agreement of the Company, in the form attached hereto as Exhibit E (the "Company Operating Agreement"); and

(v)        all other certificates, documents and instruments reasonably requested in writing by the Company that are required to implement the transactions contemplated by this Agreement to be consummated at the Closing.

(b)        At the Closing, the Company shall:

(i)        deliver or cause to be delivered to each Purchaser the certificate contemplated by Section 6.2(a);

(ii)        mark each of the Notes and Warrants as cancelled;

(iii)        issue to each Noteholder the Class A Common Units set forth opposite such Noteholder's name on Schedule C, which shall be uncertificated;

(iv)        if the AEH Restructuring Cases have not commenced, deliver to each Purchaser an opinion of counsel of Simpson Thacher & Bartlett LLP relating to the issuance of the Class A Common Units in the form attached hereto as Exhibit F; and

(v)        deliver or cause to be delivered to each Purchaser an executed counterpart signature page from the Company to the Company Operating Agreement.

(c)        At the Closing, each Member shall deliver or cause to be delivered to the Company an executed counterpart signature page to the Company Operating Agreement.

Section 2.4    Deemed Closing. Notwithstanding anything to the contrary in this Agreement, [and pursuant to the AEH Plan of Reorganization] if all of the conditions set forth in Section 6.2 have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing and which would be satisfied if the Closing were to occur), and one or more Purchasers fails to consummate the Closing on the date that the Closing should have occurred pursuant to Section 2.2, the Company may unilaterally elect to cause the Closing to occur, in which case, (a) the Closing shall be deemed to have occurred on the date that the Closing should have occurred pursuant to Section 2.2, (b) all of the Notes and Warrants held by the Purchasers shall be deemed to have been surrendered and canceled and (c) the Company shall be deemed to have issued to the applicable Purchasers the Class A Common Units contemplated to be issued to them pursuant to Section 2.1(a). Purchasers agree that, upon the Closing under the conditions set out in this Section 2.4, the Purchasers shall be deemed to be bound by the Company Operating Agreement to the same extent as if each such Purchaser had executed and delivered the Company Operating Agreement at the Closing. The parties hereto shall (and shall cause their respective Affiliates to) do such acts, execute such documents and instruments and cooperate with each other as may be reasonably requested in writing by the Company to make effective this Section 2.4.

Section 2.5    Tax Treatment. The parties hereto agree that for all applicable tax purposes the exchange of the Notes for the Class A Common Units shall be treated as a tax free contribution of the Notes governed by Treasury Regulation Section 1.721-1(d) and that the Liquidation Value of the Class A Common Units is at least equal to the principal amount and

accrued interest outstanding on the Notes as of [November 30, 2018]. For these purposes "Liquidation Value" shall have the meaning set forth in Treasury Regulation Section 1.108-8. No party hereto shall take any position for applicable tax purposes that is inconsistent with the foregoing unless otherwise required pursuant to a final determination as defined in Section 1313 of the Code.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to each Purchaser, as of the date hereof and as of the Closing Date, that:

Section 3.1    Incorporation; Authorization; Enforceability; Non-contravention; Consents.

(a)    The Company is an entity duly organized, validly existing and in good standing (if applicable) under the laws of the State of Delaware. The Company (i) has all requisite corporate (or similar) power and authority to carry on its business as now conducted, and to own and use its properties and assets and (ii) is in good standing and is duly qualified to transact business in each jurisdiction where the ownership or use of its properties and assets or the conduct of its business requires it to be so qualified, with such exceptions to this clause (ii) as do not or would not constitute, individually or in the aggregate, a Company Material Adverse Effect.

(b)    The Company has all necessary limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Such execution, delivery, performance and consummation by the Company has been duly authorized by all requisite limited liability company action on the part of the Company, and no other limited liability company action on the part of the Company is necessary to authorize the execution, delivery and performance by the Company of this Agreement and the other Transaction Documents to which it is or will be a party and the consummation by the Company of the transactions contemplated hereby and thereby. This Agreement and each other Transaction Document to which the Company is (or will at the Closing be) a party, assuming due and valid authorization, execution and delivery by each other party hereto, constitutes (or will at the Closing constitute) a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except to the extent that enforceability may be affected by bankruptcy, insolvency, reorganization, moratorium, and other similar Legal Requirements affecting the rights and remedies of creditors generally and general equitable principles.

(c)    The execution and delivery by the Company of this Agreement and the other Transaction Documents to which it is or will be a party, the performance by the Company of its obligations hereunder and thereunder, and the consummation by the Company of the transactions contemplated hereby and thereby do not and will not (with or without notice or lapse of time or both):

(i)        contravene any provision in the organizational documents of the Company;

(ii)        except to the extent such violation, conflict, breach, default, modification, revocation, cancellation, termination or acceleration, or created or changed rights or obligations of any party thereto, or failure to obtain approval, consent or waiver, or to give notice, does not or would not constitute, individually or in the aggregate, a Company Material Adverse Effect, (A) violate, conflict with, result in a breach of any provision of, constitute a default under, result in or permit the modification, revocation, cancellation, termination or acceleration of, or create or change any rights or obligations of any party thereto under, any Contract to which the Company is a party or any Permit owned or held by the Company or (B) require any approval, consent or waiver of, or notice to, any party to any such Contract or Permit; or

(iii)        except to the extent such violation or conflict does not and is not reasonably likely to constitute, individually or in the aggregate, a Company Material Adverse Effect, violate or conflict with any Legal Requirement applicable to the Company.

(d)        Other than as contemplated by the Restructuring Transaction Support Letter or the AEH Plan of Reorganization and other than such authorizations, consents, Orders, permits, approvals, notices, filings, registrations and qualifications, the failure of which to obtain does not or would not constitute, individually or in the aggregate, a Company Material Adverse Effect, no authorization, consent, Order, permit or approval of, or notice to, or filing, registration or qualification with, any Governmental Authority is necessary to be obtained or made by the Company in connection with the consummation by the Company of the transactions contemplated by this Agreement or the other Transaction Documents.

Section 3.2        Absence of Litigation. Other than as contemplated by the Restructuring Transaction Support Letter or the AEH Plan of Reorganization and except with such exceptions as do not or would not constitute, individually or in the aggregate, a Company Material Adverse Effect, (a) there is no investigation pending or, to the knowledge of the Company, threatened against the Company before or by any Governmental Authority, (b) there is no Action (other than investigations) pending or, to the knowledge of the Company, threatened against the Company, at law or in equity, before or by any Governmental Authority, and (c) there are no outstanding Orders to which the Company is a party or is otherwise bound. As of the date hereof, there is no Action pending or, to the knowledge of the Company, threatened, against the Company seeking to restrain or prohibit the consummation of the transactions contemplated by this Agreement or the other Transaction Documents.

Section 3.3        No Broker. Other than Barclays Capital Inc., there is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of the Company in connection with the transactions contemplated by this Agreement or the other Transaction Documents or who might be entitled to any fee or commission from any Purchaser upon consummation of the transactions contemplated by this Agreement or the other Transaction Documents.

Section 3.4     Side Letters. Other than the Restructuring Transaction Support Letter, the Company has not entered into any side letter or similar agreement with any Purchaser, solely in its capacity as such in connection with the transactions contemplated by Section 2.1, under which the Company has any additional obligations to such Purchaser in connection with the transactions contemplated hereby other than those set forth herein or which would obligate the Company to pay to such Purchaser any additional consideration in connection with the transactions contemplated hereby other than as set forth herein.

Section 3.5     No Other Representations and Warranties. Except for the representations and warranties expressly contained in this Article III or the other Transaction Documents, (a) the Company is not making, and has not made, any representation or warranty of any kind whatsoever, express or implied, at law or in equity, relating to the Company or its Affiliates or otherwise in connection with this Agreement, and Purchasers are not relying on any representation or warranty except for those expressly set forth in this Article III and (b) no Person has been authorized by the Company to make any representation or warranty relating to the Company or its Affiliates or otherwise in connection with this Agreement, and if made, such representation or warranty is not being relied upon by Purchasers as having been authorized by the Company.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Each Purchaser severally and not jointly, represents and warrants to the Company, as of the date hereof and as of the Closing Date, that:

Section 4.1     Incorporation; Authorization; Enforceability; Non-contravention; Consents.

(a)     Such Purchaser is an entity duly organized, validly existing and in good standing (if applicable) under the laws of its jurisdiction of organization. Such Purchaser (i) has all requisite corporate (or similar) power and authority to carry on its business as now conducted, and to own and use its properties and assets and (ii) is in good standing and is duly qualified to transact business in each jurisdiction where the ownership or use of its properties and assets or the conduct of its business requires it to be so qualified, with such exceptions to this clause (ii) as do not or would not constitute, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b)     Such Purchaser has all necessary corporate (or similar) power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is or will be a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. Such execution, delivery, performance and consummation by such Purchaser has been duly authorized by all requisite corporate (or similar) action on the part of such Purchaser, and no other corporate (or similar) or equityholder action on the part of such Purchaser is necessary to authorize the execution, delivery and performance by such Purchaser of this Agreement and the other Transaction Documents to which such Purchaser is or will be a party and the consummation by such Purchaser of the transactions contemplated hereby and thereby. This Agreement and each other Transaction Document to which such

11

Purchaser is (or will at the Closing be) a party, assuming due and valid authorization, execution and delivery by each other party hereto, constitutes (or will at the Closing constitute) a legal, valid and binding obligation of such Purchaser, enforceable against such Purchaser, in accordance with its respective terms, except to the extent that enforceability may be affected by bankruptcy, insolvency, reorganization, moratorium, and other similar Legal Requirements affecting the rights and remedies of creditors generally and general equitable principles.

(c)     The execution and delivery by such Purchaser of this Agreement and the other Transaction Documents to which it is or will be a party, the performance by such Purchaser of its obligations hereunder and thereunder, and the consummation by such Purchaser of the transactions contemplated hereby and thereby do not and will not (with or without notice or lapse of time or both):

(i)     contravene any provision of the organizational documents of such Purchaser;

(ii)     except to the extent such violation, conflict, breach, default, modification, revocation, cancellation, termination or acceleration, or created or changed rights or obligations of any party thereto, or failure to obtain approval, consent or waiver, or to give notice, does not or would not constitute, individually or in the aggregate, a Purchaser Material Adverse Effect, (A) violate, conflict with, result in a breach of any provision of, constitute a default under, result in or permit the modification, revocation, cancellation, termination or acceleration of, or create or change any rights or obligations of any party thereto under, any Contract to which such Purchaser is a party or any Permit owned or held by such Purchaser or (B) require any approval, consent or waiver of, or notice to, any party to any such Contract or Permit;

(iii)     result in the creation or imposition of any Lien upon, or any Person obtaining any right to acquire ownership of or other interest in, the Notes or the Warrants; or

(iv)     except to the extent such violation or does not or would not constitute, individually or in the aggregate, a Purchaser Material Adverse Effect, violate or conflict with any Legal Requirements applicable to such Purchaser.

(d)     Other than as contemplated by the Restructuring Transaction Support Letter or the AEH Plan of Reorganization and other than such authorizations, consents, Orders, permits, approvals, notices, filings, registrations and qualifications, the failure of which to obtain does not or would not constitute, individually or in the aggregate, a Purchaser Material Adverse Effect, no authorization, consent, Order, permit or approval of, or notice to, or filing, registration or qualification with, any Governmental Authority is necessary to be obtained or made by such Purchaser in connection with the consummation by such Purchaser of the transactions contemplated by this Agreement or the other Transaction Documents.

Section 4.2     <u>Title to Notes and Warrants</u>. Such Purchaser has good and valid legal and beneficial title to the Notes and Warrants set forth opposite such Purchaser's name on <u>Schedule</u>

D hereto, is the sole record, legal and beneficial owner of such Notes and Warrants, and has the full right, power and authority to surrender the Notes and Warrants pursuant to this Agreement. Such Notes and Warrants are owned by such Purchaser free and clear of all Liens other than restrictions on transfers pursuant to applicable securities laws or the Note and Warrant Purchase Agreement. There are no outstanding subscriptions, options, warrants, rights, contracts, understandings or agreements to purchase or otherwise acquire such Notes and Warrants.

Section 4.3    Absence of Litigation. Other than as contemplated by the Restructuring Transaction Support Letter or the AEH Plan of Reorganization and except with such exceptions as do not or would not constitute, individually or in the aggregate, a Purchaser Material Adverse Effect, (a) there is no investigation pending or, to the knowledge of such Purchaser, threatened against such Purchaser before or by any Governmental Authority, (b) there is no Action (other than investigations) pending or, to the knowledge of such Purchaser, threatened against such Purchaser, at law or in equity, before or by any Governmental Authority, and (c) there are no outstanding Orders to which such Purchaser is a party or is otherwise bound. Such Purchaser is not operating under or subject to any Order that relates to the Notes and Warrants. As of the date hereof, there is no Action pending or, to the knowledge of such Purchaser, threatened, against such Purchaser seeking to restrain or prohibit the consummation of the transactions contemplated by this Agreement or the other Transaction Documents.

Section 4.4    No Broker. There is no investment banker, broker, finder, or other intermediary retained by or authorized to act on behalf of such Purchaser who might be entitled to any fee or commission from the Company or any of its Subsidiaries upon consummation of the transactions contemplated by this Agreement or the other Transaction Documents.

Section 4.5    Accredited Investor. Such Purchaser is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "Securities Act") or a "qualified institutional buyer" (within the meaning of Rule 144A of the Securities Act). Such Purchaser is acquiring the Class A Common Units from the Company for such Purchaser's own account as principal and not with a view to distribution thereof in violation of the Securities Act or any other securities laws.

Section 4.6    Restrictions on Transfer; No Public Market. Such Purchaser understands and acknowledges that (a) there are restrictions on such Purchaser's ability to resell the Class A Common Units under the Securities Act or other applicable securities laws, (b) the Class A Common Units are being offered and issued to such Purchaser in reliance on one or more specific exemptions from the registration requirements of the Securities Act and applicable state securities laws, (c) the Class A Common Units have not been registered under the Securities Act or the securities laws of any state, and may not be sold except pursuant to an effective registration statement or pursuant to a duly available exemption from such registration requirements, and (d) there is no public market for the Class A Common Units, the Class A Common Units do not trade on an exchange or automatic quotation system, and no such market is expected to develop.

Section 4.7    Investment Representations.

(a)     Such Purchaser's knowledge and experience in financial and business matters is such that such Purchaser is capable of evaluating the merits and risks of the transactions contemplated by this Agreement and the other Transaction Documents.

(b)     In making its decision to enter into this Agreement, such Purchaser has taken such independent legal and financial advice as it has deemed necessary or advisable in order to enable it to evaluate the merits and risks of the transactions contemplated by this Agreement and the other Transaction Documents, and has relied exclusively on its own independent investigation and such independent legal and financial advice as it has deemed necessary or advisable.

(c)     Such Purchaser has been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Company and its representatives concerning the Company and its Subsidiaries and the terms and conditions of the transactions contemplated by this Agreement and the other Transaction Documents and to obtain any additional information which such Purchaser deemed necessary.

(d)     Such Purchaser acknowledges and agrees that (i) it is responsible for its own taxes relating to the transactions contemplated by this Agreement and the other Transaction Documents, (ii) it has relied upon the advice of its own tax advisors in connection with the transactions contemplated by this Agreement and the other Transaction Documents and (iii) none of the Company or any of its Affiliates or representatives has made any representation or warranty as to the tax treatment of any transaction contemplated by this Agreement or the other Transaction Documents.

Section 4.8     <u>Plan Assets</u>. Either (a) no portion of the Notes or Warrants constitutes the assets of any Plan or (b)(i) such Notes and Warrants constitute assets of an insurance company general account, (ii) for the entire period during which such Purchaser holds any Class A Common Units or other Equity Interests, less than 25% of the assets of such insurance company general account will constitute "plan assets" of any "benefit plan investor" and (iii) the acquisition and holding of such Class A Common Units or Equity Interests, as the case may be (and any other interests in the Company for which any Class A Common Units or other Equity Interests may be converted or exchanged), by such Purchaser, will satisfy the requirements of Department of Labor Prohibited Transaction Class Exemption 95-60, and will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

Section 4.9     <u>OFAC</u>. To the knowledge of such Purchaser, (a) none of such Purchaser or any of such Purchaser's Affiliates that beneficially own a majority of such Purchaser is an Embargoed Person with the result that such Purchaser's investment in the Class A Common Units is prohibited by or in violation of U.S. law and (b) if and to the extent that such Purchaser or any of such Purchaser's Affiliates that beneficially own a majority of such Purchaser are required by law to maintain an anti-money laundering compliance program under applicable anti-money laundering laws and regulations, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), such compliance programs are currently being maintained in all material respects.

Section 4.10   <u>U.S. Persons</u>. Such Purchaser is a United States person within the meaning of Section 7701(a)(30) of the Code.

Section 4.11   <u>No Other Representations and Warranties</u>. Except for the representations and warranties expressly contained in this Article IV and in the other Transaction Documents, (a) such Purchaser is not making, and has not made, any representation or warranty of any kind whatsoever, express or implied, at law or in equity, relating to such Purchaser or its Affiliates or otherwise in connection with this Agreement, and the Company is not relying on any representation or warranty except for those expressly set forth in this Article IV and (b) no Person has been authorized by such Purchaser to make any representation or warranty relating to such Purchaser or its Affiliates or otherwise in connection with this Agreement, and if made, such representation or warranty is not being relied upon by the Company as having been authorized by such Purchaser.

ARTICLE V
COVENANTS

Section 5.1   <u>Rights and Liabilities under the Note and Warrant Purchase Agreement and the Warrants</u>. Contingent upon the occurrence of the Closing, the Note and Warrant Purchase Agreement shall be deemed to have been terminated, and none of the parties hereto shall have any further rights or liabilities under the Note and Warrant Purchase Agreement.

Section 5.2   <u>Mutual Release</u>.

(a)   Subject to the following sentence, the Company hereby, for itself and all of its Subsidiaries (the "<u>Company Releasors</u>"), contingent upon the occurrence of the Closing, effective on the Closing Date, fully and unconditionally releases, acquits and forever discharges Purchasers, their respective Affiliates and each of their respective past, present and future directors, officers, employees, incorporators, members, partners, stockholders, Affiliates, agents, attorneys, representatives and their respective successors and assigns, in their capacities as such, (collectively, the "<u>Purchaser Released Parties</u>"), from any and all manner of (i) claims that the Company Releasors ever had, now have or hereafter can, shall or may have, against the Purchaser Released Parties and (ii) Liabilities that the Purchaser Released Parties ever had, now have or hereafter can, shall or may have, to the Company Releasors, in the case of each of clauses (i) and (ii), relating to, arising out of or in connection with any facts or circumstances relating to the Note and Warrant Purchase Agreement which occurred prior to the Closing (each such claim or Liability in clauses (i) and (ii), a "<u>Company Released Claim/Liability</u>"), and agrees not to bring or threaten to bring or otherwise join in (or assign to any third party) any Company Released Claim/Liability against the Purchaser Released Parties or any of them. The foregoing notwithstanding, the Company Releasors are not releasing, acquitting or discharging the Purchaser Released Parties from (A) any claims or Liabilities relating to, arising out of or in connection with any of the obligations or agreements of the Purchaser Released Parties or any of them expressly established pursuant to this Agreement, the other Transaction Documents, or the ARD Term Loan Credit Agreement or (B) any claim for fraud. The Purchaser Released Parties are expressly intended as third party beneficiaries of this provision of this Agreement.

15

(b)    Subject to the following sentence, Purchasers hereby, for themselves and all of their Affiliates (the "Purchaser Releasors"), contingent upon the occurrence of the Closing, effective on the Closing Date, fully and unconditionally release, acquit and forever discharge the Company, its Affiliates and each of their respective past, present and future directors, officers, employees, incorporators, members, partners, stockholders, Affiliates, agents, attorneys, representatives and their respective successors and assigns, in their capacities as such, (collectively, the "Company Released Parties"), from any and all manner of (i) claims that the Purchaser Releasors ever had, now have or hereafter can, shall or may have, against the Company Released Parties and (ii) Liabilities that the Company Released Parties ever had, now have or hereafter can, shall or may have, to the Purchaser Releasors, in the case of each of clauses (i) and (ii), relating to, arising out of or in connection with any facts or circumstances relating to the Note and Warrant Purchase Agreement which occurred prior to the Closing (each such claim or Liability in clauses (i) and (ii), a "Purchaser Released Claim/Liability"), and agree not to bring or threaten to bring or otherwise join in (or assign to any third party) any Purchaser Released Claim/Liability against the Company Released Parties or any of them. The foregoing notwithstanding, the Purchaser Releasors are not releasing, acquitting or discharging the Company Released Parties from (A) any claims or Liabilities relating to, arising out of or in connection with any of the obligations or agreements of the Company Released Parties or any of them expressly established pursuant to this Agreement, the other Transaction Documents, or the ARD Term Loan Credit Agreement or (B) any claim for fraud. The Company Released Parties are expressly intended as third party beneficiaries of this provision of this Agreement.

Section 5.3    Cooperation. Subject to the terms and conditions of this Agreement, each of the parties hereto shall take, or cause to be taken, all necessary actions and to do, or cause to be done, all things necessary or desirable under applicable Legal Requirements for such party to consummate the transactions contemplated by this Agreement, including (a) preparing and filing as promptly as practicable with any Governmental Authority all documentation to effect all necessary or advisable filings, notices, petitions, statements, registrations, submissions of information, applications and other documents by such party and (b) obtaining and maintaining all approvals, consents, registrations, permits, authorizations, actions or non-actions, and other confirmations required or advisable to be obtained by such party from any Governmental Authority that are necessary, proper or advisable for such party to consummate the transactions contemplated by this Agreement.

Section 5.4    Confidentiality. Except as may be requested or required by applicable Legal Requirement or as specifically contemplated hereby, the parties hereto will maintain the confidentiality of the transactions contemplated by this Agreement and the other Transaction Documents, except that the parties hereto may disclose the terms of the transaction to their respective Affiliates, directors, officers, members, trustees, employees, agents, advisors, attorneys, accountants, agents and other professionals in connection with the closing of the transactions contemplated by and/or the performance of the parties' respective obligations under this Agreement or the other Transaction Documents or the enforcement of the parties' respective rights and obligations hereunder or thereunder.

Section 5.5    Transfers of Notes and Warrants. Purchasers and the Members agree that, upon any Transfer (as such term is defined in the Note and Warrant Purchase Agreement) of Notes or Warrants by a Purchaser or Equity Interests in the Company by a Member, such

16

Purchaser or Member shall cause the transferee to become a party to this Agreement by executing and delivering to the Company a joinder to this Agreement agreeing to be bound by this Agreement as if such transferee were a Purchaser or Member that had originally signed this Agreement as of the date hereof, and which will otherwise be in a form reasonably acceptable to the Company. Purchasers and the Members agree that the execution and delivery of such a joinder will be a condition to the effectiveness of any Transfer of Notes or Warrants or Equity Interests in the Company. Any Transfer of Notes or Warrants or Equity Interests in the Company to a Person that is not then a party to this Agreement that does not include the execution and delivery to the Company of such a joinder prior to or concurrently with such Transfer shall be null and void *ab initio*.

Section 5.6    Approval of Company Operating Agreement. Each of the Purchasers and the Members hereby approves the form of Company Operating Agreement and consents to the Company Operating Agreement being entered into at the Closing, including as contemplated by Section 2.4. Each of the Purchasers and the Members hereby waives any preemptive rights arising under the Amended and Restated Operating Agreement of the Company, dated October 14, 2014, as amended, including pursuant to Sections 4.6 or 4.7 thereof, arising by reason of the transactions contemplated by this Agreement.

ARTICLE VI
CLOSING CONDITIONS

Section 6.1    Conditions Precedent to Obligations of the Company. The obligation of the Company to consummate the transactions contemplated hereby is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions precedent (any one or more of which may be waived in writing in whole or in part by the Company in its sole discretion):

(a)    Representations, Warranties and Covenants. The representations and warranties of Purchasers in Article IV shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct only as of such specific date), and Purchasers shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by them at or prior to the Closing Date. Each Purchaser shall furnish the Company with a certificate or certificates in the form attached hereto as Exhibit G dated as of the Closing Date and signed by a duly authorized representative of such Purchaser to the effect that the conditions set forth in this Section 6.1(a) have been satisfied.

(b)    Orders; Legal Requirements. There shall exist no Order or Legal Requirement restraining, enjoining or prohibiting the consummation by the Company of the transactions contemplated by this Agreement or the other Transaction Documents.

(c)    Joint Development Agreement. The Joint Development Agreement shall have been executed on or before the Closing Date.

(d)    Fullstream Contract. A Subsidiary of the Company shall have entered into a Contract with Fullstream Energy (or an Affiliate thereof), for the construction of the ACP

17

Connector (as defined in the Joint Development Agreement) or a substantially equivalent Pipeline (as defined in the Joint Development Agreement).

(e)  ARD Term Loan Credit Agreement. The Closing Date (as defined in the ARD Term Loan Credit Agreement) under the ARD Term Loan Credit Agreement shall have occurred on or before the Closing Date.

(f)  RBL Credit Facility. The Closing Date (as defined in the RBL Credit Facility) under the RBL Credit Facility shall have occurred on or before the Closing Date.

(g)  AEH Plan of Reorganization. If the AEH Restructuring Cases have commenced, the AEH Plan of Reorganization shall have become effective on or prior to the Closing Date.

(h)  Simultaneity. All of the Purchasers shall have consummated the transactions contemplated hereby (including the surrender and cancellation of 100% of the outstanding Notes in exchange for the issuance of Class A Common Units by the Company) substantially contemporaneously (i.e., within 24 hours) with each other Purchaser, it being understood that if the Company has exercised its rights under Section 2.4, this condition shall be deemed to have been satisfied.

(i)  Deliverables. Purchasers shall have delivered all the certificates, instruments, contracts and other items specified to be delivered by them in Section 2.3(a), and the Members shall have delivered the items specified to be delivered by them in Section 2.3(c).

Section 6.2  Conditions Precedent to Obligations of Purchasers. The obligation of a Purchaser to consummate the transactions contemplated hereby is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions precedent (any one or more of which may be waived in writing in whole or in part by such Purchaser in its sole discretion):

(a)  Representations, Warranties and Covenants. The representations and warranties of the Company in Article III shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct only as of such specific date), and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date. The Company shall furnish such Purchaser with a certificate in the form attached hereto as Exhibit H dated the Closing Date and signed by a manager or officer of the Company to the effect that the conditions set forth in this Section 6.2(a) have been satisfied.

(b)  Orders; Legal Requirements. There shall exist no Order or Legal Requirement restraining, enjoining or prohibiting the consummation by such Purchaser of the transactions contemplated by this Agreement or the other Transaction Documents.

(c)  Joint Development Agreement. The Joint Development Agreement shall have been executed on or before the Closing Date.

(d)      Fullstream Contract. A Subsidiary of the Company shall have entered into a Contract with Fullstream Energy (or an Affiliate thereof), for the construction of the ACP Connector (as defined in the Joint Development Agreement) or a substantially equivalent Pipeline (as defined in the Joint Development Agreement).

(e)      ARD Term Loan Credit Agreement. The Closing Date (as defined in the ARD Term Loan Credit Agreement) under the ARD Term Loan Credit Agreement shall have occurred on or before the Closing Date.

(f)      RBL Credit Facility. The Closing Date (as defined in the RBL Credit Facility) under the RBL Credit Facility shall have occurred on or before the Closing Date.

(g)      AEH Plan of Reorganization. If the AEH Restructuring Cases have commenced, the AEH Plan of Reorganization shall have become effective on or prior to the Closing Date.

(h)      Simultaneity. The Company and all of the other Purchasers shall have consummated the transactions contemplated hereby (including the surrender and cancellation of 100% of the outstanding Notes in exchange for the issuance of Class A Common Units by the Company) substantially contemporaneously (i.e., within 24 hours) of the Closing Date, it being understood that if the Company has exercised its rights under Section 2.4, this condition shall be deemed to have been satisfied.

(i)      Arsenal Midstream. The Company shall not, directly or indirectly, have transferred, sold or otherwise disposed of to a third party, any equity interests of Arsenal Midstream LLC.

(j)      Deliverables. The Company shall have delivered to such Purchaser the certificates, instruments, contracts and other items specified to be delivered by it to such Purchaser in Section 2.3(b).

ARTICLE VII
TERMINATION

Section 7.1      Termination. This Agreement may be terminated at any time prior to the Closing:

(a)      by the written consent of the Company and the Required Holders;

(b)      by either the Company or the Required Holders if the Closing has not occurred by 11:59 p.m., New York time, on March 21, 2019 (the "End Date"); provided, however, that the right to terminate this Agreement under this Section 7.1(b) shall not be available to (i) the Company, if the failure of the Company to fulfill any obligation or condition under this Agreement has been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the End Date, or (ii) the Required Holders, if the failure of any Purchaser to fulfill any obligation or condition under this Agreement has been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the End Date. Under no circumstances shall the Company be allowed to rely on the provisions of Section 2.4 to avoid a

19

termination under this clause (b) to the extent that, at such time as the Company seeks to exercise its rights under Section 2.4, the Company has failed to fulfill any obligation or condition under this Agreement or is otherwise in default hereunder, and such failure or default has been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the End Date.

Section 7.2    Effect of Termination. In the event of termination of this Agreement pursuant to Section 7.1, written notice thereof shall forthwith be given by the terminating party or parties to the other party or parties hereto, and this Agreement shall thereupon terminate and become void and have no effect, and the transactions contemplated hereby shall be abandoned without further action by the parties hereto and no party hereto shall have any liability hereunder, except that (a) such termination shall not relieve any party hereto of any liability for any intentional breach of any covenant or agreement contained in this Agreement occurring prior to such termination and (b) the provisions of Section 5.4, this Section 7.2 and Article VIII (in each case, along with corresponding defined terms) shall survive the termination of this Agreement.

ARTICLE VIII
MISCELLANEOUS

Section 8.1    Action by Purchasers. If any amendment, consent, approval, waiver or action of Purchasers is required or contemplated hereunder, such amendment, consent, approval, waiver or action shall be deemed given if the Required Holders provide such amendment, consent, approval, waiver or action in writing.

Section 8.2    Survival. The representations and warranties made by the Company herein and in the certificates or other instruments delivered by the Company in connection with or pursuant to this Agreement shall survive until the 18-month anniversary of the Closing; provided, that the representations and warranties in Section 3.1(a) (first sentence), Section 3.1(b) and Section 3.1(c) shall survive the Closing and the issuance of the Class A Common Units indefinitely. The representations and warranties of each Purchaser herein shall survive the Closing until the 18-month anniversary of the Closing; provided, that the representations and warranties in Section 4.1(a) (first sentence), Section 4.1(b), Section 4.1(c) and Section 4.2 shall survive the Closing and the issuance of the Class A Common Units indefinitely.

Section 8.3    Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement Copies of executed counterparts transmitted by facsimile, email or other electronic transmission service (via PDF or otherwise) shall be considered original executed counterparts for purposes of this Section 8.3.

Section 8.4    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement and the rights and duties of the parties hereto hereunder shall be governed by and construed in accordance with the laws of the State of Delaware that apply to contracts made and performed entirely within such state, without regard to principles of conflicts of laws.

(b)    Any Action with respect to this Agreement or any matter arising out of or in connection with this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and

20

obligations arising hereunder brought by a party hereto or its successors or assigns, shall be brought and determined exclusively in the Delaware Chancery Court or, if such court shall not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court. Each of the parties hereto hereby irrevocably submits with regard to any such Action for itself and in respect of its property, generally and unconditionally, to the sole and exclusive personal jurisdiction of the aforesaid courts and agrees that it will not bring any Action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each party hereto irrevocably consents to service of process in any Action in any of the aforesaid courts by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized overnight delivery service, to such party at such party's address referred to in Section 8.7. Each party hereto hereby irrevocably and unconditionally waives, and agrees not to assert as a defense, counterclaim or otherwise, in any Action brought by any party with respect to this Agreement (i) any claim that it is not personally subject to the jurisdiction of the aforesaid courts for any reason other than the failure to serve process in accordance with this Section 8.4, (ii) any claim that it or its property is exempt or immune from the jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) any objection which such party may now or hereafter have (A) to the laying of venue of any of the aforesaid Actions arising out of or in connection with this Agreement brought in the courts referred to above, (B) that such Action brought in any such court has been brought in an inconvenient forum and (C) that this Agreement or the subject matter hereof may not be enforced in or by such courts. Nothing herein shall affect the right of any party to serve process in any other manner permitted by Legal Requirements.

(c)     To the extent that any party hereto has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself, or to such party's property, each such party hereby irrevocably waives such immunity in respect of such party's obligations with respect to this Agreement.

(d)     WAIVER OF JURY TRIAL. EACH PARTY HERETO, FOR ITSELF AND ITS AFFILIATES, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE ACTIONS OF THE PARTIES HERETO OR THEIR RESPECTIVE AFFILIATES PURSUANT TO THIS AGREEMENT IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

(e)     EACH PARTY HERETO ACKNOWLEDGES THAT IT IS KNOWINGLY AND VOLUNTARILY AGREEING TO THE CHOICE OF DELAWARE LAW TO GOVERN THIS AGREEMENT AND TO THE JURISDICTION OF DELAWARE COURTS IN CONNECTION WITH PROCEEDINGS BROUGHT HEREUNDER. THE PARTIES HERETO INTEND THIS TO BE AN EFFECTIVE CHOICE OF DELAWARE LAW AND AN EFFECTIVE CONSENT TO JURISDICTION AND SERVICE OF PROCESS UNDER 6 DEL. C. § 2708.

Section 8.5    Entire Agreement; No Third Party Beneficiary. This Agreement and the other Transaction Documents contain the entire agreement by and among the parties hereto with respect to the subject matter hereof and all prior negotiations, writings and understandings relating to the subject matter of this Agreement and the other Transaction Documents are merged in and are superseded and canceled by, this Agreement and the other Transaction Documents. This Agreement is not intended to confer upon any Person not a party hereto (or their successors and permitted assigns) any rights or remedies hereunder except to the extent otherwise set forth in Section 5.2 or in Section 8.18.

Section 8.6    Expenses. Each party hereto shall pay its own fees and expenses (including the fees of any attorneys, accountants, investment bankers or others engaged by such party) in connection with this Agreement and the transactions contemplated hereby.

Section 8.7    Notices. All notices and other communications hereunder will be in writing and given by certified or registered mail, return receipt requested, internationally recognized overnight delivery service (such as Federal Express), or e-mail, in each case, at such party's address or e-mail address set forth below or such other address or e-mail address as such party may hereafter specify by notice to the other parties hereto given in accordance herewith. Any such notice or other communication shall be deemed to have been given as of the date so personally delivered or transmitted by e-mail (if delivered or transmitted during normal business hours of the recipient and, if not, then on the next Business Day), three Business Days after the date sent by overnight delivery services or seven days after the date so mailed if by certified or registered mail.

If to the Company:

Arsenal Energy Holdings LLC
6031 Wallace Road Ext., Suite 300
Wexford, Pennsylvania 15090
Attn: Craig Lavender
Email: clavender@arsenalresources.com
Fax: 800-428-0981

with a copy to (which shall not constitute notice):

Simpson Thacher & Bartlett LLP
600 Travis Street, Suite 5400
Houston, Texas 77002
Attn: Christopher R. May
E-mail: cmay@stblaw.com
Fax: 713-821-5602

002129-0002-25324783

If to Purchasers, as set forth in the Note and Warrant Purchase Agreement or Warrants, as applicable.

If to the Members, as set forth in the Amended and Restated Operating Agreement of the Company, dated October 14, 2014, as amended.

Section 8.8    Successors and Assigns. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party hereto may assign its rights or delegate its obligations, in whole or in part, directly or indirectly, by operation of the law or otherwise, under this Agreement without the prior written consent of the other parties hereto. Any purported assignment or delegation in violation of this Agreement shall be null and void *ab initio*.

Section 8.9    Headings. The Section, Article and other headings contained in this Agreement are inserted for convenience of reference only and will not affect the meaning or interpretation of this Agreement.

Section 8.10    Amendments and Waivers. This Agreement may not be modified or amended except by an instrument or instruments in writing signed by the Company and the Required Holders. Any party hereto to whom performance or compliance is owed hereunder may, only by an instrument in writing, waive performance or compliance by any other party or parties hereto of or with any term or provision hereof on the part of such other party or parties hereto to be performed or complied with. No failure or delay of any party hereto in exercising any right or remedy hereunder shall operate as a waiver thereof, nor will any single or partial exercise of any right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The waiver by any party hereto of a breach of any term or provision hereof shall not be construed as a waiver of any subsequent breach. The rights and remedies of the parties hereto hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have hereunder.

Section 8.11    Interpretation.

(a)    For the purposes hereof: (i) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires; (ii) the terms "hereof", "herein", and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including the Exhibits) and not to any particular provision of this Agreement, and Article, Section, paragraph, and Exhibit references are to the Articles, Sections, paragraphs, and Exhibits of this Agreement unless otherwise specified; (iii) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation", unless the context otherwise requires or unless otherwise specified; (iv) the word "or" shall not be exclusive; and (v) all references to "$" and "dollars" shall be deemed to refer to United States dollars unless otherwise specifically provided.

(b)    With regard to each and every term of this Agreement, the parties hereto understand and agree that the same has been mutually negotiated, prepared and drafted, and if at

23

any time the parties hereto desire or are required to interpret or construe any such term or any agreement or instrument subject hereto, no consideration shall be given to the issue of which party actually prepared, drafted or requested any term of this Agreement.

Section 8.12    Severability. Any provision hereof that is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof; provided, however, that the Company and Purchasers will attempt in good faith to reform this Agreement in a manner consistent with the intent of any such ineffective provision for the purpose of carrying out such intent.

Section 8.13    Further Assurances. From and after the Closing, the parties hereto shall do such acts, execute such documents and instruments and cooperate with each other as may be reasonably required to make effective the transactions contemplated hereby.

Section 8.14    Business Days. If any date provided for in this Agreement shall fall on a day that is not a Business Day, the date provided for shall be deemed to refer to the next Business Day.

Section 8.15    Specific Performance. Each of the parties hereto acknowledges that none of the parties hereto would have an adequate remedy at law for money damages in the event that any of the covenants or agreements set forth in this Agreement were not performed or threatened not to be performed in accordance with their terms and therefore, each party hereto agrees that each other party hereto shall be entitled to seek specific performance, injunctive and other equitable relief in addition to any other remedy to which it may be entitled at law or in equity (without the necessity of proving the inadequacy as a remedy of money damages or the posting of a bond).

Section 8.16    Joint and Several Obligations. Purchasers' and the Members' respective obligations hereunder are several and not joint, and no Purchaser or Member shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser or Member hereunder.

Section 8.17    No Reliance. Each Purchaser and Member acknowledges that it has, independently and without reliance upon the Company, any other Purchaser or Member and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement or any related agreement to which is a party. Each Purchaser and Member also acknowledges that it will, independently and without reliance upon the Company, any other Purchaser or Member and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

Section 8.18    No Recourse Against Non-Parties. All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to

enter into this Agreement), may be made only against the entities that are expressly identified as parties hereto. No Person who is not a named party to this Agreement, including any director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of any named party to this Agreement ("Non-Party Affiliates") shall have any Liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose Liability of an entity party against its owners or Affiliates) for any obligations or Liabilities arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution; and each party hereto waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Non-Party Affiliates are expressly intended as third party beneficiaries of this provision of this Agreement.

Section 8.19    Effectiveness of Agreement. This Agreement will become effective when the Agreement has been executed by the Company and Purchasers holding all of the outstanding Notes and Warrants; provided, that, if the AEH Restructuring Cases are commenced, this Agreement will become effective upon the effective date of the AEH Plan of Reorganization, regardless of whether this Agreement has been executed by any Purchasers.

[Signature pages follow]

**Exhibit B**

Form of New AEH Operating Agreement

**SECOND AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**ARSENAL ENERGY HOLDINGS LLC**

**[●], 2019**

# TABLE OF CONTENTS

**Page**

## ARTICLE 1
## FORMATION

| | | |
|---|---|---|
| 1.1 | Formation and Continuation | 2 |
| 1.2 | Name; Principal Place of Business | 2 |
| 1.3 | Agent for Service of Process | 2 |
| 1.4 | Purpose | 2 |

## ARTICLE 2
## UNITS

| | | |
|---|---|---|
| 2.1 | Units | 2 |
| 2.2 | Common Units | 2 |
| 2.3 | Profits Interest Units | 3 |
| 2.4 | Voting Rights of Unitholders | 3 |
| 2.5 | Record of Unit Holdings | 3 |
| 2.6 | Additional Classes | 3 |
| 2.7 | Business Combinations | 4 |

## ARTICLE 3
## MEMBERSHIP

| | | |
|---|---|---|
| 3.1 | Members | 4 |
| 3.2 | Additional Members | 4 |
| 3.3 | Resignation or Withdrawal of a Member | 4 |
| 3.4 | Disassociation of a Member | 4 |
| 3.5 | Meetings of Members | 5 |
| 3.6 | No Authority as Agent | 5 |
| 3.7 | Investment Opportunities | 5 |

## ARTICLE 4
## TRANSFERS; ASSIGNMENTS

| | | |
|---|---|---|
| 4.1 | Restrictions on Transfers of Company Units | 5 |
| 4.2 | Admission of Substitute Members | 6 |
| 4.3 | Rights of Assignees | 6 |
| 4.4 | Effect of Transfer of Units on Capital Accounts | 6 |
| 4.5 | Transfers in Compliance with Law | 6 |
| 4.6 | Preemptive Rights | 6 |
| 4.7 | ERISA Matters | 8 |
| 4.8 | Involuntary Transfers | 8 |

## ARTICLE 5
## CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS

| | | |
|---|---|---|
| 5.1 | Capital Accounts | 8 |
| 5.2 | Initial Capital Contributions; Conversion of Common Units; Profits Interest Units | 8 |
| 5.3 | Additional Contributions | 9 |
| 5.4 | Return of Capital Contributions | 9 |

## ARTICLE 6
## MANAGEMENT

| | | |
|---|---|---|
| 6.1 | Management Authority | 9 |

| | | |
|---|---|---|
| 6.2 | Management Committee | 9 |
| 6.3 | Officers and Employees | 13 |
| 6.4 | Replacement of Auditor or Petroleum Engineer | 13 |
| 6.5 | Management Committee Observer | 13 |
| 6.6 | Committees | 13 |
| 6.7 | Tax Covenants | 13 |

ARTICLE 7
DISTRIBUTIONS

| | | |
|---|---|---|
| 7.1 | Tax Distributions | 14 |
| 7.2 | Distributions | 15 |
| 7.3 | Distributions in Kind | 16 |
| 7.4 | Restrictions on Distributions | 16 |
| 7.5 | Return of Distributions Generally | 16 |
| 7.6 | No Other Withdrawals | 17 |

ARTICLE 8
ALLOCATIONS

| | | |
|---|---|---|
| 8.1 | Allocation of Profits and Losses | 17 |
| 8.2 | Allocations upon Transfer | 18 |
| 8.3 | Tax Treatment | 18 |
| 8.4 | Tax Allocations | 19 |
| 8.5 | Tax Allocations with Respect to Depletable Properties | 19 |
| 8.6 | Effect on Distributions | 20 |
| 8.7 | Audit Rules | 20 |

ARTICLE 9
ACCOUNTING AND RECORDS

| | | |
|---|---|---|
| 9.1 | Books and Records | 21 |
| 9.2 | Reports; Quarterly Meeting | 22 |
| 9.3 | Confidentiality | 23 |
| 9.4 | Tax Returns | 23 |
| 9.5 | Tax Matters Member | 24 |
| 9.6 | Annual Plan and Budget | 24 |

ARTICLE 10
LIABILITY, EXCULPATION AND INDEMNIFICATION; FIDUCIARY DUTIES

| | | |
|---|---|---|
| 10.1 | Liability | 25 |
| 10.2 | Exculpation | 25 |
| 10.3 | Duties and Liabilities of Covered Persons. | 26 |
| 10.4 | Indemnification | 26 |
| 10.5 | Expenses | 26 |
| 10.6 | Insurance | 26 |
| 10.7 | Waiver of Fiduciary Duties | 27 |
| 10.8 | Unitholder Duties | 27 |

ARTICLE 11
DISSOLUTION

| | | |
|---|---|---|
| 11.1 | Dissolution | 27 |
| 11.2 | Authority to Wind Up | 27 |
| 11.3 | Distribution of Property | 28 |
| 11.4 | Capital Account Deficit | 28 |

ii

ARTICLE 12
MISCELLANEOUS

12.1    Amendments ........................................................................................................... 28
12.2    Public Offering....................................................................................................... 28
12.3    Successors and Assigns........................................................................................... 30
12.4    Governing Law and Severability ............................................................................ 30
12.5    Counterparts; Facsimiles........................................................................................ 30
12.6    Titles and Subtitles; Illustrations............................................................................ 30
12.7    Notices .................................................................................................................. 30
12.8    Entire Agreement ................................................................................................... 31
12.9    Tax Advances......................................................................................................... 31
12.10   Arbitration............................................................................................................. 32


Schedule I          Members; Units

Exhibit A           Definitions
Exhibit B           Transfer Provisions

002129-0002-25671445

**SECOND AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**ARSENAL ENERGY HOLDINGS LLC**

This **SECOND AMENDED AND RESTATED OPERATING AGREEMENT** of ARSENAL ENERGY HOLDINGS LLC (formerly known as Mountaineer Energy Holdings, LLC), a Delaware limited liability company (the "**Company**"), is entered into as of [●], 2019 (the "**Effective Date**"), by and among the Members or Unitholders signatory hereto or otherwise made party hereto from time to time.[1]

**RECITALS**

A.        The Company was formed by filing a Certificate of Formation with the Office of the Secretary of State of the State of Delaware on July 11, 2014 (the "**Original Certificate**").

B.        On July 29, 2014, Holdings entered into the Limited Liability Company Agreement of the Company (the "**Initial Operating Agreement**") as the sole member of the Company.

C.        On October 14, 2014, Holdings and FR Mountaineer Keystone Holdings LLC entered into the Amended and Restated Operating Agreement of the Company (as amended by Amendment No. 1, dated as of November 10, 2016, the "**Amended and Restated Operating Agreement**").

D.        The Original Certificate was amended on February 20, 2017 to change the name of the Company to "Arsenal Energy Holdings LLC" by the filing of a Certificate of Amendment to Certificate of Formation of the Company with the Office of the Secretary of State of the State of Delaware.

E.        The Company and each of the purchasers ("**Purchasers**") of subordinated unsecured notes (the "**Notes**") and warrants (the "**Warrants**") are party to one or more of (a) the Note and Warrant Purchase Agreement, dated as of July 29, 2014 (as amended, supplemented or otherwise modified from time to time, the "**2014 Note and Warrant Purchase Agreement**"), (b) the Note and Warrant Purchase Agreement, dated as of November 10, 2016 (as amended, supplemented or otherwise modified from time to time, the "**2016A Note and Warrant Purchase Agreement**"), and (c) the Note and Warrant Purchase Agreement, dated as of December 22, 2016 (as amended, supplemented or otherwise modified from time to time, the "**2016B Note and Warrant Purchase Agreement**" and, together with the 2014 Note and Warrant Purchase Agreement and the 2016A Note and Warrant Purchase Agreement, the "**Note and Warrant Purchase Agreement**").

F.        The Note and Warrant Purchase Agreement has previously been amended by (a) Amendment No. 1 to Note and Warrant Purchase Agreement, dated as of September 26, 2014, (b) Waiver and Amendment No. 2 to Note and Warrant Purchase Agreement, dated as of November 10, 2016, and (c) Waiver and Amendment No. 3 to Note and Warrant Purchase Agreement, dated as of March 16, 2017, entered into, in each case, by the Company and the Purchasers party thereto.

G.        In accordance with the Exchange Agreement, dated as of [●], 2019 (the "**Exchange Agreement**"), by and among the Company, each of the Purchasers who are signatory or otherwise deemed to be party thereto, and, solely for purposes of Section 2.3(c) of the Exchange Agreement, each of the Members of the Company who are signatory or otherwise deemed to be a party thereto, in exchange for the

---

[1] Note to Draft: Schedules and definitions related to Class A Common Units and Class A Liquidation Preference will be updated as necessary due to the contemplated change in the reference date for conversion used in the Exchange Agreement.

surrender and cancelation by Purchasers of all of the outstanding Notes, the Company is issuing to the Purchasers identified therein Class A Common Units (the "***Exchange***").

H.      The parties hereto now desire to amend and restate the Amended and Restated Operating Agreement to reflect the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual agreements and representations set forth herein, and intending to be legally bound, the parties to this Agreement set forth the agreement for the Company under the laws of the State of Delaware upon the terms and subject to the conditions of this Agreement.

## ARTICLE 1
## FORMATION

1.1     <u>Formation and Continuation</u>. The Members hereby agree to continue the Company as a limited liability company under the Act, upon the terms and subject to the conditions set forth in this Agreement.

1.2     <u>Name; Principal Place of Business</u>. Unless and until amended in accordance with this Agreement and the Act, the name of the Company will be "Arsenal Energy Holdings LLC". The principal place of business of the Company shall be 6031 Wallace Road Ext., Suite 300, Wexford, Pennsylvania 15090, or such other place or places within the United States as determined by consent of the Management Committee.

1.3     <u>Agent for Service of Process</u>. Until such time as the Company has appointed a different person to act in the State of Delaware as the agent of the Company for service of process, the Company's agent for service of process in the State of Delaware shall be Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

1.4     <u>Purpose</u>. The Company is formed solely for the object and purpose of (a) investing in and conducting oil and gas exploration, development, gathering, transportation and marketing activities in the AMI, (b) investing in or operating related ancillary businesses that operate in the AMI, and (c) engaging in any and all activities necessary or incidental to the foregoing.

## ARTICLE 2
## UNITS

2.1     <u>Units</u>. The Company shall be authorized to issue three classes of Units, to be designated as "***Class A Common Units***", "***Class B Common Units***", "***Class C Common Units***" (collectively, the "***Common Units***") and "***Profits Interest Units***". The rights associated with the Units are set forth hereinafter. The Units shall not be represented by certificates. Subject to <u>Section 4.6</u> and <u>Article 6</u>, the total number of Units the Company is empowered to issue is unlimited.

2.2     <u>Common Units</u>.

2.2.1     Common Units may be issued at any time on terms and conditions determined by the Management Committee.

2

2.2.2    Except as may be agreed between the Company and a holder of Common Units, the holders of Common Units shall not have any obligation to contribute capital to the Company.

2.3    <u>Profits Interest Units</u>.

2.3.1    The Profits Interest Units shall be issuable only to Persons who are employed by or provide services to the Company or any of its Subsidiaries. The Company may from time to time effect one or more issuances of Profits Interest Units. The Management Committee shall designate a "***Threshold Amount***" applicable to each issuance of Profits Interest Units to the extent necessary to cause such Profits Interest Units to constitute "profits interests", but which shall not be less than zero. The Threshold Amount for each series of Profits Interest Units shall, as of any date of determination, be not less than an amount equal to the aggregate amount that would be distributed with respect to the Units issued on the date hereof and any other Units issued prior to the issuance of such series of Profits Interest Units if, immediately prior to the issuance of such series of Profits Interest Units, the Company were dissolved and liquidated pursuant to <u>Article 11</u> hereof, its assets sold for cash equal to their respective fair market values, all Company liabilities were satisfied in full and the balance were distributed pursuant to <u>Section 7.2</u>. For United States federal income tax purposes, the Profits Interest Units represent "profits interests" in the Company in accordance with Rev. Proc. 2001-43, 2001-2 C.B. 191 and Rev. Proc. 93-27, 1993-2 C.B. 343. Any Profits Interest Unit that is repurchased by the Company shall be cancelled.

2.3.2    The Profits Interest Units shall be held subject to the terms and conditions (including vesting, forfeiture and other provisions) of this Agreement, the 2019 Long-Term Incentive Plan of Arsenal Energy Holdings LLC (as it may be amended from time to time, the "***Management Incentive Plan***") and each applicable management interest award agreement (each, an "***Award Agreement***").

2.4    <u>Voting Rights of Unitholders</u>.

2.4.1    Each outstanding Common Unit held by a Member will have one vote on any matter put before the Members holding Common Units.

2.4.2    Unless otherwise specified herein, any action requiring the approval of Members shall be approved with a Vote of Class A Members.

2.4.3    Notwithstanding anything in this <u>Section 2.4</u> to the contrary, the vote of Members required to amend or waive any provision of this Agreement shall be as set forth in <u>Section 12.1</u>.

2.4.4    The Profits Interest Units shall have no voting rights or rights of approval, veto or consent or similar rights over any actions of the Company. Except as may be required by <u>Section 12.1</u>, to the extent this Agreement expressly provides for the vote, approval, veto or consent with respect to any actions of the Company, only the holders of Common Units will be entitled to vote on any matters requiring a vote, consent or other action of the Members.

2.5    <u>Record of Unit Holdings</u>. <u>Schedule I</u> sets forth the outstanding Units and the holders thereof as of the date of this Agreement, which shall be updated by the Company from time to time to reflect additional issuances or changes in ownership thereof.

2.6    <u>Additional Classes</u>. In addition to the Units authorized, created and issued as of the date hereof, the Company may, subject to the restrictions herein, authorize, create and issue additional classes of securities as the Management Committee shall determine in its sole and absolute discretion and without the approval of any Member with such designations, preferences and relative, participating, optional or other special rights, voting rights, powers and duties, including rights, powers and duties senior to the then

3

outstanding Units, as shall be fixed by the Management Committee and which may include (but shall not be limited to), additional classes of securities reflecting additional Capital Contributions, to which the assets and liabilities and income and expenditure attributable or allocated to such class shall be applied or charged. Notwithstanding anything to the contrary contained herein, the Management Committee is authorized to amend this Agreement, without any action on the part of any Member, as necessary to reflect the designations, preferences and relative, participating, optional or other special rights, voting rights, powers and duties of any additional class of securities. Incurring, authorizing, designating or issuing additional debt (including debt refinancings) or Equity Securities of the Company shall require the approval of the Management Committee pursuant to Section 6.2.

2.7     Business Combinations. Notwithstanding anything to the contrary contained herein other than the provisions of Exhibit B hereto, the Management Committee shall have the authority to approve any merger, consolidation or other business combination transaction involving the Company, and the Members shall have no voting rights or rights of approval, veto or consent or similar rights in connection with any such merger, consolidation or other business combination transaction; provided, that, upon the consummation of any such transaction each Member shall be entitled to receive the same proportion of the aggregate consideration from such transaction that such Member would have received if such aggregate consideration had been distributed by the Company as a distribution pursuant to Section 7.2 as in effect immediately prior to such transaction or, if such consideration is to be distributed in a different manner, 66⅔% of any adversely affected class, series or group of Common Units or Profits Interest Units shall have given their prior written approval of the manner of distribution. Notwithstanding anything to the contrary contained herein, the Management Committee is authorized to amend this Agreement, without any action on the part of any Member, to the extent necessary to implement any such merger, consolidation or other business combination transaction; provided, that if such amendment amends the provisions of Article 7 in a manner that would be adverse to any class, series or group of Common Units or Profits Interests Units (without having a similar adverse effect on the holders of all Units), such amendment shall not be effective without the prior written approval of more than 66⅔% of the affected class, series or group of Common Units or Profits Interest Units.

# ARTICLE 3
# MEMBERSHIP

3.1     Members. The Members of the Company and their respective interests in the Company shall be as set forth in Schedule I hereto, as updated from time to time.

3.2     Additional Members. Subject to Section 4.6, one or more Additional Members of the Company may be admitted to the Company as a Member upon the approval of the Management Committee, and such Persons shall be admitted as Members of the Company; provided, that they execute a counterpart signature page to this Agreement agreeing to be bound by the terms of this Agreement.

3.3     Resignation or Withdrawal of a Member. Except as specifically provided in this Agreement, no Member shall have the right to resign or withdraw from membership in the Company or withdraw its interest in the capital of the Company.

3.4     Disassociation of a Member. The incapacity, death, Bankruptcy or Dissolution of a Member: (a) will cause such Member to become a Disassociated Member; and (b) will terminate the continued membership of such Member in the Company. If any Member becomes a Disassociated Member, the Disassociated Member or its legal representative, successor or assign may request admission to the Company as a Substitute Member pursuant to Section 4.2. If no request for Substitute Member status is made or granted pursuant to Section 4.2, the Disassociated Member or its legal representative, successor or assign shall thereafter have only those rights of an Assignee under this Agreement.

4

3.5     <u>Meetings of Members</u>. Meetings may be held, if at all, in any manner and at any date, time or place as may be authorized by a Vote of Class A Members, including by written consent of Members whose affirmative vote would constitute the approval required to be taken on the action. Notice of the time and place of a meeting shall be delivered to each Member at least 24 hours in advance. If any action is taken without the express written consent of all Members, the Company shall promptly notify any Members whose consent was not solicited or received of such action.

3.6     <u>No Authority as Agent</u>. No Member shall have the authority, in its capacity as a Member, to enter into any transaction on behalf of the Company or to otherwise bind the Company except as provided in <u>Article 6</u> hereof.

3.7     <u>Investment Opportunities</u>.

3.7.1     If the Company offers, at any time following the date hereof, to any Unitholder an opportunity to invest in projects or acquisitions proposed to be undertaken by the Company or its Subsidiaries, it will, within 15 Business Days of such offer, provide written notice of such offer, as well as the same opportunity to invest, to each other Unitholder; <u>provided</u>, that the foregoing shall not apply to the Management Services Agreement. Each Unitholder will be entitled to invest a pro rata amount of the total amount to be invested by all Unitholders (which amount may be determined by the Company in its sole discretion) reflecting the aggregate number of outstanding Common Units held by such Unitholder, compared to the aggregate number of outstanding Common Units held by all participating Unitholders.

3.7.2     If the Company enters into any side letter or similar agreement with any Unitholder, in its capacity as such, the Company shall, within 30 days of entering into such side letter or similar agreement, provide a copy of such side letter or similar agreement to each other Member or Unitholder that is not a party to such side letter or similar agreement and provide such other Unitholders the opportunity to participate in such side letter or similar agreement on the terms set forth therein. The foregoing shall not apply to the Management Services Agreement.

**ARTICLE 4**
**TRANSFERS; ASSIGNMENTS**

4.1     <u>Restrictions on Transfers of Company Units</u>.

4.1.1     No Unitholder shall, directly or indirectly, sell, assign, pledge, mortgage or otherwise dispose of or transfer its Units, whether in whole or in part, (collectively, "***Transfer***"), unless (a) such Transfer is a Permitted Transfer, (b) such Transfer is effected pursuant to the "Drag-Along Rights" or "Tag-Along Rights" provisions set forth in <u>Section 1</u> and <u>Section 2</u> of <u>Exhibit B</u>, (c) in the case of a Transfer by a Key Holder other than a Transfer described in (a) or (b) above, the transferor complies with the "Right of First Offer" provisions set forth in <u>Section 4</u> of <u>Exhibit B</u>, (d) pursuant to any repurchase rights set forth in any applicable Award Agreement or (e) in the case of a Transfer by a Unitholder other than a Key Holder, the Management Committee shall have granted its express written consent to such Transfer, which consent may be withheld or conditioned for any or for no reason.

4.1.2     Notwithstanding <u>Section 4.1.1</u>, a Member may not Transfer any of his or her Profits Interest Units other than (a) with the prior written consent of the Management Committee (which consent shall be granted or withheld in the sole discretion of the Management Committee without regard to the best interests of any Member), (b) to the Company, (c) pursuant to any repurchase rights set forth in any applicable Award Agreement or (d) pursuant to the "Drag-Along Rights" or "Tag-Along Rights" provisions set forth in Section 1 and Section 2 of <u>Exhibit B</u>

5

4.1.3    Notwithstanding <u>Section 4.1.1</u> and <u>Section 4.1.2</u>, no Transfer of Units shall be permitted (a) if the transferee is not a United States Person within the meaning of Section 7701(a)(30) of the Code (unless the Management Committee shall have provided its consent to such Transfer) or (b) if it would cause all or any portion of the assets of the Company to (i) constitute "plan assets" (for purposes of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law) or (ii) be subject to the fiduciary responsibility or prohibited transaction provisions of ERISA or Section 4975 of the Code, or of any applicable Similar Law.

4.2    <u>Admission of Substitute Members</u>. An Assignee of Units of the Company shall be admitted as a Substitute Member if (a) the Assignee is an Affiliate of a Key Holder, (b) with the approval of the Management Committee, or (c) the Assignee received the Units in a Permitted Transfer. If so admitted, the Substitute Member shall have, with respect to the Units so assigned, all the rights and powers and shall be subject to all the restrictions and liabilities the Member who assigned such Units had by virtue of such Member's ownership of the assigned Units. The admission of a Substitute Member shall not release any Member who assigned such Units from liability to the Company that may have arisen prior to the Transfer.

4.3    <u>Rights of Assignees</u>. Unless it is a Substitute Member, the Assignee of any Units shall have no right to vote on, consent to, approve or participate in the determination of any matter, or to otherwise participate in the management of the business and affairs of the Company or to become a Member. Unless it is a Substitute Member, the Assignee is only entitled to receive distributions (including its return of capital) and to be allocated the Profits and Losses attributable to the Units assigned to the Assignee.

4.4    <u>Effect of Transfer of Units on Capital Accounts</u>. In the case of any Transfer of Units, the Assignee shall also succeed to the Capital Account of the previous holder thereof in respect of such Units. The determination of the Capital Account associated with any Units that have been assigned shall be made by the Tax Matters Member in good faith and in a manner consistent with the books and records of the Company.

4.5    <u>Transfers in Compliance with Law</u>. Notwithstanding any provision hereof to the contrary, no sale or other disposition of an interest in the Company may be made except in compliance with all federal, state and other applicable laws, including federal and state securities laws and no Transfer will be valid if it would cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations thereunder.

4.6    <u>Preemptive Rights</u>.

4.6.1    If the Company proposes to issue additional Equity Securities to any Person other than any direct or indirect Subsidiary of the Company, the Company shall deliver to each Key Holder (each, a "***Participating Member***") a written notice of such proposed issuance at least 20 days prior to the date of the proposed issuance (the "***Subscription Notice***"). Such notice shall include, to the extent applicable, (i) the amount, kind and terms of the Equity Securities to be included in the issuance, (ii) the price of the Equity Securities to be included in the issuance and (iii) the proposed issuance date, if known.

4.6.2    Each Participating Member shall have the option, by delivering an irrevocable written notice (a "***Subscription Acceptance***") to the Company within 15 Business Days after the Subscription Notice is delivered to such Participating Member, to irrevocably subscribe for, on the same terms as those of the proposed issuance of such additional Equity Securities, such number or amount, as applicable, of Equity Securities as is equal to the product of (i) the number or amount of such additional Equity Securities to be offered <u>multiplied by</u> (ii) a fraction the numerator of which is the number of Common Units owned by such Participating Member and the denominator of which is the number of Common Units owned by all Participating Members, in each case, on the same terms and conditions as are

to be provided to the proposed purchaser in the issuance in question. Each Participating Member who does not exercise such option in accordance with the above requirements shall be deemed to have waived all of such Participating Member's rights with respect to such issuance.

4.6.3    If at the end of the 90th day after the date of the effectiveness of the notice contemplated by <u>Section 4.6.1</u> above as such period may be extended to obtain any required regulatory approvals, the Company has not completed the issuance, each Participating Member shall be released from such Participating Member's obligations under the written commitment, the notice shall be null and void, and it shall be necessary for a separate notice to be furnished, and the terms and provisions of this <u>Section 4.6</u> separately complied with, in order to consummate such issuance.

4.6.4    Notwithstanding the requirements of this <u>Section 4.6</u>, the Company may proceed with the issuance of any Equity Securities that would otherwise be subject to this <u>Section 4.6</u> prior to having complied with the provisions of <u>Sections 4.6.1</u> and <u>4.6.2</u>; <u>provided</u>, that the Company shall:

(a)    provide to each Participating Member in connection with such issuance (i) prompt notice of such issuance and (ii) the Subscription Notice described in <u>Sections 4.6.1</u>; and

(b)    offer to issue (or have Transferred) to each Participating Member such number of Equity Securities of the type issued in the issuance as may be requested by such Participating Member (not to exceed the number of Equity Securities that such Participating Member would have been entitled to purchase pursuant to <u>Section 4.6.2</u> (after giving effect to the issuance of any Equity Securities under this <u>Section 4.6.4(b)</u>) if the Company had delivered a Subscription Notice, and such Participating Member had properly exercised its rights under <u>Section 4.6.2</u> in full, prior to the issuance) on the same economic terms and conditions with respect to such Equity Securities as the subscribers in issuance received and subject to the delivery by such Participating Member of a Subscription Acceptance within 7 days after the Subscription Notice is received by such Participating Member.

4.6.5    The provisions of this <u>Section 4.6</u> shall not apply to issuances by the Company as follows:

(a)    any issuance of securities upon the exercise or conversion of any Equity Securities outstanding on the date hereof or issued after the date hereof in a transaction that complied with the provisions of this <u>Section 4.6</u> or for which the provisions of this <u>Section 4.6</u> did not apply;

(b)    any issuance of Equity Securities to officers, employees, directors or consultants of the Company or any of its Subsidiaries in connection with such Person's employment or consulting arrangements with the Company or its Subsidiaries;

(c)    any issuance of Equity Securities, (A) in connection with any direct or indirect business combination or acquisition transaction involving the Company or any of its Subsidiaries, including with respect to a Third Party Organic Transaction, (B) in connection with any joint venture or strategic partnership or (C) to financial institutions, commercial lenders, broker/finders or any similar party, or their respective designees, in connection with the incurrence or guarantee of indebtedness by the Company or any of its Subsidiaries;

(d)    any issuance of Equity Securities in connection with any Unit split, Unit dividend or distribution or recapitalization transaction;

(e)    any issuance of Equity Securities in connection with any transaction undertaken pursuant to <u>Section 4.7</u>, <u>Section 7.3</u> or <u>Section 12.2</u>; or

7

4.6.6    The provisions of this <u>Section 4.6</u> shall terminate upon the earlier of (i) the consummation of a Public Offering and (ii) the listing of Units on a United States national securities exchange not involving a Public Offering.

4.7    <u>ERISA Matters</u>. Anything else contained herein to the contrary notwithstanding, if the Management Committee determines that the continued participation of any ERISA Member in the Company would be reasonably likely to result in (i) a material violation of the fiduciary responsibility or prohibited transaction provisions of Title I of ERISA, Section 4975 of the Code or any applicable Similar Law, in each case, with respect to such ERISA Member or (ii) all or any portion of the assets of the Company being characterized as Plan Assets (each of clauses (i) and (ii) being an "***ERISA Event***"), then the Company shall notify such ERISA Member of such ERISA Event and the Company shall take or permit such actions as the Management Committee deems in good faith to be necessary or appropriate to prevent or cure such result. In no event shall uniformity of treatment with respect to all ERISA Members be required, but no ERISA Member shall be deprived of the value of its Membership Interests.

4.8    <u>Involuntary Transfers</u>. Except as otherwise provided in this Agreement, any Transfer of title or beneficial ownership of any Units held by a Management Member upon default, foreclosure, forfeit, divorce, court order or other than by a voluntary decision (other than death) on the part of a Management Member (each, an "***Involuntary Transfer***") shall be void unless that Management Member complies with this <u>Section 4.8</u> and enables the Company to exercise its full rights hereunder and the Person to whom such Units have been Transferred (the "***Involuntary Transferee***") executes an addendum agreement in form and substance reasonably satisfactory to the Company. Upon any Involuntary Transfer, the Company shall have the right to purchase such Units pursuant to this <u>Section 4.8</u> and the Person to whom such Units have been Transferred shall have the obligation to sell such Units in accordance with this <u>Section 4.8</u>. Upon the Involuntary Transfer of any Units, such Management Member shall promptly (but in no event later than 2 Business Days after such Involuntary Transfer) furnish written notice to the Company indicating that the Involuntary Transfer has occurred, specifying the name of the Involuntary Transferee, giving a detailed description of the circumstances giving rise to, and stating the legal basis for, the Involuntary Transfer. Upon the receipt of the notice described in the preceding sentence, and for 90 Business Days thereafter, the Company shall have the right to purchase, and the Involuntary Transferee shall have the obligation to sell, all (but not less than all) of the Units acquired by the Involuntary Transferee for a purchase price equal to the lesser of (a) the fair market value of such Units (as determined by the Management Committee in its sole discretion) and (b) the amount of the indebtedness or other liability that gave rise to the Involuntary Transfer, plus the excess, if any, of the Carrying Value of such Units over the amount of such indebtedness or other liability that gave rise to the Involuntary Transfer. For purposes of this <u>Section 4.8</u>, "***Carrying Value***" means with respect to any Units purchased by the Company, the value equal to the Capital Contribution, if any, made by the selling Management Member in respect of any such Units less the amount of distributions made in respect of such Units. Subject to the approval of the Management Committee, the Company shall be permitted to assign all or a portion of its right to purchase under this <u>Section 4.8</u> to any Member or any of its Affiliates.

## ARTICLE 5
## CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS

5.1    <u>Capital Accounts</u>. A separate Capital Account shall be maintained for each Unitholder by the Company in accordance with this Agreement and the rules of Section 704 of the Code and the Treasury Regulations thereunder. Capital Accounts shall not govern distributions by the Company to the Unitholders, it being understood that Capital Accounts shall be maintained solely to assist the Company in allocating tax items of the Company.

5.2    <u>Initial Capital Contributions; Conversion of Common Units; Profits Interest Units</u>.

5.2.1    As of the date hereof, each Class A Member has surrendered its Notes for cancelation, and, in exchange for such surrender and cancelation, the Company has issued to each Class A Member the number of Class A Common Units set forth opposite each such Class A Member's name on Schedule I hereto. The Initial Class A Liquidation Preference of the Class A Common Units held by each Class A Member is set forth opposite each such Class A Member's name on Schedule I hereto.

5.2.2    As of, and effective upon, the date hereof, each issued and outstanding Common Unit (as defined in the Amended and Restated Operating Agreement) held by Can-China and Mercuria immediately prior to the effectiveness of this Agreement shall be automatically reclassified as and become one Class B Common Unit. As of the date hereof, each Class B Member holds the number of Class B Common Units set forth opposite each such Class B Member's name on Schedule I hereto.

5.2.3    As of, and effective upon, the date hereof, each issued and outstanding Common Unit (as defined in the Amended and Restated Operating Agreement) held by First Reserve immediately prior to the effectiveness of this Agreement shall be automatically reclassified as and become one Class C Common Unit. As of the date hereof, each Class C Member holds the number of Class C Common Units set forth opposite each such Class C Member's name on Schedule I hereto.

5.2.4    At or following the date hereof, subject to the terms and conditions set forth in this Agreement, the Management Incentive Plan and each applicable Award Agreement provided pursuant to the Management Incentive Plan, the Company may issue Profits Interest Units. The holders of Profits Interest Units shall not be required to make any Capital Contribution to the Company in exchange for such Profits Interest Units.

5.3    Additional Contributions. No Unitholder shall be required to make an additional capital contribution without the consent of such Unitholder.

5.4    Return of Capital Contributions. Except as otherwise provided in Article 7, (a) a Unitholder is not entitled to the return of any part of its capital contributions or to be paid interest in respect of either its Capital Account or its capital contributions, (b) an unrepaid capital contribution is not a liability of the Company or of any Unitholder, and (c) a Unitholder is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Unitholder's capital contributions.

## ARTICLE 6
## MANAGEMENT

6.1    Management Authority. The business and affairs of the Company shall be managed by or under the direction of a body of managers under the Act comprising a "***Management Committee***." Except as specifically set forth in this Agreement or Exhibit B hereto, the Management Committee shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company described herein, including all powers, statutory or otherwise, possessed by managers of a limited liability company under the laws of the State of Delaware. Except as otherwise required by law, approval of any action by the Management Committee in accordance with this Agreement shall constitute approval of such action by the Company. Except as otherwise expressly provided in this Agreement, no Member or Representative shall have the authority to bind the Company. Except as specifically set forth in this Agreement, the Management Committee shall have plenary authority to cause the Company to do, or cause to be done, all acts and actions which in their sole judgment are necessary, proper, convenient or desirable in order to operate and conduct the Company's business and to carry out and fulfill the purposes of the Company in accordance with this Agreement.

6.2    Management Committee.

6.2.1    <u>Action</u>.

(a)    At any meeting of the Management Committee at which there is a quorum (or in connection with any written consent in accordance with <u>Section 6.2.3(g)</u>), except as otherwise expressly provided in this Agreement or <u>Exhibit B</u> hereto where the approval of a greater number of the votes entitled to be voted by all Representatives is required, any action to be taken or approved by the Management Committee shall be deemed to be taken or approved if approved by the affirmative vote of a majority of the votes entitled to be voted by all the Representatives. While a Class A Member that has rights to designate a Representative pursuant to <u>Section 6.2.3</u> has not designated a Representative, the votes of the Representative such Class A Member is entitled to designate shall not be counted for any purpose under this Agreement, including for purposes of determining the number of votes of Representatives that would be entitled to vote on or approve any matter hereunder or in determining whether any quorum requirement has been satisfied; <u>provided</u>, that upon the resignation, removal, death or incapacity of a Representative, the Member who appointed such Representative shall not be deemed to have not designated a Representative until 30 days after such resignation, removal, death or incapacity.

(b)    Notwithstanding the first sentence of <u>Section 6.2.1(a)</u>, none of the following actions shall be taken or approved by the Management Committee, or taken by the Company or any Subsidiary of the Company without the written approval of at least 66⅔% of the votes entitled to be voted by all the Representatives:

(A)    the Company or any Subsidiary, on the one hand, and any Member or Affiliate of a Member, on the other hand, entering into or amending any material agreement or entering into any other material transaction (including any merger, consolidation or other business combination or refinancing or recapitalization), except (i) agreements or transactions between or among the Company and its Subsidiaries, or between or among Subsidiaries of the Company, (ii) distributions by the Company to the Members in accordance with this Agreement, (iii) issuances of additional Units (or Equity Securities convertible or exchangeable into additional Units) by the Company in accordance with this Agreement, (iv) compensation arrangements (including equity incentive compensation) with officers and employees of the Company and its Subsidiaries, (v) transactions which are entered into in the ordinary course of business with Affiliates of any Member on terms which are commercially reasonable and no less favorable to the Company or any Subsidiary than would be obtained in a comparable arm's-length transaction with an unrelated third party, (vi) indebtedness for borrowed money permitted by <u>Section 6.2.1 (b)(B)</u>, (vii) the entry into the RBL Facility and consummation of the transactions contemplated thereunder and (viii) the entry into the Joint Development Agreement and consummation of the transactions contemplated thereunder;

(B)    the Company or any Subsidiary, incurring indebtedness for borrowed money except (i) indebtedness for borrowed money incurred pursuant to the RBL Facility, the ARD Term Loan Credit Agreement or the PDC Notes or any other credit facilities, indentures, or other agreements existing on the Closing Date, (ii) indebtedness for borrowed money that refinances restates, modifies or amends any indebtedness for borrowed money of the Company or any of its Subsidiaries, (iii) intercompany indebtedness of the Company and its Subsidiaries, or (iv) trade payables or credit or other similar indebtedness;

(C)    the Company authorizing, designating or issuing any Equity Securities (other than authorizations, designations or issuances of Profits Interest Units); or

(D)    any voluntary dissolution, liquidation or winding up of the Company.

(c)    Notwithstanding the first sentence of <u>Section 6.2.1(a)</u>, none of the following actions shall be taken or approved by the Management Committee, or taken by the Company without the written approval of each Class B Member:

(A)    the Company issuing any Class B Common Units.

6.2.2    <u>Meetings of the Management Committee</u>. Meetings of the Management Committee may be held, if at all, in any manner and at any date, time or place as may be authorized by the Management Committee. Notice of the time and place of any regularly scheduled meeting shall be delivered to the Representatives and to the Class A Members at least 14 days in advance, and notice of the time and place of any special meeting as well as instructions for teleconference participation shall be delivered to the Representatives and to the Class A Members at least 72 hours in advance. Unless waived by each Representative, the Company shall provide any written materials or "board books" for such meeting, if any, to each Representative at least 24 hours in advance of each meeting of the Management Committee. Proposals to the Management Committee may be made by the CEO or any Representative or group of Representatives with aggregate voting power representing at least 20% of the outstanding Class A Common Units that would be entitled to vote on the applicable proposal.

6.2.3    <u>Constitution of Management Committee</u>.

(a)    <u>Number; Qualifications; Etc</u>. The Management Committee shall consist of the following Representatives:

(A)    (i) two Representatives appointed by First Reserve if and for so long as the number of Class A Common Units owned directly or indirectly by First Reserve is more than 25% of the outstanding Class A Common Units and (ii) one Representative appointed by First Reserve if and for so long as the number of Class A Common Units owned directly or indirectly by First Reserve is less than or equal to 25% of the outstanding Class A Common Units and more than 5% of the outstanding Class A Common Units;

(B)    if and for so long as the number of Class A Common Units owned directly or indirectly by any other Member, either individually or in the aggregate with any other Members who are Affiliates of such first Member (the latter being considered for this purpose to be "***Group Members***"), is equal to or greater than 5% of the outstanding Class A Common Units, one Representative appointed by such Member or Group Members;

(C)    one Representative appointed collectively by the Class A Members (together with their Group Members) that each own less than 5% of the outstanding Class A Common Units (who shall be appointed with the written consent of such Class A Members representing on a combined basis more than 50% of the aggregate number of Class A Common Units outstanding held by such Class A Members); and

(D)    one non-voting Representative who shall be the CEO.

Such Persons shall serve as Representatives until their death, disability, removal (under the terms of this Agreement) or resignation. Each Member shall have the right to direct any Representative(s) affiliated with it to act in such Member's best interests when voting on or consenting to a given matter and, to the fullest extent permitted by law and subject to the terms and conditions of this Agreement, such Representatives shall not have any duty to act in the best interests of the Company when voting on or consenting to such a matter. To the fullest extent permitted by law, such Representatives shall not be deemed an agent or sub-agent of the Company. No Representative shall have the authority in its capacity as a Representative to

enter into any transaction on behalf of the Company. Unless otherwise provided for by the Management Committee, no Representative is entitled to remuneration by the Company for his or her activities as a Representative.

(b)　　Voting. On all matters presented to the Management Committee, each Representative (other than the First Reserve Representatives and the CEO) shall have a number of votes equal to the number of outstanding Class A Common Units held by the Class A Member or Class A Members that appointed such Representative, and such Representative shall cast such votes as directed by the Class A Member or Class A Members in a written direction executed by the applicable Class A Member and delivered to the Management Committee. The First Reserve Representatives shall collectively have a number of votes equal to the number of outstanding Class A Common Units held by First Reserve, and such First Reserve Representatives shall cast all such votes as directed by First Reserve in a written direction executed by First Reserve and delivered to the Management Committee. A single First Reserve Representative may vote for any or all First Reserve Representatives, whether or not such other First Reserve Representative is present. The CEO shall have no voting or consent rights on the Management Committee. In no event will unanimous approval of the Management Committee be required for any action to be taken or approved by the Management Committee, whether at a meeting of the Management Committee, by consent in writing or otherwise.

(c)　　Resignation. Any Representative may resign at any time by giving written notice of his or her resignation to the Company. The resignation of any Representative shall take effect upon receipt of that notice or at such later time as specified in the notice.

(d)　　Removal. Any Representative may be removed at any time, with or without cause, at the sole discretion of the Members or Persons that originally appointed the Representative.

(e)　　Vacancies. A vacancy on the Management Committee may only be filled by the Members or Persons that originally appointed the Representative whose death, disability, removal or resignation created such vacancy.

(f)　　Quorum. Representatives having a majority of the voting power of all Representatives shall constitute a quorum for the transaction of business of the Management Committee.

(g)　　Action by Written Consent or Telephone Conference. Any action permitted or required by the Act, the certificate of formation of the Company or this Agreement to be taken at a meeting of the Management Committee or any committee designated by the Management Committee may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by the Representatives or representatives of such other committee, as the case may be, with voting power sufficient to take such action if taken at a meeting of the Management Committee. If such written consent is not signed by all Representatives of the Management Committee or representatives of such other committee, the Company shall provide notice at least 24 hours in advance of taking such action by written consent to each Representative or representative of such other committee not signing any such consent. Such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Management Committee or any such other committee, as the case may be. Subject to the requirements of this Agreement for notice of meetings, the Representatives, or representatives of any other committee designated by the Management Committee, may participate in and hold a meeting of the Management Committee or any such other committee, as the case may be, by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for

12

the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(h)      Information Requests. The Company shall provide such information as may reasonably be requested by any Representative in his or her capacity as a Representative or any Class A Member in its capacity as a Class A Member.

6.3      Officers and Employees. The Management Committee shall appoint such officers and employees of the Company as it deems necessary or desirable, at any time or from time to time. The officers shall serve at the pleasure of the Management Committee, and any officer may be removed by the Management Committee in conformity with the terms of such officer's employment agreement. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Management Committee. The day-to-day business, affairs, operations and activities of the Company shall, subject to the direction, control and supervision of the Management Committee, be managed by such officers and employees of the Company as shall be designated or appointed from time to time by the Management Committee as provided herein.

6.4      Replacement of Auditor or Petroleum Engineer.

6.4.1      If the Company replaces the existing external independent auditor of the Company and its Subsidiaries, the Company shall use commercially reasonable efforts to appoint an Approved Auditor as the replacement auditor.

6.4.2      If the Company replaces the existing external petroleum engineer of the Company and its Subsidiaries, the Company shall use commercially reasonable efforts to appoint an Approved Petroleum Engineer as the replacement petroleum engineer.

6.5      Management Committee Observer. The Management Committee shall have the authority to from time to time designate observers to the Management Committee with such rights and obligations as may be agreed between the Company and any such observer. Any such observer shall be subject to the same obligations of confidentiality as Representatives with respect to all information obtained in their capacity as an observer. Any such observer shall not be a Representative and shall have no voting or consent rights.

6.6      Committees. The Management Committee may designate one or more committees, each committee to consist of one or more of the Representatives. In the event of the disqualification, resignation or removal of a committee member, the Management Committee may appoint another member of the Management Committee to fill such vacancy. Any such committee, to the extent provided in the Management Committee's resolution establishing such committee, shall have and may exercise all the powers and authority of the Management Committee in the management of the Company's business and affairs subject to any limitations contained herein or in the Act. Such committee or committees shall have such name or names as may be determined from time to time by the Management Committee. The voting power of members of any committee shall be consistent with the provisions of Section 6.2.3(b) above. Each committee shall keep regular minutes of its meetings and report the same to the Management Committee and the Secretary of the Company, if one is so elected, when required. Each Representative shall have the right, but not the obligation, to serve on all committees of the Management Committee.

6.7      Tax Covenants.

6.7.1      The Management Committee shall use reasonable best efforts to cause the Company and its Subsidiaries not to engage, directly or indirectly, in a transaction that, as of the date the

transaction is entered into, is a "listed transaction", a "prohibited reportable transaction", or a "subsequently listed transaction" (each as defined in Section 4965(e) of the Code). If the Management Committee has actual knowledge that the Company or its Subsidiaries has engaged, directly or indirectly, in a transaction that is a "listed transaction", a "prohibited reportable transaction", or a "subsequently listed transaction" (each as defined in Section 4965(e) of the Code) it shall promptly notify the Unitholders of such determination.

6.7.2    Prior to the Company (i) making an investment outside of the United States or investing in a tax transparent entity organized within the United States with operations outside of the United States, or (ii) establishing an office outside of the United States, the Management Committee shall obtain the advice of a reputable qualified tax professional that making such investment or establishing such office should not (in light of the then existing law) cause any Unitholder (or any direct or indirect owner of any Unitholder) to be directly subject to (i) tax (on a net income basis) in any foreign jurisdictions and (ii) any tax filing obligation in any foreign jurisdictions (other than tax filings necessary to establish treaty protection, to obtain an exemption from or a reduction in a withholding tax, or to claim a refund), in each case, solely as a result of such Unitholder's ownership of Units. If, notwithstanding the Management Committee's receipt of any such advice, the Management Committee has actual knowledge that, as a direct result of an investment by, or activity of, the Company, a Unitholder is required to file a tax return in any jurisdiction outside the United States solely as a result of its ownership of Units, the Management Committee shall notify the Unitholders as promptly as practicable after obtaining such knowledge.

6.7.3    The Management Committee shall notify the Unitholders if the Company or its Subsidiaries owns an interest in an entity that the Management Company actually knows that is a "passive foreign investment company" as defined in Section 1297 of the Code (a "**PFIC**"). In such event, the Management Committee shall (i) notify the Unitholders, and (ii) if the Management Committee determines, in its sole discretion exercised in good faith, that making a "qualified electing fund" ("**QEF**") election with respect to such entity pursuant to Section 1295 of the Code would be in the best interests of the Company, then the Management Committee shall use commercially reasonable best efforts to cause the PFIC to provide to the Company and its Subsidiaries such statements that will enable the Company or its Subsidiaries to make a QEF election with respect to such entity pursuant to Section 1295 of the Code and to make such election.

6.7.4    The Management Committee shall use commercially reasonable best efforts to provide any Unitholder with any tax information reasonably requested by such Unitholder and reasonably necessary for such Unitholder (or its direct or indirect owners) to comply with its tax return filing, withholding or information reporting obligations, including without limitation, information regarding estimates of taxable income, information with respect to the Company's unrelated business taxable income, income effectively connected with a trade or business within the United States, and/or fixed or determinable annual or periodical income, and the state source of any Company income.

## ARTICLE 7
## DISTRIBUTIONS

7.1    <u>Tax Distributions</u>. Subject to <u>Section 7.5</u>, to the fullest extent possible without impairing the ability of the Company to continue to conduct its business and activities, and in order to permit Unitholders to pay taxes on their allocable share of the taxable income of the Company, determined without regard to limitations on the allowance of deductions applicable to a particular Unitholders, the Company shall, as determined by the Tax Matters Member in good faith, make quarterly distributions, to the extent there is available cash to each Unitholder in an amount equal to the excess, if any, of (a) the estimated cumulative tax liability of each Unitholder on the cumulative taxable income, gains, losses, deductions and credits of the Company solely attributable to periods from and after the Effective Date through the end of

such quarter allocable to such Unitholder (and such Unitholder's predecessors in interest) for U.S. income tax purposes, computed as if each Unitholder paid income tax at the highest marginal U.S. federal, state and local tax rate (taking into account the character of the income recognized but disregarding the deductibility of state and local income taxes for federal income tax purposes) applicable to an individual, or, if higher, a corporation, resident of New York, New York, over (b) any prior distributions made to such Unitholder (and such Unitholder's predecessors in interest) pursuant to this <u>Article 7</u>; <u>provided</u>, <u>however</u>, that distributions under this <u>Section 7.1</u> shall not be made following an event resulting or reasonably expected by the Tax Matters Member to result in the dissolution of the Company. Distributions to a holder under this <u>Section 7.1</u> shall be treated as advance distributions of amounts otherwise remaining to be distributed to such Unitholders as set forth in <u>Section 7.2</u>.

7.2    <u>Distributions</u>.

7.2.1    Subject to <u>Section 7.1</u> and except as set forth in <u>Article 11</u> with respect to distributions made following the dissolution of the Company, the Management Committee may cause the Company to make distributions to the Unitholders to the extent that the cash available to the Company is in excess of the reasonably anticipated needs of the business (including reserves determined by the Management Committee). Any such distributions shall be made as provided below:

(a)    *first*, to holders of Class A Common Units, *pro rata* in respect of the percentage of outstanding Class A Common Units held by each such Unitholder, until such time as the holders of Class A Common Units have received aggregate distributions equal to their aggregate Initial Class A Liquidation Preference;

(b)    *second*, 87% to the holders of Class A Common Units, *pro rata* in respect of the percentage of outstanding Class A Common Units held by each such Unitholder and 13% to the holders of Profits Interest Units, *pro rata* in respect of the percentage of outstanding Profits Interest Units held by each such Unitholder, until such time as an amount equal to the aggregate Additional Class A Liquidation Preference has been distributed to the holders of Class A Common Units;

(c)    *third*, the Class A Sharing Percentage to the holders of Class A Common Units, *pro rata* in respect of the percentage of the aggregate outstanding Class A Common Units held by each such Unitholder, 87% minus the Class A Sharing Percentage to the holders of Class B Common Units, *pro rata* in respect of the percentage of the aggregate outstanding Class B Common Units held by each such Unitholder, and 13% to the holders of Profits Interest Units, *pro rata* in respect of the percentage of outstanding vested Profits Interest Units held by each such Unitholder, until such time as an amount equal to the aggregate Class B Liquidation Preference has been distributed to the holders of Class B Common Units;

(d)    *fourth*, the Class A Sharing Percentage to the holders of Class A Common Units, *pro rata* in respect of the percentage of the aggregate outstanding Class A Common Units held by each such Unitholder, 87% minus the Class A Sharing Percentage to the holders of Class C Common Units, *pro rata* in respect of the percentage of the aggregate outstanding Class C Common Units held by each such Unitholder, and 13% to the holders of Profits Interest Units, *pro rata* in respect of the percentage of outstanding vested Profits Interest Units held by each such Unitholder, until such time as an amount equal to the aggregate Class C Liquidation Preference has been distributed to the holders of Class C Common Units; and

(e)    *thereafter*, 87% to the holders of the Class A Common Units, Class B Common Units and Class C Common Units, *pro rata* in respect of the percentage of the aggregate outstanding Class A Common Units, Class B Common Units and Class C Common Units held by each such

15

Unitholder, and 13% to the holders of Profits Interest Units, *pro rata* in respect of the percentage of outstanding Profits Interest Units held by each such Unitholder.

        7.2.2    Threshold Amounts. For purposes of Section 7.2.1 and Section 11.3, a Profits Interest Unit shall not be entitled to share or participate in any distributions pursuant to Section 7.2.1, and shall not be counted for purposes of calculating the applicable percentage of outstanding Units until such time as the aggregate amount of distributions made pursuant to Section 7.2.1 to the holders of the then issued and outstanding Units (other than the holder of such Profits Interest Unit) following the issuance of such Profits Interest Unit shall be equal to the Threshold Amount designated for such Profits Interest Unit. Any distributions required under this Agreement to be made to holders of Profits Interest Units shall only be made to holders of outstanding Profits Interest Units.

        7.2.3    Transfers of Profits Interest Units. Notwithstanding anything in this Agreement to the contrary, any amounts paid to a holder of Profits Interest Units in connection with a redemption, repurchase or other Transfer (including in connection with a Drag-Along Sale) in accordance with this Agreement or any applicable Award Agreement shall be treated as an advance distribution of, and shall reduce by a like amount, the next amounts otherwise distributable to the holders of Profits Interest Units under Section 7.2.1.

        7.2.4    Unvested Amounts. Notwithstanding anything in this Agreement to the contrary, any portion of any distribution to be made to a holder of Profits Interests Units under Section 7.2.1(b), Section 7.2.1(c), Section 7.2.1(d) or Section 7.2.1(e) that relates to a Profits Interests Unit that by the terms of any applicable Award Agreement is not vested (the "***Unvested Amount***") shall be set aside and held by the Company until the earlier of the vesting or forfeiture of such unvested Profits Interests Unit. In the event such unvested Profits Interests Unit vests with respect to such holder, the Unvested Amount shall be distributed to such holder upon (and to the extent of) such vesting. Upon (and to the extent of) a forfeiture of such unvested Profits Interests Unit, the Unvested Amount shall be distributed to all other holders that received distributions pursuant to the clause and at the time such Unvested Amount would have been made but for the operation of this Section 7.2.4, *pro rata* to such distributions.

        7.3    Distributions in Kind. All distributions shall be made in cash or cash equivalents unless the Management Committee shall have approved a distribution of property in kind. Any such distribution shall be valued based on the fair market value of the property to be distributed as determined by the Management Committee in good faith within 90 days of the date of such distribution and shall be in accordance with Section 7.2.

        7.4    Restrictions on Distributions. Except pursuant to Section 7.1, the Company shall not make any distribution to the Unitholders unless, immediately after giving effect to the distribution, the Company shall have sufficient cash available to meet the reasonably anticipated needs of the Company, as such needs are determined in the sole discretion of the Management Committee.

        7.5    Return of Distributions Generally. Unitholders and Assignees who receive distributions made in violation of the Act or this Agreement shall return such distributions to the Company. Except as provided in Section 7.1, and except for those distributions made in violation of the Act or this Agreement, no Unitholder or Assignee shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Unitholder or Assignee or paid by a Unitholder or Assignee for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Unitholder or Assignee.

7.6    No Other Withdrawals. Except as provided in this Article 7, no withdrawals or distributions shall be required or permitted.

# ARTICLE 8
# ALLOCATIONS

8.1    Allocation of Profits and Losses.

8.1.1    The Profits and Losses of the Company for each Fiscal Year or other relevant period of calculation, as determined by the Tax Matters Member in accordance with the provisions hereof, shall be allocated among the Unitholders in a manner such that the Capital Account of each Unitholder, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Unitholder pursuant to Section 7.2 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liability), and the net assets of the Company were distributed in accordance with Section 7.2 to the Unitholders immediately after making such allocation, minus (ii) such Unitholder's share of partnership minimum gain and partner nonrecourse debt minimum gain (determined in accordance with Regulation Section 1.704-2), computed immediately prior to the hypothetical sale of assets.

8.1.2    Notwithstanding any other provision in this Agreement to the contrary, if there is a net decrease in partnership minimum gain or partner nonrecourse debt minimum gain (determined in accordance with the principles of Regulation Sections 1.704-2(d) and 1.704-2(i)) during any taxable year of the Company, each Unitholder shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to its respective share of such net decrease during such year, determined pursuant to Regulations Sections 1.704-2(g) and 1.704-2(i)(5). The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 8.1.2 is intended to comply with the minimum gain chargeback requirement in such Regulations Section and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent of the exceptions provided in Regulations Section 1.704-2(f) and 1.704-2(i)(4).

8.1.3    Notwithstanding any other provision of this Agreement to the contrary (other than Section 8.1.2 above), if any Unitholder unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to such Unitholder in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit Capital Account balance of such Unitholder created by such adjustments, allocations or distributions as promptly as possible; provided, that an allocation pursuant to this Section 8.1.3 shall be made only if and to the extent that a Unitholder would have a deficit Capital Account balance in excess of such sum after all other allocations provided for in this Section 8.1 have been tentatively made as if this Section 8.1.3 was not in this Agreement. This Section 8.1.3 is intended to qualify with the "qualified income offset" requirement of the Regulations Section 1.704-1(b)(2)(ii).

8.1.4    If any Unitholder has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Unitholder is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Unitholder is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Unitholder shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided, that an allocation pursuant to this Section 8.1.4 shall be made only if and to the extent that a Unitholder would have a deficit Capital Account in excess of such sum after all other allocations provided for in the definition of "*Capital Account*" or this Section 8.1 have been tentatively made as if Section 8.1.3 and this Section 8.1.4 were not in this Agreement.

17

8.1.5    Any partner nonrecourse deductions (determined in accordance with the principles of Regulations Section 1.704-2(i)(1)) for any Fiscal Year or other period shall be specially allocated to the Unitholder who bears the economic risk of loss with respect to the nonrecourse debt to which such nonrecourse deductions are attributable in accordance with Regulations Section 1.704-2(i)(1). Nonrecourse deductions (determined in accordance with the principles of Regulations Section 1.704-2(b)(1)) of the Company for any Fiscal Year or other period shall be allocated (as nearly as possible) under Treasury Regulation Section 1.704-2 to the holders of Common Units in proportion to the number of Common Units held by each Unitholder.

8.1.6    Simulated Depletion for each Depletable Property, and Simulated Loss upon the disposition of a Depletable Property, shall be allocated among the Unitholders in proportion to their shares of the Simulated Basis in such property. The Simulated Basis of each Depletable Property shall be allocated to each Unitholder in accordance with such Unitholder's Capital Interest Percentage as of the time such Depletable Property is acquired by the Company (and any additions to such Simulated Basis resulting from expenditures required to be capitalized in such Simulated Basis shall be allocated among the Unitholders in a manner designed to cause the Unitholders' proportionate shares of such Simulated Basis to be in accordance with their Capital Interest Percentages as determined at the time of any such additions), and shall be reallocated among the Unitholders in accordance with the Unitholders' Capital Interest Percentages as determined immediately following the occurrence of an event giving rise to an adjustment to the Gross Asset Values of the Company's Depletable Properties pursuant to clause (ii) of the definition of "***Gross Asset Value***."

8.1.7    Any special allocations of items of income gain loss or deduction pursuant to Section 8.1.2, Section 8.1.3, Section 8.1.4, Section 8.1.5 or Section 8.1.6 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount of any items so allocated and all other items allocated to each Unitholder shall, to the extent possible, be equal to the net amount that would have been allocated to each Unitholder if such allocations pursuant to any allocation made to satisfy Section 8.1.2, Section 8.1.3, Section 8.1.4, Section 8.1.5 or Section 8.1.6 had not occurred. The Tax Matters Member shall take account of the fact that certain of such allocations will by operation of the governing provisions reverse themselves in a future period for purposes of applying this Section 8.1.7.

8.1.8    If the built-in gain in Company assets subject to nonrecourse indebtedness exceeds the gain described in Treasury Regulation Section 1.752-3(a)(2), the excess nonrecourse liabilities shall be allocated (a) first, among the Class C Members up to the amount of built-in gain that is allocable to the Class C Members on Section 704(c) Property and (b) second, among the Members in accordance with their interest in company profits as reasonably determined by the Management Committee.

8.2    <u>Allocations upon Transfer</u>. If, during an Accounting Period, a Unitholder transfers all or any portion of its Units to an Assignee, items of Profits and Losses, together with corresponding tax items, that otherwise would have been allocated to such Unitholder with regard to such Accounting Period shall be allocated between that Unitholder and the Assignee in accordance with their respective Units during the Accounting Period using any method permitted by Section 706 of the Code and selected by the Management Committee; <u>provided</u>, that the "closing of the books" method shall be selected with respect to the transactions contemplated by the Exchange.

8.3    <u>Tax Treatment</u>. The Unitholders expect and intend that the Company shall be treated as a partnership for all federal and state income tax purposes, and the Unitholders agree that they will not: (a) take a position on any federal, state, local or other tax return, or otherwise assert a position, inconsistent with such expectation and intent; or (b) elect for the Company to be treated as an association taxable as a corporation for tax purposes or do any other act or thing which could cause the Company to be treated as other than a partnership for federal income tax purposes. Each Unitholder agrees that it is solely responsible

18

and will timely pay all income and other taxes applicable to the receipt, ownership (including allocations of taxable income) and disposition of its Units.

8.4       Tax Allocations.

8.4.1       Unless otherwise required by Sections 704(b) and (c) of the Code or the Treasury Regulations promulgated thereunder, all items of income, gain, loss or deduction, as determined for federal, state and local tax purposes, shall be allocated among the Unitholders in the same manner as the corresponding items of income, gain, loss or deduction are allocated pursuant to Section 8.1.

8.4.2       In accordance with Section 704(c) of the Code and the applicable Treasury Regulations thereunder, any income, gain, loss or deduction with respect to any property contributed to the capital of the Company, or with respect to any property which has a Gross Asset Value different than its adjusted tax basis, shall, solely for federal income tax purposes, be allocated among the Unitholders so as to take into account any variation between the adjusted tax basis of such property and the Gross Asset Value of such property. The Management Committee shall cause the Company to elect any method of allocation permitted by Treasury Regulations Section 1.704-3 with respect to such allocation. Unitholders shall provide the Company with the adjusted tax basis of any property contributed to the Company to enable such allocation to be made.

8.4.3       Except as provided in Section 8.4.2, the Management Committee shall be authorized in its sole discretion to make appropriate adjustments to the allocations of items to comply with Section 704 of the Code and the Treasury Regulations thereunder. Allocations pursuant to this Section 8.4 are made solely for tax purposes and shall not offset, or in any way be taken into account in computing, any Unitholder's Capital Account balance or share of Company distributions. Each Member is aware of the income tax consequences of the allocations made by this Agreement and agrees to be bound by the provisions of this Article 8 in reporting its share of Company income and loss for income tax purposes. Except as provided in Section 8.4.2, the Management Committee also shall be authorized in its sole discretion to make all elections required or permitted to be made by the Company under the Code (including but not limited to an election under Section 754, Section 743(e) or Section 6226 of the Code and the safe harbor election provided for by the Proposed Revenue Procedure included in Notice 2005-43, or any similar election provided in a final revenue procedure or other published guidance relating to the compensatory transfer of partnership interests (the latter election, a "*Safe Harbor Election*"), in the manner that the Tax Matters Member determines will be most advantageous to the Company. Each Unitholder agrees to comply with all requirements of the Proposed Revenue Procedure included in Notice 2005-43, or any similar final revenue procedure or other published guidance relating to the compensatory transfer of partnership interests, if a Safe Harbor Election is made, in a manner consistent with such election.

8.5       Tax Allocations with Respect to Depletable Properties.

8.5.1       Cost and percentage depletion deductions with respect to any Depletable Property shall be computed separately by the Unitholders rather than the Company. For purposes of such computations, the U.S. federal income tax basis of each Depletable Property shall be allocated to each Unitholder in accordance with such Unitholder's Capital Interest Percentage as of the time such Depletable Property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Unitholders in a manner designed to cause the Unitholders' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Capital Interest Percentages as determined at the time of such additions), and shall be reallocated among the Unitholders in accordance with the Unitholders' Capital Interest Percentages as determined immediately following the occurrence of an event giving rise to an adjustment to the Gross Asset Values of the Company's Depletable Properties pursuant to clause (ii) of the definition

19

of "***Gross Asset Value***." The Company shall inform each Unitholder of such Unitholder's allocable share of the U.S. federal income tax basis of each Depletable Property promptly following the acquisition of such Depletable Property by the Company, any adjustment resulting from expenditures required to be capitalized in such basis, and any reallocation of such basis as provided in the previous sentence.

8.5.2    For purposes of the separate computation of gain or loss by each Unitholder on the taxable disposition of Depletable Property, the amount realized from such disposition shall be allocated (i) first, to the Unitholders in an amount equal to the Simulated Basis in such Depletable Property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gains.

8.5.3    The allocations described in this <u>Section 8.5.3</u> are intended to be applied in accordance with the Unitholders' "interests in partnership capital" under Code Section 613A(c)(7)(D); <u>provided</u> that the Unitholders understand and agree that the Management Committee may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate the differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to Depletable Properties, in such manner as determined consistent with the principles contained in <u>Section 8.4.2</u>. The provisions of this <u>Section 8.5.3</u> and the other provisions of this Agreement relating to allocations under Code Section 613A(c)(7)(D) are intended to comply with Treasury Regulation Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

8.5.4    Each Unitholder, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each Depletable Property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition of such property by the Company. Upon the reasonable request of the Company, each Unitholder shall advise the Company of its adjusted tax basis in each Depletable Property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company. The Company may rely on such information and, if it is not provided by the Unitholder, may make such reasonable assumptions as it shall determine with respect thereto.

8.6    <u>Effect on Distributions</u>. The provisions in this Agreement regarding the maintenance of Capital Accounts and allocations of Profits, Losses and other items of Company income, gain, loss or deduction are intended to effect an allocation of tax items of the Company that are in accordance with the Unitholders' "interests in the partnership" within the meaning of Treasury Regulations Section 1.704-1(b)(3) by utilizing the principles of allocation contained in Treasury Regulation Section 1.704-1(b)(2)(iv) and Treasury Regulation Section 1.704-2 with respect to maintenance of capital accounts and allocations, and shall be interpreted and applied accordingly. Capital Account balances shall not be used to determine the amount or timing of distributions to the Unitholders pursuant to the Agreement.

8.7    <u>Audit Rules</u>.

8.7.1    If the Company is subject to an audit or proceeding by the Internal Revenue Service under Chapter 63C of the Code (the "***Budget Act Audit Rules***"), or any successor provisions thereto, or if the Company has filed an administrative adjustment request under section 6227 of the Code, the Managing Member shall promptly notify the Members in writing of such audit, proceedings, or administrative adjustment and shall keep the Members reasonably informed of all material matters that come to its attention in respect thereof and as otherwise reasonably requested by the Members.

002129-0002-25671445

8.7.2    If the Managing Member is notified in writing within five (5) days of the date of this Agreement of a Member or a Member's parent's status as a "tax-exempt entity" within the meaning of Section 168(h)(2) of the Code, the Managing Member agrees that, in the event any adjustment by any United States federal, state or local taxing authority to any item of income, gain, loss, deduction or credit (or any partner's distributive share thereof) of the Company is determined, and any tax (or interest, penalty, addition to tax or additional amount) attributable thereto is assessed and collected, at the partnership level pursuant to Subchapter C of Chapter 63 of the Code as amended by the Bipartisan Budget Act of 2015 (or pursuant to any comparable or similar provision of United States state or local tax law), the Managing Member shall use commercially reasonable efforts to obtain a reduction to the extent available pursuant to Section 6225(c)(3) of the Bipartisan Budget Act of 2015 in any imputed underpayment that is allocable to such Member and shall, use commercially reasonable efforts to allocate to such Member the benefit of any such reduction when allocating such tax in accordance with the principles of <u>Section 12.9</u>. Such Member shall provide the Managing Member with any information or documentation reasonably requested by the Managing Member and necessary for the Managing Member to comply with this paragraph.

8.7.3    In the event of any item of income, gain, loss, deduction or credit (or any partner's distributive share thereof), and any tax (or interest, penalty, addition to tax or additional amount) attributable thereto that is assessed and collected at the partnership level pursuant to Subchapter C of Chapter 63 of the Code as amended by the Bipartisan Budget Act of 2015 (or pursuant to any comparable or similar provision of United States state or local tax law) relating to a period prior to the exchange of the Notes pursuant to the Exchange Agreement, the Managing Member will use commercially reasonable efforts to allocate any such income, gain, loss, deduction or credit (or any partner's distributive share thereof), and any tax (or interest, penalty, addition to tax or additional amount) attributable thereto to Members holding Units prior to the Exchange.

8.7.4    In connection with any U.S. federal tax audit of the Company for a taxable year thereof for which the provisions of the Bipartisan Budget Act of 2015 apply, the Tax Matters Member will not be required to consider the tax position or policy of any specific Member, as distinguished from the tax position or policy of Members of the Company generally. Notwithstanding the foregoing, the Company acknowledges certain Members have a policy providing that such Member generally cannot be required to amend its tax returns by third parties and the Company agrees to use commercially reasonable efforts not to cause any such Member to have to file an amended tax return.

## ARTICLE 9
## ACCOUNTING AND RECORDS

9.1    <u>Books and Records</u>.

9.1.1    <u>Supervision; Inspection</u>. Proper and complete books of account and records of the business of the Company (including those books and records identified in Section 18-305 of the Act) shall be kept under the supervision of the Management Committee at the Company's principal office in Wexford, Pennsylvania. Such books and records shall be open to inspection, audit and copying by any Representative, any Member and their respective designated agents, upon reasonable notice at any time during business hours, for any purpose reasonably related to such Person's interest in the Company.

9.1.2    <u>Reliance on Books and Records</u>. Any Member or Representative shall be fully protected in relying in good faith upon the records and books of account of the Company and upon such information, opinions, reports or statements presented to the Company by any of its other Members or employees, or by any other Person, as to matters the Member or such Representative reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as

to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

9.2    Reports; Quarterly Meeting.

9.2.1    Each Class A Member shall be entitled to receive (i) the same financial information provided to the lenders pursuant to Sections 8.01, 8.02 and 8.10 of the ARD Term Loan Credit Agreement (it being understood that the obligation to provide such information shall continue irrespective of any termination of the ARD Term Loan Credit Agreement and that such information shall include, at a minimum, the annual audited and quarterly unaudited financial statements required to be provided under the ARD Term Loan Credit Agreement) and (ii) the same financial information with respect to the Company and its Subsidiaries as is provided to the lenders pursuant to Sections 8.01, 8.02 and 8.10 of the ARD Term Loan Credit Agreement as if the Company were the Borrower (as defined in the ARD Term Loan Credit Agreement) thereunder (it being understood that the obligation to provide such information shall continue irrespective of any termination of the ARD Term Loan Credit Agreement and that such information shall include, at a minimum, annual audited and quarterly unaudited financial statements required to be provided under the ARD Term Loan Credit Agreement).

9.2.2    The Company shall provide to each Class A Member:

(a)    a copy of each reserve report that the Company or any of its Subsidiaries provide from time to time to the RBL Administrative Agent (as defined in the ARD Term Loan Credit Agreement);

(b)    a monthly "flash" reporting package, including production by field, key income statement items, and other non-financial data if and when furnished to representatives on the Management Committee;

(c)    a consolidated annual budget relating to each fiscal year if and when furnished to representatives on the Management Committee;

(d)    written notice of any matter set forth in Section 8.02(b)-(e) of the ARD Term Loan Credit Agreement as if the Company were the Borrower (as defined in the ARD Term Loan Credit Agreement);

(e)    written notice of any material audit, investigation or legal proceeding filed against the Company or any of its Subsidiaries; and

(f)    written notice of any intention to engage in a capital raise by the Company, along with a range of the amounts the Company proposes to raise and a summary of the material proposed economic terms (if known), at least 10 Business Days before the final terms of such capital raise are submitted for approval at a meeting (or by written consent) of the Management Committee.

9.2.3    The Company shall provide to each Class A Member the same information and materials that are provided to the Representatives at meetings of the Management Committee.

9.2.4    A quarterly meeting of the Class A Members shall be held at such date, time and place as may be fixed by the Management Committee for the purpose of presenting information about the Company to the Class A Members and to conduct such other business as the Management Committee shall determine.

Notwithstanding the foregoing, the reports or other information required to be furnished by this <u>Section 9.2</u> shall be subject to the confidentiality obligations set forth in <u>Section 9.3</u>.

9.3    <u>Confidentiality</u>.

9.3.1    The Unitholders acknowledge that they may receive information from or regarding the Company or the Subsidiaries in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company, its Subsidiaries or Persons with which they do business. Each Unitholder shall hold in confidence and not disclose any information it receives regarding the Company or its Subsidiaries that is identified as being confidential and may not disclose it to any Person other than another Unitholder except for disclosures (i) requested or required by applicable law, regulation, legal or judicial process, the rules of any applicable securities exchange or upon the request or inquiry of any bank, securities or insurance regulatory authority or self-regulatory organization having jurisdictions over such Unitholder or an Affiliate of such Unitholder (but the Unitholder shall notify the Company promptly of any request for that information before disclosing it if practicable and legally permissible), (ii) to its Affiliates, members, partners, and trustees and its advisers or representatives of the Unitholder, <u>provided</u>, that such Persons hold such disclosures confidential and do not use such information for pecuniary gain or, in the case of service providers, do not use such information for purposes other than the services being provided to the Unitholder, (iii) of information that the Unitholder also has received from a source independent of the Company that the Unitholder reasonably believes obtained that information without breach of any obligation of confidentiality, (iv) to any Person to which such Unitholder offers to sell any Units so long as it first obtains a confidentiality agreement from the proposed transferee at least as restrictive as that set forth in this <u>Section 9.3</u>, (v) of information in connection with litigation against the Company to which the disclosing Unitholder is a party, or (vi) to existing and prospective investors in a Member so long as it first obtains a confidentiality agreement from such Person at least as restrictive as that set forth in this <u>Section 9.3</u>. The Unitholders agree that breach of the provisions of this <u>Section 9.3</u> may cause irreparable injury to the Company for which monetary damages (or other remedy at law) are inadequate. Accordingly, the Unitholders agree that the provisions of this <u>Section 9.3</u> may be enforced by specific performance or other appropriate equitable remedy.

9.3.2    None of the Company, its Subsidiaries or any of their respective Affiliates shall issue any press releases, published notices or other public disclosure using the name of any Unitholder or any Unitholder's Affiliates in connection with the Company or any of its Subsidiaries or any of their respective Affiliates without obtaining such Unitholder's prior written consent, except (a) to the extent required by applicable law, rule, regulation (including any money laundering or anti-terrorist laws, rules or regulations) or other controlling judicial or regulatory requirement or governmental request, (b) to a court or to an arbitrator in connection with any litigation or other dispute or otherwise as necessary to enforce the terms of this Agreement or the Exchange Agreement or (c) to other Unitholders if the Company is disclosing the names of the Unitholders generally. For the avoidance of doubt, the Company, its Subsidiaries or any of their respective Affiliates shall not, without a Unitholder's prior written consent, represent directly or indirectly, that any product or any service provided by the Company, its Subsidiaries or any of their respective Affiliates has been approved or endorsed by such Unitholder.

9.4    <u>Tax Returns</u>. The Company shall, within 60 days after the end of each Fiscal Year (as such time period may be extended in accordance with any timely filed extensions to file tax returns at the election of the Tax Matters Member), cause to be filed a federal income tax information return and deliver to each Unitholder a Schedule K-1 showing such Unitholder's distributive share of the Company's income, deductions and credits, and all other information necessary for such Unitholder to file its federal income tax returns. The Company similarly shall cause to be filed, and provide information to the Unitholders regarding, all appropriate state and local income tax returns. Such tax returns shall be submitted to the Management Committee for approval no later than 30 days prior to the anticipated filing date thereof, and

any changes requested by the Management Committee shall be made thereto. Such tax returns shall not be filed until approved by the Management Committee, and appropriate extensions of time to file shall be obtained if necessary in order to cause such returns not to be delinquent, including, to the extent not already set forth on such schedule, such Unitholder's share of the Company's "unrelated business taxable income" as defined in Section 512 and Section 514 of the Code, if any, reported to the Internal Revenue Service. The Company shall also (i) provide the Unitholders with a confirmation accompanying such tax returns (based on information available as of such date) as to whether the Company has directly or indirectly participated in any "reportable transactions", together with any information (available on or prior to such date) the Unitholders will need to complete and file an IRS Form 8886; and (ii) promptly provide any information regarding reportable transactions which subsequently becomes available.

9.5     Tax Matters Member.

9.5.1     If the number of Common Units owned directly or indirectly by First Reserve is less than 10% of the outstanding Common Units, the tax matters partner of the Company pursuant to Code Section 6231(a)(7) or the "partnership representative" within the meaning of Section 6223(a) of the Code and the Bipartisan Budget Act of 2015, as applicable (the "*Tax Matters Member*"), shall be a Unitholder designated from time to time by the Management Committee subject to replacement by the Management Committee. If and so long as the number of Common Units owned directly or indirectly by First Reserve is equal to or more than 10% of the outstanding Common Units, the Tax Matters Member shall be Holdings. The Tax Matters Member shall take such actions as may be necessary to cause to the extent possible each other Unitholder to become a notice partner within the meaning of Code Section 6231(a)(8), if applicable. The Tax Matters Member shall inform the Management Committee of all material written notices or assessments received from any taxing authority in its capacity as Tax Matters Member by giving notice thereof on or before the twentieth (20th) day after (or if applicable, such shorter period as may be required by the appropriate statutory or regulations provisions) receipt thereof and, within that time, shall forward to each other Unitholder copies of all such notices and assessments received in that capacity.

9.5.2     Any reasonable, documented cost or expense incurred by the Tax Matters Member in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.

9.5.3     The Tax Matters Member shall not enter into any extension of the period of limitations for making assessments on behalf of the Unitholders without first obtaining the consent of the Management Committee. The Tax Matters Member shall not bind any Unitholder to a settlement without obtaining the consent of such Unitholder if such settlement is reasonably expected to have a materially disproportionate effect on such Unitholder. If applicable, any Unitholder that enters into a settlement agreement with respect to any Company item (within the meaning of Code Section 6231(a)(3) prior to amendment by the Bipartisan Budget Act of 2015) shall notify the Company of such settlement agreement and its terms within fifteen (15) days from the date of the settlement, and the Company shall inform the other Unitholders of the same within five (5) days of receipt of notice thereof.

9.6     Annual Plan and Budget.

9.6.1     The activities, operations and expenses of the Company and any Subsidiary of the Company (including capital expenditures) for any period shall be set forth in an Annual Plan and Budget (the "*Annual Plan and Budget*").

9.6.2     For each calendar year commencing with calendar year 2019, the officers of the Company shall prepare and submit to the Management Committee, on or before December 1 of the year immediately preceding such calendar year, an Annual Plan and Budget. The Annual Plan and Budget shall

24

be subject to approval by the Management Committee. If the Management Committee does not approve any proposed Annual Plan and Budget, the Company shall continue to use the Annual Plan and Budget then in effect, extrapolated to a 12-month budget period if necessary, except that (a) any items of the proposed Annual Plan and Budget that previously have been approved by the Management Committee shall be given effect in substitution of the corresponding items in the Annual Plan and Budget for the previous year, (b) any one-time or non-recurring items and the corresponding budget entries therefor shall be deleted, and (c) all other expenses from the Annual Plan and Budget for the previous year shall be increased by 5%.

      9.6.3    Each fiscal quarter, the Management Committee shall review and, subject to approval by the Management Committee, amend the Annual Plan and Budget.

      9.6.4    Each Annual Plan and Budget shall contain at least the following:

      (a)    estimates of the expenditures covered by the Annual Plan and Budget by budget category (including operating expenditures and capital expenditures), in reasonable detail to identify the nature, scope and duration of the activity in question;

      (b)    estimates of the schedule pursuant to which costs and expenses included in the Annual Plan and Budget are anticipated to be incurred by the Company or any Subsidiary of the Company;

      (c)    any other information reasonably requested in writing by a Representative;

      (d)    estimates of revenues and estimated returns on invested capital;

      (e)    progress on prior Annual Plans and Budgets, including any shortfalls or overages; and

      (f)    any costs and expenses estimated to be expended due to health, safety, security and environmental issues or any regulatory issues.

      9.6.5    Expenditures in an Annual Plan and Budget may extend over more than one calendar year if and to the extent that such expenditures represent activities or operations that require commitments in excess of one calendar year or across more than one calendar year.

## ARTICLE 10
## LIABILITY, EXCULPATION AND INDEMNIFICATION; FIDUCIARY DUTIES

      10.1    Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

      10.2    Exculpation. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or

statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to Unitholders might properly be paid.

10.3     Duties and Liabilities of Covered Persons. To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, including, without limitation, the provisions of Section 10.7 hereof eliminating certain fiduciary duties, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person. Unless otherwise expressly provided herein, (i) whenever a conflict of interest exists or arises between Covered Persons or (ii) whenever this Agreement or any other agreement contemplated herein provides that a Covered Person shall act in a manner that is, or provides terms that are, fair and reasonable to the Company or any Unitholder, the Covered Person shall resolve such conflict of interest, taking such action or providing such terms, considering in each case the relative interest of each party (including its own interest), such conflict, agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable generally accepted accounting practices or principles. In the absence of bad faith by the Covered Person, the resolution, action or term so made, taken or provided by the Covered Person shall not constitute a breach of this Agreement or any other agreement contemplated herein or of any duty or obligation of the Covered Person at law or in equity or otherwise. Whenever in this Agreement a Covered Person is permitted or required to make a decision (A) in its "discretion" or under a grant of similar authority or latitude, the Covered Person shall be entitled to consider such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person or (B) in its "good faith" or under another express standard, the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or other applicable law.

10.4     Indemnification. To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement; provided, however, that any indemnity under this Section 10.4 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

10.5     Expenses. To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding for which indemnification hereunder applies shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined in such final disposition that the Covered Person is not entitled to be indemnified as authorized in this Article 10. The Management Committee and the Company may enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 10.4 hereof and containing such other procedures regarding indemnification as are appropriate.

10.6     Insurance. The Company may purchase and maintain insurance, to the extent and in such amounts as the Management Committee shall deem reasonable, on behalf of Covered Persons and such other Persons as the Management Committee shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the

26

Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

10.7     Waiver of Fiduciary Duties.

10.7.1    THIS AGREEMENT IS NOT INTENDED TO, AND DOES NOT, CREATE OR IMPOSE ANY FIDUCIARY DUTY ON ANY COVERED PERSON, EXCEPT AS PROVIDED IN SECTION 10.7.2. THE UNITHOLDERS HEREBY WAIVE ANY AND ALL FIDUCIARY DUTIES OWED BY OR TO THE UNITHOLDERS THAT, ABSENT SUCH WAIVER, MAY BE IMPLIED BY LAW, AND IN DOING SO, RECOGNIZE, ACKNOWLEDGE AND AGREE THAT THE COVERED PERSONS' DUTIES AND OBLIGATIONS TO ONE ANOTHER AND TO THE COMPANY ARE ONLY AS EXPRESSLY SET FORTH IN THIS AGREEMENT, OR ANY OTHER EXPRESS AGREEMENTS TO WHICH THEY ARE A PARTY.

10.7.2    Notwithstanding Section 10.7.1, the Covered Persons in exercising their rights and authority hereunder will act in good faith and in a manner that is consistent with the terms of this Agreement and that does not willfully or intentionally deny the Unitholders the rights and benefits under this Agreement.

10.8     Unitholder Duties. The Unitholders acknowledge and agree that the Key Holders and their respective Affiliates are engaged in investing in the energy sector generally, including investments that are or may be in competition with the purpose of the Company set forth in Section 1.4, and accordingly each of the Key Holders may determine in its sole discretion whether to bring any Company Opportunity to the Company or to pursue such opportunity directly for itself or indirectly through an Affiliate or other Person. None of the Key Holders, or any Representative shall have any obligation to bring any opportunity to the Company, to refrain or cause any of their respective Affiliates or any other Person to refrain from pursuing such opportunity, or to otherwise refrain from engaging in or possessing an interest in other business opportunities or ventures of every kind and description, independently or with others, including, without limitation, businesses that may compete the Company, the other Members and/or the Representatives.

## ARTICLE 11
## DISSOLUTION

11.1     Dissolution. The Company shall be dissolved, its property disposed of and its affairs wound up upon the first to occur of the following (a "***Dissolution Event***"):

11.1.1    At the election of the Management Committee;

11.1.2    the entry of a decree of judicial dissolution under the Act;

11.1.3    the consummation of a Third Party Organic Transaction pursuant to clause (x) of the definition thereof; provided, however, that the consummation of a Third Party Organic Transaction shall not be deemed to be a liquidation, dissolution or winding up of the Company only for purposes of this Section 11.1 if, within 15 days after delivery of written notice of such Third Party Organic Transaction by the Company to the Members, the holders of at least two-thirds of the Common Units provide the Company with written notice that such Third Party Organic Transaction shall not be deemed a liquidation, dissolution or winding up of the Company for purposes of this Section 11.1.

11.2     Authority to Wind Up. The Unitholders shall retain all power and authority required to marshal the assets of the Company, to pay the Company's creditors, to distribute assets and otherwise wind up the business and affairs of the Company.

11.3   <u>Distribution of Property</u>. Upon dissolution and winding up of the Company, the affairs of the Company shall be wound up and the Company liquidated by the Unitholders. The assets of the Company shall be applied to pay creditors of the Company in the order of priority provided by law. Any remaining assets shall be distributed to the Unitholders in accordance with <u>Section 7.2</u>.

11.4   <u>Capital Account Deficit</u>. Any Unitholder with a deficit in its Capital Account shall not be required to contribute such deficit amount to the Company upon the liquidation thereof.

**ARTICLE 12**
**MISCELLANEOUS**

12.1   <u>Amendments</u>. Except as otherwise set forth herein (including <u>Section 2.6</u>, <u>Section 2.7</u> and <u>Section 12.2</u>), any amendment or waiver to this Agreement shall be adopted and be effective as an amendment or waiver hereto if approved by a Vote of Class A Members; <u>provided</u>, <u>however</u> that no amendment or waiver that (a) would alter or change the rights, obligations, powers or preferences of the holders of any class, series or group of Common Units in a disproportionate and adverse manner (without having a similar disproportionate and adverse effect on the holders of all of such Common Units) or (b) would be disproportionately and materially adverse to any of the rights, obligations, powers or preferences of the holders of any class, series or group of Profits Interest Units as compared to the rights, obligations, powers or preferences of the holders of Common Units hereunder, shall be made, and any such purported amendment shall be void and ineffective, without the written consent of the holders of more than 66⅔% of the affected class, series or group of Common Units or Profits Interest Units, as applicable, which consent may be withheld or delayed in the sole discretion of such holders (it being understood that amendments to create and issue additional classes of securities as contemplated by <u>Section 2.6</u> from time to time will, in each case, be deemed to not have a disproportionate and adverse effect on the holders of any class, series or group of Units); and <u>provided</u>, <u>further</u>, that no amendment or waiver, by merger or otherwise, that would create an additional liability for such Unitholder shall be made, and any such purported amendment shall be void and ineffective as it applies to such Unitholder, without the written consent of such Unitholder. Updates to the Register of Members set forth on <u>Schedule I</u> hereto shall not constitute amendments requiring approval pursuant to this <u>Section 12.1</u>. Notwithstanding the foregoing, if any amendment to or waiver of this Agreement is made without the written consent of a holder of Units, such holder shall receive notice and a copy of such amendment or waiver.

12.2   <u>Public Offering</u>.

12.2.1   Notwithstanding anything in this Agreement to the contrary, immediately prior to the effective date of a registration statement filed with the U.S. Securities and Exchange Commission (or similar filing with another regulatory body) with respect to the first firm commitment underwritten offering of equity securities by the Company (or by a successor entity) (a "***Public Offering***"), the Management Committee may cause the Company to be converted (a "***Public Company Conversion***") into a corporation or other entity suitable for such offering through merger, statutory conversion, redomestication, amalgamation, or any other transaction or series of transactions, so long as (i) the relative economic rights of the Unitholders are substantially the same following such Public Company Conversion (if applicable after giving effect to the Public Offering Simplification principles set forth in <u>Section 12.2.3</u>) and (ii) the Public Company Conversion is arranged in a manner that is intended to minimize, to the extent reasonable in the Management Committee's discretion, recognition of gain or loss for United States federal income tax purposes. The Management Committee shall have the right, but not the obligation, to cause the Company to effect a Public Offering, and the Members agree to cooperate with the Company and to take all such action as may be reasonably required (as determined by the Management Committee) in connection therewith to effectuate, or cause to be effectuated, the Public Offering, including, if the Management Committee determines it to be desirable, winding up and liquidating the Company. In connection with a

28

Public Offering, the outstanding Units may, at the Management Committee's election, and without any action on the part of any Member, be converted, exchanged or redeemed for shares (or other Equity Securities) of the resulting corporation or other entity following the Public Company Conversion at the equivalent value of such shares (or other Equity Securities) as determined by the Management Committee based upon a hypothetical liquidation of the Company and the distribution of proceeds in the amount equal to the value of such shares (or other Equity Securities) to the Members pursuant to Section 7.2. Notwithstanding the foregoing, in connection with a Public Offering, in the case of Profits Interest Units, such Profits Interest Units may, at the Management Committee's election (which election may be made in the sole discretion of the Management Committee without regard to the best interests of any other Member), be converted, exchanged or redeemed for equity securities at the equivalent value of the Profits Interest Units as determined in good faith by the Management Committee based upon a hypothetical liquidation of the Company.

12.2.2   The Units or any Equity Securities issued to the Unitholders in accordance with this Section 12.2 shall be subject to a prohibition on sale or transfer as required by the managing underwriter for such offering (other than with respect to the Transfer of any such securities in such offering), as determined by the Management Committee.

12.2.3   Without limiting the right of the Management Committee to effect a Public Company Conversion, in connection with a Public Offering, if the Management Committee determines it to be desirable, the Class A Common Units, Class B Common Units and Class C Common Units may be reclassified into a single class of Common Units (a "***Public Offering Simplification***"). In the Public Offering Simplification, each Class A Common Unit, Class B Common Unit and Class C Common Unit shall be exchanged for a number of the single class of Common Units equal to the number of such Common Units having a value equal to the amount that would be distributed to the holder of such Class A Common Unit, Class B Common Unit or Class C Common Unit if proceeds in the amount equal to the value of all such Common Units (after giving effect to the exchange) were distributed pursuant to Section 7.2. For purposes of determining the value of Common Units pursuant to the preceding sentence, each Common Unit shall have a value equal to the offering price set forth on the cover page for the prospectus used for such Public Offering. In connection with a Public Offering Simplification, the Management Committee may make such amendments to this Agreement, without any action on the part of any Member, as the Management Committee may determine to be necessary or advisable to implement such Public Offering Simplification.

12.2.4   The terms of the Public Offering and of the equity securities offered therein, the board of directors (or similar managing body) and the officers of the entity making the Public Offering, and, if applicable, the terms of the charter or constituent documents of the successor entity in the Public Company Conversion will be determined by the Management Committee. The restrictions in Article 4 and Exhibit B will not apply to any Transfer in or following the Public Offering.

12.2.5   The Members agree, that in connection with any Public Offering, they and their Permitted Transferees will be deemed to be bound by any "lock-up" agreement approved by the Management Committee without any further action on the part of such Members or their Permitted Transferees and, if requested by the managing underwriter in such Public Offering, will enter into such "lock-up" agreement; provided, that any such lock-up provided therein shall not exceed 180 days.

12.2.6   If a Public Offering has not occurred by December 31, 2021, the Management Committee will undertake, with the assistance of a nationally recognized financial advisor, an evaluation of potential transactions, which may result in a sale of all or substantially all of the Company or its assets or a merger or other business combination or a Public Offering (any such transaction, a "***Liquidity Event***"). If approved by the Management Committee, the Company will initiate a process intended to result in a

Liquidity Event. The decision whether or not to pursue and the type, timing and completion of a Liquidity Event shall be at the sole discretion of the Management Committee. The provisions of this <u>Section 12.2.6</u> shall terminate upon the occurrence of a Liquidity Event.

12.3    <u>Successors and Assigns</u>. The provisions of this Agreement shall inure to the benefit of, and shall be binding upon, the Company, the Members and Unitholders and their respective successors and permitted assigns.

12.4    <u>Governing Law and Severability</u>. This Agreement shall be, in all respects, construed in accordance with and governed by the laws of the State of Delaware as applied to agreements among Delaware residents entered into and to be performed entirely within Delaware. If any provision of this Agreement becomes or is deemed invalid, illegal or unenforceable in any jurisdiction by reason of the scope, extent or duration of its coverage, then such provision shall be deemed amended to the extent necessary to conform to applicable law so as to be valid and enforceable or, if such provision cannot be so amended without materially altering the intention of the parties, then such provision shall be stricken and the remainder of this Agreement shall continue in full force and effect. Should there ever occur any conflict between any provision contained in this Agreement and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but the provision of this Agreement affected thereby shall be curtailed and limited only to the extent necessary to bring it into compliance with the law. All the other terms and provisions of this Agreement shall continue in full force and effect without impairment or limitation.

12.5    <u>Counterparts; Facsimiles</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Facsimile signatures shall, for all purposes, be treated as originals.

12.6    <u>Titles and Subtitles; Illustrations</u>. The headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Illustrations or examples provided in any Exhibit to this Agreement are for purposes of clarifying the intent of any word or phrase to which such illustration relates that may be ambiguous under any particular facts or circumstances. In the event of any conflict between an illustration or an example and the language of this Agreement, the language of this Agreement shall control.

12.7    <u>Notices</u>. All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered, faxed, emailed or mailed by registered or certified mail as follows:

(a)    If given to the Company, to:

Arsenal Energy Holdings LLC
6031 Wallace Road Ext., Suite 300
Wexford, Pennsylvania 15090
Attention: Craig Lavender
Facsimile: 800-428-0981
E-Mail: craig.lavender@arsenalresources.com

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
600 Travis Street, Suite 5400
Houston, TX 77002
Attention: Chris May
Facsimile: 713-821-5602
E-Mail: cmay@stblaw.com

(b)        If given to any Member or Unitholder, at the address set forth below under such Person's name in Schedule I hereto.

All notices and communications shall be deemed to have been received unless otherwise set forth herein: (i) in the case of personal delivery, on the date of such delivery; (ii) in the case of facsimile, email or other electronic transmission, on the date on which the sender receives confirmation by facsimile, email or other electronic transmission that such notice was received by the addressee, provided, that a copy of such transmission is additionally sent by mail as set forth in (iv) below; (iii) in the case of overnight air courier, on the second Business Day following the day sent, with receipt confirmed by the courier; and (iv) in the case of mailing by first class certified or registered mail, postage prepaid, return receipt requested, on the fifth Business Day following such mailing.

12.8        Entire Agreement. This Agreement, any exhibits and schedules attached hereto, and the documents referred to herein and the Exchange Agreement constitute the entire agreement and understanding of the parties with respect to the terms and conditions of the transactions referred to herein and therein and supersede all other prior and contemporaneous agreements and understandings, oral or written, between the parties relating to such subject matter, other than as provided herein and therein.

12.9        Tax Advances. To the extent the Company (or any entity in which the Company holds an interest) is required by law to withhold or to make tax payments (including interest and penalties thereon) on behalf of or with respect to any Member ("***Tax Advances***"), the Company may withhold such amounts and make such tax payments as so required. All Tax Advances made on behalf of a Member shall, at the option of the Tax Matters Member, (a) be promptly paid to the Company by the Member on whose behalf such Tax Advances were made or (b) be repaid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Member or, if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to such Member. Whenever the Tax Matters Member selects the option set forth in clause (b) of the immediately preceding sentence for repayment of a Tax Advance by a Member, for all other purposes of this Agreement such Member shall be treated as having received all distributions unreduced by the amount of such Tax Advance. Each Member (and each Disassociated Member) hereby agrees to indemnify and hold harmless the Company and the Tax Matters Member and any member or officer of the Tax Matters Member from and against any liability with respect to Tax Advances required on behalf of or with respect to such Member (or Disassociated Member, as applicable). The obligations of a Member set forth in this Section 12.9 shall survive the withdrawal of any Member or any Transfer or redemption of a Member's Units. Each Member (and each Disassociated Member) shall furnish the Tax Matters Member with such information, forms and certifications as it may require and as are necessary to comply with the regulations governing the obligations of withholding tax agents, as well as such information, forms and certifications as are necessary with respect to any withholding taxes imposed by countries other than the United States and represents and warrants that the information and forms furnished by it shall be true and accurate in all respects. The amount of any taxes paid by or withheld from receipts of the Company (or any investment in which the Company invests) allocable to a Member from an investment shall be deemed to have been distributed to each Member (or Disassociated Member, as applicable) to the extent that the payment or withholding of such taxes reduced distribution proceeds otherwise distributable to such Member as provided herein.

31

12.10    <u>Arbitration</u>. If the Company and Members or Unitholders are unable to resolve any dispute arising under this Agreement following good faith negotiations, any Member, or Unitholder or the Company may refer such matter to arbitration by one arbitrator pursuant to the Rules of Commercial Arbitration (the "***Rules***") of the American Arbitration Association ("***AAA***"). The arbitrator shall be appointed by the AAA in accordance with the Rules. Following the selection of the arbitrator as set forth above, the arbitration shall be conducted promptly and expeditiously so as to enable the arbitrator to render a decision within 30 days. In any dispute involving a claim for money damages or involving any other monetary amount, the parties involved in the dispute shall each submit to the arbitrator their calculation of such amount, and the arbitrator shall be empowered only to choose an amount proposed by one of the parties. Subject to the foregoing and except to the extent the parties shall agree to the contrary, the arbitrator hearing the dispute shall apply and follow the Federal Rules of Civil Procedure and the Federal Rules of Evidence. If there is any conflict between the Rules and this <u>Section 12.10</u>, this <u>Section 12.10</u> shall govern. The arbitration shall be held in New York, New York. The parties acknowledge that the arbitrator shall have the authority to grant equitable remedies, if appropriate. Except as provided below, arbitration under this <u>Section 12.10</u> shall be the exclusive means for a party to seek resolution of any dispute arising out of, or any breach or alleged breach of, this Agreement, except that any party may bring an action before a competent court for the adoption of provisional or protective measures or equitable relief. The award of the arbitrator shall be final and binding on the parties. Each party shall bear (a) in equal proportions the cost and expenses of the arbitration proceeding assessed by the AAA, and (b) their respective expenses in prosecuting or defending the arbitration. Judgment on the arbitral award rendered may be entered in any court having jurisdiction or application may be made to such for a judicial acceptance of the award and an order of enforcement, as the case may be. The parties acknowledge and agree that any party may seek before any court of competent jurisdiction, provisional, protective or equitable relief.

[REMAINDER INTENTIONALLY BLANK]

002129-0002-25671445

**Exhibit C**

Schedule of Proposed Cure Amounts[4]

All Executory Contracts and Unexpired Leases of the Debtor, if any, shall be deemed to be assumed by the Debtor on the Effective Date pursuant to Article VI of the Plan, and the Cure amount for each such Executory Contract or Unexpired Lease shall be zero dollars.  Unless such Executory Contract or Unexpired Lease (1) expired or terminated pursuant to its own terms before the Effective Date or (2) is the subject of a motion to reject filed on or before the Effective Date, then, in accordance with Article VI of the Plan, the Executory Contract or Unexpired Lease shall be assumed. To the extent that the Debtor has entered into or does enter into any amendment or modification of any of the Executory Contracts or Unexpired Leases being assumed under Article VI of the Plan in connection with, or prior to, the assumption of such Executory Contracts or Unexpired Leases, such Executory Contracts or Unexpired Leases will be assumed as amended or modified.

**Nothing contained in the Plan or its exhibits, including this Schedule of Proposed Cure Amounts, shall constitute an admission by the Debtor, Reorganized Debtor, or any other party that any contract or lease (including any listed below) is in fact an Executory Contract or Unexpired Lease or that the Debtor or Reorganized Debtor has any liability thereunder.**

| No. | Cure Amount | Debtor Entity Name | Description of Contract | Contract Counterparty |
|-----|-------------|--------------------|-----------------------|-----------------------|
| 1. | $0 | Arsenal Energy Holdings LLC | Financial Advisory Services | Barclays Capital Inc. |
| 2. | $0 | Arsenal Energy Holdings LLC | Tax Advisory Services | Deloitte LLP |
| 3. | $0 | Arsenal Energy Holdings LLC | Auditing Services | Grant Thornton LLP |
| 4. | $0 | Arsenal Energy Holdings LLC | Strategic Internal Audit Outsourcing | Schneider Downs & Co., Inc. |

---

[4]     Cure amounts, if any, are denominated in the applicable currency of the assumed Executory Contract or Unexpired Lease.

**Exhibit B**

**Structure Chart**

# Arsenal Organization Chart



**<u>Exhibit C</u>**

**<u>Financial Projections</u>**

**Financial Projections**

For purposes of demonstrating feasibility of the Plan, the Debtor has prepared the forecasted consolidated financial projections (the "Financial Projections") for the Reorganized Debtor and its Non-Debtor Subsidiaries that collectively comprise the Company[1] for the periods ending January 1, 2018 through December 31, 2021 (the "Projection Period"). The Financial Projections were prepared based on assumptions made by the Debtor's management as to the future performance of the Company, and reflect management's judgment and expectations regarding their future operations and financial position. The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control, incident to the exploration for and development, production, and sale of oil, natural gas, and natural gas liquids. Factors that may cause actual results to differ from expected results include:

1. fluctuations in oil and natural gas prices and the Company's ability to hedge against movements in prices;
2. the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows;
3. the timing and amount of future production of oil and natural gas;
4. changes in the availability and cost of capital;
5. environmental, drilling and other operating risks, including liability claims as a result of oil and natural gas operations;
6. proved and unproved drilling locations and future drilling plans; and
7. the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, and climate change regulation.

If one or more of the risks or uncertainties referenced above occur, or if underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Furthermore, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction, or guaranty of the Company's future performance.

The Financial Projections have not been audited or reviewed by a registered independent accounting firm, and were not prepared with a view toward compliance with the guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board ("FASB"), particularly for reorganization accounting. The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Pre-Packaged Plan of Reorganization of Arsenal Energy Holdings LLC* (as may be amended, supplemented or otherwise modified, the "Plan"). Consistent therewith, the consolidated Financial Projections encompass those operations of the Company after the Effective Date.

THE DEBTOR PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF ITS ADVISERS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTOR DOES NOT PUBLISH PROJECTIONS OF ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS OF THE COMPANY.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH WILL BE BEYOND THE CONTROL OF THE COMPANY, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTOR AND REORGANIZED DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING AFTER THE DATE ON WHICH THE DEBTOR PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE DISCLOSURE STATEMENT, THE DEBTOR AND REORGANIZED DEBTOR, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AND INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

I.    **OVERVIEW**

The Company is an oil and gas company focused on the exploitation and development of oil, natural gas liquids ("NGL"), and natural gas properties in the United States, specifically in the Appalachian basin.  The Company, through subsidiaries, also engages in certain midstream activities including gathering and water management. The Debtor is a top-tier holding company with no material assets other than its equity interests in the Non-Debtor Subsidiaries through which the Company operates and holds its revenue producing assets.
5.


II.    **ACCOUNTING AND PRESENTATION POLICIES**

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in the Company's historical financial statements (GAAP consolidated basis). The Financial Projections have not been prepared under the intention of compliance with published guidelines of the SEC, the American Institute of Certified Public Accountants, the FASB, or any other standard-setting body. The projected financial information does not reflect the impact of fresh start accounting, which could result in material changes to the projected values.

Adjusted EBITDA is a non-GAAP financial measure intended to provide useful information to evaluate the operations of the Debtor's business excluding certain items. Adjusted EBITDA should not be considered an alternative to net income, operating income, cash flow from operating activities or any other measure of financial performance presented in accordance with US GAAP. The Company's projected adjusted EBITDA may not be comparable to similarly titled measures of another company because all companies may not calculate adjusted EBITDA in the same manner.

III.    **METHODOLOGY**

The Financial Projections were prepared using a bottoms-up approach incorporating multiple sources of detailed information including region, area, and well-level analyses from each of the Company's operating divisions.

The projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

IV.    **ASSUMPTIONS**

The Financial Projections include projected financial statements for 2019–2021 assuming that the Effective Date of the Plan is February 1, 2019 (the **"Emergence Date"**). The Financial Projections include consolidated financial statements inclusive of the Non-Debtor Subsidiaries.

V.    **ASSUMPTIONS**

A.  **Restructuring**

The Financial Projections include assumptions related to the Debtor's and the Company's restructuring initiatives.

B.  **Total Revenue**

Total revenue consists of net production revenue and other revenue, including hedge revenue.  For production and other revenues with third party participation (including the IOG-ARD JV), the amounts shown represent only such revenue that is attributable to the Company (see "H" below).   Please note that production revenues are expected to increase beyond 2022 as wells initially funded by the IOG-ARD JV begin to "revert" resulting in an increase in the proportion of Company cash flow from each such well.

C.  **Operating Expenses**

Operating expenses consist of lease operating expenses, midstream operating expenses, transportation expenses, processing fees, pre-drilling and other non-oil and gas operating expenses, and inventory change expense.  All operating expenses reflect Company portion of expenses after deduction of expenses related to any third-party interests (including the IOG-ARD JV).

### D.  General & Administrative Expenses

General and administrative ("G&A") expenses primarily consists of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations and comply with regulatory requirements. The Company's projected G&A expenses are based on the current development and operational plans, include certain management - targeted expense reductions, and exclude non-cash expenses.

### E.  Capital Expenditures

Capital expenditures include planned capital expenditures related to oil & gas properties, capitalized engineering expenses, and expenditures to acquire properties.  On wells with third party participation (including the IOG-ARD JV), the amounts shown represent only the Company's portion of well capital expenditures (see "H" below).

The Company has significant flexibility to moderate or adjust planned capital expenditures based on well results, market pricing, availability of capital and other factors.  Additionally, while not included in the projection, after giving effect to the deleveraging transactions in the Plan and the Recapitalization, the Company will have more flexibility to use opportunistic asset sales to fund capital expenditures for higher returning projects.

### F.  Changes in Net Working Capital & Cash Transaction Expenses

Changes in net working capital relate to changes in net working capital accounts. Cash transaction expenses consist of cash expenses related to the transaction activities.

### G.  Cash Interest

Cash interest includes estimated interest disbursements payable on the Company's outstanding debt.

### H.  Key Balance Sheet Items

Based on current market metrics for raising debt and equity capital for performing Oil & Gas assets, we have assumed that following consummation of the Plan and the Recapitalization, including the equitization of 100% of the Subordinated Notes, the Non-Debtor Subsidiaries engaged in E&P operations would be sufficiently and appropriately deleveraged and thus able to obtain incremental debt and/or equity capital to fund its projected capital expenditure needs.

The projections additionally assume that the Company will be able to extend or refinance the Seller Notes in late 2020.

Note:  "Net Debt" is calculated as total debt less balance sheet cash.

### I.  General Upstream Assumptions

- Rig pace assumes 1.25 rigs in 2019, 1.50 rigs in 2020 and 2.00 rigs in 2021
- D&C costs reflect current market pricing for services costs for a 7,000' foot well, as adjusted by individual well lateral length
- Assumes  participation by the IOG-ARD JV on 40 wells during the projection period including 10 IOG-ARD JV wells in 2019, 14 in 2020, 16 in 2021
  - Investor / Arsenal JV working interest of 65% / 35% pre-reversion, 25% / 75% post-reversion
  - 13% IRR and 1.3x ROI hurdle rate

- 2.1 Bcf / 1,000' type curve for all new wells
- Price deck (based on strip pricing as of 12/14/18)
  - 2019: $3.09 / MMBtu
  - 2020: $2.71 / MMBtu
  - 2021: $2.62 / MMBtu
- Differentials based on TCO-Pool, TETCO-M2 and DTI

**J.  Midstream Assumptions**

- Arsenal Midstream, a wholly-owned subsidiary of the Debtor, provides all well connections, gathering, and water services
- All midstream costs modeled based upon negotiated project structures and terms with Arsenal Midstream and third parties

| *Financial Projections (000's)* | **2019** | **2020** | **2021** |
|---|---|---|---|
| Total Revenue | $145,732 | $248,109 | $358,876 |
| Less: Lease Operating Expenses | (5,368) | (9,547) | (14,271) |
| Less: Production Taxes | (6,516) | (12,081) | (17,984) |
| Less: Transportation Costs | (71,183) | (96,024) | (116,055) |
| Less: General & Adminstrative | (23,009) | (24,225) | (25,637) |
| **EBITDAX** | **$39,656** | **$106,232** | **$184,930** |
| Less: Capital Expenditures | (182,031) | (191,342) | (300,832) |
| Less / Add: Changes in Net Working Capital | 14,488 | (435) | 7,656 |
| Less: Transaction Expenses | (4,000) | - | - |
| **Unlevered Free Cash Flow** | **($131,886)** | **($85,546)** | **($108,247)** |
| Less: Cash Interest Expense | (33,953) | (43,499) | (52,165) |
| **Levered Free Cash Flow** | **($165,840)** | **($129,045)** | **($160,412)** |

| *Key Balance Sheet Items (000's)* | **2019** | **2020** | **2021** |
|---|---|---|---|
| Total Debt | 563,476 | 720,461 | 917,999 |
| RBL | 192,559 | 320,563 | 482,080 |
| Term Loan | 235,226 | 247,700 | 260,655 |
| Seller Note | 135,691 | 152,198 | 175,264 |
| Total Cash | 19,936 | 18,895 | 20,000 |
| Net Debt | 543,541 | 701,566 | 897,999 |
| Total Available Liquidity | 37,376 | 115,832 | 155,420 |

**<u>Exhibit D</u>**

**<u>Liquidation Analysis</u>**

**Arsenal Energy Holdings LLC, as debtor and debtor-in-possession**

**Liquidation Analysis**

---

NOTHING CONTAINED IN THE FOLLOWING LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTOR OR THE REORGANIZED DEBTOR. THE DISCUSSION BELOW SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS OR EQUITY INTERESTS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS AND EQUITY INTERESTS IN THE CHAPTER 11 CASE COULD DIFFER MATERIALLY FROM THE DISCUSSION PRESENTED BELOW.

---

### *Analysis*

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Equity Interest in each Impaired Class: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. Accordingly, the Debtor must demonstrate that the estimated recovery of each Holder of an Impaired Claim or Equity Interest under the Plan is not less than the amount such holder would receive in a chapter 7 liquidation.

The Debtor believes that the Plan satisfies the best interests test and that each holder of an Impaired Claim or Equity Interest will receive value under the Plan on the Effective Date that is not less than the value such holder would receive if the Debtor liquidated under chapter 7 of the Bankruptcy Code. In this case, the Subordinated Notes are being converted into New AEH Class A Common Units, with a liquidation preference equal to the outstanding principal amount and accrued interest of the Subordinated Notes (the "Stated Liquidation Preference"), which would result in the same or better recovery than a liquidation of the Company given the application of the absolute priority rule. Similarly, the Existing AEH Common Equity Interests are currently junior in recovery to the Subordinated Notes and upon conversion into New AEH Common Units pursuant to the Plan will remain junior to a similar amount of senior capital. The Debtor and its advisors believe that its analysis and conclusions are fair and represent management's and its advisors' best judgment regarding the results of a liquidation of the Company under chapter 7 of the Bankruptcy Code taking into account various factors including the structural subordination of the Subordinated Notes and the Existing AEH Common Equity Interests, and the conversion of the Subordinated Notes into New AEH Class A Common Units with the Stated Liquidation Preference, the absence of a robust market for the sale of the Debtor's assets and the negative impact on values arising from a distressed sale of oil and gas property in a relatively short amount of time under current market conditions. Moreover, liquidation value represents a significant discount to going concern value and is not in any way, reflective of the Reorganized Debtor's equity value, which would be significantly higher, which is why confirmation of the Plan is in the best interest of creditors. Nothing contained herein is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation of the Company for purposes of the best interests test. Actual results may be different than amounts referred to in the Plan. The liquidation analysis is based upon certain assumptions discussed below herein and in the Disclosure Statement.

### *Certain Assumptions*

The Debtor's liquidation analysis assumes that the liquidation would commence on or about February 1, 2019 (the "Conversion Date") under the direction of a chapter 7 trustee and would continue for a period of between one and four months, during which time all of the Company's assets would be sold, and the cash proceeds (net of liquidation related costs), together with the cash on hand, would then be distributed to creditors in accordance with the priority scheme

established under the Bankruptcy Code. The Debtor is a top tier holding company whose only material assets is the equity interests in the Non-Debtor Subsidiaries through which the Company operates and in which the Company holds all its material assets. The analysis assumes a liquidation sale of all of the Company's assets (i.e., including the assets of the Non-Debtor Subsidiaries).[1] The Non-Debtor Subsidiaries have significant liabilities that would need to be satisfied prior to any distributions in respect of the equity held by the Debtor. Thus, the value of the Debtor's assets (i.e., its equity in the Non-Debtor Subsidiaries) and the recovery of the Claims and Equity Interests in and against the Debtor will depend on the amount of surplus (if any) remaining after the sale of all of the Company's assets and satisfaction of structurally senior creditors of the Non-Debtor Subsidiaries from the proceeds of such sale.

The Debtor would expect the chapter 7 trustee to retain professionals to assist in the liquidation of the estate. It is assumed that the Company would continue to operate all wells at the Conversion Date in order to maximize the liquidation value. All other operations are assumed to cease in order to minimize costs associated with the chapter 7 wind down and liquidation.

THE DEBTOR BELIEVES THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR, THE COMPANY OR A CHAPTER 7 TRUSTEE. THE LIQUIDATION ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE DEBTOR'S CONCLUSIONS.

---

[1]   A conversion to the Debtor's Chapter 11 Case into a liquidation under chapter 7 would trigger various defaults and events of defaults under the debt instruments of the Non-Debtors Subsidiaries, which likely would necessitate the commencement of additional cases under chapter 7 or 11 of the Bankruptcy Code for such entities or the possible sale of such entities' assets under state law foreclosure proceedings.  Consistent with a best interest of creditors test at the Non-Debtor Subsidiaries, we have assumed that such entities would liquidate under chapter 7, and the analysis therefore reflects a global liquidation of the Company assets.

**Dependence on assumptions**

The Debtor's liquidation analysis is based on a number of estimates and assumptions that, although developed and considered reasonable by management and the Debtor's advisors, are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtor and the liquidation and actual results could vary materially and adversely from the Debtor's conclusions.

A.    **Cash and Cash Equivalents**

As of the estimated date of liquidation, the Company is assumed to have approximately $30 million in cash and cash equivalents. The Debtor estimates a 100% recovery on Cash.[2]

B.    **Accounts Receivable**

This balance is primarily comprised of receivables from the sale of oil & gas, natural-gas and NGLs, Joint Interest billings, and income from related parties. Estimated proceeds realized from accounts receivable under a liquidation are based on management's estimate of collectability and the assumption that every reasonable effort will be made by the Chapter 7 Trustee to collect receivables from customers. In a liquidation scenario, the debtor estimates recoveries to be 80-90% of amounts outstanding.

C.    **Oil & Gas Properties**

The estimated recovery value for the Company's Oil & Gas assets represents the total of the estimated value of the PDP reserves, the non-producing oil and gas properties (including PUDs, probable and possible) and the midstream assets.  The Company is expected to market the oil and gas properties both as a whole and individual asset basis over a 1-2 month period.

The Debtor calculated PDP Reserves using production and cost data of proved reserves from the Company's Reserve Reports. The Debtor calculated future discounted cash flows of the PDP reserves  using the NYMEX strip prices as of December 5, 2018, and discounted at appropriate rates indicative of liquidation values in the current commodity price environment, as derived by Barclays based on its substantial experience and expertise in such matters. The estimated liquidation proceeds used by the Debtor reflects the assets being marketed in an expedited distressed disposition process.

The liquidation value of the Company's non-producing oil and gas properties was calculated by the Debtor using PhdWin database, assuming strip prices as of December 5, 2018 and appropriate discount rates and risking. The estimated liquidation proceeds used by the Debtor reflects the assets being marketed in an expedited distressed disposition process.

The Debtor valued  the Company's midstream assets in a liquidation scenario based on LTM EBITDA multiplied by the range of EV/EBITDA multiples of comparable midstream companies. The estimated liquidation proceeds used by the Debtor reflects the assets being marketed in an expedited distressed disposition process.

---

[2]    Only a small portion of the cash balance (approximately $200k) is anticipated to be held by the Debtor, with the remaining cash help by entities that are structurally senior to the Debtor. Such Cash would be used to fund administrative expenses of the liquidation and therefore would not be available to the Debtor's pre-petition creditors.

**D.      Chapter 7 Administrative Claims**

Chapter 7 Administrative Claims include trustee and professional fees, asset sale fee, wind-down expenses, DIP interest expenses, and other operating and administrative expenses required for the duration of the liquidation proceedings (assumed to be between one to four months).

- Trustee fees include costs associated with the appointment of a Chapter 7 trustee. The liquidation analysis assumed that the Chapter 7 trustee would be compensated in accordance with the guidelines of section 326 of the Bankruptcy Code. The Debtor estimated that it would incur Chapter 7 Trustee fees of 3.0% of the gross proceeds available for distribution.
- Professional Fees are the assumed costs and expenses of attorneys, accountants and other professionals retained by the Chapter 7 trustee to administer liquidation and wind-down the estate. The Debtor estimated that professional fees would equal $1-2 million.
- Asset sale fee is the expected cost of marketing and selling the Debtors' core assets. The Debtor estimated the sale fee to be 2.5% of the purchase price for the oil & gas properties.
- Estimated wind-down expenses deemed necessary to operate the Company during the pendency of the liquidation proceedings including salaries, severance, utility and other costs.

**E.      Claims**

- ARD RBL – Estimated outstanding balance under the RBL as of the petition date.
- ARDH1 TL – Outstanding balance under the Term Loan as of the petition date
- ARDH2 Seller Note Guarantee – Guarantee by ARDH2 to the AEH Seller Note as of the petition date
- General Unsecured Claims – Estimated general unsecured claims including any outstanding accounts payable and other unsecured claims, including, on the high-end, the potential rejection damages related to certain long-haul firm transportation contracts (prior to any mitigation)
- AEH Seller Note – Remaining outstanding balance under the AEH Seller Note after any payments based on the guarantee provided by ARDH2
- AEH Subordinated Notes – Outstanding balance under the AEH Subordinated Notes as of the petition date